## EXPERT REPORT OF JOEL W. STOESSER

*Thomas E. Perez, United States Department of Labor v. First Bankers Trust Services, Inc., Vincent J. Di Pano and SJP Group, Inc. Employee Stock Ownership Plan*,
Case No. 3:12-cv-04450-MAS-DEA

Dated October 8, 2014

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................. 1

II.    QUALIFICATIONS ............................................................................ 2

III.    METHODOLOGY ............................................................................... 4

IV.    OPINIONS .......................................................................................... 4

    A.    Question Presented 1: Was the analysis of market conditions expressed in the Transaction Valuations and underlying the forecasts of the Company's financial performance that were prepared in connection with the Transaction (the "Projections") reasonable, and was there any material change in the reasonableness of that analysis caused by events between January 1, 2007 and April 16, 2007?.................................. 4

        1.    Observations and Opinion ................................................ 4

        2.    The Projections ................................................................ 6

        3.    The Expected Performance of the Relevant Markets ...................................... 6

        4.    The Significance of the Company's Performance in 2006............................ 12

        5.    The Significance of the Results in the First Quarter of 2007 ........................ 15

        6.    The Selection of Peer Companies.................................................................. 17

        7.    Method Weighting in Real Estate Valuations ................................................ 18

    B.    Question Presented 2: How did the SJP Group's position in its real estate market at the time of the Transaction affect the value of the Company? ................................. 19

        1.    Observations and Opinion ................................................ 19

    C.    Question Presented 3: How did the financing offers the Company received in connection with the Transaction reflect on the fairness of the Transaction terms?...... 23

        1.    Observations and Opinion ................................................ 23

        2.    The ESOP Financing Offers .......................................................................... 24

        3.    The Significance of the Loan Commitments .................................................. 25

i

# I.    <u>INTRODUCTION</u>

I was retained by the Groom Law Group, Chartered, to provide certain observations and opinions in regard to issues raised in the case referenced above.  The case involves the sale by Vincent J. Di Pano of stock in the SJP Group, Inc. (the "Company") on April 16, 2007 to the Company's Employee Stock Ownership Plan ("ESOP") (the "Transaction").

I was asked to provide analysis and opinions regarding the following questions:

1.  Was the analysis of market conditions expressed in the valuations by Duff & Phelps LLC (the "Duff & Phelps Confidential Information Memorandum") and Prairie Capital Advisors, Inc. (the "April 16, 2007 Prairie Report") (collectively, the "Transaction Valuations") and underlying the forecasts of the Company's financial performance that were prepared in connection with the Transaction reasonable, and was there any material change in the reasonableness of those analyses caused by events between January 1, 2007 and April 16, 2007?

2.  How did the SJP Group's position in its real estate market at the time of the Transaction affect the value of the Company?

3.  How do the financing offers the Company received in connection with the Transaction reflect on the fairness of the Transaction terms?

In the course of my analysis I have also provided other observations and opinions I deemed pertinent, including analysis of the reasoning in the Expert Report of Dana Messina dated September 4, 2014 ("Messina Report").  I was not asked to perform a valuation of the Company as of the date of the Transaction and have formed no opinion on the fairness of the terms of the Transaction.  However, I have considerable experience in valuing entities in all aspects of the real estate business and have reviewed the Transaction Valuations and the Messina Report from the perspective of that specialized experience.  I have formed opinions on those portions of the Transaction Valuations and

1

Messina Report that purport to express opinions about the real estate market or how entities in that market are valued.

While this report summarizes my current opinions, I understand that I may be asked to provide additional opinions as the case progresses.

My hourly rate for providing this expert report and appearing as an expert witness at trial is $550 per hour.

## II.   <u>QUALIFICATIONS</u>

I base my opinions on my knowledge gained through over 40 years of experience as an investment manager, portfolio manager and investment advisor in the field of commercial and residential equity real estate and mortgage lending for institutional and individual investors.  I have invested for and managed over 40 real estate investment portfolios for more than 200 institutional and high net worth investors.  The majority of those investors were ERISA plans.  Those real estate portfolios totaled in excess of $14 billion.  I have personally been involved in the origination and negotiation of more than $4 billion of transactions in all major property types of both existing properties and development projects involving the full range of development activities including construction.  My investment work experience includes purchase and sale of individual properties, portfolios of properties and both private and public real estate operating companies.  I have been involved with all property types including, land development, single family home development, multi-family residential (garden apartments, high-rise apartments, condominiums and senior housing, including age-restricted housing, independent care and assisted living facilities), office (CBD and suburban); retail (grocery anchored, convenience shopping centers, community shopping centers, power

2

centers and regional shopping malls), industrial (bulk, flex space, R&D, incubator space, and self-storage facilities) and hotels (resort facilities, full-service, limited service and budget lodging facilities).

I have been a real estate department head, headed investment management companies, chaired investment committees and managed significant investment management staffs and served on boards of both private and public real estate companies as a director and trustee.  My work experience includes senior level officer assignments with Prudential Financial, CIGNA and Connecticut General Life Insurance, three of the largest real estate investment managers in the country at the time I was with them.  I have published extensively in national and internationally distributed real estate investment industry publications on the subjects of investment concepts, investment strategies and portfolio construction and design.  I have taught at graduate schools on the subjects of real estate investment management and portfolio theory and have been a frequent speaker at real estate industry conferences.  My extensive career in real estate investment is highly relevant to this case and provides the experience and basis for me to offer my opinions.

Attached as Exhibit A is my resume.  Attached as Exhibit B is a list of publications that I have authored or co-authored.  I have been an expert witness/consultant for the Department of Labor as well as private sector clients on ERISA real estate investment issues, but I have not testified as an expert witness in the last four years.

3

### III.   METHODOLOGY

I initially met with counsel to gain an overview of the case.  In preparing to respond to the issues raised in the case I reviewed numerous case documents, including the complaint, certain depositions, the Transaction Valuations, the Messina Report and the Expert Report of Richard Puntillo dated August 14, 2014.  I also had a conversation with Mr. Di Pano to learn more about the Company and the business strategies he and his co-owner were pursuing in 2006-2007.  Finally, I did my own research of industry and academic publications, including information from Emerging Trends in Real Estate produced by the Urban Land Institute and Price Waterhouse Coopers, Property & Portfolio Research, Inc., the Risk Management Association, REIS, Inc., Deloitte Center for Financial Services, the Economist, Arthur Margon, U.S. Census Bureau, NYC Department of Housing Preservation & Development, The New York Times, Fannie Mae, NAREIT (National Association of Real Estate Investment Trusts), NCREIF (National Council of Real Estate Investment Fiduciaries) and the Hovnanian Enterprises, Inc. 2006 Annual Report.

A list of the material I considered in preparing this report is attached as Exhibit C.

### IV.   OPINIONS

**A.   Question Presented 1: Was the analysis of market conditions expressed in the Transaction Valuations and underlying the forecasts of the Company's financial performance that were prepared in connection with the Transaction (the "Projections") reasonable, and was there any material change in the reasonableness of that analysis caused by events between January 1, 2007 and April 16, 2007?**

#### 1.   Observations and Opinion

Duff & Phelps, LLC was engaged by SJP Group, Inc. to provide advice to Mr. Di Pano as the seller, including providing an opinion on the value of the stock he could offer

4

to the ESOP.  *See* Duff & Phelps Engagement Agreement (DOL-0120.52), dated Jan. 18, 2007, at 2-3.  Duff & Phelps is a respected valuation and investment banking firm.

Prairie Capital Advisors, Inc. was engaged by First Bankers Trust Services, Inc. ("FBTS"), the Trustee and Independent Fiduciary of the ESOP, to provide a valuation of the Company and a fairness opinion concerning the terms of the Transaction.  *See* Prairie Engagement Agreement (DOL-0116.62), dated Nov. 20, 2014, at 1-2.  Prairie Capital is also a respected valuation and investment banking firm.

It appears from the deposition testimony of principals of both Duff & Phelps and Prairie Capital that they had experienced professional staffs to perform assessments of economic markets in which the Company operated and the then current market conditions and forecasted market conditions to which the Company would be subject in the future. *See, e.g.*, Miscione Dep. at 11-13; Gross Dep. at 13-17.  Prairie Capital also included in its due diligence procedures a review of real estate economic and industry information from sources outside its own company staff, including the Northern Trust U.S. Economic and Interest Rate Outlook, Standard Poor's Industry Surveys, Trends and Projections, The Value Line Investment Survey, The Risk Management Association and FactSet's Mergerstat review.  *See* April 16, 2007 Prairie Report, at 3-4.  These are all good and respected sources within the real estate industry.

I have read the analyses of the real estate markets in both the Duff & Phelps and Prairie Capital Valuations and their conclusions about the reasonableness of the Projections to the extent the Projections were based on opinions about the state of the real estate market in which the Company operated throughout the projection period.  *See, e.g.*, Duff & Phelps Confidential Information Memorandum, at II-3, VI-8; April 16, 2007

Prairie Report, at 22-41; Gross Dep. at 115-20.  In my opinion, those analyses were thoughtful and included reasonable views of the national real estate market at the time, as well as the specific economic and industry conditions in which the Company operated.  I found no material change in the reasonableness of those views because of any events between January 1, 2007 and April 16, 2007.

The Messina Report relies principally on the narrative and sources cited in the Prairie Capital Valuation concerning the real estate market generally, and especially the market in which the Company operated.  As discussed below, I believe that there are significant errors in the analysis of those markets in the Messina Report.

### 2.   The Projections

The Projections were based on the Company's historical and projected financial information that was provided by the Company and its outside accountant to Duff & Phelps and Prairie Capital, which those valuation firms then reviewed and analyzed in the Transaction Valuations.  *See, e.g.*, Miscione Dep. at 319-22; Gross Dep. at 56, 108, 115-18.  I offer no opinion on the specific numbers used in the Projections, but I note that both the Transaction Valuations and the Messina Report assume that the Company's future performance would be significantly affected by the performance of the national real estate market as well as the specific real estate market in which the Company operated.  I agree with that assumption.

### 3.   The Expected Performance of the Relevant Markets

The Projections assume that the Company's performance would be essentially flat in 2007 and then grow modestly for most of the projection period because that was consistent with the consensus view of the relevant real estate markets in late 2006 and the

spring of 2007 and the Company's position in those markets. Those markets had suffered their first downturns in the decade in late 2005 into 2006, and the Projections assumed that the down cycle would continue in 2007, and then only slowly improve throughout the rest of the projection period. *See* Duff & Phelps Confidential Information Memorandum, at Exhibit 5 – Summary Forecasted Financial Performance; April 16, 2007 Prairie Report, at 49. It should be noted that both Duff & Phelps and Prairie Capital were well aware of the softness of the housing industry, which started in late 2005 but became more noticeable in 2006 and early 2007, and that softness is addressed and accounted for in the Transaction Valuations. *See, e.g.*, Duff & Phelps Confidential Information Memorandum, at II-3; April 16, 2007 Prairie Report, at 22-41. However, it was not until late 2007 and early 2008 that the housing industry and later other construction-related industries experienced the dramatic downturn caused by the subprime lending financial crisis. This was well after the Transaction, and there were few if any respected industry sources at the time of the Transaction forecasting the severe recession that later developed. Indeed, it is well known that the U.S. Federal Reserve Bank, among many others, failed to foresee the financial crisis which devastated the housing industry.[1]

In my opinion, the consensus view of the housing market in 2007 was consistent with the view of the relevant markets reflected in the Projections and the Transaction Valuations that housing was in a down cycle, but that it would likely recover in 2008 and was positioned for growth well into the future.

---

[1] New York Times, Business Section, page B6, September 13, 2014.

**KARONIS EXHIBIT 21**                    **Page 9**

The 2006 edition of the highly regarded "Emerging Trends in Real Estate" produced by the Urban Land Institute and Price Waterhouse Coopers indicated that the "Real Estate Climate Remains Favorable" and that in spite of the housing industry slowdown there were opportunities to develop and construct infill housing.  The 2007 edition indicated that there was relative equilibrium in the real estate industry and that most interviewees for the survey were bullish about 2007.  A total of 84% of the Emerging Trends survey respondents (all seasoned investment professionals) indicated that the prospects for profitably in 2007 were good to excellent (Good 28.9%, Very Good 32.8% and Excellent 22.3%).

In 2006, Property & Portfolio Research, Inc., a highly regarded economic research and forecasting firm, forecasted that average household formations from 2006 through 2015 would be above historical averages, a positive indicator for the homebuilding industry and the construction firms involved in that business.

The economic forecaster, Arthur Margon, in 2007 indicated that the probability for a moderate recovery was 60% and that the chance for a recession was only 35%.  He also predicted economic growth of 2.5% and that single home ownership was entering a phase where "Overshoot" (overweight) should be considered and that multifamily rental and extended stay facilities were in a growth phase.  These were all positive indicators for the construction industry and the Company.

Citigroup in their Homebuilding Report dated September 11, 2006 stated that "heading into FY07, the rebound will likely become quite dramatic," and they expected

**KARONIS EXHIBIT 21**                                              **Page 10**

(homebuilding) order growth to rebound roughly 10% in the 1st Q 2007 and remain in the double-digits for all of 2007.[2]

Contrary to the Messina Report, Hovnanian Inc., a national home builder, did not believe that the housing industry was likely to remain in a down cycle for the period reflected in the Projections. On the contrary, Hovnanian was optimistic that 2008 would see stabilization or an increase in housing starts.[3]

Two investment industry performance return indexes representing the private real estate investment market and the public real estate market reflect how the investment communities viewed the economy and real estate performance.

NCREIF (National Council of Real Estate Investment Fiduciaries) in their NCREIF Property Index, a composite of total rate of return measure of investment performance of a very large pool of commercial real estate properties acquired in the private market on behalf of institutional investors, mostly pension funds, showed positive returns in 2006 of +3.85% in the 1st Q, +3.72% in the 2nd Q, +3.45% in the 3rd Q and +5.67% in the 4th Q. The index returns were also positive in all quarters of 2007, including the first quarter. The NCREIF index returns did not go negative until the 3rd Q of 2008 but turned highly positive in 2010 and beyond.

NAREIT (National Association of Real Estate Investment Trusts) shows publicly traded REIT returns with a similar pattern although somewhat different timing which would be expected as the public real estate market typically displays changes in

---

[2] Citigroup Homebuilding Report, A Buyer's Market; Addendum, dated September 11, 2006.
[3] Hovnanian Enterprises, Inc. 2006 Annual Report, K Hovnanian Homes, Our Financials, at 7 (2006), http://www.khov.com/Home/Careers/OurCompany/OurFinancials/OurFinancials.htm ("We continue to believe that a number of underlying trends make the long-term outlook for housing very positive . . . . We expect the decline in national housing activity in 2006 to be followed by another falloff in 2007 as the excess inventories of speculator-owned homes are sold to true homebuyers, but we are optimistic that 2008 will see a stabilization or an increase in housing starts again.").

performance due to economic conditions by 6 to 9 months sooner than the private real estate market.  REIT performance in residential properties was positive by +38.93% in 2006 then turned negative in the latter half of 2007 but then turned positive in 2009 by +30.82% and positive in 2010 by +46.01%.  The pattern for all REIT property types was similar.  The NAREIT index (all property types) was highly positive, +34.35% in 2006, turned negative in the later part of 2007 but then highly positive, +27.45% in 2009, +27.58% in 2010 and positive thereafter.

These private and public real estate performance indexes in 2006 indicate that the markets were not anticipating a decline in real estate performance in the near term.  The public real estate market index did not reflect a softening until the 2nd half of 2007, and the private real estate market did not start to react to what became the severe downturn caused by the subprime financial crisis until about 9 months later, i.e., the late 2nd Q and early 3rd Q of 2008.

Long term, the Harvard Joint Center for Housing Studies and the Brookings Institution were predicting in 2006 that U.S housing starts would average between 1.8 million and 2.0 million homes annually until 2030 in order to keep pace with projected household formation and the loss of housing supply through deterioration and physical obsolescence of an estimated 20.1 million housing units between 2000 and 2030.[4]  This level of projected housing starts would present significant opportunities for growth for a company like SJP Group.

In sum, there was no meaningful forecast that I am aware of in late 2006 and early 2007 that the real estate industry and specifically the heavy construction industry would

---

[4] Hovnanian Enterprises, Inc. 2006 Annual Report, K Hovnanian Homes, Our Financials, at 7 (2006), http://www.khov.com/Home/Careers/OurCompany/OurFinancials/OurFinancials.htm

10

experience the recession that materialized in 2008 and 2009.  The Company had good reason to expect positive business performance beyond 2007 in spite of the slowdown in homebuilding in 2005-2006.  The Transaction Valuations properly reflected these business assumptions.

While it is important to be familiar with studies and predictions of trends in the market at large, individual real estate markets can vary widely.  For example, the markets in which the Company was operating in 2007 bore little resemblance or relationship to other markets such as the market for residential property in Scottsdale, Arizona or Detroit, Michigan.  Based on my conversation with Mr. Di Pano, the principals of the Company, Mr. Di Pano and Mr. Dugan, believed that they were targeting areas for work that would outperform the real estate market at large.  In particular, the Company had been expanding its business into the New York City metropolitan area, particularly Dutchess County, NY and Orange County, NY.  *See, e.g.*, Duff & Phelps Confidential Information Memorandum, at V-3, V-7; Dugan Dep. at 214-16.  The high cost of housing in New York City had been increasingly driving people to move further away from the city and into those areas.  At the time of the Transaction, a significant portion of the Company's backlog of work and opportunities to bid on work was from New York.  *See, e.g.*, Duff & Phelps Confidential Memorandum, at V-7; Di Pano Dep. at 87-90, 136-55.  But that did not mean that the Company's traditional markets were not expected to be active; based on conversations with its customers, especially Hovnanian, the Company

11

expected there to be considerable activity in areas of New Jersey where the Company was the dominant provider of construction services.[5]

As indicated at various places below, I found Mr. Di Pano and Mr. Dugan to be credible, knowledgeable, strategic, and thoughtful about the real estate business generally, and especially about the Company's past and future prospects within the markets in which they operated.

### 4.     The Significance of the Company's Performance in 2006

A principal difference between the Transaction Valuations and the Messina Report is that the former uses the Company's financial results in 2006 as a baseline from which to assume future performance, while the latter discounts the 2006 results as an anomaly and essentially assumes that there had been no change in the Company's ability to generate returns between 2000 and 2006.

Experienced real estate investors generally place more weight on recent results than historical performance.  Where those recent results differ from historical performance, the investor looks for reasons to determine whether, as the Messina Report puts it, the recent results are a "new normal."  Later in this report, I discuss my agreement with the analysis in the Transaction Valuations that changes in the Company's leadership and business strategy explain the strong 2006 results and support the use of that year as a baseline for the Projections.

---

[5] In making the case that the Projections were overly optimistic, the Messina Report relies on data indicating that building permits in New Jersey decreased in 2006 compared to 2005.  In my opinion, a one-year change in the number of building permits in a given state is not a particularly meaningful data point. However, even if it were appropriate to focus on one year of building permit data, several of the counties in New Jersey and New York where the Company was working or planned to work in 2007 and beyond saw an increase in building permits from 2005 to 2006.  These include Passaic and Essex Counties in New Jersey and Dutchess County in New York.  *See* United States Census Bureau Building Permit data.

In contrast, I did not see any explanation in the Messina Report for the 2006 results. Rather, the Messina Report focuses on the cyclical nature of the real estate business and observes that the Projections assume a relatively flat market, thereby implying that the 2006 results could not be repeated as the market changed. I agree that real estate markets are cyclical over long periods of time, and that the Projections assume relatively modest market growth during the projection period. But I do not agree with the conclusion in the Messina Report that the market's volatility would cause a reasonable real estate investment professional to discount the Company's 2006 results as an anomaly that did not indicate any sustainable change in the Company's ability to generate returns. That might be true if 2006 had been a very positive year in the real estate markets and one could speculate that such results could not be repeated when those markets inevitably hit a down year in its cycle. But that does not accord with the facts here.

On the contrary, 2006 was a *down* year in the residential real estate markets and so there was every reason to believe that the Company could match its 2006 performance in other down years, and would exceed it when the cycle turned up. In my opinion, if an investor was as focused on market cyclicality as the Messina Report, then that investor under these facts would believe that the Projections were reasonable because they did not include any assumptions about profitability when the real estate market should be expected to recover and eventually hit the inevitable peaks in its cycle.

Second, in arguing that it was an error to use 2006 as a base year in the Projections because it was only one year and was not likely to be repeated in the period covered by the Projections, the Messina Report ignores the significant backlog of awarded work and the volume of current bids for future work that the Company had at

the time of the Transaction.  Going into 2007, the business backlog amounted to $58 million, which was up considerably from a backlog of $38 million going into 2006.  *See* Duff & Phelps Confidential Information Memorandum, at V-6 – V-7.  The Company also had an additional $8.5 million of work, which had been awarded towards the end of 2006. *See* Duff & Phelps Confidential Information Memorandum, at V-6 – V-7; Dugan Dep. at 257-58.  Historically, the Company had bid on about $140 million of work per year, and had a yearly success rate of about 45% in winning bids (the success rate was as high as 70% in rock crushing and 50% in site development; paving had about a 30% success rate but accounted for only about 20% of the SJP Group business).  *See* Duff & Phelps Confidential Information Memorandum, at V-7 – V-8.  A success rate of 45% on $140 million of bids would have generated about $63 million of contracts for 2007, which when added to the $58 million backlog and $8.5 of work already awarded would have generated about $129.5 million of business in 2007 and 2008 (without accounting for business bid on, won and worked in 2008 and later years).[6]  A chart is illustrative:

| SOURCE | AMOUNT |
|---|---|
| Backlog going into 2007 | $58 million |
| Work awarded going into 2007 | $8.5 million |
| Anticipated contracts based on historical numbers ($140 million of bids, 45% success rate) | $63 million |
| **TOTAL** | $129.5 million |

In short, based on the business in hand, already awarded business, and a continuation of the Company's demonstrated performance in winning bids, it was highly likely that the

---

[6] The Company did not necessarily expect to perform all of this work in 2007 - some of that work would be performed in 2008 or later years.  *See, e.g.*, Duff & Phelps Confidential Information Memorandum, at V-7.

14

Company would replicate the 2006 results in 2007, and a strong likelihood that it would do so in 2008 as well.  In my opinion, a reasonable real estate investor would conclude that the Company had demonstrated the ability to generate financial results similar to 2006 in the future, therefore supporting the use of the 2006 results as a baseline for the Projections.

### 5.    The Significance of the Results in the First Quarter of 2007

There is no dispute that the Company did not achieve its expected financial results in the first quarter of 2007.[7]  A reasonable real estate investor would certainly want to know whether that performance indicated a fundamental problem with the Projections, or whether it was due to temporary issues that did not negate any of the assumptions underlying the Projections.

In this case, there is reason to conclude that the 2007 first quarter results were caused by a temporary problem that indicated nothing about the Company's future prospects.  As Mr. Di Pano and others testified, the Company's revenue in that period lagged because it was limited in its ability to work on its existing contracts in the 1st quarter of 2007, due to bad weather.  *See, e.g.*, Di Pano Dep. at 255-62; Dugan Dep. at 211, 232-41; Office of the New Jersey State Climatologist at Rutgers University, February 2007 Climate Summary, dated March 1, 2007; Office of the New Jersey State Climatologist at Rutgers University, March 2007 Climate Summary, dated April 2, 2007.  But business disruption from bad weather that causes delays of projects is fully expected to occur from time to time in the construction business.  While these delays can affect a

---

[7] Notably, at the time of the Transaction, only the actual financials for the Company for January and February of 2007 were available.  *See* Gross Dep. at 249.  The financials for March and April of 2007 were not available.  *See, e.g.*, Gross Dep. at 249; D'Esposito Dep. at 21-25.

company's financial performance in the short term, in almost all cases the construction projects are restarted after the weather improves, and the company's revenues catch up to the expected level. Indeed, in some cases developer customers are willing to pay a premium for site preparation delayed by bad weather in order to speed recovery of their project's timing. In any event, in my opinion, there would have been no reason to expect any long term financial impact on the Company by the bad weather in early 2007, only a short term delay of about three months in some of the Company's business activities.

The Messina Report does not challenge the fact that there was bad weather in the first quarter of 2007, nor acknowledge that the financial results of companies in the construction business can be temporarily affected by bad weather. Rather, the Messina Report implies that the early 2007 results can be explained as a return to the Company's historical levels of revenue generation. That might be justified if, for example, the Company's backlog had disappeared or it was experiencing a decrease in the number of opportunities to bid on new business; that is, if the basic indicators of the Company's ability to generate revenue had significantly retreated from the 2006 levels. But that was not the case. As noted, the Company had a large and growing backlog in the first quarter of 2007, and was presented with a healthy number of opportunities to bid on new work during that period. None of the Company's customers approached the Company seeking to cancel contracts during this time. In my opinion, it was an error for the Messina Report to conclude that the Company's financial results in the first quarter of 2007 indicated a return to its pre-2006 level of revenue generation.

16

### 6.    The Selection of Peer Companies

Although I was not asked by counsel to opine on the methodologies used in the Valuations, I note that the Messina Report makes a significant change in the type of peer companies used in what it calls the Market Multiple method; it uses large homebuilders as peer companies, while Prairie Capital used engineering and construction companies in its Market Approach.  *See* April 16, 2007 Prairie Report, at 56-57, 76-81.  I have had considerable experience identifying comparable/peer entities for valuations in the real estate business and have an opinion on the selection of such companies.

In my opinion, the Company's peer group should not include home builder companies because the Company had significant other customers that were in other businesses or activities that were not home building.  The home building business is only in home building development while the Company was in heavy construction and had non-home builder customers such as commercial real estate developers in property types other than home building, general contractors, other construction companies and municipal and state governments.  In addition, the heavy construction and home building businesses are different and behave differently: the operating costs, operation ratios, profit margins and other performance ratios of home builders are different from those of heavy construction companies, as are capital costs.

I consider the Prairie Capital peer group to be appropriate because they are in businesses similar to the Company.  While some of the peer group are much larger companies and are public entities, they nevertheless are acceptable comparisons.  The Prairie Capital Valuation recognized that SJP Group was much smaller than the companies in the peer group and also recognized the impact on value of the peers being publicly traded and differences in diversification of business activity and customer

17

concentration.  Some of the differences between SJP Group and those large engineering

companies would result in higher values for the Company; for example, as a private

company SJP Group had the advantage of lower operating costs and, therefore, had

higher profit margins compared to larger public companies that generally have higher

G&A (general and administrative costs).  Nevertheless, Prairie Capital applied a 40%

discount in the multiples in their valuation to account for the differences identified with

the peer group.  *See* April 16, 2007 Prairie Report, at 56-57.  In my opinion, this is a

significant if not overly conservative discount.

### 7.      Method Weighting in Real Estate Valuations

The April 16, 2007 Prairie Report uses a weighted average of 50% for the Income

Approach (discounted cash flow method) and 50% for the Market Approach.  *See* April

16, 2007 Prairie Report, at 58.  These are typical weightings used in such valuations and

are often used in academic environments.  But as an active real estate investor for more

than 40 years, it has been my experience that investors in that market tend to place more

weight on actual market prices, especially in certain real estate investment cycles.  Thus,

the 50%/50% weighting is often appropriate in normal investment markets, but when

there is a significant imbalance between available money for investment and available

investments considered desirable (investment supply), then it is not uncommon for the

market approach to receive a greater weighting.  In this kind of investment environment,

while an income approach such as discounted cash flow might indicate a certain value for

the investment, a higher price, sometimes a much higher price, might be paid due to

scarcity of investment product, thus resulting in a higher value for the market approach.

18

In late 2006 and early 2007 there was still a lot of money seeking real estate investments and the markets were experiencing frothy highs because this demand exceeded the available investment opportunities.  Increasingly higher multiples were being paid for real estate management companies and real estate and real estate related operating companies.  There was a considerable imbalance of investment supply and demand that would have justified a different weighting between the income approach and the market approach in the Transaction Valuations with the market approach being given a higher weighting, perhaps between 60% and 75%.  If these weightings had been applied in the Transaction Valuations, it would have generated a higher valuation.

**B.      Question Presented 2: How did the SJP Group's position in its real estate market at the time of the Transaction affect the value of the Company?**

### 1.      <u>Observations and Opinion</u>

As noted, I carefully reviewed the depositions of Mr. Di Pano and Mr. Dugan, and had a lengthy conversation with the former about the Company's business strategy.  In my opinion, SJP Group was well positioned within its industry and had a competitive advantage.

The Company was well established and well respected and was one of New Jersey's largest heavy construction companies.  It had a record of innovation.  The Company's paving division was the first in the U.S. to use paving machines equipped with electronic laser grade sensors which provided very high elevation accuracy.  *See, e.g.*, Duff & Phelps Confidential Information Memorandum, at V-3; April 16, 2007 Prairie Report, at 6.  The Company was also an industry leader in using GPS technology for equipment grade control and site layout.  *See, e.g.*, Duff & Phelps Confidential Information Memorandum, at V-3; April 16, 2007 Prairie Report, at 6.  The Company's

19

National Crushing & Recycling unit provided to developers high production and most importantly mobile onsite rock crushing. *See* Duff & Phelps Confidential Information Memorandum, at V-3 – V-4; April 16, 2007 Prairie Report, at 6-7. This was a considerable competitive advantage as the Company was able to provide customers with considerable cost savings and shorter project times. It also represented a significant growth opportunity for the Company as it could do rock crushing both for jobs in which it was the principal site developer and where it was contracted to do rock crushing for other site developers. Finally, the Company was an industry leader in concrete and asphalt recycling and had state of the art equipment and technology to provide these services. As pointed out in the Duff & Phelps Confidential Information Memorandum, in 2006 the company crushed and utilized nearly 1 million tons of stone and recycled material. This eliminated the need to purchase this material from 3rd party quarries and other material suppliers. *See* Duff & Phelps Confidential Information Memorandum, at V-4. The Dyna-Tec Drilling & Blasting unit provided the Company competitive advantages for both residential and commercial site customers. *See* Duff & Phelps Confidential Information Memorandum, at V-4 – V-5; April 16, 2007 Prairie Report, at 7-8. In general, this business platform provided the Company with some competitive advantages through their vertical integration that allowed it to be more operating cost efficient than companies without those broad range of capabilities.

Based on these factors, it is my opinion that the Company was a dominant player in its markets due to its technology, equipment, experienced personnel, advanced production, established customer relationships, and processing techniques.

As discussed above, one of my criticisms of the Messina Report is that there is no plausible explanation for how SJP Group was able to achieve excellent results in 2006 despite the fact that that year was a down cycle in its primary market.  In my opinion, those results were not an anomaly and reflected significant changes in the ability of the business to generate returns compared to the period prior to 2006.

Most importantly, 2006 was free of the impact on the Company's performance of the illness and then death of Carmen Yacuzzio, the original owner.  *See, e.g.*, Miscione Dep. at 71-75, 97; Dugan Dep. at 16.  With new ownership in control, the Company had a new business strategy to increasingly diversify its customer focus and expand its operations and productivity.  *See, e.g.*, Miscione Dep. at 71-75.  This new business strategy allowed the Company to take full advantage of the millions of dollars it was investing in cutting edge technology.  *See, e.g.*, Duff & Phelps Confidential Information Memorandum, at V-2 – V-4; April 16, 2007 Prairie Report, at 5-7; Di Pano Dep. at 65-75; D'Esposito Dep. at 188.  In my opinion, the new business strategy articulated by Mr. Dugan and Mr. Di Pano was reasonably designed to increase the Company's ability to generate returns.  Most importantly, that strategy was demonstrably working as the Company was able to grow substantially in a down year in its market, and had a large backlog and substantial bidding activity in another down year in its market.  Those results cannot be explained other than by the conclusion that SJP Group now held an advantage over its competitors that enabled it to do well even in down years in its market.

The Messina Report seems to acknowledge that the Company did enjoy a competitive advantage in the 2006-2007 time period by arguing that economic theory would suggest that such an advantage could not be sustained because new competitors

**KARONIS EXHIBIT 21**                                    **Page 23**

will realize that there are profits to be made and will enter the market and drive down prices. The Messina Report then contains speculation about the Company's potential competitors and incorrectly concludes that the Company's business was an easy business to enter. Whatever the merits of the macroeconomic theory cited in the Messina Report as an academic matter, in my opinion, the conclusion that the Company could not maintain its competitive advantage throughout the period of the Projections ignores numerous facts.

First, it should be noted that the SJP Group as a private company was not required to make its financial information publicly known and, therefore, its high level of operating profit and profit margins would not be known by the competitive peer group or any potential competitor. The Messina Report does not explain how these potential new competitors it theorizes about would even know that there were profits to be made.

Second, I do not agree that there was a low barrier to entry into the Company's business. That business requires significant capital needs to fund the high cost of equipment, especially the Company's specialized rock crushing equipment. A new business entrant into the Company's market would also lack experienced personnel and established relationships with customers. And while the Messina Report speculates about the entry of a large construction company into the Company's market, it does not identify a single national construction company, much less one that was known at the time to be interested in that market.

Third, the contention in the Messina Report that the Company's home builder customers would enter its business is not credible. Home builder companies have large capital needs and those companies are often challenged to access enough capital to meet

**KARONIS EXHIBIT 21**                                          **Page 24**

their needs.  Diverting capital away from the home builder core business and core competency and entering into a different business in which they had no expertise would most likely weaken the home builder, not strengthen it.  Contrary to what the Messina Report speculates, in over 40 years in the real estate investment business, I have never known of a developer and certainly not a home builder developer that has gone into the heavy construction business of the type the Company was in.  Similarly, Mr. Di Pano explained to me that no home builder had ever competed against the Company during his many years there.  I also do not believe that Hovnanian would be the first, as the Messina Report suggests.  On the contrary, according to Mr. Di Pano, Hovnanian had approached the Company about a closer relationship and was interested in reducing the demands on its capital by selling some of its property holdings to the Company.

In short, based on my review of all the relevant facts and my 40 years of experience in the real estate industry and as a real estate investor, it is my opinion that the Company had competitive advantages and was well-positioned to maintain those advantages throughout the Projection period.

C.   **Question Presented 3: How did the financing offers the Company received in connection with the Transaction reflect on the fairness of the Transaction terms?**

1.   <u>**Observations and Opinion**</u>

As noted, I have considerable experience as an equity investor and as a lender to entities in the real estate industry.  Valuations of the borrowers and their proposed projects are part of the data that lenders review during the underwriting process.  If a lender then decides to make the loan, it is a strong indication that the lender finds the valuation to be reasonable.  On the other hand, if the lender does not agree with the

valuation, then a different loan amount may be offered or a credit enhancement may be required such as personal guarantees and\or additional collateral.  In this respect, a loan commitment represents an independent corroboration of the fairness of the Transaction's terms by a person willing to spend his own money in the Transaction.

### 2.    The ESOP Financing Offers

To fund the Transaction at issue here, the Company planned to borrow $16,000,000 in the form of two term loans.  *See* Duff & Phelps Confidential Information Memorandum, at IV-2; Prairie Fairness Opinion (DOL-0116.67) ("Prairie Fairness Opinion"), dated Apr. 16, 2007, at 1.  The first term loan was to have an initial balance of $8,000,000 to be amortized over 10 years at an annual interest rate of 8.5%  fixed for 60 months and then followed by a floating rate at 30-day LIBOR plus 250 basis points for 60 months.  *See* Prairie Fairness Opinion, at 1.  The second term loan was designed to have an initial balance of $8,000,000 to be amortized over 10 years at an annual interest rate floating over 30-day LIBOR plus 250 basis points.  *See* Prairie Fairness Opinion, at 1. The ESOP was to borrow $16,000,000 from the Company in the form of an internal loan to be amortized over 10 years at an annual interest rate of 8.0%.  *See* Prairie Fairness Opinion, at 1.  This ESOP loan would then be repaid through annual contributions made by the Company to the ESOP.

Citibank, N.A. made a financing offer of $16,000,000 term loan for seven years with repayment in equal quarterly principal payments.  The interest rate was to float at a spread over the Prime Rate or LIBOR.  Citibank also offered the Company a $4,000,000 revolving line of credit for 3 years as part of the financing.  *See* Citibank Term Sheet (DOL-0112.2.64), dated Mar. 1, 2007.

LaSalle Business Credit, LLC offered up to $34,000,000 of loans in a credit facility.  This offer included a revolving credit facility of up to $14,000,000, a term loan of $15,000,000 for 5 years and a machinery and equipment acquisition line of up to $5,000,000.  These were all floating rate notes.  *See* LaSalle Business Credit, LLC Term Sheet (DOL-0112.2.643), dated Mar. 9, 2007.

Bank of America offered $14,000,000 in revolving ($4 million for 2 years) and term loan ($10 million for 5 years) facilities.  *See* Bank of America Term Sheet (DOL-0112.2.763), dated Feb. 15, 2007.

First American Bank offered financing for the Transaction of $16,000,000 divided in two equal amounts of $8,000,000 each, one of which would have a term of 10 years with a fixed rate at 8.5% for 60 months followed by a floating rate over 30-day LIBOR plus 250 basis points for 60 months.  The other $8 million note would have a floating rate for 10 years.  Also offered were a $4,000,000 line of credit and a $2,500,000 equipment term note.  *See* First American Bank Term Sheet (DOL-0128.393), dated Mar. 13, 2007.

The Company ultimately decided to utilize the First American Bank financing which did not require personal guarantees of the SJP Group principals or credit enhancements.  *See* Loan and Security Agreement between SJP Group, Inc. and First American Bank (DOL-0120.20), dated Apr. 1, 2007; First American Bank Term Sheet, Mar. 13, 2007, at 2.

### 3.        The Significance of the Loan Commitments

These lenders are all well established, highly experienced and credible financing organizations.  They have high loan underwriting standards and it is reasonable to assume that they would have reviewed the Transaction structure, the conclusions in the

25

Transaction Valuations and especially the financial condition and projected financial condition of the Company thoroughly.  Thus, the willingness of all these independent lenders to provide financing for the Transaction lends "real world" credibility to the opinions of value of both Prairie Capital and Duff & Phelps.

The fact that a personal guarantee was not required as a condition of the financing is also significant.  It is not uncommon for a lender to require personal guarantees in real estate related loans and loans to smaller operating companies in the real estate construction business.  The decision by First American Bank not to require personal guarantees as a condition of the financing indicates that the lender had sufficient confidence in the financial strength of the Company not only when it made the loan but projected out for the 10 years of the loan term.

The fact that these independent lenders were willing to issue loan commitments for the Transaction also undermines the credibility of the theoretical conclusion of value in the Messina Report.  That Report opines that the enterprise value of the Company at the time of the Transaction was $17,144,737.  While there is no evidence in the record of the precise value the lenders placed on the Company, in my experience, no lender would agree to loan over 95% of a company's value in any transaction like this.

In my opinion, the fact that independent and well-respected lenders were willing to make commitments to finance the Transaction strongly supports the conclusion that the terms of the Transaction were fair to the ESOP.

Respectfully submitted,

Joel W. Stoesser
Managing Principal, JWS Advisors, LLC

26

# EXHIBIT A

# Joel W. Stoesser

1 Robins Lane
Kinnelon, NJ 07405
Tel: 973-492-0219
*jwstoesser@jwsadv.com*

**Professional Experience**

Currently from 2002:  Managing Principal, JWS Advisors, LLC, a real estate investment advisory and consulting company and Manager of Bristol Capital Investors, LLC, a real estate private equity investment fund.

Mr. Stoesser serves as an expert witness and consultant in investment litigation and also as an advisor involving investment practices, fiduciary responsibilities, portfolio construction and investment strategy, investment selection, investment management and investment due diligence standards.  He also serves as an independent fiduciary for institutional investors.

Mr. Stoesser is Chairman of the Investment Committees of Hamilton Capital Partners Funds LLC and closed-end real estate equity funds, and is a member of the Investment Committee of the AFL-CIO Building Investment Trust, an open-end institutional real estate investment fund.  He is a recent Board member of Lillibridge Healthcare Real Estate Trust, a private real estate operating company and private REIT.

1992-2001:  Managing Director and Head of Investment Advisory Services, Prudential Real Estate Investors (PREI) and Chairman of the PREI Investment Committee.  Mr. Stoesser also was a member of the firm's Management Committee and a member of the firm's International Management Committee.

As the group head of Investment Advisory Services for Prudential Real Estate Investors (PREI), Mr. Stoesser had responsibilities for institutional individual client accounts and specialized commingled accounts for real estate equity and mortgage investment programs.  These investment management activities also included strategic and tactical real estate asset advisory functions.  Most of the clients were ERISA Plans.  Mr. Stoesser also provided strategic planning and tactical management of corporate facilities to U.S. and multi-national corporations.  He was the Chief Executive Officer of PruCorp Real Estate Advisors and Chairman of the Board of Prudential Realty Partnerships, Inc., an investment management advisory company, and Chairman of the Board and President of Strategic Performance Fund II, a private real estate investment trust. He simultaneously served as a Senior Vice-President of Prudential Investment Corporation.

The Advisory Services Group had a staff of eighty people, including thirty-four dedicated portfolio managers, asset managers, analysts and clerical support staff, and eleven dedicated accounting staff members.  In addition, there were thirty-five agricultural investment managers and farm managers. Mr. Stoesser's responsibilities included the Agricultural Equity management division.

Prudential Real Estate Investors in 2001 managed approximately $15 billion of real estate investments in all property types in private and public formats.  PREI invested and sold in excess of $2.5 billion of real estate per year.

Mr. Stoesser had senior management responsibilities for six single client real estate accounts and two commingled real estate closed-end portfolios, including a private REIT.  He also had responsibilities for two open-end mortgage portfolios, three institutional single client account mortgage portfolios and four agricultural single client portfolio accounts.  The Real Estate and Mortgage programs under his responsibilities totaled in excess of $4.5 billion in gross assets.  Under Mr. Stoesser's management, the Advisory Services group also liquidated twelve complete real estate portfolios totaling approximately $1.7 billion over a five-year period.  His investment management responsibilities included the Portfolio Management of all investment real estate for The General Account of Prudential Insurance Company, an assignment he assumed in the summer of 1999.

**Transactional Experience**

Mr. Stoesser's investment management career spans over forty years and started with transactions where he originated and negotiated both core and value-added investments.  His experience includes office (CBD and suburban); retail (grocery anchored convenience shopping centers, community shopping centers, power centers and regional shopping malls); industrial (bulk, flex space, R&D, incubator space, and self-storage facilities); multifamily (garden apartments, high-rise apartments, condominiums and senior housing, including age-restricted housing, independent care and assisted living facilities); and hotels (resort facilities, full-service, limited service and budget lodging facilities).

Mr. Stoesser has extensive experience in structuring transactions, including wholly owned properties and joint ventures using general and limited partnership structures, limited liability corporations, trust vehicles and real estate operating companies.  He has managed investments through trusts, unit trusts, partnerships, insurance company separate accounts, both public and private real estate investment trusts, 501C Corporations and advisory accounts.  He is experienced in buying both existing and to-be-built properties through forward commitments with closing upon completion of construction.  He also has experience in development and construction programs.

During his career, he has managed in excess of $15 billion of real estate equity and mortgage assets including distressed mortgages and securitized real estate.

Mr. Stoesser has personally been involved in the origination and negotiation of more than $4 billion of transactions.

**Prior Experience**

Prior to these responsibilities, Mr. Stoesser served from 1988 until 1992 as a Senior Vice President and Senior Portfolio Manager of the Prudential Realty Group and head of external client special investment programs for mortgage real estate and agricultural assets.   His responsibilities included institutional commingled and individual client discretionary and advisory accounts and a public REIT.  Total committed and funded assets reached about $1.8 billion during this assignment with a total of eighteen portfolios under management. Real estate assets included investments in industrial, office, apartment, retail and hotel properties.  Both core and value-added strategies were utilized.

Mr. Stoesser served from 1981 to 1988 as Senior Vice President and Senior Portfolio Manager of CIGNA Investments, Inc., where he was department head of investment management for all client investment programs for mortgage and real estate assets.  Areas of responsibility included commingled and individual client accounts from U.S. domestic and international sources of funds.   Major subordinate units under his management included portfolio management, consultant and client service, macro real estate economic research, real estate strategic planning, real estate capital markets product development for both mortgages and real estate equities, real estate client sales and client management. He started the mortgage and real estate client account money management function for CIGNA in 1981, which by early 1988 comprised twenty-two different portfolios with over $3 billion of committed and funded assets.

From 1979 to 1981, Mr. Stoesser served as head of the Real Estate Equity Department of Connecticut General Life Insurance Company, where he had management responsibilities for investment portfolios of the Connecticut General Corporate Account, the parent holding corporation's real estate subsidiaries and Connecticut General Mortgage and Realty Investments, a public real estate investment trust.   His management responsibilities included transactional acquisitions and investment sales, including the negotiating and underwriting of real estate investment equities.  Also included were responsibilities for asset management and the engineering and architectural staff divisions.  The market value of these real estate programs totaled in excess of $1 billion.

Mr. Stoesser served from 1977 to 1978 as the Director of Strategic Planning for all investment operations of Connecticut General Life Insurance Company where he managed and directed the planning efforts to determine the long range investment, financial, operational and organizational directions of the investment operations of the company and the strategies needed to implement the identified directions. Investment operations included the departments of mortgage and real estate, bonds, stocks, treasury operations and financial planning and controls.

3

Operational responsibilities included managing task forces comprising seventy senior level people. The strategic planning process established was one of the first in the investment operations of an insurance company and was regarded as an industry model.

Beginning in 1968, Mr. Stoesser held various investment assignments with Connecticut General as a Real Estate Investment Officer responsible for originating and managing mortgage and real estate investments. During this time, he also served as Portfolio Manager of the $3.5 billion Connecticut General Corporate mortgage and real estate equity portfolio. His operational responsibilities in these assignments included mortgage and real estate debt and equity analysis, investment origination, construction loan administration, loan closing, investment administration and asset and property management.

**Military Experience**

Between 1963 and 1968, Mr. Stoesser served as a regular officer in the United States Army. He held a top secret security clearance, had assignments in Europe and Vietnam and was decorated nine times, including six times in combat.

**Education**

Mr. Stoesser holds a BA in Economics from St. Lawrence University, 1963, and an MBA in Finance from the University of Hartford, 1973. He has also attended the Executive Management Program at the Graduate School of Business of the University of Michigan and has completed the MAI course prerequisites with the American Appraisal Institute.

**Other Professional Experience**

Mr. Stoesser is the recent Chairman of the Board and President of Strategic Performance Fund II, a private REIT, former Board member of Prudential Real Estate Investment Trust, a public REIT (NYSE), former Trustee and Chairman Endowment Committee, Community Church of Smoke Rise, former member of The Board and Chairman of Summerstage, Inc., a professional resident summer theater, and former consultant on strategic planning to the Foundation for the Extension and Development of the American Professional Theater (FEDAPT).

Mr. Stoesser has been a registered Investment Advisor in MD, MI and NJ, NASD qualified and a registered representative with Series 22 and 63.

From 1974 to 1978 he was a member of the adjunct faculty of the Graduate School of Business University of Hartford responsible for graduate classes in real estate finance. He has been a guest lecturer in real estate finance at the Wharton School of Business, The Tuck Graduate School of Business, Dartmouth College, the Graduate School of Business at Rutgers University and the Graduate School of

Business at Boston College.  He has spoken frequently at real estate industry professional conferences, has appeared before the U.S. Department of Labor as a consultant and expert witness and has served as an expert witness in litigation involving investment practices, fiduciary responsibilities, portfolio construction and investment strategy, investment selection and investment due diligence standards.

Mr. Stoesser is the author of investment articles and papers published nationally in *Journal of Real Estate Portfolio Management*, *Real Estate Finance*, *Pension World, Wall Street Transcript*, *Shopping Centers Today*, *Institute for Fiduciary Education (IFE)*, *Investing Magazine* and was a contributing author of the books "Life Insurance Investments," published by the Life Management Institute and "Real Estate Portfolio Management," published by Institutional Investor.  Mr. Stoesser has been quoted in *Pensions and Investment Age*, *Dow Jones Capital Markets Report Wire*, *Wall Street Journal*, *Connecticut Business Journal*, *National Real Estate Investor* and *Money Management Letter*, *Incorporating Trust News.*

He has been a member of the Pension Real Estate Association and served as the Chairman of its membership committee.  He has also been a member of the National Association of Real Estate Investment Trusts and member of its Editorial Board, the National Association of Real Estate Investment managers, International Council of Shopping Centers and the Urban Land Institute.

5

# **<u>EXHIBIT B</u>**

**Joel W. Stoesser Published Material**

- Stoesser, Joel W. and Robert C. Hess, Ph.D. "Styles of Higher Return Strategies." Journal of Real Estate Portfolio Management, Vol. 6, No. 4, 2000

- Ziering, Barry A., Ph.D. and Joel W. Stoesser. "Development and Implication of an Integrated Portfolio Management Paradigm." Real Estate Finance, Vol. 14, No. 1, Spring 1997

- Stoesser, Joel W. "Real Estate Return Enhancement Through Secondary and Non-Traditional Investing." Pension World,  Vol. 25, No. 6, June 1989

- Stoesser, Joel W. "The Changing Dynamics of Core vs. Specialist Investing in Today's Market." Institute for Fiduciary Education (IFE)", September 1996

- Stoesser, Joel W., "Remodeling Commingled Funds." Institute for Fiduciary Education (IFE), February 1995

- Stoesser, Joel W. "Revisiting the Case for Real Estate Investing Through Direct Investments." Institute for Fiduciary Education (IFE), May 1990

- Stoesser, Joel W. "Mortgage Investing: A Renewed Perspective." Investing, Vol. 4, No. 3, Fall 1990

- Stoesser, Joel W. and Barry A. Ziering, Ph.D. "Achieving Critical Mass in an Equity Real Estate Portfolio: A Strategic Perspective" Prudential Real Estate Investors Client Paper, February 1996

- Stoesser, Joel W. and Blake Eagle, Thomas J. Gochberg, Robert Kinney, Meyer Melnikoff, George R. Puskar, Brenda J. Sullivan, "Real Estate a Roundtable Discussion." The Wall Street Transcript, December 14, 1981

- Stoesser, Joel W. "Multi-Family Housing Issues in Portfolio Construction", Prudential Real Estate Investors Client Paper, August 1995

- Stoesser, Joel W., "Real Estate in an Overbuilt and Disinflationary Environment", CIGNA Client Paper, April 25, 1986

- Stoesser, Joel W. and C. Stephen Cordes, "Investment Outlook during an Inflationary Economy", Pension World, January 1982

- Stoesser, Joel W. "Development and Maintenance of Portfolio Managers", Prudential Real Estate Investors Management Study Paper, December 1991

- Stoesser, Joel W. "How to Flourish in an Overbuilt Real Estate Market", Pension World, June 1986

1

- Stoesser, Joel W. "Real Estate Investing in a Weakened Market", <u>Pension World</u>, June 1987

- Stoesser, Joel W. "Institution's Equity Role Isn't Temporary", <u>Shopping Centers Today, ICSC</u>, May 1981

- Stoesser, Joel W. , Contributing Author to the Book, "Real Estate Portfolio Management", Brian R. Bruce, Editor, <u>Institutional Investor</u>, Probus Publishing Co. 1991

- Stoesser, Joel W. , Contributing Author to the Book, "Life Insurance Readings", <u>Life Management Institute, LOMA</u>, 1981, Copyright 1982

2

# <u>EXHIBIT C</u>

### List of Documents Considered

- Hilda L. Solis, Secretary of Labor, United States Department of Labor v. First Bankers Trust Services, Inc., Vincent Di Pano and the SJP Group, Inc. Employee Stock Ownership Plan Complaint, Case 3:12-cv-04450-MAS-DEA, filed 07/17/12

- Case 3:12-cv-04450-MAS-DEA, Notice of Motion to Dismiss, filed 10/30/12

- Case 3:12-cv-04450-MAS-DEA, Memorandum of Law in Support of Defendant Vincent Di Pano's Motion to Dismiss, filed 10/30/12

- Case 3:12-cv-04450-MAS-DEA, Plaintiff's Memorandum of Law in Opposition to Vincent Di Pano's Motion to Dismiss, filed 12/03/12

- Case 3:12-cv-04450-MAS-DEA, Reply Memorandum in Support of Defendant Vincent Di Pano's Motion to Dismiss, filed 12/17/12

- Case 3:12-cv-04450-MAS-DEA, Court Order, Defendant's Motions are denied, filed 05/31/13

- Case 3:12-cv-04450-MAS-DEA, Answer of Defendant Vincent Di Pano, filed 06/13/13

- Exhibit A, Agreement between First Bankers Trust Services, Inc. and the SJP Group, dated November 16, 2006

- Exhibit B, SJP Group, Inc. Employee Stock Ownership Plan, (ESOP) Effective January 1, 2006

- Duff & Phelps, LLC, ESOP Feasibility Presentation (draft), dated December 2006

- Duff & Phelps, LLC, Engagement Agreement, dated January 18, 2007

- Duff & Phelps, LLC, Confidential Information Memorandum, dated January 2007

- Prairie Capital Advisors, Inc., Engagement Agreement, dated November 20, 2014

- Prairie Capital Advisors, Inc., The SJP Group Valuation Report as of April 16, 2007

- Prairie Capital Advisors, Inc. letter to First Bankers Trust Services, Inc. Re: ESOP, dated April 16, 2007

- Prairie Capital Advisors, Inc., The SJP Group Valuation Report as of April 30, 2007

- ESOP financing proposal from Citibank, N.A. dated March 1, 2007

- ESOP financing proposal from Bank of America, N.A. dated February 15, 2007

1

**KARONIS EXHIBIT 21**                                        **Page 39**

- ESOP financing proposal from First American Bank dated March 13, 2007

- ESOP financing proposal from LaSalle Business Credit, LLC dated March 9, 2007

- ESOP financing proposal from Merrill Lynch Business Financial Services Inc. dated February 28, 2007

- ONJSC at Rutgers University reports on weather dated March 1 and April 2, 2007 and updated March 22 and April 27, 2007, also weather reports dated May 7, 2007

- Deposition of Vincent Di Pano, February 26, 2014

- Deposition of John Miscione, April 24, 2014

- Deposition of Peter Aliferis, March 26, 2014

- Deposition of Frank Dugan, April 1, 2014

- Deposition of Michael D'Esposito, April 2, 2014

- Deposition of Robert J. Gross, March 25, 2014

- Deposition of Brian Ippensen, May 28, 2014

- Expert Report of Kirkland Messina, September 4, 2014

- Expert Report of Richard Puntillo, August 14, 2014

- Hovnanian Enterprises, Inc. reports of preliminary results for fiscal fourth quarter, 2006

- Hovnanian Enterprises, Inc. Annual Report, 2006

- Citigroup report of Hovnanian Enterprises 4Q2006 results

- Citigroup Homebuilding Report, A Buyer's Market; Addendum, September 11, 2006

- U,S. Housing Market Conditions, 2Q 2006, US Department of Housing and Urban Development

- NYC Department of Housing Preservation & Development News Release, February 5, 2007

- United States Census Bureau  Building Permit data

- McGraw Hill Construction 2007 Outlook Report, prepared October 2006

- BB&T Capital Markets Construction 2007 Forecast Report, November 22, 2006

2

**KARONIS EXHIBIT 21**                              **Page 40**

- Citigroup Homebuilding Report, September 11, 2006

- Goldman Sachs Hovnanian Homebuilders Report dated November 8, 2006

- Goldman Sachs Building – Homebuilders Small & Mid-Cap Research Report dated November 17, 2005

- Emerging Trends in Real Estate, 2006, produced by the Urban Land Institute and Price Waterhouse Coopers

- Emerging Trends in Real Estate, 2007, produced by the Urban Land Institute and Price Waterhouse Coopers

- Real Estate Market Overview, PPR, Property & Portfolio Research, Inc., May 9, 2006

- Real Estate Market Outlook and Implications, PPR, Property & Portfolio Research, Inc., March 5, 2007

- Real Estate Market Overview, PPR, Property & Portfolio Research, Inc., May 6, 2008

- The Economic and Real Estate Outlook, Arthur Margon in a presentation to the Risk Management Association, October 2006

- Market Update – Outlook and Implications, March 5, 2007, PPR, Property & Portfolio Research, Inc. Presentation to The Risk Management Association

- CMBS Investors Conference Presentation, Wachovia Securities, January 7-9, 2007

- REIS, Markets, the Economy and Commercial Real Estate, December, 2011

- REIS, Mid-Year Update, the Economy and Real Estate, September 9, 2014

- FannieMae, Multifamily Market Outlook, September 2014

- Deloitte U.S. Residential Mortgage Market Update, April 2013

- NCREIF Property Index, NCREIF (National Council of Real Estate Investment Fiduciaries)

- NAREIT Residential Index and NAREIT Index (all properties), NAREIT (National Association of Real Estate Investment Trusts)

3

**KARONIS EXHIBIT 21**                                    **Page 41**