**FOX ROTHSCHILD LLP**
100 Park Avenue, Suite 1500
New York, New York 10017
Telephone: (212) 878-7900
Fax: (212) 692-0940
*Attorneys for Defendant First Bankers Trust Services, Inc.*
Appearance: Keith R. McMurdy
E-mail: kmcmurdy@foxrothschild.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

THOMAS R. PEREZ, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,

Plaintiff,

v.

FIRST BANKERS TRUST SERVICES, INC., VINCENT DIPANO and the SJP GROUP, INC. EMPLOYEE STOCK OWNERSHIP PLAN,

Defendants.

**Case No. 3:12-cv-4450(MAS)(DEA)**

### DEFENDANT FIRST BANKERS TRUST SERVICES, INC.'S STATEMENT OF UNCONTESTED FACTS  PURSUANT TO FED. R. CIV. P. 56 AND LOCAL RULE 56.1

Defendant First Bankers Trust Services, Inc. ("FBTS"), by its attorneys Fox Rothschild LLP, pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, hereby submits the following Statement of Uncontested Facts in support of its Motion for Summary Judgment.

**A.**   Background

    **I.**   First Bankers Trust Services

    1.   At all times relevant to this action, FBTS, among other things, provided trustee services for Employee Stock Ownership Plans ("ESOPs"), as well as services to benefit plans, individual trusts, and custodians of IRAs.  Declaration of Keith R. McMurdy ("McMurdy

Decl."), Exhibit 1 (Deposition of Brian Ippensen dated May 28, 2014), 14:8-17; Exhibit 2 (FBTS Website printout).

2.       In the 2006-2007 timeframe, FBTS had a group of employees dedicated to trustee services for ESOPs. McMurdy Decl., Exhibit 1, 14:18-22.

3.       By retention agreement dated November 16, 2006 (the "Retention Agreement"), FBTS was retained to act as the Independent Trustee for an ESOP sponsored by SJP (the "SJP ESOP"). McMurdy Decl., Exhibit 3 (FBTS – SJP Engagement Letter dated November 16, 2006).

4.       The terms of the Retention Agreement provide, among other requirements, that FBTS would "conduct appropriate due diligence and review documents regarding loans and proposed stock purchases with a view to the trust's eventual funding." McMurdy Decl., Exhibit 1, 38:21-39:9; Exhibit 3, page 2, Part 1).

5.       Under the terms of the Retention Agreement, FBTS was entitled to retain its own independent financial advisor to assist in the evaluation of the proposed transaction, and to retain independent legal counsel of is choosing. McMurdy Decl., Exhibit 15 (Deposition of Kjersti Cory dated May 27, 2014), 32:2-36:1; Exhibit 3, Page 4, Part 10).

6.       Consistent with the terms of the Retention Agreement, FBTS understood that it's retention was for the purpose of purchasing securities for the SJP ESOP (the "SJP Transaction"). McMurdy Decl., Exhibit 1, 19:16-20:8; Exhibit 3.

7.       FBTS had an Employee Benefits Committee (the "EB Committee"), which includes employee benefit officers of FBTS. At the time of the transaction the FBTS EB Committee was comprised of Kjersti Cory, Blake Mock, Kim Serbin and Merri Ash, who

reviewed the SJP Transaction.  McMurdy Decl., Exhibit 1, 159:2-14; Exhibit 4 (FBTS Financial Report Review), p. 3.

**II.    SJP**

8.      SJP is a site development construction company, based in New Jersey.  McMurdy Decl., Exhibit 5 (Deposition of Frank Dugan of SJP dated April 1, 2014), 13:8-14:12.

9.      SJP consists of three different companies: National Crushing & Recycling, SJP Contractors and Dynatec Drilling & Blasting.  McMurdy Decl., Exhibit 6 (Deposition of Peter Aliferis of Prairie Capital dated March 25, 2014), 227:17-228:5.

10.     Vince DiPano was a shareholder of SJP and sold his shares to the SJP ESOP. McMurdy Decl., Exhibit 1, 18:14-19:1

11.     SJP performs various types of preparation work for sites being prepared for home construction, including work related  underground utilities, sanitary and storm sewers, water, earth, tree clearing, and rock crushing.  McMurdy Decl., Exhibit 5, 13:8-14:22.

12.     The SJP ESOP ultimately purchased the shares for $16 million, the proposed value, on April 16, 2007.  McMurdy Decl., Exhibit 12, pg. 2.

**III.   Prairie Capital**

13.     Prairie Capital Advisors ("Prairie Capital") is in the business of doing ESOP-related investment banking work, as well as mergers, acquisitions, and other investment banking and valuation work.  McMurdy Decl., Exhibit 11 (Deposition of Robert Gross), 18:16-19:13; Exhibit 6, 19:16-22.

14.     Peter Aliferis was employed with Prairie Capital from 2001 to 2010.  Exhibit 6, 16:20-18:11.

15.     During his employment of Prairie Capital, Aliferis performed mostly ESOP-related work, including valuations, estate planning valuations and transactions.   Approximately 75 to 80 percent of the work he performed was ESOP-related.  Exhibit 6, 20:1-15.

16.     Aliferis was the project manager for the SJP Transaction.  McMurdy Decl., Exhibit 11, 44:21-45:5.

17.     Aliferis performed valuation work on the valuation of SJP in connection with the SJP Transaction.  McMurdy Decl., Exhibit 6, 20:16-22.

**B.     FBTS Verified The Qualifications of Prairie Capital**

18.     FBTS retained Prairie Capital to work on the SJP Transaction as its financial advisor, to assist in the due diligence of FBTS and to issue a valuation of SJP (the "Valuation Report") and a fairness opinion (the "Fairness Opinion") on the SJP Transaction.  McMurdy Decl., Exhibit 1, 218:15-219:10; Exhibit 6, 29:20-30:7; 34:16-35:6; Exhibit 7 (Prairie Capital – FBTS Engagement Letter dated November 20, 2006); Exhibit 9 (Prairie Capital Fairness Opinion dated April 16, 2007); Exhibit 10 (Prairie Capital Valuation Report dated April 16, 2007).

19.     FBTS selected Prairie Capital as investment advisors after considering other candidates McMurdy Decl., Exhibit 1, 48:7-49:7.

20.     FBTS chose Prairie Capital because, in the opinion of FBTS personnel, they performed good work and they were comfortable with the product Prairie Capital had provided in the past.  McMurdy Decl., Exhibit 1, 48:7-19.

21.     Based on prior working engagements, Prairie Capital was familiar with the expectations and requirements that FBTS would require in performing financial due diligence.  McMurdy Decl., Exhibit 11, 57:8-58:12.

22.     The members of the Prairie Capital team who worked on the Valuation Report had worked with construction-related companies prior to the SJP Transaction and all had experience dealing with construction related firms.  McMurdy Decl., Exhibit 6, 126:17-127:18.

23.     Prairie Capital understood that, pursuant to its engagement by FBTS, Prairie Capital had a duty only to FBTS and reported solely to FBTS, rather than to SJP, the party who was paying its fees.  McMurdy Decl., Exhibit 11, 28:12-29:8; Exhibit 7.

24.     In the terms and conditions section of Prairie Capital's engagement letter with FBTS, Prairie Capital states:

> In completing this engagement, we will rely on information provided by the client and the company, including but not limited to financial statements, projections, product information, facilities description, employee data and other information as may be requested.  We will accept this information as being accurate without independent verification.

McMurdy Decl., Exhibit 1, 214:3-20; Exhibit 7, p. 4.

25.     The foregoing paragraph is a standard term used by valuation firms.  McMurdy Decl., Exhibit 1, 213:21-214:3; McMurdy Decl., Exhibit 6, 100:3-16

**C.     FBTS Ensured the Accuracy and Completeness of the Data Provided**

26.     In conjunction with the SJP Transaction, a Stock Purchase Agreement was executed between FBTS (on behalf of the ESOT), SJP Group and Vincent DiPano, the selling shareholder, which is dated April 16, 2007.  McMurdy Decl., Exhibit 12 (Stock Purchase Agreement dated April 16, 2007).

27.     The Stock Purchase Agreement included various representations and warranties by SJP and the Selling Shareholder regarding the provision of certain required financial information to FBTS as trustee of the SJP ESOP:

3.13(a) <u>Financial Statements</u>.  The company has delivered to the ESOT copies of the Company's subsidiary's combined compiled financial statements prepared by its accountants for the fiscal years ending December 31, 2003, December 31, 2004 and December 31, 2005, and the consolidated pro-forma financial statement for the Company for the fiscal year ending  December 31, 2006 (the "Basic Warranty Date"), which statements include all notes and schedules attached thereto ("Basic Warranty Date Financial Statements").   All financial statements have been prepared in accordance with generally accepted accounting principles ("GAAP") (except as shown in the statements including the covering letter of the accountants preparing such statements) throughout the periods indicated and fairly present as of the date indicated the financial condition, assets and liabilities and results of operations of the Company.

(b)  <u>Records and Books of Account</u>.  The records and books of accounts of the Company have been, and through the Closing Date will be, regularly kept and maintained in conformity with GAAP applied on a consistent basis with preceding years.

6.2  <u>Representations and Warranties</u>.   The representations and warranties made by the Seller and the Company in Article of this Agreement shall be true and correct in all material respects at and as of the Closing Date with the same force and effect as though all such representations and warranties had been made on the Closing Date and the Company shall have delivered to the ESOT a certificate to such effect, signed by Seller an executive officer of the Company.

8.1. <u>Agreement</u>.  Subject to the provisions of Section 8.2 below, the Seller shall indemnify the ESOT for any loss, cost, expense or other damage, including attorney's fees suffered by the ESOT ("Damages"), resulting from, arising out of or incurred with respect to any misrepresentation or breach of any representation, warranty or covenant made by the Seller or the Company herein. The exclusive measure of Damages shall be the amount by which the fair market value of the Shares as of the Closing Date is less than the purchase price paid to the Seller at Closing as a result of the misrepresentation or the breach of any representation, warranty or covenant made by the Seller or the Company herein.

McMurdy Decl., Exhibit 12, Page 6, 17 and 19.

28.    In addition, in a separate Retention Agreement, SJP agreed to provide FBTS or Prairie Capital with the financial information they requested, which Michael D'Esposito, the CFO of agreed to provide.  McMurdy Decl., Exhibit 13 (Deposition of Michael D'Esposito of SJP dated April 2, 2014), 147:4-150:19; Exhibit 3, Page 4, Part 13.

29.    Michael D'Esposito is the CFO for SJP and does all the different accounting work for SJP, including managing the accounts receivable, accounts payable payroll, and preparing financial data for the company's outside auditors to complete certified financial reports every year.  McMurdy Decl., Exhibit 13, 12:8-13:10.

30.    D'Esposito provided financial information to Prairie Capital in response to specific requests from Aliferis.  McMurdy Decl., Exhibit 13,151:9-16; 151:21-152:6; 193:21-9.

31.    At no point in time did Prairie Capital request information from SJP that SJP did not provide. McMurdy Decl., Exhibit 13, 194:10-14.

32.    Duff & Phelps, the financial advisor for SJP, requested financial information from SJP for the purposes of a preparing a valuation of the company.  At no point in time did Duff & Phelps request information which SJP refused to provide.  McMurdy Decl., Exhibit 13, 193:7-20; Exhibit 14 (Deposition of John Miscione of Duff & Phelps dated April 24, 2014), 64:22-67:8; Exhibit 6, 155:3-16.

33.    SJP provided Duff & Phelps with a summary of its forecasted financial performance, which Duff & Phelps included in the confidential memorandum dated January 7, 2007 it drafted for the SJP Transaction  (the "Offering Memorandum").  SJP explained to Duff & Phelps how it came up with the forecasted financial information.  McMurdy Decl., Exhibit 14, 238:6-239:9; Exhibit 18.

34.     Duff & Phelps sent Prairie Capital SJP's historical financial statements and expected financial statements as of the year end December 31, 2006. McMurdy Decl., Exhibit 14, 197:12-199:1; Exhibit 19.

35.     In January of 2007, Duff & Phelps had a meeting with Peter Aliferis of Prairie Capital and Merri Ash of FBTS where the Offering Memorandum was presented an discussed. McMurdy Decl., Exhibit 14, 200:13-201:3

36.     Duff & Phelps sent the Offering Memorandum to Peter Aliferis of Prairie Capital via e-mail on March 2, 2007. McMurdy Decl., Exhibit 14, 208:4-210:22; Exhibit 18; Exhibit 6, 151:12-152:1; Exhibit 10.

37.     The D&P Memorandum was one of many documents Prairie Capital relied upon in preparing the Valuation Report. McMurdy Decl., Exhibit 6, 157:16-20.

38.     In the normal course, Prairie Capital would have provided the D & P Memorandum to FBTS at the time Prairie Capital first received it from FBTS. McMurdy Decl., Exhibit 6, 159:7-22.

39.     In the normal course, Prairie Capital would have had discussions with both Duff & Phelps and SJP about the financial projections in the Offering Memorandum. McMurdy Decl., Exhibit 6, 162:12-164:4.

40.     The Valuation Report prepared by Prairie Capital included an analysis of audited financial statements for the five year period ending December 31, 2006. McMurdy Decl., Exhibit 11, 202:4-203:15; Exhibit 10, p. 4; Exhibit 1, 209:22-210:5.

41.     Prairie Capital considered and reviewed interim financials of SJP as of February 28, 2007 in the Valuation Report. McMurdy Decl., Exhibit 11, 252:11-17; Exhibit 10.

42.     Prairie Capital received financial information directly from SJP or SJP's advisors, which it then used in the Valuation Report.  McMurdy Decl., Exhibit 6, 54:6-10; 55:15-20; Exhibit 10.

43.     SJP provided financial projections to Prairie Capital, which were used in the Valuation Report based upon a discount in cash flow.  McMurdy Decl., Ex. 1, 168:7-17; 169:8-12; Exhibit 9, p. 49.

44.     Prairie Capital reviewed the financial data from SJP to make sure it looked appropriate.  McMurdy Decl., Exhibit 6, 55:21-57:5.

45.     Prairie Capital relied on the financial information provided to it by SJP and its advisors.  McMurdy Decl., Exhibit 6, 77:15-20.

46.     Brian Ippensen, president of FBTS, was comfortable that the conservative financial projections provided to Prairie Capital by SJP and used in the Valuation Report were going to produce a very reasonable and "not an overly optimistic number."  McMurdy Decl., Exhibit 1, 172:2-17; Exhibit 9, p. 49.

47.     Both Robert Gross, one of the founders of Prairie Capital, and Aliferis testified that they had no reason to believe that any of the financial information provided to Prairie Capital from SJP was inaccurate or misleading.  McMurdy Decl., Exhibit 6, 363:6-15; Exhibit 11, 289:8-15.

48.     Both Gross and Aliferis testified that they had no reason to believe that any of the financial forecasts provided to Prairie Capital from SJP was inflated or otherwise unreasonable.  McMurdy Decl., Exhibit 6, 364:18-365:2; Exhibit 11, 290:9-17.

49.     Both Gross and Aliferis testified that they had no reason to believe that SJP withheld any information about its financial performance from Prairie Capital.  McMurdy Decl., Exhibit 6, 365:10-15; Exhibit 11, 290:18-291:1

50.     Gross testified that he had no reason to believe that SJP or DiPano misrepresented any information SJP's financial performance in connection with the Valuation Report. McMurdy Decl., Exhibit 11, 291:2-17; Exhibit 10.

51.     Prairie Capital determined that the projections put forth by SJP were conservative and reasonable.  McMurdy Decl., Exhibit 6, 387:10-19.

52.     If Prairie Capital felt that the financial projections received from a company that were "too optimistic," it would discuss the numbers with management and if necessary, adjust the numbers to a more conservative level using a higher discount rate or by changing the projections all together.  McMurdy Decl., Exhibit 6, 90:13-94:11.

53.     If the numbers were too optimistic and the company was not willing to revise them, Prairie Capital would not complete a valuation.  McMurdy Decl., Exhibit 6, 170:12-171:13; 172:18-173:15.

54.     Prairie Capital reviewed the financial projections for SJP in the Offering Memorandum and determined that they were reasonable.  Nonetheless,  Prairie Capital still used reasonably high discount rates to factor in the risk of achieving cash flows.  McMurdy Decl., Exhibit 6, 387:20-388:13.

55.     If Prairie Capital received financial information or projections from either SJP or Duff & Phelps that it didn't think it was "accurate or appropriate," it would engage in further discussions on such information and would not have "just blindly relied upon it."  McMurdy Decl., Exhibit 6, 388:14-389:6.

56.     Prairie Capital engaged in conversations with SJP management regarding the financial projections for SJP in the Valuation Report.  McMurdy Decl., Exhibit 6, 139:17-140:9.

57.     With respect to the 2007 financial projections, Prairie Capital had discussions with SJP management about why the $60.7 million figure was accurate.  McMurdy Decl., Exhibit 6, 282:3-20.

58.     SJP explained to Prairie Capital that it could make up for the lower revenues in the first quarter of 2007 in the third and fourth quarters of the year.  McMurdy Decl., Exhibit 6, 282:3-20.

59.     In addition to meetings on November 15, 2006 and March 12, 2007, Prairie Capital spoke with SJP management on an ongoing basis.  McMurdy Decl., Exhibit 6, 311:20-312:15.

60.     The Valuation Report stated that "Information supplied by others that was considered in this valuation is from sources believed to be reliable and no further responsibility is assumed for its accuracy.  We have assumed that the information furnished by the company has been reasonably prepared and reflects the best currently available estimates and judgment."  McMurdy Decl., Exhibit 6, 88:22-89:9; 96:15- 97:2; Exhibit 10, p. 66.

61.     Aliferis understood this provision to include information provided by SJP, its accountants and advisors.  McMurdy Decl., Exhibit 6, 89:15-90:4; Exhibit 10, p. 66.

62.     Aliferis further understood this provision to mean that the information being provided to Prairie Capital was reasonably prepared by SJP and its advisors without any misrepresentations and in accordance with generally accepted accounting principles.  McMurdy Decl., Exhibit 6, 97:12-98:5.

63.     This information could include audited financial statements, internally prepared financial statements, summarizations of sales to particular customers, lists of fixed assets owned by the company, balance sheets, income statements, and observations about the company. Prairie Capital assumed all of this information to be accurate.  McMurdy Decl., Exhibit 11, 73:21-74:15; Exhibit 1, 27:18-28:13.

64.     Prairie Capital asked for information from SJP on an ongoing basis for several weeks to a month, in the time period of late 2006 to early 2007.  McMurdy Decl., Exhibit 5, 253:8-22.

65.     FBTS expected Prairie Capital to review SJP's financial information in connection with producing the Valuation Report and also to communicate directly with SJP and/or Duff & Phelps directly (rather than through FBTS).  McMurdy Decl., Exhibit 1, 68:2-69:1.

66.     Prairie Capital is entitled to rely on the accuracy of audited financial statements prepared in accordance with GAAP.  McMurdy Decl., Exhibit 11, 73:5-20.

67.     In the Fairness Opinion, Prairie Capital set forth that it exercised independent judgment in evaluating the transaction information and did not rely on information that was determined to be inadequate or incomplete.  McMurdy Decl., Exhibit 11, 75:6-77:14; Exhibit 9, p. 3.

68.     FBTS expected Prairie Capital to review SJP's financial information in drafting the Valuation Report.  McMurdy Decl., Exhibit 15, 152:11-13.

69.     FBTS participated in a due diligence meeting on November 15, 2006 with Prairie Capital, FBTS' legal counsel, Steiker, Fischer, Edwards & Greenapple, P.C. (the "Steiker

Firm"), and SJP regarding the operational and financial wherewithal of the company.  McMurdy Decl., Exhibit 11, 300:2-15.

70.    Gross testified that FBTS was involved from the earliest stages of the development of the SJP Transaction and that FBTS did not "swoop in at the end, ask for a meeting…and look at the report without having already developed a fair amount of familiarity with the company."  McMurdy Decl., Exhibit 11, 300:21-301:10.

71.    Gross testified that based on prior interactions with FBTS and based on an understanding of the FBTS personalities involved in the SJP Transaction, he knew there was a lot of involvement between Prairie Capital and FBTS throughout the process.  McMurdy Decl., Exhibit 11, 301:2-7.

72.    FBTS received a completed Valuation Report from Prairie Capital and a completed legal due diligence memorandum from the Steiker Firm and accordingly and therefore had no basis to believe SJP withheld or misrepresented any financial information from FBTS.  McMurdy Decl., Exhibit 1, 368:7-22.

73.    FBTS' competitors in the ESOP industry do not independently verify financial information provided to a valuation firm by a company looking to complete an ESOP transaction.  McMurdy Decl., Exhibit 1, 216:13-18.

74.    Ippensen knew that this practice was not adopted by FBTS' competitors because if it had been, one of the attorneys or valuation firms in the industry would have suggested that FBTS do the same.  McMurdy Decl., Exhibit 1, 216:19-217:8.

75.    When Prairie Capital was first hired, FBTS would have conveyed the percentage stock at stake in the transaction along with the general asking price, which was a range of dollar amounts for the anticipated transaction.  McMurdy Decl., Exhibit 6, 32:12-19; 33:17-22.

76.     Prairie Capital would not automatically agree to the price – it serves as a starting point for the review and negotiation of the transaction.  McMurdy Decl., Exhibit 6, 32:12-33:2.

77.     Ippensen discussed with Aliferis whether he was comfortable that the information he was provided by SJP would enable him to draft the Valuation Report.  Aliferis responded that he was comfortable with the information.  McMurdy Decl., Exhibit 1, 214:13-21.

78.     Aliferis went to the SJP office and asked a "number of questions" in conjunction with the SJP Transaction.  McMurdy Decl., Exhibit 13, 50:20-51:1.

79.     Ippensen and Aliferis engaged in discussions regarding the latter's review of SJP's financial projections and regarding Prairie Capital's discussions with SJP .  McMurdy Decl., Exhibit 1, 94:8-22.

80.     Ippensen and Aliferis discussed that $60 million seemed like a reasonable financial projection for the next year, considering SJP had a backlog of approximately $58 million.  McMurdy Decl., Exhibit 1, 95:1-12.

81.     FBTS also retained legal counsel, the Steiker Firm, which made a due diligence request to SJP, requesting information and documents on SJP's corporate organization, business activities, employee benefit plans, pending litigation and claims.  McMurdy Decl., Exhibit 15 61:2-62:7; Exhibit 16 (Due Diligence Request from Steiker Firm to SJP dated February 7, 2007).

82.     FBTS, through its attorneys, negotiated certain terms of the SJP ESOP transaction, including the terms of the loan note and stock appreciation rights. 228:16-229:8.

**D.     FBTS Reasonably Relied on the Prairie Valuation**

83.     Prior to agreeing to serve as a trustee for a client, FBTS goes through a detailed review process, which included a review of the company, its financials, and the viability of the company going forward.  McMurdy Decl., Exhibit 15, 27:17-29:12.

84.    Merri Ash went to the SJP office and asked "many questions." McMurdy Decl., Exhibit 13, 49:2-6; 144:4-9.

85.    There was a due diligence meeting between FBTS, the Steiker Firm and SJP at SJP's office.  McMurdy Decl., Exhibit 1, 25:7-27:10.

86.    The purpose of the due diligence meeting for FBTS was to "kick the tires," meet with the client, understand its business and gather information to bring back to the EB Committee to determine whether or not to accept the client.  McMurdy Decl., Exhibit 1, 27:11-17.

87.    If FBTS determines that a company is not financially healthy based on the review of its financials, FBTS will pass on engaging the client.  McMurdy Decl., Exhibit 15, 30:5-10.

88.    Prairie Capital put on a presentation of the Valuation Report for FBTS, during which FBTS discussed the report and asked questions about the report to Prairie Capital. McMurdy Decl., Exhibit 6, 59:2-10; Exhibit 15, 72:2-10.

89.    FBTS received a draft copy of the valuation from Prairie Capital, as well as other documentation such as the note, two to three weeks prior to Prairie Capital's presentation to FBTS.  McMurdy Decl., Exhibit 6, 57:11-58:10; Exhibit 15, 80:20-81:11; Exhibit 1, 112:21-113:19.

90.    The Fairness Opinion was prepared by Prairie Capital and was also sent in advance of the transaction date for review by FBTS. McMurdy Decl., Exhibit 1, 88:7-89:9; Exhibit 9.

91.    FBTS will have numerous conversations with their valuation advisor in advance of the initial call between the valuation adviser and the EB committee.  McMurdy Decl., Exhibit 1, 112:21-113:19.

92.     Throughout the process, there is a "healthy amount of back and forth" and "sanity checking" questions between Prairie Capital and FBTS.  McMurdy Decl., Exhibit 11, 44:4-13.

93.     FBTS follows a set process for completing its review, including retention of an valuators and legal counsel, as well as standard reviews, including reviews of draft reports and conversations with its legal and valuation advisors regarding any outstanding questions. McMurdy Decl., Exhibit 1, 112:21-115:5.

94.     Prairie Capital acknowledged that as part of its set due diligence process, FBTS is known to actively participate during the review of a valuation report, discussing all aspect of a transaction, including valuation and the transaction mechanics and structure.  McMurdy Decl., Exhibit 11, 52:10-16.

95.     Leading up to the SJP Transaction, FBTS engaged in ongoing discussions with Prairie Capital, in person and via email.  McMurdy Decl., Exhibit 6, 64:1-65:7.

96.     FBTS had the responsibility to determine whether the seller's proposed sales price was equivalent to fair market value.  To fulfill this they hired their own financial advisor, Prairie Capital.  Prairie Capital did its own work and made a conclusion as to the value of the SJP stock. FBTS looked through Prairie Capital's report for content and clarity.  If there was something FBTS didn't understand, FBTS asked questions, looked at the value amount Prairie Capital assigned to the SJP stock, and made a determination  about whether the value was reasonable. McMurdy Decl., Exhibit 1, 40:17-41:22; 112:21-113:12.

97.     FBTS' typical due diligence process with respect to ESOP transactions includes visiting with the client, understanding what it does, and gathering information.  FBTS also hires its own financial and legal advisors.  The advisors give presentations to the FBTS committee at which time committee members "would have been able to ask questions and understand what it

was that those professionals had gathered." FBTS also discusses with its professionals the price and terms of ESOP note, as well as how the ESOP note would be funded and the other parties involved.  FBTS reviews the valuation report, matches it up with what information FBTS already knows and understands about the company.  FBTS would then have made an assessment of the findings in the valuation report and decided to either continue with the transaction or not complete it.  McMurdy Decl., Exhibit 1, 38:21-40:16

98.    As part of its process, during the initial call, the EB Committee "voices any concern" or identifies any issues with the valuation report.  McMurdy Decl., Exhibit 1, 112:21-115:11.

99.    As part of its process, FBTS schedules a follow up call prior to the close of the transaction to ensure that all of their questions have been answered regarding the valuation report.  McMurdy Decl., Exhibit 1, 115:12-16.

100.    On April 13, 2007, members of the EB Committee, Steve Greenapple, an attorney from the Steiker Firm, and Aliferis participated in a conference call relating to the SJP Transaction, during which Aliferis gave a presentation on the transaction valuation of SJP as prepared by Prairie Capital.  McMurdy Decl., Exhibit 1, 116:2-21, 159:2-9; Exhibit 17 (FBTS Conference Call Notes dated April 13, 2007); Exhibit 4, p. 3.

101.    Notes from the conference call indicate that the attendees discussed various details of SJP's business operations and of the SJP Transaction.  McMurdy Decl., Exhibit 17.

102.    Notes from the conference call also indicate that members of the EB Committee asked questions Greenapple and Aliferis relating to the SJP Transaction.  McMurdy Decl., Exhibit 17.

103.   Aliferis had attended calls prior to the April 13, 2007 call during which drafts of the Valuation Report were discussed.  McMurdy Decl., Exhibit 1, 117:6-10.

104.   Ippensen attended a conference call with Aliferis, during which they discussed Aliferis' process in drafting the Valuation Report, whether SJP was being responsive to any requests by Aliferis or Prairie Capital, and whether Aliferis was receiving the information he needed to complete the Valuation Report.  McMurdy Decl., Exhibit 1, 120:20-121:6.

105.   Prairie Capital would not have completed the Valuation Report without having all the information it needed from SJP.  McMurdy Decl., Exhibit 1, 368:17-369:4.

106.   It is common practice for FBTS to ask valuators on what basis they weight the discounted cash flow method and the guideline public company method when valuing a company and it would be typical in a valuator's presentation to FBTS to explain its approach. McMurdy Decl., Exhibit 1, 257:2-258:1; 258:10-22.

107.   Prairie Capital decides the weight it places on the two different methods based on internal discussions, discussions with company management, and a review of how the company is performing relative to the marketplace.  McMurdy Decl., Exhibit 6, 176:6-22.

108.   In the Valuation Report, Prairie Capital discusses the construction industry in the state of New Jersey.  FBTS understood that this was included to fulfill the requirement of including financial information in the report.  McMurdy Decl., Exhibit 1, 346:8-13; Exhibit 10, p. 30-32.

109.   During the April 13, 2007 conference call, FBTS and Prairie Capital discussed the rock crusher equipment, which was a competitive advantage SJP had over its competitors. McMurdy Decl., Exhibit 11, 188:15-189:12; Exhibit 17.

110.    FBTS had an understanding of the two different valuation approaches used by Prairie Capital in the Valuation Report.  McMurdy Decl., Exhibit 15, 187:19-189;5; 190:20-194:1; Exhibit 10, Exhibit C.

111.    Prairie Capital organizes teams to produce valuation reports, so that several sets of eyes are reviewing the information.  McMurdy Decl., Exhibit 11, 43:17-44:3.

112.    There were several layers of review of the Valuation Report at both the Prairie Capital and FBTS levels.  McMurdy Decl., Exhibit 11, 44:4-13.

113.    Prairie Capital considered a number of factors in performing due diligence for the Valuation Report, as set forth in the "Procedures" section of the report.  These factors included:

(1) The nature of the business and the history of the enterprise from its inception.

(2) The economic outlook in general and the condition and outlook of the specific industry in particular.

(3) The book value of the stock and the financial condition of the business.

(4) The earning capacity of the company.

(5) The dividend-paying capacity.

(6) Whether or not the enterprise has goodwill or other intangible value.

(7) Sales of the stock and the size of the block of stock to be valued.

(8) The market price of stocks of corporations engaged in the same or similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

McMurdy Decl., Exhibit 6, 66:15-67:14; Exhibit 10, p. 3.

114.    A due diligence analysis of these factors give Prairie Capital an understanding of the company, the operational and financial wherewithal of the business, where they've been and the thought process going forward.  McMurdy Decl., Exhibit 6, 67:18-68:4.

115.    Prairie Capital used a combination of the income approach, also known as the discounted cash flow method, and the market approach, also known as the guideline public company method, in the Valuation Report.  McMurdy Decl., Exhibit 6, 102:22-103:4.

116.    The income approach to valuation projects the free cash flow of the business and discounts them to present value based on the risks associates with achieving those cash flows.  McMurdy Decl., Exhibit 6, 103:5-11.

117.    The market approach to valuations compares similar, publicly-traded companies, whose value is based on share price, to the company being valued.  McMurdy Decl., Exhibit 6, 103:12-22.

118.    In order to find the comparable companies in the market approach, Prairie Capital speaks with management of the company to gain familiarity with the particular industry and conducts research in the marketplace.  McMurdy Decl., Exhibit 6, 105:9-16; 216:11-217:7.

119.    Prairie Capital used Capital IQ, a database commonly used in corporate finance, to assist in identifying companies comparable to SJP.  McMurdy Decl., Exhibit 6, 217:8-218:13.

120.     Once Prairie Capital has created the company peer group, it consults with company management to determine if the group makes sense.  McMurdy Decl., Exhibit 6, 105:9-106:2.

121.    Prairie Capital and SJP discussed the peer group selected for the Valuation Report and came to a consensus that they were "reasonable, comparable companies to utilize in [the] analysis."  McMurdy Decl., Exhibit 6, 122:10-123:3.

122.    In the Valuation Report, Prairie Capital calculated the "implied valuation multiples," which are the enterprise value of SJP applied to the latest multiples, year-end multiples, and near term multiples.  McMurdy Decl., Exhibit 6, 110:2-17; Exhibit 10, Appendix B, Exhibit B, p. 8.

123.    The implied valuation multiples are then compared with the marketplace, specifically the industry of the subject company.  McMurdy Decl., Exhibit 6, 111:4-112:4.

124.    Prairie Capital compares a subject company's multiples with multiples in the marketplace: if the comparison shows a significant difference, it constitutes a "sanity check," which may Prairie Capital to further evaluate its valuation of the subject company.  McMurdy Decl., Exhibit 6, 119:10-22.

125.    The comparison of the implied multiples for SJP and the actual multiples of the peer group in the Valuation Report showed that SJP was trading at a discount to what the market was trading.  McMurdy Decl., Exhibit 6, 120:6-121:12.

126.    The comparison further showed that Prairie Capital put a reasonable fair value on the SJP compared to the market place as a whole.  McMurdy Decl., Exhibit 6, 120:6-121:12.

127.    Gross has participated in approximately 200 ESOP transactions and 1000 company valuations.  McMurdy Decl., Exhibit 11, 297:7-298:3.

128.    Gross testified that there was nothing out of the ordinary with respect to the SJP Transaction as compared to the other transactions in which he has participated.  McMurdy Decl., Exhibit 11, 298:4-10.

129.    Gross testified that there was nothing he thought FBTS should have done differently with respect to their due diligence on the SJP Transaction.  McMurdy Decl., Exhibit 11, 298:11-16

130.    D'Esposito had no reason to believe that FBTS was not doing its job adequately.

McMurdy Decl., Exhibit 13, 154:9-12.

131.    D'Esposito had an understanding that it could fire or replace FBTS if at any time,

SJP felt that FBTS was not doing its job.  McMurdy Decl., Exhibit 13,154:13-155:8

Dated: February 6, 2015                   Respectfully submitted,
                                          **FOX ROTHSCHILD LLP**

                                          /s/ _____
                                          Keith R. McMurdy
                                          Elizabeth A. Chew, Esq.
                                          100 Park Avenue
                                          Suite 1500
                                          New York, NY 10017
                                          (212) 878-7900 (phone)
                                          (212) 692-0940 (facsimile)

                                          *Attorneys for Defendant First Bankers Trust*
                                          *Services, Inc.*