## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

THOMAS E. PEREZ, Secretary of
Labor, United States Department of Labor,

      Plaintiff,

v.

FIRST BANKERS TRUST SERVICES,
INC.,

      Defendant.

No. 3:12-cv-04450-MAS-DEA

### PROPOSED FINDINGS OF FACT AND CONCLUSIONS
### OF LAW OF DEFENDANT, FIRST BANKERS TRUST SERVICES, INC.

**FOX ROTHSCHILD LLP**

Daniel A. Schnapp
Elizabeth C. Viele
Matthew S. Olesh
100 Park Avenue
Suite 1500
New York, NY 10017
Telephone: (212) 878-7900
Facsimile: (212) 692-0940

Brian D. Sullivan
75 Eisenhower Parkway
Suite 200
Roseland, NJ 07068-1600
Telephone: (973) 992-4800
Facsimile: (973) 992-9125

## TABLE OF CONTENTS

Page

FINDINGS OF FACT ............................................................................................................. 1

I.      Introduction and Case Background .................................................................... 1

II.     Parties To The ESOP Transaction ..................................................................... 1

        A.      SJP ............................................................................................................ 1
                1.      Background on SJP ....................................................................... 1
                2.      SJP Experienced A Change In Management in 2004 and 2005,
                        Which Resulted In Growth and Increased Profitability for SJP ................. 2
                3.      SJP's Backlog ............................................................................... 3
                4.      SJP's Mobile Rock Crusher Gave SJP A Competitive Advantage ........... 4

        B.      First Bankers Trust Services, Inc. ........................................................ 5
        C.      Duff & Phelps ...................................................................................... 5
        D.      Prairie Capital Advisors, Inc. ............................................................ 7
        E.      Steiker Fischer Greenapple & Edwards, P.C. ................................... 9
        F.      The Curchin Group ............................................................................ 9

III.    FBTS Conducted an Iterative Due Diligence Process from October 2006 until the
        Close of the Transaction .................................................................................. 10

        A.      FBTS' Employee Benefits Committee, Which Reviewed and Approved the
                Transaction .......................................................................................... 10
        B.      FBTS Commenced Its Due Diligence Process on the Proposed Transaction in
                October 2006 ....................................................................................... 11
        C.      FBTS And Its Advisors Attended A Due Diligence Meeting at SJP on
                November 15, 2006 ............................................................................. 12
        D.      SFE & G Conducted Legal Due Diligence On Behalf of FBTS ......................... 14
        E.      Prairie Capital Was A Qualified Valuation Advisor ............................................. 15
        F.      Prairie Capital Conducted Due Diligence, Including Attending an Additional
                Meeting with SJP on March 12, 2007 ............................................... 15
        G.      Prairie Capital Requested Information from SJP and Duff & Phelps ................ 16
        H.      Prairie Capital Provided Financial Projections to SJP To Confirm Their
                Reasonableness .................................................................................. 19
        I.      FBTS Held a Meeting on March 29, 2007 To Discuss The Transaction ............. 20
        J.      Cory Discussed the Draft Valuation Report with Aliferis Prior to the Meeting
                on April 13, 2007 ................................................................................ 21
        K.      FBTS Received a Draft Valuation Report on April 11, 2007 ............................... 22
        L.      FBTS Held a Meeting on April 13, 2007 To Discuss The Transaction ............... 24
        M.      FBTS, Through Its Advisors, Negotiated Various Aspects of the Transaction .... 28
        N.      FBTS Reporting Requirements and Internal Audit Procedures ........................... 28

IV.     FBTS Took Reasonable Care To Ensure That Prairie Capital Received Complete and
        Accurate Information ........................................................................................ 29

V.      FBTS Reasonably Relied Upon the Prairie Capital Valuation Report ............................ 30

i

A.    SJP Growth Between 2005 and 2006................................................ 31
B.    SJP's Projected Growth in 2007 and Beyond ................................. 31
C.    SJP Had An Over $60 Million Backlog Coming into 2007 .............. 35
D.    SJP's Mobile Rock Crusher Gave It A Competitive Advantage ......... 36
E.    Prairie Capital Accounted For SJP's Relationships With Its Customers.............. 37

      1.    Kara Holmes ................................................................ 37
      2.    Hovnanian ................................................................... 37

F.    Prairie Used Two Recognized Valuation Methodologies to Value SJP .............. 40
G.    Prairie Capital Applied a Sensible Risk Premium ............................... 43
H.    Prairie Capital Properly Considered the State of National Housing Market in 2005-2007 In Its Analysis of the Fair Market Value of SJP.............................. 45

VI.     FBTS Properly Considered SJP's Financial Performance In the First Quarter of 2007... 47

VII.    Three Lenders Provided Commitment Letters to SJP For, At a Minimum, the Full Amount of The Transaction ............................................................ 49

VIII.   SJP Forgave The Loan to the SJP Plan Such That The Amount Paid by the SJP Plan For the Stock Was Lower than the Secretary's Estimate of Fair Market Value.............. 50

IX.     After The Transaction Closed, And In Response To An Inquiry From the Department Of Labor, Prairie Capital Recalculated Its Valuation Of SJP And Found That It Was Actually Higher Than Its Previous Valuation................................. 50

CONCLUSIONS OF LAW .................................................................. 51

X.      FBTS Fulfilled Its Fiduciary Duties to the SJP Plan ......................... 51

A.    Legal Standards Under ERISA ............................................... 51
B.    FBTS Satisfied Its Obligations Under ERISA ................................ 52
C.    FBTS Reasonably Relied On Prairie Capital's Report ....................... 53

XI.     FBTS Ensured, In Good Faith, That the SJP Plan Did Not Pay More than Adequate Consideration For the SJP Stock.................................................. 55

XII.    The Secretary Failed to Put Forth Any Credible Expert Testimony or Evidence Sufficient to Make Any Showing That FBTS Did Not Fulfill Its Fiduciary Duties or Paid More Than Adequate Consideration For SJP Stock ............................. 58

A.    The Opinion of the Secretary's Expert, Richard Puntillo, Is Not Credible and Uses an Inapplicable Standard ............................................. 58
B.    Puntillo's "Red Flags" Are Not Supported By The Evidence ............. 60

      1.    SJP's First Quarter 2007 Results .......................................... 60
      2.    Hovnanian and SJP's Customer Base .................................. 62

C.    The Opinion Of Plaintiff's Damages Expert, Dana Messina, Is Not Credible..... 62

XIII.   No Damage Award Is Properly Entered Against FBTS ............................. 66

CONCLUSION.................................................................... 66

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bussian v. RJR Nabisco, Inc.*,
  223 F.3d 286 (5th Cir. 2000) ............................................................52

*Chao v. Hall Holding, Co., Inc.*,
  285 F.3d 415 (6th Cir. 2002) ........................................................52, 55

*Chao v. Merino*,
  452 F.3d 174 (2d Cir. 2006)..........................................................51, 55

*Diduck v. Kaszycki & Sons Contractors, Inc.*,
  874 F.2d 912 (2d Cir. 1989)................................................................51

*Donovan v. Bierwirth*,
  680 F.2d 263(2d Cir. 1982), cert. denied, 459 U.S. 1069, 103 S.Ct. 488, 74
  L.Ed.2d 631 (1982) ............................................................................51

*Donovan v. Cunningham*,
  716 F.2d 1455 (5th Cir. 1983) .................................................51, 52, 55

*Donovan v. Mazzola*,
  716 F.2d 1226 (9th Cir. 1983) ............................................................52

*Eyler v. Comm'r*,
  88 F.3d 445 (7th Cir. 1996) ................................................................55

*Fink v. National Savings and Trust Co.*,
  772 F.2d (D.C.Cir. 1985) ....................................................................51

*Harris v. Bruister*,
  2013 WL 6805155 (S.D. Miss. Dec. 20, 2013) ...................................66

*Henry v. Champlain Enterprises, Inc.*,
  445 F.3d 610 (2d Cir. 2006)................................................................55

*Henry v. Champlain Enters., Inc.*,
  288 F. Supp. 2d 202 (N.D.N.Y. 2003)................................................66

*Henry v. U.S. Trust Co. of Cal., N.A.*,
  569 F.3d 96 (2d Cir. 2009)..................................................................66

*Katsaros v. Cody*,
   744 F.2d 270 (2d Cir. 1984).......................................................................................51

*Keach v. U.S. Trust Co.*,
   419 F.3d 626 (7th Cir. 2005) ....................................................................................52

*Perez v. First Bankers Trust Services, Inc., et al.*,
   Civil Action No. 12-4450, 2015 WL 5722843 (D.N.J. Sept. 29, 2015) ...........................5, 55

*Roth v. Sawyer-Cleator Lumber Co.*,
   16 F.3d 915 (8th Cir. 1994) .......................................................................................51

*In re Unisys Sav. Plan Litig.*,
   74 F.3d 420 (3d Cir. 1996)........................................................................................51

*Withers v. Teachers Retirement System of the City of New York*,
   447 F.Supp. 1248 (S.D.N.Y. 1978), aff'd. mem., 595 F.2d 1210 (2d Cir. 1979) ...................52

**Statutes**

Employee Retirement Income Security Act ("ERISA").................1, 14, 16, 51, 52, 53, 55, 58, 59

## FINDINGS OF FACT

### I.     Introduction and Case Background

1.     On April 16, 2007, the SJP Group, Inc. Employee Stock Ownership Trust (the "SJP Plan" or the "SJP ESOP") purchased 380,000 shares of commons stock of the SJP Group, Inc. ("SJP"), representing 39% of the total stock, for the amount of $16,000,000.00 (the "Transaction" or the "ESOP Transaction").  Joint Ex. 11, p. 1.

2.     The SJP ESOP was created in January, 2007 so that SJP could sponsor a pension plan for SJP's employees.  5/23/16 Transcript (F. Dugan), p. 109:10-14.

3.     On or about November 16, 2006, Defendant, First Bankers Trust Services, Inc. ("FBTS" or the "Trustee") was retained as trustee of the SJP ESOP.  Joint Ex. 6; 5/24/16 Transcript (M. D'Esposito), p. 26:12-15.

4.     In 2009, the Department of Labor ("DOL") initiated an investigation into the Transaction to determine compliance with ERISA.  5/24/16 Transcript (M. Munoz), p. 98:11-99:1.

5.     As part of its investigation, the DOL subpoenaed Vincent Di Pano, SJP's former CEO and the seller in the Transaction, as well as SJP, its financial advisor, Duff and Phelps, FBTS's financial and valuation advisor, Prairie Capital Advisors, Inc. ("Prairie Capital" or "Prairie"), and Prairie Capital's principal, Peter Aliferis.  5/24/16 Transcript (M. Munoz), p. 101:3-103:11, Plaintiff's Ex. 26, 28, 30, 34, 35.

6.     On July 17, 2012, the DOL filed its Complaint in this action.

7.     In its Complaint, the DOL alleged, among other things, that FBTS, as trustee, did not adequately perform its duties and, as a result, caused the SJP ESOP to overpay for the SJP common stock.

8.     Trial of this case, however, has conclusively demonstrated that FBTS complied with its fiduciary duties in all respects, that the SJP ESOP paid fair market value for the SJP stock, and that, in any event, the DOL has failed to establish any actual economic loss.

### II.    Parties To The ESOP Transaction

#### A.     SJP

##### 1.     Background on SJP

9.     In 2006, SJP was comprised of SJP Contractors Inc. ("SJP Contractors"), National Crushing & Recycling LLC ("National Crushing"), and Dyna-Tec Drilling & Blasting LLC ("Dyna-Tec").  Joint Ex. 9, p. 8 of 98; Joint Ex. 1, Ex. 20, p. 25.

10.     SJP Contractors performed several types of services, including value engineering, paving, excavation, underground utility installation, and equipment maintenance.  Joint Ex. 1, Ex. 20, p. 25.

11.     In addition, SJP provided land development and construction services for residential homebuilders and commercial real estate developers in New Jersey, New York and Pennsylvania.  Joint Ex. 9, p. 8 of 98; 5/23/16 Transcript (V. Di Pano), p. 19:1- 13.

12.     National Crushing performed rock crushing, asphalt, concrete recycling and equipment maintenance services.  Joint Ex. 1, Ex. 20, p. 25.

13.     Dyna-Tec performed blasting shot service and rock drilling services.  Joint Ex. 1, Ex. 20, p. 25.

14.     In the period from 2002 to 2007, SJP had the capacity to perform site work on any number of types of facilities, including hotel or resort projects, hospitals, schools and universities, and correctional facilities.  5/23/16 Transcript (F. Dugan), p. 162:1-13.

15.     This included commercial site work, such as earth moving, putting in underground utilities, road building, and building parking lots, tennis courts, and recreational areas.  5/23/16 Transcript (F. Dugan), p. 160:1-11.

16.     SJP was a vertically integrated company because it provided multiple services for the major portions of the development of a project.  5/23/16 Transcript (V. Di Pano), p. 46:2-20.

17.     For example, SJP had the ability to clear a worksite, to process refuse from the site, and then to perform finish work on the site, such as paving, the creation of roads and other necessary infrastructure for home building activity.  5/25/16 Transcript (J. Miscione), p. 24:3-10.

**2.      SJP Experienced A Change In Management in 2004 and 2005, Which Resulted In Growth and Increased Profitability for SJP**

18.     Vincent Di Pano became CEO of SJP in late 2004 or 2005, following the death of Carmen Yacuzzio, the founder of SJP.  5/23/16 Transcript (V. Di Pano, F. Dugan), p. 48:19-20, 107:15-20.

19.     Mr. Yacuzzio had taken a conservative approach to running the company.  5/24/16 Transcript (M. D'Esposito), p. 31:4-12.

20.     As of April 16, 2007, Frank Dugan was president of SJP.  5/23/16 Transcript (F. Dugan), p. 107:12-14.

21.     Following Yacuzzio's death and as of April 16, 2007, Dugan had a 30% interest in the three companies comprising SJP and Di Pano had a 70% interest.  5/23/16 Transcript (F. Dugan), p. 109:3-9, 136:21-23.

22.     Mike D'Esposito was CFO of SJP.  5/24/16 Transcript (M. D'Esposito), p. 7: 10- 12.

23.     After Di Pano became CEO, he modernized SJP by, among other things, making upgrades to SJP's equipment fleet and computer systems, as well as changing the management of SJP's maintenance facility and the heavy equipment tracking system. 5/23/16 Transcript (V. Di Pano), p. 48:21-49:3.

24.     Di Pano made more aggressive efforts to obtain new customers than Yacuzzio did. 5/24/16 Transcript (M. D'Esposito), p. 77:11-23.

25.     Di Pano was more interested in technology than Yacuzzio. 5/24/16 Transcript (M. D'Esposito), p. 77:11-23.

26.     Di Pano made efforts to bid on larger customers than Yacuzzio. 5/24/16 Transcript (M. D'Esposito), p. 78:4-6; 6/29/16 Transcript, p. 89:7-10.

27.     As a result of the changes made by Di Pano, SJP noticed a dramatic increase in its profitability. 5/23/16 Transcript (V. Di Pano), p. 49:12-15; 6/29/16 Transcript (P. Aliferis), p. 88:17-22.

28.     As a result of the changes made by Di Pano, SJP was able to obtain new work and larger projects, and 2006 proved to be SJP's most profitable year. 5/23/16 Transcript (V. Di Pano), p. 50:5-16; Joint Ex. 9, p. 13 of 98, 32 of 98.

29.     SJP experienced significant, positive revenue growth in the years 2005 and 2006, a fact that was unchallenged at trial. 5/24/16 Transcript (M. D'Esposito), p. 30:22-25; Joint Ex. 1, p. 34, 39; Joint Ex. 9, p. 32 of 98.

### 3.     SJP's Backlog

30.     Backlog is work on hand (i.e. new work or a previous year's unfinished contract work) that has yet to be performed. 5/23/16 Transcript (V. Di Pano), p. 41:3-14.

31.     SJP's backlog at the end of 2006 was approximately $58 million. Joint Ex. 1, p. 27; Joint Ex. 9, p. 13 of 98; 6/29/16 Transcript (P. Aliferis), p. 153:23-154:1.

32.     In contrast, SJP's backlog at the end of 2005 was $38 million, and 2006 proved to be SJP's most profitable year. Joint Ex. 9, p. 13 of 98, 32 of 98.

33.     As of October 2006, SJP had backlog totaling $57,743,170. Joint Ex. 1, p. 26, Ex. 22.

34.     SJP was also awarded $8.5 million worth of new work at the end of 2006. Joint Ex. 1, p. 27 of 138.

35.     SJP expected to work on 75 percent of the $58 million backlog in 2007. 5/26/16 Transcript (B. Ippensen), p. 74:19-21; Joint Ex. 1, p. 27; Joint Ex. 9, p. 13 of 98.

36.     The backlog grew from 2005 to 2006 as a result of SJP's bidding on larger, multi-phase projects and an increased work rate. 5/23/16 Transcript (V. Di Pano), p. 70:37-46.

3

37.     Thus, at the end of 2006, SJP had $60 million in bids outstanding and was awarded $8.5 million of this work, which was not disputed at trial.  Joint Ex. 1, p. 26.

### 4.     SJP's Mobile Rock Crusher Gave SJP A Competitive Advantage

38.     SJP provided onsite rock crushing services.   With the use of its mobile rock crushers, SJP was able to save its customers the cost of hauling crushed rock to job sites.  Moreover, because the crushed rock could then be used for other purposes on the job site, this also eliminated the cost of purchasing and delivering the material that would otherwise be used for those purposes.  Joint Ex. 9, p. 9-10 of 98; 5/23/16 Transcript (V. Di Pano), p. 18:8-20.

39.     SJP's use of mobile rock crushers was a major innovation in the industry.  Joint Ex. 9, p. 10 of 98.

40.     Unlike a stationary rock crusher, a mobile rock crusher was track mounted and able to move around a job site.  5/23/16 Transcript (V. Di Pano), p. 27:8-17.

41.     As a result, a mobile rock crusher could move to a blasting location on a site, rather than trucking the blasting refuse to the crusher.  This eliminated an additional cost.  5/23/16 Transcript (V. Di Pano), p. 29:20-25; 5/24/16 Transcript (M. D'Esposito), p. 19:12-23.

42.     SJP first started using mobile rock crushers in 1996, but the technology on the crushers evolved over the years.  5/23/16 Transcript (V. Di Pano), p. 30:3-6; 37:25-6.

43.     SJP made modifications to the mobile rock crushing equipment on a yearly basis and employed new technology for the crushers every two to three years.  5/23/16 Transcript (V. Di Pano), p. 40:21-41:2.

44.     One of the upgrades implemented on its mobile rock crushers was a vibrating screen on its mobile rock crushers, which was able to more capably sort smaller rock fragments from dirt, an innovation discovered on a trip made by Vincent Di Pano to Finland.  5/23/16 Transcript (V. Di Pano), p. 39:4-40:2.

45.     One of the benefits of the portable rock crusher was that it took less than one day to set up, as opposed to a stationary rock crusher, which took five days to set up.  5/23/16 Transcript (V. Di Pano), p. 28:1-9; 29:3-11.

46.     SJP's mobile rock crushers were the first of their kind in the United States and were featured in a CBS TV Evening News Story.  Joint Ex. 9, p. 10 of 98; 5/23/16 Transcript (V. Di Pano), p. 48:10-14.

47.     SJP's use of the mobile rock crushing equipment allowed them to capture customers who wanted to develop sites that were previously prohibitive or more costly to develop.  5/23/16 Transcript (V. Di Pano), p. 48:6-18.

B.     **First Bankers Trust Services, Inc.**

48.     FBTS has been in the business of administering ESOP plans since 1989.  5/26/16 Transcript (B. Ippensen), p. 132:11-13.

49.     FBTS' responsibility as trustee to the SJP Plan was, in part, to ensure that the SJP Plan did not pay more than adequate consideration for the SJP shares it was purchasing from Di Pano.  5/26/16 Transcript (B. Ippensen), p. 4:24-5:2.

50.     FBTS' responsibility as trustee to the SJP Plan was also, in part, to determine the fair market value of the SJP shares Di Pano was selling to the SJP Plan.  5/26/16 Transcript (B. Ippensen), p. 6:25-7:4.

51.     FBTS understood that, at all times, it was acting in a fiduciary capacity to the SJP Plan beneficiaries.  5/26/16 Transcript (B. Ippensen), p. 131:22-25.

52.     FBTS' fee as transactional trustee for the SJP Plan was $30,000.  Joint Ex. 6, p. 3; 5/26/16 Transcript (B. Ippensen), p. 140:4-9.

53.     FBTS did not receive a success fee or bonus with respect to its work as transactional trustee for the SJP Plan.  5/26/16 Transcript (B. Ippensen), p. 140:10-14.

54.     Although FBTS was being paid by SJP, FBTS understood that it represented the ESOP beneficiaries in the proposed transaction, which is typical in an ESOP transaction.  Joint Ex. 6; 5/26/16 Transcript (B. Ippensen), p. 4:19-23.

55.     Prior to an ESOP transaction, FBTS always conducts both financial and legal due diligence.  5/25/16 Transcript (K. Cory), p. 88:20-89:2.

56.     FBTS was permitted to engage an independent financial advisor and approve of a valuation report and/or fairness opinion furnished by such independent financial advisor.  Joint Ex. 6, p. 4 of 12.

57.     The valuation firm would prepare a report determining the fair market value of the shares to be purchased by the ESOP.  5/25/16 Transcript (K. Cory), p. 89:18-24.

C.     **Duff & Phelps**

58.     SJP and Duff & Phelps, LLC ("Duff & Phelps") entered into an engagement agreement dated January 18, 2007, pursuant to which Duff & Phelps agreed to perform, *inter alia*, the following services:

       a.     Determine the value of SJP's equity for the ESOP transaction;

       b.     Prepare a transaction memorandum and financial models for presentation to the ESOP trustee;

      c.      Participate in due diligence visits, meetings, and consultation between SJP and the ESOP trustee;

      d.      Coordinate distribution of all financial information related to the ESOP \ transaction to the ESOP trustee and its advisors;

      e.      Assist SJP in negotiating with the ESOP trustee;

      f.      Assist SJP in negotiating ESOP transaction documents; and

      g.      Act as agent for SJP in identifying and developing sources of financing.

FBTS Ex. 25, D00485-86.

59.      Duff & Phelps drafted a Confidential Information Memorandum.  Joint Ex. 1.

60.      It typically took Duff & Phelps approximately three to six weeks to prepare a document like the Confidential Information Memorandum.  5/25/16 Transcript (J. Miscione), p. 34:14-16.

61.      Duff & Phelps relied on historical financial information provided by SJP to draft the Confidential Information Memorandum.  5/25/16 Transcript (J. Miscione), p. 34:17-20.

62.      On March 2, 2007, Daniel Christoffel of Duff & Phelps sent the Confidential Information Memorandum to Aliferis and Prarie via email.  Joint Ex. 2.

63.      Daniel Christoffel worked on the Confidential Information Memorandum under Miscione's supervision at Duff & Phelps.  5/25/16 Transcript (J. Miscione), p. 29:20-22; 33:17-22.

64.      Victor Lee worked on the Confidential Information Memorandum prior to Christoffel's involvement.  5/25/16 Transcript (J. Miscione), p. 47:18-25.

65.      Miscione, managing director of Duff & Phelps at the time of the Transaction, testified that he had no reason to believe that any of the historical financial information provided by SJP was inaccurate.  5/25/16 Transcript (J. Miscione), p. 4:18-21; 34:21-25.

66.      Duff & Phelps used a model to create the financial projections in the Confidential Information Memorandum based on financial information provided to it by SJP.  5/25/16 Transcript (J. Miscione), p. 76:15-23.

67.      The Confidential Information Memorandum was drafted for review by 1) the financial institutions that would finance the Transaction and 2) FBTS and its team.  Joint Ex. 1, 5/25/16 Transcript (J. Miscione), p. 7:3-16.

68.      In instances, such as the present Transaction, where a company hires its own financial advisor and that advisor prepares a report, it is to be expected that a trustee's valuation

expert would read, review and understand that report and incorporate that information into its own report.  6/21/16 Transcript (S. Fischer), p. 43:9-13.

69.     In the Confidential Information Memorandum, SJP had estimated growth of adjusted revenues for the year ending December 31, 2006 of 34.4%.  Joint Ex. 1, p. 34.

70.     The Confidential Information Memorandum attached copies of SJP's audited financial statements.  Joint Ex. 1, p. 56 of 138.

71.     Di Pano did not request that the shares he sold to the ESOP be valued at a particular price.  5/23/16 Transcript (V. Di Pano), p. 55:1-4.

72.     Di Pano told Duff & Phelps that he wanted the financial projections for SJP to be conservative, a fact that was uncontroverted at trial.  5/23/16 Transcript (V. Di Pano), p. 55:13-19.

73.     D'Esposito reviewed the Confidential Information Memorandum prior to the close of the Transaction.  5/24/16 Transcript (M. D'Esposito), p. 10: 3-7.

74.     The Confidential Information Memorandum contained a discussion of analysis of the site preparation industry, including financial, regulatory and regional issues.  Joint Ex. 2, p. 46-54; 5/26/16 Transcript (B. Ippensen), p. 153:20-154:21.

75.     The Confidential Information Memorandum specifically discussed the seasonality of demand in the site preparation industry, how changing demand for services between seasons affected cash flow, labor, and equipment management.  Joint Ex. 2, p. 49; 5/26/16 Transcript (B. Ippensen), p. 155:5-156:5.

76.     The Confidential Information Memorandum contains a discussion about Hovnanian, including an analysis of Hovnanian's financial performance in 2005 and 2006.  Joint Ex. 2, p. 53; 5/26/16 Transcript (B. Ippensen), p. 156:22-158:17.

77.     The Confidential Information Memorandum states that "New Jersey will continue to be a primary focus for [Hovnanian]" and that 23.7% of Hovnanian's proposed communities are located in New Jersey, the largest concentration of the company's 17 states.  Joint Ex. 2, p. 53.

### D.    **Prairie Capital Advisors, Inc.**

78.     FBTS retained Prairie Capital Advisors, Inc. ("Prairie Capital") an independent financial and valuation advisor to assist in the evaluation of the proposed transaction.  Joint Ex. 6, p. 4. Prairie Capital was FBTS' financial advisor as to the issues of valuation and fairness with respect to the Transaction.  6/30/16 Transcript (R. Gross), p. 26:25-27:21

79.     FBTS chose Prairie because it did good work and was familiar with the contracting and construction industry.  7/6/16 Transcript (M. Ash), p. 103:19-22.

80.     FBTS also selected Prairie Capital based on their previous work experience with the valuation firm and believed that Prairie Capital had a great reputation in the valuation industry.  5/26/16 Transcript (B. Ippensen), p. 143:14-144:2; 5/27/16 Transcript, p. 157:24-158:5

81.     FBTS' expert, Stephen R. Fischer, testified that Prairie Capital is a highly respected valuation firm in the ESOP industry, which was not disputed at trial.  6/21/16 Transcript (S. Fischer), p. 40:6-7.

82.     Fischer testified that one of the heads of Prairie Capital, Robert Gross, is a "thought leader" in the ESOP field.  6/21/16 Transcript (S. Fischer), p. 40:10-18.

83.     Gross testified that he was involved in "hundreds" of ESOP transactions over the course of his career.  6/30/16 Transcript (R. Gross), p. 26:15-19.

84.     On November 20, 2006, FBTS entered into an engagement agreement with Prairie Capital pursuant to which Prairie Capital would serve as financial and valuation advisor to the Trustee.  Joint Ex. 7.

85.     FBTS retained Prairie Capital to provide the following services, among other things:

  a.     Estimate the fair market value of SJP's stock;

  b.     Provide a valuation report; and

  c.     Provide a fairness opinion.

Joint Ex. 7, p. 2.

86.     Prairie Capital's opinion addressed "whether the consideration to be paid for the shares by the ESOP is equal to or less than their fair market value as of the date of closing, and whether the transaction is fair to the ESOP Trust from a financial point of view."  Joint Ex. 7, p. 2.

87.     The purpose of Prairie's fairness opinion was to opine as to whether the transaction was fair from a financial point of view to the ESOP and the terms of financing were reasonable, and set forth the terms under which it conducted its analysis.  6/30/16 Transcript (R. Gross), p. 48:14-49:5.

88.     Although FBTS retained Prairie to provide a valuation report, FBTS understood that FBTS was ultimately responsible for the making the determination of the fair market value of Di Pano's shares.  5/26/16 Transcript (B. Ippensen), p. 7:5-11.

89.     In its fairness opinion, Prairie Capital opined that the consideration the ESOP was paying as part of the transaction did not exceed fair market value, and the terms and conditions of the transaction were fair to the ESOP trust.  6/30/16 Transcript (R. Gross), p. 58:18-59:12.

90.     Prairie typically has ongoing discussions with management through the transaction date.  6/30/16 Transcript (R. Gross), p. 7:15-21.

91.     Prairie also has discussions with the seller regarding the company, its services and products, customers, marketplace, the financial state of the company and its actual financial statements, and the company's outlook going forward.  6/30/16 Transcript (R. Gross), p. 8:4-9:3.

92.     Prairie understood that it was representing the interest of FBTS and the ESOP, and not the seller, with respect to the SJP transaction.  6/30/16 Transcript (R. Gross), p. 20:14-18

93.     It was Prairie's practice at the time of the SJP transaction to perform research on the subject company's industry and marketplace, the state of the economy, and the competitive landscape the company was operating within.  6/30/16 Transcript (R. Gross), p. 22:13-25.

### E.     Steiker Fischer Greenapple & Edwards, P.C.

94.     FBTS retained an independent legal counsel in connection with the proposed transaction.  Joint Ex. 6, p. 4.

95.     Steiker, Fischer, Edwards & Greenapple, P.C. ("SFE & G") served as FBTS' legal counsel on the SJP ESOP Transaction.  FBTS Ex. 7.

96.     FBTS retained SFE & G to conduct due diligence with respect to the Transaction. FBTS Ex. 7, D00035; 5/26/16 Transcript (B. Ippensen), p. 76:6-8; 168:2-13.

97.     SFE & G was also involved with putting together the plan and trust documents for the SJP Plan.  FBTS Ex. 7, D00035; 5/26/16 Transcript (B. Ippensen), p. 168:2-13; 169:11-19.

98.     In addition, SFE & G was retained to examine legal and fiduciary issues related to the Transaction and to provide a legal opinion in connection with the Transaction.  FBTS Ex. 7, D00036; FBTS Ex. 13, D00083.

99.     Further, SFE & G was retained to review any "related management compensation or equity plans associated with the Transaction," which included the SARs (stock appreciation rights) plan.  FBTS Ex. 7, D00035; 5/26/16 Transcript (B. Ippensen), p. 170:18-22.

### F.     The Curchin Group

100.     The Curchin Group is a certified public accounting firm located in Red Bank, New Jersey.  7/1/16 Transcript (R. Fouratt), p. 4:20-21.

101.     The Curchin Group created certified audited financial statements of SJP on a yearly basis, starting in the 1990s.  5/23/16 Transcript (F. Dugan), p. 139:20-140:19.

102.     The Curchin Group's work for SJP included an annual audit, for which it would confirm contracts, confirm cash in the bank, look at billings, look at revenues, and make sure accounts payable were stated correctly, among other things.  7/1/16 Transcript (R. Fouratt), p. 7:1-9.

103.    As part of this process, the Curchin Group would meet with SJP's management and accounting staff, which provided information in the form of general ledgers, trial balances, copies of contracts, and invoices, among other things, which would include information about SJP's backlog.  7/1/16 Transcript (R. Fouratt), p. 7:14-8:1.

## III.    FBTS Conducted an Iterative Due Diligence Process from October 2006 until the Close of the Transaction

### A.    FBTS' Employee Benefits Committee, Which Reviewed and Approved the Transaction

104.    Peter Aliferis of Prairie Capital testified that the benefit of working with a professional trustee, like FBTS, was its various capabilities in the areas of accounting, finance, legal, and ESOP administration.  6/29/16 Transcript (P. Aliferis), p. 111:5-18; 148:25-149:16.

105.    Aliferis testified that he understood that FBTS had the capacity to understand Prairie Capital's valuation conclusions relating to discount rate and company specific risk for example.  6/29/16 Transcript (P. Aliferis), p. 148:25-149:16.

106.    Aliferis further testified that such capabilities uniquely positioned FBTS as a professional trustee to make prudent decisions on behalf of ESOP participants.  6/29/16 Transcript (P. Aliferis), p. 111:5-18.

107.    In 2006 and 2007, FBTS had an Employee Benefits Committee ("EB Committee") responsible for reviewing proposed ESOP transactions.  5/25/16 Transcript (K. Cory), p. 88:9-13.

108.    Not all transactions are immediately approved.  The EB Committee rejected transactions where there was dissent among committee members about whether to approve it.  5/26/16 Transcript (B. Ippensen), p. 140:1-3.

109.    The different members of the EB Committee had different responsibilities with respect to reviewing proposed ESOP transactions.  5/26/16 Transcript (B. Ippensen), p. 134:17-20.

110.    Brian Ippensen, Kjersti Cory, Kim Serbin, and Merri Ash were among the members of the EB Committee who reviewed the Transaction.  7/6/16 Transcript (M. Ash), p. 27:21-25.

111.    Brian Ippensen was the president of FBTS in 2006 and 2007 and a member of the EB committee.  5/26/16 Transcript (B. Ippensen), p. 4:8-12; 92:2-6.

112.    Ippensen had been a Certified Public Accountant since 1991.  5/26/16 Transcript (B. Ippensen), p. 133:13-16.

113.    As of April 13, 2007, Ippensen estimated that he had reviewed 250 to 300 valuation reports during the course of his career.  5/26/16 Transcript (B. Ippensen), p. 133:17-20.

114.    Merri Ash was a member of the EB Committee.  5/26/16 Transcript (B. Ippensen), p. 132:24-133:1.

115.    Ash's primary role for the EB Committee was business development.  5/26/16 Transcript (B. Ippensen), p. 134:21-135:1.

116.    Ash was a "point person" on the Transaction as she attended the November 15, 2006 due diligence meeting on behalf of FBTS and participated in follow-up meetings on the Transaction.  5/25/16 Transcript (K. Cory), p. 116:10-21; 5/26/16 Transcript (B. Ippensen), p. 140:15-19.

117.    In general, Ash engaged in substantial interaction with FBTS' valuation and financial advisors, as well as company management, during the due diligence phase of the proposed ESOP transaction.  5/25/16 Transcript (K. Cory), p. 116:22-117:8; 5/26/16 Transcript (B. Ippensen), p. 140:15-19.

118.    Kjersti Cory was a trust officer at FBTS in 2006 and 2007 and a member of the EB Committee.  5/25/16 Transcript (K. Cory), p. 86:25-87:5, p. 88:15-16.

119.    Cory left employment at FBTS in 2012 and as of the date of her testimony, and worked for an FBTS competitor.  5/25/16 Transcript (K. Cory), p. 87:6-8; 117:14-19.

120.    Along with Ash, Cory was also responsible for shepherding the Transaction through to closing.  5/26/16 Transcript (B. Ippensen), p. 141:2-5.

121.    Cory and Ash's duties included communicating with SFE & G and Prairie Capital.  5/26/16 Transcript (B. Ippensen), p. 141:6-12.

122.    Kim Serbin was also a member of the EB Committee at the time of the Transaction.  5/27/16 Transcript (K. Serbin), p. 103:12-15.

123.    Serbin had an educational background of business administration with an emphasis in accounting and finance, which she brought to bear in her role as a member of the EB Committee.  5/27/16 Transcript (K. Serbin), p. 103:16-25.

124.    It is common practice for the EB Committee to have oral discussions about a proposed transaction without memorializing the conversation in writing.  5/26/16 Transcript (B. Ippensen), p. 147:19-22.

125.    The EB Committee discussed the SJP Transaction frequently starting from October 2006.  5/27/16 Transcript (K. Serbin), p. 152:15-24.

B.    **FBTS Commenced Its Due Diligence Process on the Proposed Transaction in October 2006**

126.    FBTS first considered a trustee role with respect to the Transaction in the fourth quarter of 2006, sometime towards the end of October.  5/27/16 Transcript (K. Serbin), p. 104:1-9; 7/6/16 Transcript (M. Ash), p. 102:18-23.

127.    FBTS utilizes an internal approval process to determine whether to take on the role of transactional trustee.  5/27/16 Transcript (K. Serbin), p. 104:12-25.

128.    Prior to being retained, and before any diligence commences, FBTS has to go through two approval processes with its EB Committee, including the selection of financial and legal advisors and a discussion of details about the company.  7/6/16 Transcript (M. Ash), p. 103:6-104:17.

129.    When analyzing whether to accept an engagement as an ESOP trustee, FBTS reviews various aspects of the selling company, including the industry in which the company is involved, lines of business, the location, management, and basic financial information.  5/26/16 Transcript (B. Ippensen), p. 135:20-136:6.

130.    FBTS' practice was to analyze its prospective role with respect to the ESOP when determining whether to accept an ESOP trustee engagement.  5/26/16 Transcript (B. Ippensen), p. 135:20-136:10.

131.    FBTS would not accept an ESOP trustee engagement if it determines that that the company involved is not suitable.  5/26/16 Transcript (B. Ippensen), p. 137:1-5.

132.    After FBTS has been appointed as trustee, it assigns a team to work directly on a transaction and to work and consult with the members of the EB Committee in ultimately approving or rejecting the transaction.  5/27/16 Transcript (K. Cory), p. 104: 12-25.

133.    Cory and Ash were the two team members working directly on the SJP Transaction.  5/27/16 Transcript (K. Cory), p. 105:1-14.

134.    Ash was the FBTS representative first contacted by a third party regarding whether FBTS was interested in serving as a transactional trustee for the SJP Transaction.  5/27/16 Transcript (K. Cory), p. 105:8-14.

135.    Prior to issuing its engagement letter on November 15, 2006, Ash presented financial information on SJP to the EB Committee.  5/26/16 Transcript (B. Ippensen), p. 37:21-39:8.

136.    Prior to November 15, 2006, Ash and Ippensen discussed the selection of professional advisors for the proposed transaction and determined that it would engage SFE & G as legal counsel and Prairie Capital as a valuation advisor.  5/26/16 Transcript (B. Ippensen), p. 143:14-144:2.

## C.    FBTS And Its Advisors Attended A Due Diligence Meeting at SJP on November 15, 2006

137.    On November 15, 2006, a due diligence meeting took place at SJP, and present at which were: Ash from FBTS; Di Pano, D'Espositio and Dugan of SJP; Peter Aliferis of Prairie Capital; Steve Greenapple of SFE & G; John Miscione of Duff & Phelps; Steve Etkind of Sadis & Goldberg and Alvin Cheslow of Drescher & Cheslow.  5/23/16 Transcript (V. Di Pano), p. 53:5-12.

138.    The meeting was held so that, among other things, FBTS could learn about SJP and determine whether it would be interested in serving as a trustee for the proposed transaction. 5/26/16 Transcript (B. Ippensen), p. 8:12-18.

139.    The topics discussed at the meeting included SJP's historical trend analysis, SJP's business as a whole, the industry, competitive advantages and disadvantages in the marketplace, strategy, and financial projections.  5/24/16 Transcript (M. D'Esposito), p. 31:4-8; 6/29/16 Transcript (P. Aliferis), p. 113:20-114:8.

140.    SJP provided information regarding its reputation, its competitive advantages, its relationship with its customers, and its plans to expand into different regions.  6/29/16 Transcript (P. Aliferis), p. 47:7-22.

141.    FBTS had the opportunity at the meeting to interview and ask questions of SJP management.  5/25/16 Transcript (J. Miscione), p. 45:19-21; 6/29/16 Transcript (P. Aliferis), p. 114:9-11.

142.    FBTS was provided with SJP's historical financial information at the meeting. 5/24/16 Transcript (M. D'Esposito), p. 39:11-22.

143.    In addition, on November 14, 2006, Lee of Duff & Phelps emailed Aliferis SJP financial statements for the years 2002 to 2005, as well as a 2006 pro forma, which allowed Aliferis the opportunity to ask questions about the financials at the meeting.  FBTS Ex. 2; 7/6/16 Transcript (M. Ash), p. 105:7-10.

144.    The November 15 2006 meeting included a tour of SJP's facility, where the attendees observed SJP's equipment and facilities firsthand.  5/23/16 Transcript (F. Dugan), p. 139:8-12; 7/6/16 Transcript (M. Ash), p. 105:11-15.

145.    The meeting included a discussion about customer concentration with Hovnanian and an exploration as to what it meant to SJP, and it was understood that Prairie would analyze and address the issue of customer concentration in its report.  7/6/16 Transcript (M. Ash), p. 105:17-106:7.

146.    The meeting also included a discussion about SJP's plans for expansion and diversification, both in the types of work it did and geographically.  7/6/16 Transcript (M. Ash), p. 106:8-14.

147.    Ash testified that she evaluated company management at the meeting and judged them to be a good, cohesive management team.  7/6/16 Transcript (M. Ash), p. 106:15-107:5.

148.    FBTS relied on Ash to make this evaluation due to her experience assessing people as part of her job function.  7/6/16 Transcript (M. Ash), p. 107:6-14.

149.    After the meeting, Ash gave a presentation to FBTS about what she learned at the meeting about SJP and the proposed transaction.  5/26/16 Transcript (B. Ippensen), p. 9:22-25; 137:10-18.

150.     Ash regularly met with company management for proposed ESOP transactions and reported back to the EB Committee.  5/26/16 Transcript (B. Ippensen), p. 137:16-22.

**D.     SFE & G Conducted Legal Due Diligence On Behalf of FBTS**

151.     On February 7, 2007, SFE & G sent Dugan an email request for information and due diligence checklist which the law firm needed "in order for us to conduct our due diligence for the trustee."  Joint Ex. 13, p. 1; 5/23/16 Transcript (F. Dugan), p. 188: 13-17.

152.     Ash of FBTS was copied on the February 7, 2007 email.  Joint Ex. 13, p. 1.

153.     The due diligence checklist was 4 pages long and requested information and documents relating to corporate organization, business activities, employee benefit plans, and litigation and claims.  Joint Ex. 13, p. 2-5.

154.     Dugan testified that he has no reason to believe that SFE & G did not receive all requested information and documents; to the extent such information and documents were available.  5/23/16 Transcript (F. Dugan), p. 188: 18-21.

155.     FBTS' counsel sends a legal due diligence list to the seller, reviews the information and identifies areas of concern or relevance to the transaction, and then advises FBTS as to their findings.  5/25/16 Transcript (K. Cory), p. 168:22-169:16.

156.     Ash had multiple conversations with Greenapple about due diligence in order to ensure that he was receiving all of the due diligence items he asked for so that he could provide his legal opinion.  7/6/16 Transcript (M. Ash), p. 110:8-14.

157.     Ash had conversations with SFE & G during the months of February and March, 2007, regarding its due diligence and to ensure that there were no issues that needed to be resolved.  7/6/16 Transcript (M. Ash), p. 113:9-22.

158.     FBTS relied on SFE & G to review documents produced in response to its due diligence request to SJP.  5/26/16 Transcript (B. Ippensen), p. 167:9-21.

159.     During the due diligence process of an ESOP transaction, FBTS discusses its questions about the transaction to its legal counsel, who then communicates with the seller's counsel.  5/25/16 Transcript (K. Cory), p. 124:10-19.

160.     After performing its legal due diligence, SFE & G produced a legal opinion letter, in which it analyzed the proposed transaction and determined it was not a prohibited transaction under ERISA.  FBTS Ex. 13; 5/26/16 Transcript (B. Ippensen), p. 174:16-175:11.

161.     SFE & G completed the legal due diligence for the Transaction and felt satisfied with their findings prior to completing its opinion letter.  5/26/16 Transcript (B. Ippensen), p. 176:2-10.

162.    If SFE & G reviewed a document that could have a financial impact on the Transaction, then they would have reported it to FBTS.  5/27/16 Transcript (B. Ippensen), p. 30:15-31:1.

E.    **Prairie Capital Was A Qualified Valuation Advisor**

163.    At the time of the Transaction, Aliferis was employed at Prairie Capital as the Vice President of Corporate Finance.  6/29/16 Transcript (P. Aliferis), p. 4:9-13.

164.    At the time of the Transaction, Prairie Capital, among other things, performed valuations of closely-held companies.  6/29/16 Transcript (P. Aliferis), p. 4:14-19.

165.    Aliferis led the Prairie Capital team working on the SJP valuation.  6/29/16 Transcript (P. Aliferis), p. 5:7-10.

166.    Aliferis had previously performed one to two valuations for FBTS prior to the SJP Transaction.  6/29/16 Transcript (P. Aliferis), p. 6:1-3; 110:16-1

167.    Prairie Capital takes a "holistic view" of valuing a company, conducting due diligence on the company, its operations, financial performance, historical trend analysis, backlog, industry, competitors, and marketplace.  6/29/16 Transcript (P. Aliferis), p. 9:20-10:7.

168.    Aliferis testified that in order to do its job, Prairie Capital needed to ensure it had the most up-to-date information about SJP and to ask appropriate questions of the key members of management.  6/29/16 Transcript (P. Aliferis), p. 138:11-22.

169.    Prairie Capital's review included a variety of data points, such as SJP's revenue, profitability, working capital, and discount rates.  6/29/16 Transcript (P. Aliferis), p. 122:19-123:7.

170.    Prairie Capital also developed its own models in order to fully analyze the proposed transaction structure to determine the impact the transaction has on the company, understanding cash flow coverage, financing structure, and employee benefits aspects.  6/30/16 Transcript (R. Gross), p. 43:19-44:17.

171.    Part of Prairie Capital's practice is to engage in ongoing discussions with key members of the company management.  6/29/16 Transcript (P. Aliferis), p. 12:18-23.

172.    Prairie Capital conducted independent due diligence on the conclusions set forth in the Confidential Information Memorandum.  6/29/16 Transcript (P. Aliferis), p. 50:1-10.

F.    **Prairie Capital Conducted Due Diligence, Including Attending an Additional Meeting with SJP on March 12, 2007**

173.    Following the November 15, 2006 meeting, Prairie Capital commenced its long-term due diligence process.  6/29/16 Transcript (P. Aliferis), p. 113:20-114:8.

174.    Prairie understood that its role was as financial advisor to the ESOP trustee, which involved "the determination of value, so that there can be a measurement of the transaction valuation versus current value and that addresses the question of adequate consideration under ERISA," as well as "looking through the eyes of the ESOP trustee to provide them information that helps them determine whether it's prudent to proceed with the transaction."  6/30/16 Transcript (R. Gross), p. 27:3-13.

175.    Prairie began its analysis in November, 2006, with a fair amount of interchange and analysis from that point forward.  6/30/16 Transcript (R. Gross), p. 27:22-28:11.

176.    During its due diligence process, Prairie Capital asked questions of Duff & Phelps, SJP's financial advisor, as well as SJP management.  6/29/16 Transcript (P. Aliferis), p. 115:2-8.

177.    Prairie Capital also had discussions regarding the basis of the valuation and the transaction taken as a whole with FBTS and its counsel.  6/29/16 Transcript (P. Aliferis), p. 115:8-11.

178.    Prairie Capital worked on its analyses during this time, discussing all of the nuances of the Transaction.  6/29/16 Transcript (P. Aliferis), p. 115:11-14.

179.    Prairie Capital had discussions with SJP management in order to assure itself that it was performing a professional job in the creation of the valuation report.  6/29/16 Transcript (P. Aliferis), p. 115:22-116:4.

180.    Prairie Capital's discussions with FBTS were mostly between Aliferis, for Prairie Capital, and Kjersti Cory and Merri Ash, for FBTS.  6/29/16 Transcript (P. Aliferis), p. 116:10-16.

181.    In addition to the November 15, 2006 meeting, Aliferis met with SJP again on March 12, 2007 at SJP's offices.  6/29/16 Transcript (P. Aliferis), p. 42:20-23, 43:18-20.

182.    Aliferis recalls visiting three to four of SJP's work sites to see the different services they offered.  6/29/16 Transcript (P. Aliferis), p. 43:21-44:6.

183.    Robert Gross of Prairie Capital testified that Prairie Capital followed the appropriate processes and met the standards that he considered to be appropriate with regard to working on ESOP transactions.  6/30/16 Transcript (R. Gross), p. 31:15-18.

184.    Gross testified that Prairie followed its procedures, gave itself enough time do to the analysis, conducted the analysis, prepared a report and fairness opinion, and had the appropriate sorts of meetings with the ESOP fiduciaries in advance of closing, and delivered timely and credible analysis. 6/30/16 Transcript (R. Gross), p. 31:21-32:1.

G.    **Prairie Capital Requested Information from SJP and Duff & Phelps**

185.    It is typical in ESOP transactions that valuation companies get information relating to the company from the company itself.   6/21/16 Transcript (S. Fischer), p. 42:18-23.

16

186.     Initially, Dugan and D'Esposito provided information about SJP to the Trustee via Duff & Phelps.  Subsequently, Dugan and D'Esposito began to communicate directly with the Trustee and Prairie Capital.  5/23/16 Transcript (V. Di Pano), p. 42:7-19.

187.     Dugan provided information regarding contracts, backlog, customer information, and field operations.  5/23/16 Transcript (V. Di Pano), p. 78:21-79:3.

188.     Dugan also provided information regarding the backlog and SJP customers. 5/23/16 Transcript (F. Dugan), p. 149:17-150.

189.     It was Prairie's typical practice to not independently audit non-financial information, such as information about contracts, facilities and equipment, received from a company, but to not consider that information if it believes it to be incorrect.  6/30/16 Transcript (R. Gross), p. 24:13-25:13.

190.     D'Esposito provided financial information.  5/23/16 Transcript (V. Di Pano), p. 78:21-79:4.

191.     D'Esposito spent a significant amount of time pulling together the information and documents requested by SFE & G on February 7, 2007.  Joint Ex. 13; 5/24/16 Transcript (M. D'Esposito), p. 40:10-43:4.

192.     On March 16, 2007, Aliferis requested additional information from D'Esposito, including, but not limited to, information regarding SJP's top ten customers in terms of overall revenue for December 31, 2006; updated backlog and revenue recognition, names and estimated revenues associated with the then current top 5 to 7 job bids; an updated staffing matrix for the fiscal year ended 2006; and the composition of revenues for SJP Contractors, National Crushing, and Dyna-Tec.  FBTS Ex. 32.

193.     Aliferis testified that he sent the March 16 email because in addition to reviewing the Confidential Information Memorandum, Prairie Capital needed to do independent due diligence and ask additional questions that would provide more support to the Valuation Report. 6/29/16 Transcript (P. Aliferis), p. 138:1-10.

194.     Aliferis also spoke with SJP management about backlog to confirm that the statements concerning backlog in the Confidential Information Memorandum were correct. 6/29/16 Transcript (P. Aliferis), p. 64:6-10.

195.     In addition, Aliferis spoke with SJP management about their profit margins on typical jobs.  6/29/16 Transcript (P. Aliferis), p. 70:9-14.

196.     The Confidential Information Memorandum was incorporated as part of Prairie's analysis, although Prairie did not accept it blindly, and instead viewed it with a healthy degree of skepticism.  6/30/16 Transcript (R. Gross), p. 43:4-18.

197.     On March 28, 2007, D'Esposito sent an email to Aliferis, copying *inter alia*, Miscione, a representative of First American Bank, and Daniel Christoffel of Duff & Phelps, attaching the draft audited combined financial statements for the period ending December 31,

2006 prepared by the Curchin Group.  FBTS Ex. 34; 5/24/16 Transcript (M. D'Esposito), p. 30:2-5.

198.    In the March 28 email, D'Esposito informed Prairie Capital that SJP exceeded its projected EBITDA for 2006 of $9.5 million with an adjusted EBITDA for 2006 of $11 million. FBTS Ex. 34; 5/24/16 Transcript (M. D'Esposito), p. 51:12-25.

199.    As illustrated by Prairie Capital's communications with SJP management, Prairie Capital does make efforts to verify the financial information presented to it.  6/29/16 Transcript (P. Aliferis), p. 115:22-116:4.

200.    Prairie Capital asked for information regarding the operational overview of SJP and the different services offered by SJP in the market.  6/29/16 Transcript (P. Aliferis), p. 119:7-15.

201.    Prairie Capital also wanted to see historical audited financial statements, as well as information relating to backlog, customers, suppliers, and year-to-date financial information. 6/29/16 Transcript (P. Aliferis), p. 119:7-20.

202.    Finally, Prairie Capital wanted to understand SJP's view of the marketplace and SJP's expectations regarding its operations going forward.  6/29/16 Transcript (P. Aliferis), p. 119:7-24.

203.    SJP provided all of the information that Prairie Capital requested.  6/29/16 Transcript (P. Aliferis), p. 119:25-120:1.

204.    At no time did SJP fail to provide any information that was requested from it relating to the Transaction.  5/24/16 Transcript (M. D'Esposito), p. 29:4-8.

205.    At no time did any party claim that SJP did not provide information that was requested.  5/24/16 Transcript (M. D'Esposito), p. 29:9-12.

206.    Plaintiff's damages expert, Dana Messina, acknowledged that he was unaware of any failure on the part of SJP or Mr. Di Pano to disclosure any information that was material to the valuation of SJP.  7/14/16 Transcript (D. Messina), p. 165:25-166:4.

207.    Ash and Cory had multiple conversations with Aliferis to ensure that he was getting all of the information he needed from SJP.  7/6/16 Transcript (M. Ash), p. 109:23-110:2.

208.    At no time did any party claim that the historical information set forth in the independently verified accounting statements prepared by the Curchin Group was incorrect. 5/24/16 Transcript (M. D'Esposito), p. 29:13-18.

209.    Melanie Munoz, a senior investigator at the United States Department of Labor Employee Benefits Administration, testified that she has no reason to believe that SJP's historical financial information was incorrect and, in fact, believes the information was accurate. 5/24/16 Transcript (M. Munoz), p. 124:23-125:6.

210.     Ms. Munoz testified that she does not believe any of the historical information for SJP provided in response to the DOL's subpoenas was inaccurate and, in fact, her finding was that SJP's historical financial information was absolutely accurate.  5/24/16 Transcript (M. Munoz), p. 124:23-125:6.

211.     FBTS expected Prairie Capital to review the financial information provided to it by SJP and Duff & Phelps.  5/26/16 Transcript (B. Ippensen), p. 34:9-17.

212.     FBTS was assured that Prairie Capital received accurate information from SJP because the information largely came in the form of audited financial statements.  5/26/16 Transcript (B. Ippensen), p. 35:14-24.

213.     Prairie received and reviewed internally-prepared SJP financial statements for the months of January and February, 2007, but did not receive statements for information from March, 2007 through the date of closing (April 16, 2007) because it was not Prairie's normal practice to do so, since they would not be available in such a short period of time.  6/30/16 Transcript (R. Gross), p. 39:22-41:7.

214.     Aliferis testified that the due diligence process was "collaborative" and that he was in contact with SJP, FBTS and Duff & Phelps throughout the process.  6/29/16 Transcript (P. Aliferis), p. 140:14-141:1.

215.     Aliferis further testified that Prairie Capital made a point of providing all information it received to FBTS and copying FBTS on all relevant correspondence, so at the time of Prairie Capital's presentation to FBTS, FBTS was not seeing information about the Transaction for the first time.  6/29/16 Transcript (P. Aliferis), p. 143:3-13.

216.     In addition, Aliferis testified that he followed up with key members of management throughout the process to make sure that nothing had changed with regard to the overall operations of the business.  6/29/16 Transcript (P. Aliferis), p. 158:6-12.

## H.     Prairie Capital Provided Financial Projections to SJP To Confirm Their Reasonableness

217.     By email dated March 24, 2007, Aliferis sent D'Esposito and Miscione the preliminary projections that were utilized by Prairie for the valuation of the common stock of SJP.  FBTS Ex. 9.

218.     The March 24 email requested that D'Esposito "review the enclosed analysis and verify the comments" so that Prairie Capital could move forward with its valuation report.  FBTS Ex. 9.

219.     Aliferis testified that he sent the March 24 email so that SJP management and Duff & Phelps could review the projections that Prairie Capital was using.  6/29/16 Transcript (P. Aliferis), p. 139:21-140:2; FBTS Ex. 9.

220.    In order to verify the projections, Prairie Capital reviewed updated financial information for SJP and engaged in continuing conversations with SJP's management and Duff & Phelps.  6/29/16 Transcript (P. Aliferis), p. 79:20-25.

221.    Aliferis testified that it was important for SJP management to review the projections to ensure that they are consistent with the company's operations.  6/29/16 Transcript (P. Aliferis), p. 140:3-13.

222.    After speaking with the company, Prairie Capital determined that SJP's projections were backed up, in part, by strong backlog and continued bids for work.  6/29/16 Transcript (P. Aliferis), p. 106:18-107:1.

I.    **FBTS Held a Meeting on March 29, 2007 To Discuss The Transaction**

223.    On March 29, 2007, FBTS conducted a conference call to discuss the Transaction. FBTS Ex. 11.

224.    The meeting attendees were EB Committee members Cory and Ash, as well as FBTS' legal counsel, Steve Greenapple and Margaret Steere.  FBTS Ex. 11, D00080.

225.    Cory took notes from the March 29, 2007 meeting.  FBTS Ex. 11, D00080-81; 5/25/16 Transcript (K. Cory), p. 126:15-127:6.

226.    As the meeting notes evidence, the meeting attendees discussed the stock appreciation rights' post-transaction value as set forth in the Stock Purchase Agreement.  FBTS Ex. 11, D00080; 5/25/16 Transcript (K. Cory), p. 128:4-25.

227.    During the meeting, Cory asked questions about the Stock Purchase Agreement as part of FBTS' fiduciary obligations to the ESOP beneficiaries.  5/25/16 Transcript (K. Cory), p. 129: 7-13.

228.    As demonstrated by the meeting notes, FBTS was asking questions regarding the indemnification provision in the Stock Purchase Agreement and noted that the indemnification should come from the seller, the party receiving the money, not the company.  FBTS Ex. 11, D00080; 5/25/16 Transcript (K. Cory), p. 130: 6-16.

229.    The meeting notes indicate that Steve Greenapple requested a revision to the indemnification provision.  FBTS Ex. 11, D00080

230.    The terms of indemnification were a point of negotiation for FBTS, which the parties needed to complete prior to closing the Transaction.  FBTS Ex. 11, D00080; 5/25/16 Transcript (K. Cory), p. 130: 6-21.

**J.      Cory Discussed the Draft Valuation Report with Aliferis Prior to the Meeting on April 13, 2007**

231.    Aliferis and Cory had a telephone conversation in which they discussed a draft of the Valuation Report prior to meeting of the EB Committee on April 13, 2007.  6/29/16 Transcript (P. Aliferis), p. 94:13-21.

232.    During this telephone conversation, Cory took notes entitled "SJP Transaction Questions."  FBTS Ex. 12, D00082.

233.    The notes were taken by Cory prior to the EB Committee's vote on the Transaction on April 13, 2007.  5/25/16 Transcript (K. Cory), p. 167:7-11.

234.    The notes were taken by Cory prior to the vote to allow Cory to identify issues to discuss with the EB Committee.  FBTS Ex. 12; 5/26/16 Transcript (B. Ippensen), p. 178:14-20.

235.    During the course of writing the "SJP Transaction Questions," Cory was asking Aliferis questions about the Transaction.  5/26/16 Transcript (B. Ippensen), p. 179:7-18.

236.    These notes represented a summary of handwritten notes that Cory made on a draft of the Valuation Report and contain page number references to the Valuation Report.  FBTS Ex. 12, D00082; 5/25/16 Transcript (K. Cory), p. 141: 9-17, 142:1-14.

237.    Cory testified that she put note summaries together because it was easier to review than flipping through every page of a valuation report to determine what her questions were.  5/25/16 Transcript (K. Cory), p. 141:18-25.

238.    The notes show that Cory reviewed the entire report (which was 97 pages including exhibits), through the feasibility analysis which comes at the end of the report.  FBTS Ex. 12, D00082; 5/25/16 Transcript (K. Cory), p. 142: 8-17.

239.    Cory's notes reflect that she took reasonable steps to assure herself and to verify that Prairie Capital's conclusions in the Valuation Report were correct.  FBTS Ex. 12, D00082; 5/25/16 Transcript (K. Cory), p. 146: 10-13, 147:3-6, p. 167:3-6.

240.    The notes show that Cory included the initials "PA" in her notes on backlog (page 10) and testified that she discussed backlog with Aliferis, mutually concluding that given the $60 million of backlog for SJP going into 2007, the projections were somewhat conservative. FBTS Ex. 12, D00082; 5/25/16 Transcript (K. Cory), p. 142: 21-143:23.

241.    Given the significant backlog and growth in backlog over 2005 and 2006, Cory concluded that SJP could have done even better than the projected zero percent revenue growth.  5/25/16 Transcript (K. Cory), p. 164:23-165:9.

242.    The notes show that Cory wrote initials "PA" in her notes on employee relations (page 12) and testified that she discussed with Aliferis which employees would be participating in the ESOP, as it would affect benefit levels.  FBTS Ex. 12, D00082; 5/25/16 Transcript (K. Cory), p. 144:6-18.

243.   The notes demonstrate that Cory wanted to have an understanding of projected revenues and assumed growth going forward of 4 to 5 percent in the forecast.  FBTS Ex. 12, D00082; 5/25/16 Transcript (K. Cory), p. 144:22-145:11.

244.   The notes also demonstrate that Cory analyzed an increase in SJP's gross margin due to its use of the mobile rock crushing equipment and the competitive advantage it gave them in terms of efficiency.  FBTS Ex. 12, D00082; 5/25/16 Transcript (K. Cory), p. 145:15-146:9.

245.   Cory also reviewed SJP's liquidity ratio (page 32 of the draft Valuation Report), which she described as the company's debt capacity or ability to pay its bills on time, and determined that it was good.  FBTS Ex. 12, D00082; 5/25/16 Transcript (K. Cory), p. 146: 14-20.

246.   Cory reviewed the liquidity ratio because it is a factor that affects the ESOP beneficiaries.  FBTS Ex. 12, D00082; 5/25/16 Transcript (K. Cory), z p. 146: 21-147:2.

247.   The notes further show that Cory reasonably assured herself that Prairie Capital correctly chose a capital asset pricing model when selecting a discount rate (page 53 of the draft Valuation Report) and Cory testified that FBTS is always "curious" as to where inputs are derived from and why a certain methodology is chosen.  FBTS Ex. 12, D00082; 5/25/16 Transcript (K. Cory), p. 147:7-25.

248.   On page 30 of the draft Valuation Report attached to Cory's summary notes, she underlined "a substantial increase over the prior year" with respect to Prairie Capital's analysis of gross profits.  Cory underlined this because an increase in gross profit margin is a factor in FBTS' analysis.  FBTS Ex. 12, p. 30; 5/25/16 Transcript (K. Cory), p. 166:11-23.

249.   Cory reviewed and felt comfortable with the projections for SJP and believed they were reasonable.  FBTS Ex. 12, D00082; 5/25/16 Transcript (K. Cory), p. 145:12-14.

## K.   FBTS Received a Draft Valuation Report on April 11, 2007

250.   Aliferis sent a draft Valuation Report to Cory on April 11, 2007.  Joint Ex. 9.

251.   Prairie Capital spent approximately two and a half to three months drafting the Valuation Report.  6/29/16 Transcript (P. Aliferis), p. 136:11-16.

252.   The EB Committee typically receives a draft valuation report a few days before the transaction is tentatively set to close.  5/27/16 Transcript (K. Serbin), p. 133:12-16.

253.   Aliferis confirmed that it was his practice to send a draft valuation report to a specific individual at FBTS, who would review it prior to sending the draft to the rest of the team at FBTS.  6/29/16 Transcript (P. Aliferis), p. 6:11-19; 95:1-14.

254.   Prairie would send the draft report, which contained as much information as was available at the time, prior to the transaction closing for review and preparation prior to the fiduciary meeting where the transaction was discussed so that any comments or other items that

arose from that meeting could be included in a final report.  6/30/16 Transcript (R. Gross), p. 36:13-38:5.

255.    FBTS had an obligation to review and to understand the Valuation Report. 5/26/16 Transcript (B. Ippensen), p. 145:21-23.

256.    Ippensen reviewed the entirety of the draft Valuation Report.  5/26/16 Transcript (B. Ippensen), p. 133:19-134:5.

257.    In addition, Ippenen performed his own "capitalized cash flow" calculation of market valuation using historical information as a "gut check."  5/27/16 Transcript (B. Ippensen), p. 13:18-14:19.

258.    Serbin thoroughly read and reviewed the draft Valuation Report prior to the meeting on April 13, 2007, at which she voted to approve the Transaction.  5/27/16 Transcript (K. Serbin), p. 106:12-107:21.

259.    Serbin testified that it was the EB Committee's job to thoroughly review the Valuation Report, be prepared to ask questions and, if necessary, challenge the information that has been provided to it.  5/27/16 Transcript (K. Serbin), p. 107:8-18.

260.    When reviewing a valuation report, FBTS evaluates several key areas, including but not limited to:

    a.    management team of the company;

    b.    the board of directors and corporate governance;

    c.    whether there are employment agreements in place;

    d.    backlog and related background information;

    e.    the company's industry;

    f.    the company's relationship with its customers;

    g.    the company's relationship with its suppliers;

    h.    financial statements; and

    i.    financial projections.

5/27/16 Transcript (K. Serbin), p. 113:9-115:6.

261.    If the EB Committee determines that the Valuation Report needs to be revised, it either a) requests that the information be provided and waits for it prior to voting or b) asks their professional advisors to provide additional detail as to the requested information and asks that it be included in the report when available.  5/27/16 Transcript (K. Serbin), p. 130:15-131:23.

262.    The valuation report must contain sufficient content about the proposed transaction or FBTS will reject it.  5/26/16 Transcript (B. Ippensen), p. 185:13-19.

263.    In addition, the EB Committee would not vote to approve or reject a Transaction if it had insufficient time to review the relevant information.  5/27/16 Transcript (K. Serbin), p. 156:2-10.

264.    If the EB Committee had needed additional time to review a valuation report or to ask questions about the report, the vote would have been adjourned to a later time.  5/27/16 Transcript (K. Serbin), p. 111:21-112:1; 156:2-10.

265.    When Ippensen reviewed the draft Valuation Report, he did so to ensure that Prairie Capital's due diligence procedures, as set forth on page 6, comported with IRS Ruling 59-60.  Joint Ex. 9, p. 6; 5/26/16 Transcript (B. Ippensen), p. 184:6-20.

266.    The fact that Prairie Capital had reviewed the audited financial statements completed by the Curchin Group gave FBTS greater assurance regarding the accuracy of the financial information in the valuation report.  Joint Ex. 9, p. 4; 5/26/16 Transcript (B. Ippensen), p. 181:9-182:8.

267.    It is typical to have a draft valuation report dated as of the transaction closing and a final report generated after the date of closing in order to allow for the final report to accurately reflect the valuation on the closing date.  6/21/16 Transcript (S. Fischer), pp. 62:4-63:12.

268.    Prior to the transaction closing on April 16, 2007, Aliferis had numerous discussions with SJP's management regasrding SJP's performance for the time period from January 1 through April 16, 2007.  6/29/16 Transcript (P. Aliferis), p. 193:9-17.

269.    Handwritten notes taken by Aliferis reflect information received from SJP's management on or before the closing date of the transaction, including information on the impact of the weather and SJP having $45 million of work remaining to complete in 2007, which was communicated to FBTS before the transaction closed.  Plaintiff Ex. 36; 6/29/16 Transcript (P. Aliferis), p. 158:13-159:23.

270.    Aliferis was also given information about SJP's efforts to keep more work in-house, rather than subcontracting it out, which would result in higher profit margins.  6/29/16 Transcript (P. Aliferis), p. 160:13-19.

271.    Aliferis' communications with SJP's management prior to the closing of the transaction confirmed his belief that SJP could realize the revenue projections set forth in Prairie Capital's valuation report.  6/29/16 Transcript (P. Aliferis), p. 161:8-12.

## L.    **FBTS Held a Meeting on April 13, 2007 To Discuss The Transaction**

272.    FBTS conducted a conference call on April 13, 2007, where presentations were given by its advisors, Aliferis and Greenapple, about the valuation report and legal due diligence, respectively.  5/25/16 Transcript (K. Cory), p. 105:4-8; 7/6/16 Transcript (M. Ash), p. 115:7-21.

273.    Cory took notes during the meeting on April 13, 2007.  Joint Ex. 12; 5/25/16 Transcript (K. Cory), p. 102:17-103:11.

274.    The meeting attendees included EB Committee members Ash, Serbin, and Cory, as well as Greenapple and Aliferis.  Joint Ex. 12.

275.    Even though Ippensen did not attend the meeting on April 13, 2007, he reviewed the information prior to the meeting and had conversations with the legal and financial advisors such that he could give his approval vote for the Transaction.  5/27/16 Transcript (K. Serbin), p. 148:8-15.

276.    FBTS' standard practice is to review the Valuation Report on a page by page basis.  5/26/16 Transcript (B. Ippensen), p. 114:25-115:5.

277.    Prior to making a decision about whether to approve a proposed transaction, FBTS will review and understand the conclusions of its legal and valuation advisors and reconcile their advisors' conclusions with the information FBTS knows about the transaction. 5/26/16 Transcript (B. Ippensen), p. 146:1-13.

278.    EB Committee members asked questions during the April 13, 2007 meeting. Joint Ex. 12; 5/25/16 Transcript (K. Cory), p. 125:21-126:4.

279.    As evidenced from the written meeting notes, the attendees discussed a number of topics related to the Transaction including, but not limited to:

        a.       SJP's vertical integration and competitive edge in being able to repurpose pavement from job sites;

        b.       Post-transaction director positions;

        c.       A collective bargaining agreement to which SJP was a party;

        d.       An OSHA exam;

        e.       Company management's focus and enthusiasm about SJP and the proposed transaction;

        f.       SJP's bid rate; and

        g.       SJP's succession planning.

Joint Ex. 12.

280.    The meeting notes also show that Aliferis informed the EB Committee members that he had reviewed SJP's financials as of February 28, 2007 and that he would review the March 31, 2007 numbers to finalize the valuation report.  Joint Ex. 12.

281.    Not all topics discussed during the meeting were included in the meeting notes. 5/27/16 Transcript (K. Serbin), p. 109:3-18; 6/29/16 Transcript (P. Aliferis), p. 163:12-15.

282.     Serbin testified that there were additional issues discussed with respect to the Transaction during the April 13, 2007 meeting that were not captured in the meeting notes. 5/27/16 Transcript (K. Serbin), p. 110:21-111:8.

283.     Aliferis walked the EB Committee through Prairie's valuation report, helping it understand how it arrived at its valuation and conclusion that the SJP ESOP was paying less than fair market value for the shares of SJP, and taking the time to go through the pertinent pages of the report.  7/6/16 Transcript (M. Ash), p. 118:10-119:1.

284.     Serbin specifically recalled the EB Committee asking Aliferis to go through a page by page presentation of the Valuation Report, with the EB Committee having the opportunity to ask questions throughout the process, a fact that was uncontroverted at trial. 5/27/16 Transcript (K. Serbin), p. 110:4-20.

285.     Although there was some information relating to the industry that was not included in the draft Valuation Report, Aliferis walked the EB Committee through the information orally, which the EB Committee relied upon during their evaluation of the Valuation Report.  5/27/16 Transcript (K. Serbin), p. 132:8-16.

286.     Aliferis further informed the EB Committee that there were no "substantial changes," referring to the financials between February 28, 2007 and what he had been advised verbally by SJP for March 31, 2007, and that the company still stood in a position to realize its revenue projections for 2007 and beyond.  Joint Ex. 12; 5/25/16 Transcript (K. Cory), p. 123:10-16; 6/29/16 Transcript (P. Aliferis), p. 162:11-163:2.

287.     Cory understood SJP to be cyclical and would not deem it to be a "substantial change" if SJP's revenues went down in the winter months.  5/25/16 Transcript (K. Cory), p. 161:16-24, 162:25-163:3.

288.     Ash testified that she understood that Aliferis meant that there were no "substantial changes" to SJP's forecast.  7/6/16 Transcript (M. Ash), p. 123:20-124:4.

289.     Aliferis confirmed that FBTS asked Prairie Capital questions about whether the projections for SJP were reasonable.  FBTS Ex. 12; 6/29/16 Transcript (P. Aliferis), p. 146:2-7.

290.     Aliferis relayed all information he learned from company management about the company's financial performance for the first quarter of 2007, as well as the causes of that performance, to FBTS during the April 13, 2007 meeting.  6/29/16 Transcript (P. Aliferis), p. 201:13-20.

291.     Greenapple also made a presentation at the April 13, 2007 meeting, during which he reviewed his legal opinion and the due diligence he had completed, as well as discussed any problems that arose as a result of his diligence work.  7/6/16 Transcript (M. Ash), p. 122:18-123:2.

292.     Prior to the April 13, 2007 meeting, FBTS participated in numerous "back and forth" dialogues and conversations with Aliferis relating to the Transaction.  5/25/16 Transcript (K. Cory), p. 105:19-23; 6/29/16 Transcript (P. Aliferis), p. 95:1-14, p. 111:25 – 112:5.

26

293.    Prior to voting, Serbin reviewed the Projected Financial Statements in the Valuation Report, including the historical sales numbers, net income, EBITDA, company profits, projected revenue, projected net income and projected EBITDA margins.  5/27/16 Transcript (K. Serbin), p. 115:13-116:10; Joint Ex. 9, p. 79.

294.    Analyzing the Projected Financial Statements allowed FBTS to evaluate the risk involved in SJP's projections, an analysis that took place prior to the vote.  5/27/16 Transcript (K. Serbin), p. 116:11-22.

295.    The zero percent revenue growth in 2007 was one of the reasons Serbin felt comfortable voting to approve the Transaction.  5/27/16 Transcript (K. Serbin), p. 119:18-25.

296.    In addition, Serbin voted to approve of the Transaction as a result of the strength of the management team and the $58 million backlog, approximately 75% of which SJP would complete in 2007.  5/27/16 Transcript (K. Serbin), p. 120:1-6, 120:16-121:6.

297.    Serbin also reviewed the Valuation Report to determine whether Prairie Capital was using appropriate methodology to calculate the value of SJP and weighting the approaches correctly.  5/27/16 Transcript (K. Serbin), p. 122:2-16.

298.    In addition to the Valuation Report itself, Ippensen testified that he considered his independent knowledge and experience, as well as information he gained from reading and watching news, when voting to approve the Transaction.  5/27/16 Transcript (B. Ippensen), p. 89:4-90:14.

299.    Based on Ippensen's independent knowledge and experience, Ippensen understood that it was predicted that the economy would slow down during 2007, but that the economy would pick up after that.  5/27/16 Transcript (B. Ippensen), p. 90:11-14.

300.    Ippensen voted affirmatively to approve the Transaction.  5/27/16 Transcript (B. Ippensen), p. 22:23-23:1.

301.    Serbin testified that she recalled Ippensen had conversations with Ash and Prairie Capital before he voted to approve the Transaction.  5/27/16 Transcript (K. Serbin), p. 152:24-153:2.

302.    FBTS would not have approved the SJP transaction unless it read, understood and analyzed the valuation report prepared by Prairie Capital, and approved the transaction after it did so.  9/23/16 Transcript (K. Cory), p. 110:6-13.

303.    FBTS does not allow a transaction to close unless it has a financial fairness opinion, a legal opinion, and the EB understands the transaction and has fully vetted any problems.  7/6/16 Transcript (M. Ash), p. 126:2-14.

**M.**     **FBTS, Through Its Advisors, Negotiated Various Aspects of the Transaction**

304.    Stock appreciation rights ("SARs") are a form of incentive compensation given to company management, which change value over time in line with the value of company stock. 5/25/16 Transcript (J. Miscione), p. 54:23-55:5.

305.    SARs are an item that can be negotiated between the buyer and seller of stock. 5/25/16 Transcript (J. Miscione), p. 55:6-9.

306.    FBTS negotiated the SARs plan in terms of who would be participating and what the targets would be. 5/26/16 Transcript (B. Ippensen), p. 171:15-24, 5/27/16 Transcript (K. Serbin), p. 126:3-5.

307.    FBTS did not propose a counteroffer to the proposed $16 million purchase price for the stock in the Confidential Information Memorandum because FBTS' conclusion of fair market value was in excess of $16 million. Joint Ex. 1, p. 8; 5/26/16 Transcript (B. Ippensen), p. 116:20-117:20.

308.    FBTS also negotiated the indemnification provision and representations and warranties in the Stock Purchase Agreement. 5/26/16 Transcript (B. Ippensen), p. 171:15-22, 5/27/16 Transcript (K. Serbin), p. 125:17-126:3.

309.    FBTS also negotiated the ESOP interest rate on the ESOP loan, which the SJP Plan would be taking out from the company to make the stock purchase. 5/26/16 Transcript (B. Ippensen), p. 171:15-172:1.

310.    In addition, FBTS negotiated aspects of the employment agreements with Dugan and Di Pano, including compensation and non-compete and non-solicitation provisions. 5/27/16 Transcript (K. Serbin), p. 124:23-125:16.

311.    Di Pano continued at SJP post-transaction as secretary treasurer and a member of the board of directors. 5/23/16 Transcript (V. Di Pano), p. 79:25-80:5.

312.    FBTS also negotiated the number of board seats post-Transaction. 5/27/16 Transcript (K. Serbin), p. 125:17-126:3.

**N.**     **FBTS Reporting Requirements and Internal Audit Procedures**

313.    In addition to its own due diligence procedures, FBTS was subject to reporting requirements from the Illinois Department of Financial and Professional Regulation, a banking and trust regulator, as well as the Federal Reserve Board, a banking regulator. 5/26/16 Transcript (B. Ippensen), p. 132:1-10.

314.    In addition, FBTS was subject to internal audit procedures by its holding company. 5/26/16 Transcript (B. Ippensen), p. 146:22-147:8.

315.    The audit procedures randomly test FBTS' work with regard to ESOPs. 5/26/16 Transcript (B. Ippensen), p. 147:1-8.

316.    This is done to help ensure that FBTS has read and understood the information provided by financial and legal advisors, has reconciled that information with the information already known by FBTS, and has made a reasoned conclusion.  5/26/16 Transcript (B. Ippensen), p. 146:1-15.

## IV.    FBTS Took Reasonable Care To Ensure That Prairie Capital Received Complete and Accurate Information

317.    As seller, Di Pano executed a Stock Purchase Agreement (the "SPA"), along with Ash of FBTS, and Dugan of SJP dated April 16, 2007.  Joint Ex. 5, p. 5.

318.    The SPA set forth various terms and conditions relating to the sale of 38% of SJP's stock to the SJP Plan by Di Pano.  Joint Ex. 5.

319.    Paragraph 3.11 of the Stock Purchase Agreement between Di Pano and FBTS provides in relevant part as follows:

> All information, reports, financial statements, exhibits and schedules furnished or to be furnished by or on behalf of the Seller or the Company pursuant to the terms of this Agreement (the "Documents") are, to the knowledge of the Seller and the Company, accurate and complete in all material respects and do not and will not omit to state any material fact necessary in order to make the information furnished, in the light of the circumstances under which such information is furnished, not misleading, and are sufficient to provide a prospective ESOT of Company stock with appropriate information about the Company and its affairs. To the knowledge of the Seller and the Company, no information, report, financial statement, exhibit or schedule prepared or furnished by or on behalf of the Seller or the Company in connection with any of the transactions contemplated under this Agreement, the Documents, or included herein or therein, contained or contains as of the date prepared or furnished any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

Joint Ex. 5, p. 6 of 25.

320.    Paragraph 8.1 of the Stock Purchase Agreement between Di Pano and FBTS provides in relevant part as follows:

> Subject to the provisions of Section 8.2 below, the Seller shall indemnify the ESOT for any loss, cost, expense or other damage, including attorney's fees suffered by the ESOT ("Damages"), resulting from, arising out of or incurred with respect to any misrepresentation or breach of any representation, warranty or covenant made by the Seller or the Company herein.

Joint Ex. 5, p. 20 of 25.

29

321.    Di Pano also executed an agreement with Duff & Phelps (the "D & P Agreement") dated January 18, 2007, setting forth the terms and conditions of Duff & Phelps' retention by SJP.  FBTS Ex. 25.

322.    In the D & P Agreement, Di Pano affirmed that SJP:

> agrees to furnish, or use its best efforts to cause to be furnished, to D & P all reasonably requested data and information concerning SJP and all such other data, material and information as D &P shall reasonably request. [SJP] represents and warrants that all of the information furnished to D & P will be accurate and complete in all material respects and will not contain any untrue statement of a material fact or fail to state a material fact necessary to make the statements therein not misleading in light of the circumstances under which they are made.  [SJP] further warrants and represents that any projections provided by it to D & P have been prepared in good faith and are based upon assumptions that, in light of the circumstances under which they are made, are reasonable.

FBTS Ex. 25, D00486-87.

323.    Through this provision, Duff & Phelps was reasonably assured that the information provided to it by SJP was completely accurate.  5/25/16 Transcript (J. Miscione), p. 47:3-10.

324.    Plaintiff's proffered damages expert, Dana Messina, acknowledged that he was unaware of any information provided by SJP to Duff and Phelps that was misleading, inaccurate or erroneous.  7/14/16 Transcript (D. Messina), p. 163:22-164:8; 165:16-24.

325.    Melanie Munoz, a senior investigator at the United States Department of Labor Employee Benefits Administration, testified that she believed that SJP's historical financial information was accurate.  5/24/16 Transcript (M. Munoz), p. 96:24-96:7; p. 124:23-125:6.

326.    FBTS was aware of and understood the significance of the representations and warranties that stated that the seller could be held responsible if it provided any false financial information, but understood this provision to be added protection which did not obviate FBTS' fiduciary duties to the ESOP.  7/6/16 Transcript (M. Ash), p. 114:16-115:6.

## V.    FBTS Reasonably Relied Upon the Prairie Capital Valuation Report

327.    Prairie Capital's report contained the key components that are typical within the ESOP industry: a review of the transaction, a discussed of Prairie's background and experience, a discussion of the materials it reviewed, a discussion of SJP's historic financial data, a discussion of SJP's projections of future performance, and a discussion of how Prairie came up with its valuation, including the methodologies used, as well as a narrative about the company and the economy.  6/21/16 Transcript (S. Fischer), pp. 41:23-42:17.

A.     **SJP Growth Between 2005 and 2006**

328.   SJP experienced significant, positive revenue growth in the years 2005 and 2006.
*See* ¶ 29.

329.   SJP's growth in the years 2005 and 2006 coincided with Di Pano's assumption of
leadership of SJP.  5/24/16 Transcript (M. D'Esposito), p. 31:4-8.

330.   FBTS attributed SJP's growth in 2005 and 2006 to the change in management
structure.  5/27/16 Transcript (B. Ippensen, K. Serbin), p. 64:21-65:9; 118:6-11.

331.   SJP's estimated growth between 2005 and 2006 in terms of net revenues and
growth was 34.4% or $60,831,000.00.  Joint Ex. 1, p. 138.

332.   FBTS analyzed SJP's growth in 2005 and 2006 by customer, utilizing the Top 10
Customer Lists in the Confidential Information Memorandum.  Joint Ex. 1, p. 126-128; 5/26/16
Transcript (B. Ippensen), p. 87:22-88:4.

333.   FBTS also attributed the 2006 growth to SJP's bidding on larger projects and
moving into areas outside of New Jersey, such as New York.  5/27/16 Transcript (B. Ippensen),
p. 65:10-15.

334.   FBTS confirmed that SJP's project size was growing by reviewing the Top 10
Customer Lists in the Confidential Information Memorandum, which demonstrated that there
were increases in certain customer revenue year by year.  Joint Ex. 1, p. 126-129; 5/26/16
Transcript (B. Ippensen), p. 59:20-60:1.

B.     **SJP's Projected Growth in 2007 and Beyond**

335.   Despite SJP's 34.4% growth in 2006, Duff & Phelps conservatively projected the
company to make 0% growth in 2007.  Joint Ex. 1, p. 9 of 138.

336.   Duff & Phelps also modestly projected 4% growth in 2008, 6% growth in 2009,
8% growth in 2010, and 6% growth in 2011.  Joint Ex. 1, p. 9 of 138.

337.   D'Esposito testified that he expected SJP to do as well in 2007 as it had in 2006,
in part because of the "huge" amount of backlog on hand.  5/24/16 Transcript (M. D'Esposito),
p. 32:9-17.

338.   D'Esposito felt that the projections for 2007 and into the future were
conservative.  Dugan also provided information regarding the backlog and SJP customers.
5/24/16 Transcript (M. D'Esposito), p. 53:8-12.

339.   Ippensen reviewed the projections in the Valuation Report and felt "extremely
comfortable" with the projected 0% growth for 2007.  5/26/16 Transcript (B. Ippensen), p.
186:24-187:5.

340.    Ippensen testified that he "remember[ed] distinctly" when reviewing the projections seeing few other reports in his 16 years' experience that projected 0% growth the year following 34% growth.  5/26/16 Transcript (B. Ippensen), p. 186:24-187:8.

341.    Ippensen believed that the projections, which projected 0% growth for 2007 and then only modestly grew in the following years, were "extremely conservative."  5/26/16 Transcript (B. Ippensen), p. 186:24-187:11.

342.    Ippensen testified that when reviewing financial projections, the most recent historical financial information is the most relevant information.  5/27/16 Transcript (B. Ippensen), p. 15:17-19; Joint Ex. 9, p. 79.

343.    Ippensen felt comfortable with the historical financial information because it was audited.  5/27/16 Transcript (B. Ippensen), p. 20:16-21:5, 28:19-22.

344.    Ippensen did not feel that the financial projections contained in the Valuation Report were unrealistic for various reasons, including growth in SJP's revenue over the prior 5 years; projected zero percent growth for 2007; $58 million backlog going into 2007; $8.5 million of awarded bids for 2007; and outstanding bids for 2007 which SJP could also have been awarded.  5/27/16 Transcript (B. Ippensen), p. 16:2-19.

345.    Between 2006 and 2007, SJP did not experience any setbacks to its business operations, such as a change in management, change in equipment, decrease in backlog, loss of major projects, or the filing of any major lawsuits.   5/27/16 Transcript (B. Ippensen), p. 16:23-17:11.

346.    Di Pano continued to be employed by SJP after the Transaction, which was significant because FBTS attributed growth in 2005 and 2006 in part to his management. 5/24/16 Transcript (M. D'Esposito), p. 31:4-20.

347.    The financial projections in the Valuation Report increased SJP's Total Operating Expenses between 2006 and 2007 and continue to increase the operating expenses from 2007 to 2011.  5/27/16 Transcript (B. Ippensen), p. 17:12-22; Joint Ex. 9, p. 79.

348.    SJP was projected to achieve revenue growth of $16 million during the five years 2007 through 2011, only $1 million more than the revenue growth that SJP achieved in 2006 as compared to 2005.  5/27/16 Transcript (B. Ippensen), p. 21:6-20; Joint Ex. 9, p. 79.

349.    In 2007, the Curchin Group reviewed the projections prepared by Duff and Phelps for SJP's operations for the five to six years following 2007 and found them to be reasonable. 7/1/16 Transcript (R. Fouratt), p. 12:15-24.

350.    In determining that the projections for the five to six years following 2007 were reasonable, the Curchin Group look at the projected gross profit margins and compared them to the historical averages of the company, finding them to be in line, and looked at sales revenue, finding that the projections made sense based on the backlog at the time.  7/1/16 Transcript (R. Fouratt), p. 13:16-14:4.

351.     The financial projections in the Valuation Report decreased EBITDA (Earnings Before Interest Taxes Depreciation and Amortization) for 2007 as compared to 2006.  5/27/16 Transcript (B. Ippensen), p. 17:23-18:17; Joint Ex. 9, p. 79.

352.     Overall, Ippensen determined that the Valuation Report was "very conservative." 5/27/16 Transcript (B. Ippensen), p. 19:11-15; Joint Ex. 9.

353.     In the Valuation Report, Prairie Capital projected that SJP's profitability, using the overall EBITDA metric for example, would decrease during the two years following 2006. 6/29/16 Transcript (P. Aliferis), p. 33:2-10; Joint Ex. 9, p. 79.

354.     When calculating the projected revenues and sales for SJP, Prairie Capital took into account whether SJP had sufficient equipment, personnel and finances to realize the projections as part of Prairie Capital's overall analysis.  6/29/16 Transcript (P. Aliferis), p. 35:7-15; Joint Ex. 9, p. 79.

355.     FBTS considered SJP's bidding on larger, more profitable projects, when Di Pano took over management in 2004, an indication of SJP's positive future financial performance. 5/26/16 Transcript (B. Ippensen), p. 59:10-19.

356.     Prairie Capital projected SJP's costs to increase because SJP was in a capital intensive business.  6/29/16 Transcript (P. Aliferis), p. 35:7-20; Joint Ex. 9, p. 79.

357.     Though Prairie Capital expected SJP's cost of sales to decrease over time, Prairie Capital took the conservative approach of keeping costs of sales consistent with SJP's prior years.  Joint Ex. 9, p. 79; 6/29/16 Transcript (P. Aliferis), p. 152:1-15.

358.     The Valuation Report shows that in 2006, SJP had a 16.25% Income from Operations, which demonstrates that the company's profitability has been increasing, specifically since 2004.  Joint Ex. 9, p. 72; 6/29/16 Transcript (P. Aliferis), p. 151:11-20.

359.     Prairie Capital also determined that the gross profit projections for 2007-2011, which mirrored the 25.4% achieved by SJP in 2006, were reasonable based on discussions with management, historical trend analysis, growth in revenue and profitability, strong backlog numbers and continued solicitation of bids on new projects.  6/29/16 Transcript (P. Aliferis), p. 152:16-153:10.

360.     Aliferis concluded that the 2 year, 3 year and 5 year averages in the Valuation Report were reasonable, given SJP's new management and SJP's efforts to adjust costs and expand the overall margin.  Joint Ex. 9, p. 72; 6/29/16 Transcript (P. Aliferis), p. 150:19-151:10.

361.     Aliferis concluded that the drivers for SJP's profitability were an increase in revenues, due to SJP's change in management, and an increase in profit margins, due to SJP's ability to provide a variety of services for each job.  Joint Ex. 9, p. 51; 6/29/16 Transcript (P. Aliferis), p. 151:14-25.

362.     The EBITDA gross profits and EBITDA margins in the Valuation Report were more favorable than the same computations in the Confidential Information Memorandum.  The

difference is a result of the fact that the Confidential Information Memorandum used financial statements based on the estimated fiscal year end and the Valuation Report included audited financial statements for the fiscal year ending March 2006.  5/26/16 Transcript (B. Ippensen), p. 54:9-21.

363.    FBTS reviewed the historical EBITDA and EBITDA margins for SJP for the years 2002 to 2006, and did not consider SJP's financial performance volatile.  5/26/16 Transcript (B. Ippensen), p. 56:6-58:7.

364.    FBTS concluded that reviewing historical financial data predating 2002 would not have been relevant to FBTS' analysis, as it would have reflected SJP's business under the prior management of Carmen Yacuzzio. 5/26/16 Transcript (B. Ippensen), p. 58:16-59:3.

365.    Backlog is an important consideration because it gives a true sense of a company's revenues for the following year, particularly for a company in the construction industry.  6/29/16 Transcript (P. Aliferis), p. 153:11-22.

366.    The Secretary's expert, Richard Puntillo, acknowledged that SJP's backlog was in the form of signed contracts, which he opined was a "powerful form of backlog." 9/19/16 Transcript (R. Puntillo), p. 82:10-15; 9/20/16 Transcript (R. Puntillo), p. 39:2-13.

367.    The Secretary's expert, Dana Messina, acknowledged that backlog is a "good indicator" for a construction business.  7/14/16 Transcript (D. Messina), p. 181:10-12.

368.    FBTS' expert, Bradley Van Horn, opined that it would have been unusual for Prairie to make any sort of independent verification of SJP's backlog.  6/30/16 Transcript (B. Van Horn), p. 97:11-98:8.

369.    Prairie Capital projects capital expenditures in the discounted cash flow analysis for both the maintenance of assets and the acquisition of new assets.  6/29/16 Transcript (P. Aliferis), p. 35:7-22.

370.    Prairie's analysis of the backlog, which had grown from $38 million at the end of 2005 to $58 million at the end of 2006, supported Prairie's forecasts regarding SJP's revenue growth in 2007 and beyond.  6/30/16 Transcript (B. Van Horn), p. 98:19-99:6.

371.    Prairie Capital determined what new equipment SJP needed to obtain in order to realize additional revenue by speaking with company management and the company's financial advisor.  6/29/16 Transcript (P. Aliferis), p. 35:23-36:3.

372.    Joel Stoesser, FBTS' expert, opined that he believed that it was appropriate to place an emphasis on SJP's more recent performance data from 2006 when trying to determine whether or not projections were reasonable, as it was SJP's strongest year that was delivered in a down market, indicating that when the economy and marketplace started to rebound, SJP's performance would increase even more so.  7/5/16 Transcript (J. Stoesser), p. 141:16-142:16.

373.    Stoesser testified that, in light of SJP's backlog and 45% bidding success rate, SJP had approximately $129.5 million of either booked business and/or realistically anticipated

business going forward from the beginning of 2007.  7/5/16 Transcript (J. Stoesser), p. 125:5-126:8.

374.    Plaintiff's expert, Richard Puntillo, testified that "[w]e buy on the future, not on the past."  9/19/16 Transcript (R. Puntillo), p. 44:15-16.

### C.    SJP Had An Over $60 Million Backlog Coming into 2007

375.    The significant amount of backlog SJP had going into 2007 was one of the reasons FBTS felt confident that SJP would be able to realize its 2007 projections as set forth in the Valuation Report.  5/26/16 Transcript (B. Ippensen), p. 75:6-9.

376.    The largest job in SJP's backlog had been awarded to it at the end of 2006, and amounted to $14,101,078.  5/23/16 Transcript (F. Dugan), p. 157, p. 9-18; Joint Ex. 1, p. 26, Ex. 22.

377.    Three of the largest jobs in SJP's backlog had been awarded in 2006 (i.e. Grove at New Windsor for $14,101,078, Reserve at New Windsor for $5,062,415 and Montvale for $2,829,289).  5/23/16 Transcript (F. Dugan), p. 157, p. 22-25; Joint Ex. 1, p. 26, Ex. 22.

378.    Di Pano personally verified portions of the backlog chart contained in the Confidential Information Memorandum.  5/23/16 Transcript (V. Di Pano), p. 89: 16-18.

379.    The Secretary's expert, Dana Messina, agreed that SJP's backlog was work that it had a reasonable expectation that it would complete in 2007 or 2008.  7/14/16 Transcript (D. Messina), p. 182:17-22.

380.    In addition, SJP generally bid approximately $140 million in work a year and has a historical hit rate of approximately 45% on average.  Joint Ex. 1, p. 26.

381.    FBTS considered SJP's historical hit rate of 45% one of the reasons SJP could meet its 2007 projections as set forth in the Valuation Report.  Joint Ex. 1, p. 26; 5/26/16 Transcript (B. Ippensen), p. 79:10-22.

382.    The 45% hit rate represented the quantity of jobs SJP successfully bid.  5/23/16 Transcript (V. Di Pano), p. 59:3-17.

383.    In light of the $60 million backlog, plus $8.5 million of outstanding bid work going into 2007, the flat revenue forecast for 2007 was conservative.  5/25/16 Transcript (J. Miscione), p. 38:14-39:2.

384.    Ash believed that SJP had a good chance of making its projections given its $58 million backlog and 45% hit rate on its bids.  7/6/16 Transcript (M. Ash), 125:13-19.

385.    SJP's growing backlog demonstrated that SJP was growing as a company and winning increased bid work.  5/23/16 Transcript (V. Di Pano), p. 70:20-25.

386.     Going into 2007, SJP was starting to expand heavily into New York by bidding on increasingly large-scale site development projects in that state, including work related to the Stewart Air Force Base and work for its existing client, Hovnanian.  5/23/16 Transcript (F. Dugan), p. 146:8-23.

387.     SJP had never had a contact cancelled by a customer.  5/23/16 Transcript (F. Dugan), p. 158, p. 1-4; p. 167:1-6.

388.     In the process of carrying out its audit, the Curchin Group would review SJP's contracts and billings to date, confirming the total amounts, the amount of work to date, the amounts billed, and any amounts to go to SJP.  7/1/16 Transcript (R. Fouratt), p. 8:15-24.

389.     The Curchin Group did this work to verify SJP's contracts to ensure that SJP's revenue was properly stated.  7/1/16 Transcript (R. Fouratt), p. 8:25-9:6.

390.     Robert Fouratt of the Curchin Group testified that he could not recall ever encountering any inaccuracy in the contracts SJP provided with respect to its audits.  7/1/16 Transcript (R. Fouratt), p. 9:7-10.

391.     The Curchin Group also independently verified SJP's backlog numbers by making inquiries to management and analyzing the information provided about the remaining work to be done, as well as contracts awarded but not yet started.  7/1/16 Transcript (R. Fouratt), p. 9:14-22.

392.     Fouratt testified that he could not recall ever encountering any inaccuracy in the process of independently verifying SJP's backlogs.  7/1/16 Transcript (R. Fouratt), p. 9:22-10:1.

**D.     SJP's Mobile Rock Crusher Gave It A Competitive Advantage**

393.     SJP informed Aliferis that it was in possession of equipment it had imported from Europe and of which no competitor in the local marketplace was in possession.  6/29/16 Transcript (P. Aliferis), p. 59:2-10.

394.     In 2006 and the first quarter of 2007, SJP's use of mobile rock crushing equipment allowed it to work in rocky areas that were difficult to develop and therefore, to provide services that none of their competitors were able to provide.  5/23/16 Transcript (V. Di Pano), p. 46:21-47:16.

395.     As of April 16, 2007, SJP was still the only company in the United States that had a mobile primary and secondary rock crusher.  5/23/16 Transcript (V. Di Pano), p. 45:6-17.

396.     FBTS determined that SJP's use of the mobile rock crushing equipment gave it a competitive advantage, which would enable it to reach the projections contained in the Valuation Report.  5/26/16 Transcript (B. Ippensen), p. 67:21-25.

397.     Prairie Capital obtained its information about SJP's innovative position in the market from a number of sources, including but not limited to, "discussions with management regarding the company's product services, customers and market."  Joint Ex. 9, p. 7.

36

398.     FBTS's expert, Joel Stoesser, opined that SJP was a leader in acquiring and expanding the use of mobile rock crushers, which gave it a competitive advantage.  7/5/16 Transcript (J. Stoesser), p. 28:4-29:9.

399.     Stoesser opined that it was the totality of SJP's equipment and mobile rock crushing ability that allowed it to meet the demands of customers such as Hovnanian.  7/5/16 Transcript (J. Stoesser), p. 142:22-144:2.

### E.     Prairie Capital Accounted For SJP's Relationships With Its Customers

#### 1.     Kara Holmes

400.     Kara Homes was a one-time customer for SJP and represented less than 2% of SJP's revenue for 2006.  Joint Ex. 1, p. 26, Ex. 21; 5/23/16 Transcript (F. Dugan), p. 143:19-24; 172:4-11.

401.     Kara Homes went bankrupt at a time when it owed money to SJP.  5/23/16 Transcript (F. Dugan), p. 121:7-12.

402.     SJP informed Prairie Capital that Kara Homes had gone into bankruptcy.  5/23/16 Transcript (F. Dugan), p. 175:6-176:1.

403.     In 2006, SJP wrote off $768,810 as an operating expense, which represented the amount owed to them by Kara Homes and approximately $70,000 in legal fees.  Joint Ex. 9, p. 31.

404.     Prairie Capital did not account for Kara Homes to be a continuing expense because it was a one-off event related to the Kara Homes bankruptcy.  Joint Ex. 9, p. 31; 5/26/16 Transcript (B. Ippensen), p. 100:17-101:15.

405.     Kara Homes was not accounted for in the backlog or projected revenues for 2007 in the Valuation Report.  5/26/16 Transcript (B. Ippensen), p. 101:16-21.

#### 2.     Hovnanian

406.     SJP started working with Hovnanian Enterprises, Inc. ("Hovnanian"), a homebuilder, in 1984 or 1985, but Di Pano's relationship with Hovnanian predated SJP's work with the company.  5/23/16 Transcript (V. Di Pano), p. 56:19-24.

407.     In 2006 and 2007, Hovnanian was SJP's largest customer.  5/24/16 Transcript (M. D'Esposito), p. 57:21-23.

408.     Though SJP enjoyed a successful business relationship with Hovnanian, SJP had been making efforts to steadily diversify away from Hovnanian.  Joint Ex. 1, p. 12.

409.     SJP's efforts to "diversify" away from Hovnanian did not mean dropping Hovnanian as a client, but rather growing SJP's overall business by obtaining additional customers.  May 24, 2016 Transcript (M. D'Esposito), p. 22:4-23:2; 35:24-36:21.

410.     As of December 2006, Hovnanian represented about 59% of all of SJP's revenue. Joint Ex. 9, p. 12.

411.     Prairie Capital applied a risk discount of 19.25%, which in part, accounted for Hovnanian's large percentage of sales with SJP.  Joint Ex. 9, p. 42; 5/26/16 Transcript (B. Ippensen), p. 82:17-83:18.

412.     The risk premium is also known as the cost of equity and represents the expected return for a particular investment – in this case SJP.  5/27/16 Transcript (B. Ippensen), p. 7:21-8:5

413.     Prairie generated discount rates by looking at a company's specific risk factors. 6/30/16 Transcript (R. Gross), p. 19:3-12.

414.     The Hovnanian Annual Report for the fiscal year 2006 (the "Hovnanian Report") indicated that Hovnanian's total revenues had increased on a year by year basis from 2002 to 2006.  Plaintiff Ex. 11, p. 3.

415.     The Hovnanian Report also showed that Hovnanian had 36 communities actively being built in New Jersey, which included some of SJP's backlog.  Plaintiff Ex. 11, p. 4; 5/24/16 Transcript (M. D'Esposito), p. 55:1-22.

416.     Despite the fact that Hovnanian may have experienced a slowdown in some areas of the country, it was still doing a lot of work in New Jersey.  6/29/16 Transcript (P. Aliferis), p. 74:1-10.

417.     The Hovnanian Report further showed that Hovnanian had 64 communities planned in the state of New Jersey.  Plaintiff Ex. 11, p. 4.

418.     The Hovnanian Report also indicated that Hovnanian planned to expand into New York by 800 percent.  Plaintiff Ex. 11, p. 4; 6/29/16 Transcript (P. Aliferis), p. 127:24-128:2.

419.     This anticipated increase in Hovnanian's work in New Jersey was consistent with what SJP management told Prairie Capital.  Plaintiff Ex. 11, p. 4; 6/29/16 Transcript (P. Aliferis), p. 127:15-20.

420.     In 2006, Hovnanian was the 6th or 7th largest homebuilder in the United States, a Forbes Platinum 400 company for five consecutive years and on Fortune Magazine's list of "100 Fastest Growing Companies" for four consecutive years, and #403 on the 2006 Fortune 500, ranked second based on five-year total return to investors of 60%.  Plaintiff Ex. 12, p. 3.

421.     SJP was able to grow its business with Hovnanian over the years because of SJP's unique capability to develop sites with rocky land.  5/23/16 Transcript (V. Di Pano), p. 56:19-57:16.

422.     Hovnanian was projecting and was optimistic about a recovery from the recession taking place in 2008 and beyond.  7/5/16 Transcript (J. Stoesser), pp. 20:23-21:4.

423.    Although Hovnanian was planning to contract on a national scale, it was planning to redeploy emphasis into certain U.S. markets, including a dramatic expansion in New Jersey and parts of New York – the markets where SJP operated – which was an opportunity for SJP despite the homebuilding market declining nationally.  7/5/16 Transcript (J. Stoesser), p. 21:4-22.

424.    SJP and Hovnanian had conversations about Hovnanian's planned dramatic expansion in New Jersey and parts of New York.  7/5/16 Transcript (J. Stoesser), p. 21:17-20.

425.    In 2006, Hovnanian was generating a substantial amount of work for SJP, including advance value engineering work SJP performed in order to get an inside track on certain Hovnanian projects.  5/23/16 Transcript (F. Dugan), p. 158, p. 5-20.

426.    SJP was performing advance work for Hovnanian on a $100 million job in Port Jervis, New York, which was the largest job SJP had ever worked on.  5/23/16 Transcript (F. Dugan), p. 158-23-159:2.

427.    In addition to Hovnanian, SJP had approximately twenty customers and thus, did not perceive its strong relationship with Hovnanian as risky to SJP's overall business.  5/24/16 Transcript (M. D'Esposito), p. 33:18-35:23.

428.    Hovnanian was a "terrific" customer for SJP, always paying promptly and giving SJP work for the 20 years prior to the Transaction.  5/24/16 Transcript (M. D'Esposito), p. 36:5-21.

429.    FBTS did not speak with Hovnanian or any other SJP customer because it would violate FBTS best practices to do so.  5/26/16 Transcript (B. Ippensen), p. 97:10-19.

430.    Because proposed ESOP transactions are not public, FBTS does not speak to customers because spreading information about a change in ownership of a given company could affect that company's relationship with its customers.  5/26/16 Transcript (B. Ippensen), p. 161:10-20.

431.    Aliferis also testified that it would not be prudent to contact company customers or industry trade associations to verify statements about the company during Prairie Capital's due diligence process.  6/29/16 Transcript (P. Aliferis), p. 50:11-51:4.

432.    Aliferis further testified that such conduct would have an adverse effect on a company's business.  6/29/16 Transcript (P. Aliferis), p. 120:15-121:8.

433.    Fischer confirmed that in a minority ESOP purchase, a trustee would not speak with a company's customers prior to approving a transaction because the ESOP is not a synergistic buyer looking to run the company or replace management, but is rather the classic financial buyer, and contacting customers could place the ESOP in the middle of a very important and delicate relationship.  6/21/16 Transcript (S. Fischer), pp. 45:24-47:6; 61:7-17.

F.  **Prairie Used Two Recognized Valuation Methodologies to Value SJP**

434.    Prairie Capital weighted two different valuation approaches, the Market Multiple Method and the Discounted Cash Flow Method, fifty percent each in the Valuation Report.  Joint Ex. 9, p. 46; 5/26/16 Transcript (B. Ippensen), p. 103:16-109.

435.    FBTS' expert, Bradley Van Horn, opined that the Market Multiple Method and the Discounted Cash Flow Method were both standard valuation methods used in the ESOP industry and were appropriately used by Prairie.  6/30/16 Transcript (B. Van Horn), p. 82:13-83:8.

436.    Plaintiff's expert, Dana Messina, also had no issue with Prairie's use of the Market Multiple Method and the Discounted Cash Flow Method, and acknowledged that they were appropriate methodologies used for valuation and that it was appropriate to give each fifty percent weight.  7/14/16 Transcript (D. Messina), p. 159:1-23.

437.    The Discounted Cash Flow Method analyzes the future earnings of a company on a discounted cash flow basis, which FBTS knew was a widely-accepted valuation method.  5/26/16 Transcript (B. Ippensen), p. 186:5-19.

438.    The Discounted Cash Flow Methods projects future cash flows discounted to a present value.  6/29/16 Transcript (P. Aliferis), p. 23:20-24; 148:4-14.

439.    When applying the Discounted Cash Flow Method, Prairie Capital considered SJP's historical trend analysis, discussions with management, information provided by SJP's accountant and financial advisor.  6/29/16 Transcript (P. Aliferis), p. 131:16-132:4.

440.    Prairie Capital also considered cost of goods sold, projections associated with revenue growth, gross profit margins, projections associated with EBITDA, projections associated with net income, capital expenditures, depreciation and amortization of other assets, working capital requirements and an increase or decrease of free cash flow associated with working capital.  6/29/16 Transcript (P. Aliferis), p. 131:16-132:13.

441.    When applying the Discounted Cash Flow Method, Prairie Capital also took into account the risk of SJP achieving the projections going forward through the use of a discount rate.  6/29/16 Transcript (P. Aliferis), p. 131:16-132:19.

442.    In order to determine a cost of equity discount rate, Prairie Capital reviewed the capital asset pricing model, the risk-free bond rate, the market risk premium, the size of the company and the company specific premium.  6/29/16 Transcript (P. Aliferis), p. 131:16-133:7.

443.    Prairie Capital also considered the issue of customer concentration in formulating the discount rate, by taking into account company specific risk.  6/29/16 Transcript (P. Aliferis), p. 148:15-24.

444.    Prairie Capital calculated a discount rate of 19.25%.  6/29/16 Transcript (P. Aliferis), p. 132:14-133:9.

445.     The cash flows are then discounted to present value using the discount rate in order to calculate the equity value.  6/29/16 Transcript (P. Aliferis), p. 133:8-12.

446.     Prairie Capital's free cash flow projections were free cash flows that could be obtained by all equity holders and took into account interest expense and outstanding long-term debt.  6/29/16 Transcript (P. Aliferis), p. 131:16-132:23.

447.     Van Horn, FBTS' expert, opined that Prairie's selection of the 19.25% discount rate was appropriate because Prairire used its standard method of calculating the rate and adjusted the objective portions for items that accounted for the specific risks in SJP, which was the appropriate way to calculate a discount rate.  6/30/16 Transcript (B. Van Horn), p. 89:3-12.

448.     When using the Market Multiple Method, Prairie Capital identified companies in the marketplace that were comparable to SJP in terms of their standard industry classifications, due to their construction, contracting, subcontracting and value added engineering capabilities. 6/29/16 Transcript (P. Aliferis), p. 133:12-19; 6/30/16 Transcript (R. Gross), p. 33:17-34:8.

449.     For the Market Multiple Method, Prairie Capital used 12 metrics from 7 guideline companies and reduced those multiples by 40% in order to develop a more conservative comparison with SJP.  5/26/16 Transcript (B. Ippensen), p. 189:13-190:10.

450.     Prairie Capital applied the 40% discount to the multiples of the public companies used in the Market Multiple Method to take into account the differences between the public companies and SJP in terms of size, access to capital, geographic diversity and economies of scale.  6/29/16 Transcript (P. Aliferis), p. 134:1-11.

451.     Aliferis concluded that the 40% discount was conservative.  6/29/16 Transcript (P. Aliferis), p. 135:23-136:10.

452.     Prairie Capital also took the conservative step of quantifying the dilutive aspect of the stock appreciation rights plan.  6/29/16 Transcript (P. Aliferis), p. 134:23-25.

453.     In addition, Prairie Capital looked at dividends in the marketplace to assess what comparable dividends were trading at as compared to an SJP security.  6/29/16 Transcript (P. Aliferis), p. 135:11-16.

454.     Prairie Capital determined that an SJP security would trade comparable to dividends in the marketplace or below.  6/29/16 Transcript (P. Aliferis), p. 135:11-16.

455.     As the Valuation Report sets forth, "when using multiples from publically traded companies, a discount is used to account for differences in size, risk, diversification, customer concentration and other factors."  Joint Ex., 9, p. 45.

456.     Ippensen determined that the 40% discount utilized by Prairie was even more conservative than he expected and resulted in his having even greater comfort in relying on the Valuation Report.  5/26/16 Transcript (B. Ippensen), p. 191:7-17.

457.    The guideline companies selected by Prairie Capital were larger than SJP, which is typical when comparing public companies with private companies, but were construction and engineering firms with similar characteristics to SJP.  5/26/16 Transcript (B. Ippensen), p. 188:18-189:12.

458.    Financial information from SJP's closest competitors, which were private companies, was not readily available.  5/23/16 Transcript (F. Dugan), p. 164:2-19; Joint Ex. 9, p. 44.

459.    Aliferis testified that it is difficult to find companies that are "exactly" like the subject company because the guideline companies may have larger operations, access to capital that the subject company does not, or provide different services; nonetheless, it is prudent to use guideline companies in a valuation analysis.  6/29/16 Transcript (P. Aliferis), p. 21:13-25.

460.    FBTS determined that the valuation approaches used by Prairie Capital as they are "fairly common practices" in the industry and "well recognized methodologies" for ESOP valuation.  5/26/16 Transcript (B. Ippensen), p. 183:22-194:5.

461.    FBTS would typically discuss the weighting of the two different valuation approaches with Prairie Capital.  5/26/16 Transcript (B. Ippensen), p. 104:9-12.

462.    Ippensen personally analyzed the 50-50 weighting of the two valuation approaches and concluded that he was comfortable with the weighting and methodology used by Prairie Capital.  5/26/16 Transcript (B. Ippensen), p. 105:7-23.

463.    Year to year revenue growth is a metric that can be employed in valuing a company using a discounted cash flow method.  5/25/16 Transcript (J. Miscione), p. 36:8-39:6.

464.    FBTS did not find it unusual that SJP outperformed its peer companies, as set forth in the Market Multiple analysis by Prairie Capital in the Valuation Report, in the categories of EBITDA, EBIT and Pretax Income percentage, because SJP had less overhead than these larger publicly traded companies.  Joint Ex. 9, p. 43; 5/26/16 Transcript (B. Ippensen), p. 111:16-112:6.

465.    For 2007, the projected cash flow for the Discounted Cash Flow Method was $60,715,660.  Joint Ex. 9, p. 81.

466.    For 2007, the expected net cash flow for the Discounted Cash Flow Method was $4,782,800.  This number represents the net income, adjusted for various items that affect cash flow, such as depreciation (plus), capital expenditures (minus), long term debt (plus/minus), net working capital (plus/minus).  Joint Ex. 9, p. 81; 5/27/16 Transcript (K. Serbin), p. 186:24-187:8.

467.    The 2007 expected net cash flow was then reduced by 25%, for a total of $3,587,100 for adjusted net cash flow, in order to account for the fact that three months of the year 2007 had passed by the time of the Transaction.  Joint Ex. 9, p. 81; 5/27/16 Transcript (B. Ippensen), p. 5:18-6:7.

468.    The 25% reduction rendered the 2007 projected cash flows more conservative, as the present value factor of 19.25% was applied to the adjusted net cash flow amount ($3,587,100) rather than the expected net cash flow amount ($4,782,800).  Joint Ex. 9, p. 81; 5/27/16 Transcript (B. Ippensen), p. 6:1-22.

469.    The present value factor of 19.25% takes into account the risk of the ability of the company to achieve a certain level of equity free cash flows.  6/29/16 Transcript (P. Aliferis), p. 24:11-22.

470.    The application of the 25% reduction rendered the estimate as to earnings more conservative.  5/27/16 Transcript (B. Ippensen), p. 7:6-17.

471.    At the time he was reviewing the Transaction, Ippensen independently performed an additional valuation on his own, the Capitalized Cash Flow Method, to ensure himself that Prairie Capital's valuation methods were accurate.  5/27/16 Transcript (B. Ippensen), p. 13:15-14:19, 85:10-18.

472.    The Capitalized Cash Flow Method is derived from the historical cash low divided by the discount rate adjusted for growth.  5/27/16 Transcript (B. Ippensen), p. 13:15-14:1.

473.    In order to perform the calculation, Ippensen added together the historical EBITDA figures for 2004, 2005, and 2006 divided by three.  That number was then divided by the 19.25 discount factor minus 4 percent i.e. the expected growth rate in the Valuation Report. 5/27/16 Transcript (B. Ippensen), p. 81:5-; Joint Ex. 9, p. 79.

474.    Ippensen's results from the Capitalized Cash Flow Method for valuation confirmed that Prairie Capital valuation of SJP was accurate.  5/27/16 Transcript (B. Ippensen), p. 14:2-10.

475.    Ippensen performed an independent valuation of the SJP stock to assure himself that Prairie Capital's valuation conclusion was correct.  5/27/16 Transcript (B. Ippensen), p. 14:11-19.

**G.    Prairie Capital Applied a Sensible Risk Premium**

476.    Prairie Capital applied a risk premium of 19.25 to projected cash flows.  5/26/16 Transcript (B. Ippensen), p. 164:6-18.

477.    In the Valuation Report, Prairie Capital also included a range of discount rates and valuation ranges for the SJP stock:

| Discount Rate | SJP Stock Valuation Range |
|---|---|
| 18.25% | $ 16,839,489 |
| 18.75% | $ 16,615,881 |
| 19.25% | $ 16,398,434 |

Joint Ex. 9, p. 51.

43

478.    Prairie Capital provided three, rather than one, valuation numbers, which represented a range of fairness as to price.  Joint Ex. 9, p. 51; 6/29/16 Transcript (P. Aliferis), p. 149:17-150:15.

479.    FBTS' expert, Van Horn, opined that it was appropriate for Prairie Capital to identify three separate discount rates as part of the method to check the reasonableness of its conclusion.  6/30/16 Transcript (B. Van Horn), p. 89:13-90:3.

480.    Prairie Capital concluded that fair market value for 38% of the SJP stock ranged from $16,398,434 to $16,839,489.  Joint Ex. 9, p. 51; 6/29/16 Transcript (P. Aliferis), p. 150:12-15.

481.    The $16 million purchase price was lower than the low end of Prairie's range of fairness.  6/29/16 Transcript (P. Aliferis), p. 150:16-18.

482.    Ippensen analyzed the risk premium and determined that it was a conservative number, especially in light of other valuation reports he had reviewed.  5/26/16 Transcript (B. Ippensen), p. 164:6-23; 5/27/16, p. 8:6-9:19.

483.    The higher the risk premium number, the greater the amount of risk applied to the enterprise value of the company.  5/26/16 Transcript (B. Ippensen), p. 164:24-165:2.

484.    The 19.25% discount rate amounted to a valuation of $16,398,434.  Joint Ex. 9, p. 48.

485.    Ippensen concluded that a lower, *less* conservative risk premium (i.e. 18.25%) would have been appropriate.  Joint Ex., 9; 5/27/16 Transcript (B. Ippensen), p. 10:4-13.

486.    A risk premium of 18.25% would have resulted in a valuation of SJP of $16,839,489.  Joint Ex. 9; 5/27/16 Transcript (B. Ippensen), p. 10:4-13.

487.    Serbin concluded that the $16 million purchase price for the SJP stock was fair market value because it was below the value resulting from the highest discount rate i.e. $16,398,434 from a 19.25% discount rate.  5/27/16 Transcript (K. Serbin), p. 123:17-124:7; Joint Ex. 9, p. 51.

488.    In addition, Prairie included a 5% discount for lack of marketability, which amounted to an additional reduction to the value of the SJP stock based on the fact that the stock is not in the publically traded marketplace.  5/27/16 Transcript (B. Ippensen), p. 12:15-13:2; 6/29/16 Transcript (P. Aliferis), p. 134:18-23; Joint Ex. 9, p. 51.

489.    Consequently, the negotiated purchase price of $16 million for a 38% minority interest in SJP was less than the fair market value range determined by Prairie Capital and FBTS.  Joint Ex. 9; 5/27/16 Transcript (B. Ippensen), p. 10:2-11:8.

490.    Because the SJP ESOP was purchasing the stock for less than fair market value, FBTS did not negotiate the price with Di Pano.  5/27/16 Transcript (B. Ippensen), p. 12:8-14; 124:8-15.

491.    FBTS was presented with a range of fair market value for the SJP stock using different discount rates and two different valuation methodologies.  Ultimately, the $16 million purchase price was below fair market value.  5/27/16 Transcript (K. Serbin), p. 142:21-143:3.

492.    FBTS was satisfied that the SJP ESOP was getting a "good deal" because it concluded that the $16 million purchase price was below the range of value set by Prairie Capital.  7/6/16 Transcript (M. Ash), p. 110:2-7.

493.    Fischer confirmed that the purchase prices in ESOP transaction is not always negotiated, but instead, a trustee may choose to accept the purchase price offered by the seller if it is reasonable or below a valuation firm's assessment of fair market value, and instead focus on negotiating other aspects of the transaction.  6/21/16 Transcript (S. Fischer), pp. 47:7-48:7.

### H.    Prairie Capital Properly Considered the State of National Housing Market in 2005-2007 In Its Analysis of the Fair Market Value of SJP

494.    Although there was an overall softening to the national housing market starting at the end of 2005, the New Jersey market in which SJP performed 70% of its work was showing an increased number of building permits.  5/23/16 Transcript (V. Di Pano), p. 71:1-72:3; Joint Ex. 1, p. 47.

495.    Aliferis testified that Prairie Capital took into account the condition of the housing market in its Valuation Report through the financial projections and discount rate.  6/29/16 Transcript (P. Aliferis), p. 81:23-82:2.

496.    2006 was a down cycle in the housing market.  Joint Ex. 2, p. 54; 5/26/16 Transcript (B. Ippensen), p. 158:18-25.

497.    Despite the down cycle in the housing market, SJP had its most profitable year in history in 2006.  5/26/16 Transcript (B. Ippensen), p. 159:1-3.

498.    Generally, New Jersey and New York did not experience the housing downturn as much as other states, such as Arizona or Florida.  5/26/16 Transcript (B. Ippensen), p. 160:24-161:2.

499.    FBTS understood that, as set forth in the Valuation Report, for the years 2007-2009, there would be a cooling of the national housing market.  5/26/16 Transcript (B. Ippensen), p. 161:25-162:13.

500.    The Valuation Report makes several references to the improvement of the national housing market in 2007-2008 (5/27/16 Transcript (B. Ippensen), p. 32:14-34:13):

> Although recent indicators have been mixed, the economy seems likely to expand at a moderate pace on balance over coming quarters. The FOMC currently acknowledges mixed signals applicable to the economy. The *Beige Book* prepared several weeks prior to a meeting of the FOMC suggested, "Despite continuing softness in automobile and housing-related sales, most Districts reported that consumer spending increased during October and early November."

45

Joint Ex. 9, p. 20;

> The FOMC reported their belief that the economy will likely continue to expand at a moderate pace despite seeing that recent indicators "have been mixed." The members of the FOMC acknowledged that the chances for slower economic growth have increased. However, they continue to stress that inflation risk continues to be a greater concern. Based on the 30 day Federal Funds futures contract, the market currently points out that FOMC is not likely to lower rates by March 2007, but there is a higher likelihood of lower rates by August of 2007.

Joint Ex. 9, p. 23;

> In the fourth quarter, the FOMC decided not to change the federal funds rate, which remained at 5.25% for the second consecutive quarter. At the end of the fourth quarter, the Committee noted that, "Readings on core inflation have been elevated, and the high level of resource utilization has the potential to sustain inflation pressures.

Joint Ex. 9, p. 29.

501.   FBTS understood that during this period, SJP would be working not only on residential site preparation, but also commercial and public construction. 5/26/16 Transcript (B. Ippensen), p. 162:5-163:9.

502.   FBTS understood that the federal Treasury Department had predicted that the housing market was going to rebound after 2007. 5/26/16 Transcript (B. Ippensen), p. 163:12-16.

503.   Based on Ippensen's review of the Valuation Report, he had an understanding that the slowdown in the economy would have less of an effect in the Northeast than in other parts of the country. 5/27/16 Transcript (B. Ippensen), p. 90:18-91:2; Joint Ex. 9, p. 26.

504.   Based on Ippensen's review of the Valuation Report, he had an understanding that the U.S. economy would show "satisfactory prospects for the forthcoming quarters." 5/27/16 Transcript (B. Ippensen), p. 91:5-18; Joint Ex. 9, p. 29.

505.    Even though Prairie's draft Valuation Report did not contain an "industry analysis" – information that was added to the report after the Transaction – the Duff and Phelps report contained such a discussion, and was reviewed by the Employee Benefits committee. 5/27/16 Transcript (K. Serbin), p. 132:17-133:4; Joint Ex. 1, p. 45-53 of 158.

506.   Ippensen understood that Duff and Phelps performed an industry analysis, reviewed it and felt comfortable with the industry analysis provided in the Confidential Information Memorandum. 5/26/16 Transcript (B. Ippensen), p. 153:20-155:4; 5/27/16 Transcript (B. Ippensen), p. 48:10-49:1.

507.   Melanie Munoz, a senior investigator at the United States Department of Labor Employee Benefits Administration, acknowledged that there were unforeseen economic circumstances during 2007-2009, but testified that the Department of Labor did not make any

consideration as to the connection between the state of the U.S. economy from July 2007 forward and the performance of SJP during that time period.  5/24/16 Transcript (M. Munoz), p. 121:10-122:17.

## VI.   FBTS Properly Considered SJP's Financial Performance In the First Quarter of 2007

508.   SJP experienced less than optimal financial performance in the first quarter of 2007.  5/23/16 Transcript (V. Di Pano), p. 64:22-25.

509.   The financial performance of SJP was affected by the cold and wet weather in the first quarter of 2007.  5/24/16 Transcript (M. D'Esposito), p. 63:15-64:2; 6/29/16 Transcript (P. Aliferis), p. 80:17-20.

510.   Dr. David Robinson, New Jersey State climatologist for the Center for Environmental Protection, Cook College/NJAES, Rutgers University, authored a February 2007 Climate Summary showing that February 2007 was the coldest February since 1895 and the second coldest month overall since 1979.  FBTS Ex. 28, D00508.

511.   Dr. Robinson also stated that April 2007 was the fourth wettest April in 113 years of statewide records.  FBTS Ex. 41, D00625.

512.   SJP could not complete its work because of the weather in February 2007. 5/24/16 Transcript (M. D'Esposito), p. 65:1-5.

513.   When Aliferis visited SJP's work sites on March 12, 2007, he noted that the weather was bad.  6/29/16 Transcript (P. Aliferis), p. 44:15-19.

514.   Since the 1990s, SJP has typically experienced lower revenues in the first three months of the year than in the remaining months of the year because the weather is usually worse in the first three months of the year.  5/24/16 Transcript (M. D'Esposito), p. 16:3-12, p. 36:25-37:5.

515.   Historically, SJP was able to make up for the decreased revenues in the first three months of the year throughout the next nine months of the year.  5/24/16 Transcript (M. D'Esposito), p. 37:9-15.

516.   For example, in 2003, SJP's monthly sales dropped by over $2 million from January to February.  However, SJP then went on to make monthly sales of almost $5 million by November 2003. 5/24/16 Transcript (M. D'Esposito), p. 58:15-59:25.

517.   Similarly, in 2004, SJP's net income started a negative point in January and went up to a high in July.  5/24/16 Transcript (M. D'Esposito), p. 62:20-63:1.

518.   Work that was affected by weather-related delays in the first quarter of 2007 could still get done in the 2007 fiscal year.  6/29/16 Transcript (P. Aliferis), p. 159:25-160:6.

47

519.    Any work that was affected by weather-related delays in 2007 and pushed back to 2008 would be expected to contribute to substantially higher revenue and profitability in 2008. 6/29/16 Transcript (P. Aliferis), p. 159:25-160:8.

520.    SJP's less-than-expected financial performance was due, in part, to the decision to shut down National Crushing for maintenance work in the beginning of January 2006.  5/23/16 Transcript (V. Di Pano), p. 65:1-9.

521.    The shutdown resulted in a lack of revenue for National Crushing and increased maintenance, equipment, and personnel costs, all of which were absorbed in January 2006. 5/23/16 Transcript (V. Di Pano), p. 65:1-20.

522.    SJP's financial performance also resulted from project cyclicality, with different levels of project work producing less revenue during some parts of the year than others.  5/23/16 Transcript (V. Di Pano), p. 65:21-25.

523.    For example, in December 2005, SJP lost over $4 million of revenue; however, 2006 was SJP's most profitable year in history.  5/27/16 Transcript (B. Ippensen), p. 87:6-13.

524.    Plaintiff's expert, Richard Puntillo, testified that SJP was in a cyclical business, both from an economic standpoint and from a weather standpoint.  9/20/16 Transcript (R. Puntillo), p. 42:12-18.

525.    SJP's financial performance during the first quarter of 2007 was due, in part, to record bad weather in January and February 2007.  5/23/16 Transcript (V. Di Pano), p. 66:1-67:5; 5/27/16 Transcript (B. Ippensen), p. 61:4-15.

526.    SJP expected that it would recover from the poor financial performance of the first quarter of 2007 during the rest of the year.  5/23/16 Transcript (V. Di Pano), p. 66:16-20.

527.    At the time she voted for the Transaction, Ash had concluded that SJP still could meet its projections despite have a bad first quarter.  7/6/16 Transcript (M. Ash), p. 125:20-126:1.

528.    At the time he voted for the Transaction, Ippensen had concluded that SJP had the capacity (throughout its personnel, equipment, management and backlog) to make up any seasonal fluctuations in its revenues throughout the remainder of 2007.  5/27/16 Transcript (B. Ippensen), p. 95:25-96:6.

529.    For example, in 2002, SJP had a $400,000 loss in the first two months of the year, but ended the year with a 20% profit overall.  5/23/16 Transcript (V. Di Pano), p. 68:2-7, 16.

530.    SJP did not make any material changes to its business in the first quarter of 2007. 5/23/16 Transcript (V. Di Pano), p. 67:16-19.

531.    FBTS had Peter Aliferis confirm with SJP, through conversations with company management, that there had been no operational or financial changes to the status of the company in the first quarter of 2007.  5/27/16 Transcript (B. Ippensen), p. 61:24-62:5, 62:20-63:10.

532.   The Curchin Group also reviewed SJP's financial statements for January and February of 2007 to check the company's overall level of activity and its profitability, and determined that the statements seemed reasonable.  7/1/16 Transcript (R. Fouratt), p. 16:1-16.

533.   The Curchin Group determined that the statements for January and February of 2007 presented no material change to the outlook for SJP.  7/1/16 Transcript (R. Fouratt), p. 17:22-18:12.

534.   Backlog does not disappear as a result of bad weather, but is completed later in the year.  5/23/16 Transcript (V. Di Pano), p. 69:8-14.

535.   Ippensen concluded that despite SJP's first quarter performance, the numbers set forth in the Valuation Report were achievable and conservative, based on Prairie Capital's use of 19.25% discount rate, zero percent prediction in revenue growth, 5% discount for lack of marketability, the 25% discount of net cash flow and the 50% discount on the market multiple method.  5/27/16 Transcript (B. Ippensen), p. 27:5-14.

536.   Ippensen was aware of the bad weather in the northeast in the first quarter of 2007 from Ash.  5/27/16 Transcript (B. Ippensen), p. 59:12-60:1.

537.   Puntillo testified that revenue performance could be affected by "temporary explainable event[s]" for some period of time, such as adverse weather or maintenance on machinery.  9/20/16 Transcript (R. Puntillo), p. 42:2-43:2.

538.   Puntillo himself acknowledged that in 2006, SJP's most profitable year, 87% of SJP's total year income was earned in the first quarter of 2006 alone, showing that SJP was capable of having an extremely successful quarter that would make its year.  Plaintiff's Demonstrative 24.

539.   Fouratt testified that the first quarter of the year is typically SJP's weakest quarter because its business was very dependent on weather conditions, with wet or cold weather halting construction and paving.  7/1/16 Transcript (R. Fouratt), p. 16:16-17:11.

540.   Fouratt testified that it was typical for SJP to have financial statements indicating that the financial results for the beginning of a given year were lower than expected, since it had the ability to make up that work later in the year.  7/1/16 Transcript (R. Fouratt), p. 17:12-21.

## VII.   Three Lenders Provided Commitment Letters to SJP For, At a Minimum, the Full Amount of The Transaction

541.   By letter dated March 13, 2007, First American Bank approved a financing package for SJP in the amount of $22.5 million in connection with the ESOP transaction.  FBTS Ex. 31, D00526.

542.   Dugan and D'Esposito provided information to First American Bank regarding SJP in connection with First American Bank's loan to the company.  5/23/16 Transcript (V. Di Pano), p. 97:2-6.

543.     First American Bank representatives visited the SJP offices on more than occasion, and SJP job sites.  5/23/16 Transcript (V. Di Pano), p. 98:17-24, 99:8-11.

544.     In addition to First American Bank, two other lending institutions, LaSalle Business Credit, LLC and Citibank, offered financing to SJP in connection with the ESOP transaction.  FBTS Exs. 29 and 30.

545.     Dugan of SJP gathered financial information to transit to the banks in connection with the financing offers.  5/23/16 Transcript (F. Dugan), p. 150:3-7.

546.     The information included SJP's customers, how SJP obtained work, how SJP bid on jobs, and how SJP tracked jobs.  5/23/16 Transcript (F. Dugan), p. 150:8-15.

547.     Specifically as to the First American Bank, Dugan discussed how SJP obtained its customers, how SJP kept its customers, and how SJP tracked, bid and billed the work it performed.  5/23/16 Transcript (F. Dugan), p. 152:22-153:5.

548.     SJP specifically showed First American Bank the format of SJP's bids.  5/23/16 Transcript (F. Dugan), p. 153:5-6.

549.     SJP took representatives of First American Bank to SJP job sites.  5/23/16 Transcript (F. Dugan), p. 153:6-7.

**VIII.   SJP Forgave The Loan to the SJP Plan Such That The Amount Paid by the SJP Plan For the Stock Was Lower than the Secretary's Estimate of Fair Market Value**

550.     In order to fund the Transaction, SJP obtained financing from First American Bank in the amount of $22.5 million.  5/27/16 Transcript (B. Ippensen), p. 23:2-14; FBTS Ex. 31, D00526.

551.     The ESOP then took a loan from SJP to fund the Transaction (the "Internal ESOP Loan").   5/27/16 Transcript (B. Ippensen), p. 24:1-5.

552.     The Internal ESOP Loan was written down by approximately $5.5 million. 5/27/16 Transcript (B. Ippensen), p. 24:6-10.

553.     The write down of the Internal ESOP Loan reduced the amount of the loan to below the Secretary's assessment of fair market value of the SJP stock purchased in the Transaction.  5/27/16 Transcript (B. Ippensen), p. 25:16-21.

**IX.   After The Transaction Closed, And In Response To An Inquiry From the Department Of Labor, Prairie Capital Recalculated Its Valuation Of SJP And Found That It Was Actually Higher Than Its Previous Valuation**

554.     In response to inquiries from and a meeting with the Department of Labor in 2010, Prairie Capital determined that two recalculations were necessary with respect to its valuation of SJP: (1) using stock prices in the market comparable approach that were rolled forward to a more current date relative to the transaction (as opposed to prices from February,

2007) and (2) an adjustment regarding the stock appreciation rights plan.  6/30/16 Transcript (R. Gross), p. 32:2-33:5.

555.    When those recalculations were made, Prairie Capital determined that SJP's value was actually higher than it had previously calculated for the report it gave to FBTS for the transaction. 6/30/16 Transcript (R. Gross), p. 33:6-10.

## CONCLUSIONS OF LAW

### X.    FBTS Fulfilled Its Fiduciary Duties to the SJP Plan

#### A.    Legal Standards Under ERISA

556.    Pursuant to section 404 of ERISA, fiduciaries are required to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man, acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA, § 404(a)(1)(B).

557.    "A fiduciary's independent investigation of the merits of a particular transaction is at the heart of the prudent person standard." *Fink v. National Savings and Trust Co.*, 772 F.2d at 957 (D.C.Cir. 1985).

558.    The focus of the Court is on whether, at the time of the transaction and under the circumstances then prevailing, the fiduciary "employed the appropriate methods to investigate the merits of the investment and to structure the investment."  *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984).

559.    The Court must take care not to judge the defendants' behavior with the benefit of hindsight. *See Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006).

560.    The focus of the inquiry is how the fiduciary acted, not whether the investment succeeded or failed.  *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

561.    The prudence standard is not concerned with results, but rather looks at the conduct and procedures utilized.  *Roth v. Sawyer-Cleator Lumber Co.,* 16 F.3d 915, 918 (8th Cir. 1994).

562.    The prudence requirement is an objective standard, focusing on a fiduciary's conduct in arriving at an investment decision, and not on the results of that decision.  *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996).

563.    Further, so long as the "prudent person" standard is met, ERISA does not impose a "duty to take any particular course of action if another approach seems preferable." *Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912, 917 (2d Cir. 1989).

564.    A trustee has a duty to seek independent advice where he lacks the requisite education, experience and skill. *Donovan v. Bierwirth*, 680 F.2d 263, 272 73(2d Cir. 1982), cert. denied, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

565.    The trustee, nevertheless, must make his own decision based on that advice. *Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir. 1983); *Withers v. Teachers Retirement System of the City of New York*, 447 F.Supp. 1248, 1254 (S.D.N.Y. 1978), aff'd. mem., 595 F.2d 1210 (2d Cir. 1979) ("In the area of investment decisions, the obligation to exercise prudence [includes] an obligation to ... make independent inquiry into the merits of particular investments rather than to rely wholly on the advice of others").

566.    Indeed, "[a]n independent appraisal is not a magic wand that fiduciaries may simply waive over a transaction to ensure that their responsibilities are filled." *Cunningham*, 716 F.2d at 1476.

567.    Rather, the fiduciary must "provide the expert with complete and accurate information," and employing sound valuation principles, "make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Hall Holding*, 285 F.3d at 430; *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 301 (5th Cir. 2000).

568.    However, fiduciaries may point to an expert's guidance as evidence of a good faith investigation.  *See Bussian v. RJR Nabisco, Inc.,* 223 F.3d 286, 300-01 (5th Cir. 2000); *Keach v. U.S. Trust Co.*, 419 F.3d 626, 636-37 (7th Cir. 2005).

## B.    FBTS Satisfied Its Obligations Under ERISA

569.    The evidence shows that FBTS satisfied its legal obligations to independently investigate the merits of the Transaction under ERISA.

570.    FBTS took appropriate steps to ensure that the professionals it retained were qualified and able to render independent advice regarding the Transaction. *See* ¶¶ 78-99.

571.    FBTS and its valuation and legal professional performed sufficient diligence to ensure that it was complying with its fiduciary obligations under ERISA.  *See* ¶¶ 104-249.

572.    FBTS took steps to ensure that the financial information from SJP was accurate and complete.  *See*  ¶¶ 317-326.

573.    FBTS adequately reviewed, assessed its conclusions, questioned it assumptions, asked probative questions, and sufficiently vetted and understood the Valuation Report before relying on it.  *See* ¶¶ 250-303.

574.    FBTS understood the nature of SJP's business and reasonably relied on its financial projections. *See* ¶¶ 327-540.

575.    FBTS' expert, Stephen R. Fischer ("Fischer"), opined that there is no bright line rule with regard to what a fiduciary must do to comply with ERISA.  6/21/16 Transcript (S. Fischer), p. 127:3-10.

576.    Fischer was the only expert witness to opine as to custom and practice in ESOP transactions.

577.     Fischer is qualified to render his opinion.  He is a graduate of Temple University, *summa cum laude,* and Columbia University School of Law, and has nearly 40 years of experience with ESOP transactions as a practicing attorney, primarily representing investment banks in connection with approximately 175 transactions.  6/21/16 Transcript (S. Fischer), p. 20:1-21:20.

578.     Fischer also has served on corporate boards for nine companies, eight of which are owned in whole or in part by an ESOP.  6/21/16 Transcript (S. Fischer), p. 22:7-14.

579.     Whenever one of those companies receives an offer to be acquired, Fischer serves as a member of the committee of the independent directors who review the transaction, typically serving as chair, and serves as a liaison between the trustee, the board, and the potential buyer. 6/21/16 Transcript (S. Fischer), p. 23:24-24:4.

580.     Fischer is a co-founder of the Steiker, Fischer, Edwards and Greenapple law firm, as well as SES Advisors, a firm that provides administrative services to ESOPs, including feasibility analyses.  6/21/16 Transcript (S. Fischer), p. 22:15-23:4.

581.     Fischer is quite familiar with how ESOPs operate and is one of the leading ESOP professionals in the field.  6/21/16 Transcript (S. Fischer), p. 24:5-12.

582.     Fischer opined that a trustee does not have an independent obligation to review due diligence materials provided by the company above and beyond the review conducted by legal counsel.  6/21/16 Transcript (S. Fischer), pp. 71:20-72:2.

583.     In contrast, the "investor due diligence" standard set forth by the Secretary's proffered expert, Richard Puntillo, is inapplicable to ESOPs.

584.     The government did not put forth any evidence at trial that Puntillo's "investor due diligence" standard applies to ESOPs.

585.     The supposed "red flags" identified by Puntillo do not change the fact that FBTS complied with its fiduciary obligations under ERISA.

586.     Similarly, the government did not proffer any evidence that FBTS's actions departed from the applicable standard of prudence under ERISA.

**C.     FBTS Reasonably Relied On Prairie Capital's Report**

587.     FBTS reasonably relied on Prairie Capital's Valuation Report.

588.     Fischer opined that Prairie Capital's valuation report is detailed, thorough, professional, well-organized, and of high quality.  6/21/16 Transcript (S. Fischer), p. 127:11-25.

589.     Fischer opined that FBTS could rely on Prairie Capital's valuation report. 6/21/16 Transcript (S. Fischer), p. 128:1-14.

590.     Fischer opined that, due to FBTS's prior experience with Prairie Capital and the fact that Prairie Capital was one of the few major players in the ESOP world, it was reasonable for FBTS to be more comfortable with Prairie Capital's work product than one with whom FBTS had never worked before or which was not a leader in the industry.  6/21/16 Transcript (S. Fischer), pp. 128:15-129:4.

591.     FBTS' valuation expert, Bradley Van Horn, opined that Prairie Capital undertook a comprehensive analysis and followed the usual and customary standards that are necessary to produce a reliable opinion in the preparation of its final valuation report.  6/30/16 Transcript (B. Van Horn), p. 75:13-76:9.

592.     Van Horn also opined that the process that Prairie Capital followed was comprehensive and in line with the normal and customary valuation procedures that were expected at the time to produce a reliable opinion.  6/30/16 Transcript (B. Van Horn), p. 77:10-14.

593.     Van Horn opined that there were no bright-line rules in 2006 or 2007 as to what needed to be done by a valuation advisor in order to meet its obligations.  6/30/16 Transcript (B. Van Horn), p. 78:12-17.

594.     Van Horn opined that the information used by Prairie in preparation of their report – the most current preceding financial statements, interim financial statements, and ongoing discussions with management – was appropriate.  6/30/16 Transcript (B. Van Horn), p. 80:22-81:20.

595.     Van Horn opined that Prairie's projected revenues for SJP for 2007 and a 5% growth rate going forward were reasonable based on bidding activity, the backlog that existed in the first quarter of 2007, and the historical growth rates of the company's biggest revenue source, Hovnanian.  6/30/16 Transcript (B. Van Horn), p. 90:9-19.

596.     Van Horn opined that Prairie's analysis of SJP's revenue for 2007 and beyond was reasonable based on SJP's backlog, bidding rate, and other potential sources of revenue from new bids.  6/30/16 Transcript (B. Van Horn), p. 98:19-101:18.

597.     Van Horn was qualified to render his opinions, having received his bachelor's degree from Carthage College, his MBA from the University of Wisconsin at Madison, and having 27 years in the business valuation profession, during which time he was part of approximately 3,500 valuations.   6/30/16 Transcript (B. Van Horn), p. 62:10-63:7.

598.     During his time in the business valuation profession, Van Horn had a significant amount of experience in valuations in the ESOP context.  6/30/16 Transcript (B. Van Horn), p. 63:20-64:7.

599.     The opinions of FBTS's experts with respect to Prairie Capital's report are credible and persuasive, and support that it was reasonable for FBTS to have relied on the report and the conclusions drawn therein.

XI.   **FBTS Ensured, In Good Faith, That the SJP Plan Did Not Pay More than Adequate Consideration For the SJP Stock**

600.   Section 406 of ERISA prohibits transactions involving the "sale or exchange... of any property between the plan and a party in interest," including the "acquisition, on behalf of the plan, of any employer security." 29 U.S.C. §1106(a)(1)(A),(E).

601.   ERISA provides a conditional exemption from the prohibited transaction provision for the acquisition of employer securities by an ESOP if the purchase is made for "adequate consideration." 29 U.S.C. § 1108(e); *see Henry v. Champlain Enterprises, Inc.*, 445 F.3d 610, 619 (2d Cir. 2006).

602.   In transactions involving securities with no known market value, such as the stock of a privately-held company like SJP, ERISA defines "adequate consideration" as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." 29 U.S.C. § 1002(18)(B).

603.   In practice, the "fair market value" inquiry overlaps considerably with the "good faith" inquiry; both are "expressly focused upon the conduct of the fiduciaries." *Henry*, 445 F.3d at 619, *quoting Donovan v. Cunningham*, 716 F.2d, 1455, 1467 (5th Cir. 2007) (emphasis in original).

604.   The role of courts in reviewing the adequacy of consideration in an ERISA case is to determine whether the fiduciary can show that the price paid represented a good faith determination of the fair market value of the asset, "not to redetermine the appropriate amount for itself *de novo*." *Henry*, 445 F.3d at 619, *quoting Chao v. Hall Holding, Co., Inc.*, 285 F.3d 415, 437 (6th Cir. 2002) (internal citation and quotation marks omitted); *see also Eyler v. Comm'r*, 88 F.3d 445, 455 (7th Cir. 1996) ("ESOP fiduciaries will carry the burden of proving that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing. Thus, the adequate consideration test focuses on the conduct of the fiduciaries in determining the price, not the price itself") (internal citation and quotation marks omitted) (emphasis added).

605.   The focus is not on SJP's performance as a stock post-transaction or whether the fair market value of SJP was correct if reviewed in hindsight.  *See Chao v. Merino*, 452 F.3d at 182.

606.   It is a fiduciary's burden to prove that the ESOP received "adequate consideration" for its purchase of company stock by a preponderance of the evidence.  *See Perez v. First Bankers Trust Services, Inc., et al.*, Civil Action No. 12-4450, 2015 WL 5722843, at *6 (D.N.J. Sept. 29, 2015).

607.   "ESOP fiduciaries will carry their burden to prove that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing." *Donovan v. Cunningham*, 716 F. 2d 1455, 1467-68 (5th Cir. 1983).

608.    FBTS has satisfied its burden and has demonstrated that the SJP ESOP's purchase of SJP stock in the Transaction was made for fair market value following a thorough and prudent investigation.

609.    The evidence shows that FBTS actively investigated the fair market value of SJP and carefully evaluated Prairie Capital's work.

610.    Prairie Capital's Valuation Report reasonably calculated the fair market value of SJP.

611.    FBTS's expert, Joel Stoesser, opined that the analysis and understanding of Duff and Phelps and Prairie Capital regarding the national real estate market as it appeared as of April 16, 2007 were reasonable and captured the economic and investing conditions at the time preceding and up to the transaction.  7/5/16 Transcript (J. Stoesser), pp. 17:8-18:23.

612.    Prior to April 16, 2007, the marketplace was awash with a "flood of capital" from institutional investors, private investors, and foreign sources of capital, seeking a limited supply of investments.  7/5/16 Transcript (J. Stoesser), pp. 18:24-19:18.

613.    Stoesser testified that as of April 16, 2007, the U.S. Federal Reserve did not properly account for the coming recession, believing that it would be short-term and that a meaningful recovery would come relatively quickly, a forecast that was commonplace throughout the investment and economic community.  7/5/16 Transcript (J. Stoesser), pp. 19:19-20:15.

614.    Stoesser testified that SJP's expectations that it would be able to service Hovnanian's emerging growth in the New Jersey and New York markets, and its plan for expansion as a result, were reasonable.  7/5/16 Transcript (J. Stoesser), pp. 21:23-22:5.

615.    Stoesser testified that Di Pano had a firm grasp on business opportunities and opportunities for growth for SJP.  7/5/16 Transcript (J. Stoesser), p. 23:1-11.

616.    Stoesser testified that he expected that SJP's projections would be even more aggressive, and believed that they were conservative when framed in the context of 2006 being such a strong year for SJP.  7/5/16 Transcript (J. Stoesser), p. 24:5-22.

617.    Stoesser opined that the forecasts and projects of Prairie Capital and Duff and Phelps were reasonable.   7/5/16 Transcript (J. Stoesser), p. 24:23-25:24.

618.    Stoesser opined that Prairie Capital and Duff and Phelps used a comparable group of national, public, heavy construction companies, and that Prairie's use of a 40 percent discount to adjust for the fact that those companies were public, larger, and in some cases may have had scopes of business activities that were more expansive than SJP's, was conservative.  7/5/16 Transcript (J. Stoesser), p. 26:1-27:20.

619.    Stoesser opined that many of the differences between SJP and the comparable companies used would have resulted in a higher value for SJP, including the fact that SJP had

lower operating costs and, therefore, higher profit margins.  7/5/16 Transcript (J. Stoesser), p. 140:19-141:10.

620.   Stoesser opined that SJP enjoyed a competitive advantage based on (a) the fact that it was a leader in acquiring and expanding the use of mobile rock crushers, and (b) its loyal customer base, particularly the fact that SJP had never lost a customer.  7/5/16 Transcript (J. Stoesser), p. 28:4-29:18.

621.   Stoesser opined that there was every reason to believe that SJP would be able to maintain its competitive advantage throughout the period of projections, and that it could continue to operate efficiently.  7/5/16 Transcript (J. Stoesser), p. 30:7-15; 33:1-12.

622.   Stoesser opined that with respect to the real estate industry, just because a national or regional market was trending in one direction did not necessarily mean that a local market would trend the same way.  7/5/16 Transcript (J. Stoesser), p. 33:13-34:21.

623.   Plaintiff's damages expert, Dana Messina, agreed that with respect to the real estate market, down cycles are not uniform in every area, town, or county, and there were areas where the housing cycle was not as week as in other parts of the county, and parts of the country – such as New York and New Jersey – were more resilient than others.  7/15/16 Transcript (D. Messina), p. 101:6-20.

624.   Stoesser opined that a lender's commitment to make a loan of $20 million was an independent corroboration of the fairness of a transaction's terms due to the fact that a lender would need to independently analyze whether the financial information and projections to which they were given access would support making a loan offer.  7/5/16 Transcript (J. Stoesser), p. 36:3-38:8.

625.   Stoesser observed that, in the case of the SJP transaction, no recourse of additional enhanced collateral was required by any of the lenders, and opined that this indicated that lenders were comfortable that there was more of an adequate coverage for the loan to be repaid with full interest over the term of the loan.  7/5/16 Transcript (J. Stoesser), p. 38:9-39:15.

626.   Stoesser opined that it was inconceivable for a lender to make a commitment to finance a transaction where the loan represented over 95 percent of a company's value, as would have been the case using Messina's enterprise valuation of SJP.  7/5/16 Transcript (J. Stoesser), p. 39:16-40:5.

627.   Stoesser opined that, as of January 1, 2007, SJP had $129.5 million of either booked business, in terms of backlog, or realistically anticipated business going forward, which existed independent of any weather conditions, which he perceived to be likely to materialize at levels at or above SJP's historical 45% capture rate.  7/5/16 Transcript (J. Stoesser), p. 125:5-127:9.

628.   Stoesser was qualified to render his opinions.  He has a bachelor's degree in economics, an MBA in finance, has done postgraduate work in corporate and real estate finance, and completed the executive management program at the University of Michigan. 7/5/16 Transcript (J. Stoesser), p. 4:17-21.

629.    Stoesser's career has been spent in real estate investing on behalf of primarily large institutions, pension plans, both public and private, and virtually all of those were subject to ERISA.  His experience includes real estate equity investing and real estate lending in the form of various types of debt structures, which includes all property types as well as real estate operating companies, development companies and companies that include real estate construction.  7/5/16 Transcript (J. Stoesser), p. 5:4-12.

630.    Stoesser was the head of the real estate department at Cigna, which was previously Connecticut General Life Insurance Company.  Stoesser was the senior portfolio manager and senior vice president in charge of all real estate investing for both the corporate accounts of the company and outside clients.  Stoesser also worked for Prudential Financial, formerly Prudential Life Insurance Company, where he was a group head and eventually the chairman of the real estate operations for both the United States and international activities, as well as real estate merchant banking operations, and was responsible for $15 billion in real estate equity and about another $23 billion in real estate debt and mortgages.  7/5/16 Transcript (J. Stoesser), p. 5:24-6:19.

631.    Stoesser is also a registered real estate advisor in New Jersey and other states. 7/5/16 Transcript (J. Stoesser), p. 6:20-25.

632.    Stoesser's experience includes extensive involvement with the construction industry.  7/5/16 Transcript (J. Stoesser), p. 7:22-8:11.

633.    Stoesser also has experience with ESOPs, including purchasing companies where ESOPs were involved.  7/5/16 Transcript (J. Stoesser), p. 8:12-21.

## XII.    The Secretary Failed to Put Forth Any Credible Expert Testimony or Evidence Sufficient to Make Any Showing That FBTS Did Not Fulfill Its Fiduciary Duties or Paid More Than Adequate Consideration For SJP Stock

### A.    The Opinion of the Secretary's Expert, Richard Puntillo, Is Not Credible and Uses an Inapplicable Standard

634.    The opinion of the Secretary's proffered expert, Richard Puntillo, is not credible and is not afforded any weight because it discusses an "investor due diligence" standard, which has no application to ESOP transactions.

635.    Fischer opined that the "investor due diligence" standard, as described by Puntillo, is used in private equity transactions, which differ greatly from ESOP transactions because ESOP are not short-term, turnaround investors, but are long-term financial investors, as well as the fact that the costs involved with private equity transactions are typically much greater than ESOP transactions will bear.  6/21/16 Transcript (S. Fischer), pp. 49:1-50:24; 55:18-58:17.

636.    Puntillo himself testified that his opinion did not speak to the ESOP industry, and that he was not opining that the "investor due diligence" standard set forth in his expert report is widely used in the ESOP industry.  9/19/16 Transcript (R. Puntillo), p. 128:19-129:1.

58

637.     Puntillo testified that he did not know whether the "investor due diligence" standard set forth in his expert report was higher or lower than the due diligence standard required under ERISA.  9/20/16 Transcript (R. Puntillo), p. 4:3-13.

638.     Puntillo testified that he did not know whether professional ESOP trustees were held to an "investor due diligence" standard in April, 2007.  9/20/16 Transcript (R. Puntillo), p. 5:19-23.

639.     Puntillo's discussion of "custom and practice" was nothing more than the steps that he personally would expect to see a private equity investor go through in making a decision to go forward with or abandon a transaction, and he rejected the notion that those steps were required for any given transaction.  9/19/16 Transcript (R. Puntillo), p. 131:11-20; 133:21-134:2.

640.     Puntillo was unaware as to what the custom and practice was among ESOP trustees in April, 2007.  9/20/16 Transcript (R. Puntillo), p. 5:24-6:1.

641.     Puntillo did not opine as to whether or not an ESOP investor would go forward with the proposed SJP transaction.  9/19/16 Transcript (R. Puntillo), p. 135:15-19.

642.     Puntillo did not opine as to whether or not FBTS followed custom or practice in the ESOP industry.  9/20/16 Transcript (R. Puntillo), p. 7:22-8:2.

643.     Puntillo was unaware whether it is custom and practice in ESOP transactions to recast financial projections.  9/20/16 Transcript (R. Puntillo), p. 24:21-25.

644.     Puntillo had no knowledge as to elements of typical practice in the ESOP industry, such as how many face-to-face meetings a professional trustee would have with management, or how a professional trustee determines whether or not to accept a potential company as part of an ESOP transaction.  9/20/16 Transcript (R. Puntillo), p. 9:9-18.

645.     In the course of forming his opinion, Puntillo did not give any consideration to the diligence conducted by FBTS' legal advisors with respect to the SJP transaction, and did not know how much of the due diligence process was the responsibility of FBTS' legal advisors.  9/19/16 Transcript (R. Puntillo), p. 136:22-138:10; 9/20/16 Transcript (R. Puntillo), p. 41:1-9.

646.     In the course of forming his opinion, Puntillo never spoke with SJP's management, nor did he read or review the transcripts of the depositions of SJP's management.  9/19/16 Transcript (R. Puntillo), p. 138:11-13.

647.     Although he testified that his opinion was based on information available to FBTS at the time of closing, Puntillo listed numerous documents from the post-closing time period as materials that he reviewed in the preparation of his report.  9/19/16 Transcript (R. Puntillo), p. 141:2-13; 144:17-146:11.

648.     Although Puntillo's area of focus does not involve ESOPs, it was his understanding that the focus of an ESOP investor is to make sure that employees are paying fair market value for a security – not to always try and get the lowest price possible in a transaction.  9/20/16 Transcript (R. Puntillo), p. 26:17-23.

649.     Puntillo did not opine as to whether an ESOP investor would go forward with the SJP transaction.  9/20/16 Transcript (R. Puntillo), p. 51:23-52:9.

650.     Puntillo was unable to testify as to whether either of the two "red flags" he identified would have resulted in a price for SJP that still fell within the fair market value range that was presented by Prairie.  9/20/16 Transcript (R. Puntillo), p. 58:21-59:2.

651.     Fischer testified that he had never seen a trustee retain an investment advisor in addition to a valuation advisor for any transaction under one billion dollars.  6/21/16 Transcript (S. Fischer), p. 61:18-24.

652.     FBTS' obligations regarding SJP's decline in revenue in the first quarter of 2007 were to look at it in the perspective of the totality of the transaction and the company as it understood it, and given the modest projections regarding SJP's sales from 2007 through 2011, Fischer did not believe that the decline rose to a level where the trustee had to take action. 6/21/16 Transcript (S. Fischer), pp. 65:10-13, 70:18-71:19.

### B.     Puntillo's "Red Flags" Are Not Supported By The Evidence

653.     Puntillo identified two of what he labeled to be "red flags" that should have been further investigated during the diligence performed for the Transaction: the purported "shortfall" in SJP's first quarter of 2007 results, and "the potential impact of the declining concentration of Hovnanian and what that might mean for the growth of non-Hovnanian customers."  9/20/16 Transcript (R. Puntillo), p. 45:9-19

654.     Neither red flag was supported by the record evidence, and in fact, Puntillo did not consider relevant evidence that undercuts his purported "red flags."

655.     Moreover, Puntillo's "red flags" are undercut by the fact that Plaintiff's damages expert, Dana Messina, was able to complete his own analysis despite the purported "red flags" and using the same information that was available to and used by FBTS.

### 1.     SJP's First Quarter 2007 Results

656.     Although Puntillo characterized SJP's financial performance during first quarter of 2007 as a red flag that should have been investigated, the record shows that FBTS was aware of the issue and received an explanation that was plausible and that did not affect the fair market value of SJP.

657.     By contrast, the Secretary has not shown that explanation to be false, nor has it offered any different explanation that FBTS would have uncovered had it engaged in further due diligence.

658.     Puntillo failed to account for the fact that SJP's first quarter 2007 results were directly impacted by bad weather.

659.     Puntillo also failed to account for the fact that SJP has historically been able to make up for any results upon which weather had an adverse impact.

660.    SJP experienced less than optimal financial performance in the first quarter of 2007.  5/23/16 Transcript (V. Di Pano), p. 64:22-25.

661.    The financial performance of SJP was affected by the cold and wet weather in the first quarter of 2007.  5/24/16 Transcript (M. D'Esposito), p. 63:15-64:2; 6/29/16 Transcript (P. Aliferis), p. 80:17-20.

662.    Since the 1990s, SJP has typically experienced lower revenues in the first three months of the year than in the remaining months of the year because the weather is usually worse in the first three months of the year.  5/24/16 Transcript (M. D'Esposito), p. 16:3-12, p. 36:25-37:5.

663.    Historically, SJP was able to make up for the decreased revenues in the first three months of the year throughout the next nine months of the year.  5/24/16 Transcript (M. D'Esposito), p. 37:9-15.

664.    For example, in 2003, SJP's monthly sales dropped by over $2 million from January to February.  However, SJP then went on to make monthly sales of almost $5 million by November 2003. 5/24/16 Transcript (M. D'Esposito), p. 58:15-59:25.

665.    Similarly, in 2004, SJP's net income started a negative point in January and went up to a high in July.  5/24/16 Transcript (M. D'Esposito), p. 62:20-63:1.

666.    Work that was affected by weather-related delays in the first quarter of 2007 could still get done in the 2007 fiscal year.  6/29/16 Transcript (P. Aliferis), p. 159:25-160:6.

667.    Any work that was affected by weather-related delays in 2007 and pushed back to 2008 would be expected to contribute to substantially higher revenue and profitability in 2008. 6/29/16 Transcript (P. Aliferis), p. 159:25-160:8.

668.    SJP's financial performance also resulted from project cyclicality, with different levels of project work producing less revenue during some parts of the year than others.  5/23/16 Transcript (V. Di Pano), p. 65:21-25.

669.    For example, in December 2005, SJP lost over $4 million of revenue; however, 2006 was SJP's most profitable year in history.  5/27/16 Transcript (B. Ippensen), p. 87:6-13.

670.    Puntillo acknowledged that SJP was in a cyclical business, both from an economic standpoint and from a weather standpoint.  9/20/16 Transcript (R. Puntillo), p. 42:12-18.

671.    Although Puntillo ignored this, SJP expected that it would recover from the poor financial performance of the first quarter of 2007 during the rest of the year.  5/23/16 Transcript (V. Di Pano), p. 66:16-20.

672.    SJP had the capacity (throughout its personnel, equipment, management and backlog) to make up any seasonal fluctuations in its revenues throughout the remainder of 2007. 5/27/16 Transcript (B. Ippensen), p. 95:25-96:6.

673.    For example, in 2002, SJP had a $400,000 loss in the first two months of the year, but ended the year with a 20% profit overall.  5/23/16 Transcript (V. Di Pano), p. 68:2-7, 16.

674.    Puntillo admitted that revenue performance could be affected by "temporary explainable event[s]" for some period of time, such as adverse weather or maintenance on machinery.  9/20/16 Transcript (R. Puntillo), p. 42:2-43:2.

675.    Puntillo acknowledged that in 2006, SJP's most profitable year, 87% of SJP's total year income was earned in the first quarter of 2006 alone, showing that SJP was capable of having an extremely successful quarter that would make its year.  Plaintiff's Demonstrative 24.

## 2.    Hovnanian and SJP's Customer Base

676.    Puntillo's concerns with Hovnanian included that he believed that is percentage of SJP's total revenues was "too large."  9/19/16 Transcript (R. Puntillo), p. 91:9-24.

677.    Puntillo also expressed concern that the percentage of SJP's total revenue accounted for by Hovnanian had been increasing, which in his words was "anything but steadily declining concentration."  9/19/16 Transcript (R. Puntillo), p. 94:6-16.

678.    However, Puntillo later admitted that his characterization of the concentration of SJP's revenue in Hovnanian as "steadily declining" was inaccurate, and was different than SJP's stated intentions to "diversify away" from Hovnanian.  9/19/16 Transcript (R. Puntillo), p. 29:17-31:2.

679.    Puntillo ignored the fact that SJP's efforts to "diversify" away from Hovnanian did not mean dropping Hovnanian as a client, but rather growing SJP's overall business by obtaining additional customers.  May 24, 2016 Transcript (M. D'Esposito), p. 22:4-23:2; 35:24-36:21.

680.    In 2006, Hovnanian was generating a substantial amount of work for SJP, including advance value engineering work SJP performed in order to get an inside track on certain Hovnanian projects.  5/23/16 Transcript (F. Dugan), p. 158, p. 5-20.

681.    In addition to Hovnanian, SJP had approximately twenty customers and thus, did not perceive its strong relationship with Hovnanian as risky to SJP's overall business.  5/24/16 Transcript (M. D'Esposito), p. 33:18-35:23.

## C.    The Opinion Of Plaintiff's Damages Expert, Dana Messina, Is Not Credible

682.    The opinion of Plaintiff's damages expert, Dana Messina, is not credible and is not afforded any weight.

683.    Stoesser opined that he differed in opinion from Messina in that Messina looked at SJP's performance in hindsight, whereas FBTS's financial advisors used 2006 – a strong year for SJP in what proved to be a down market for the industry – as a baseline going forward.  7/5/16 Transcript (J. Stoesser), pp. 23:12-24:18.

684.    Messina formulated his opinion without having any conversations with SJP, Duff and Phelps, Prairie Capital, or FBTS, and instead was derived solely based on deposition transcripts, financial statements and other documents.  7/14/16 Transcript (D. Messina), p. 149:14-150:16.

685.    Messina failed to have any conversations with SJP's management despite acknowledging that not only is it helpful to speak with company management when creating a valuation report, but is something that is typically done when performing valuations for a trustee. 7/14/16 Transcript (D. Messina), p. 152:6-153:16.

686.    Messina also failed to speak to anyone in the heavy construction or site development industry when formulating his opinion, instead relying on publicly available reports.  7/14/16 Transcript (D. Messina), p. 151:14-152:5.

687.    Messina testified that this case was the first time he had valued a construction/site preparation company.  7/14/16 Transcript (D. Messina), p. 25:12-26:16.

688.    Messina's report contained errors, including listing the incorrect name of the company it purported to value, failing to comply with the standard of correctly identify the name of the company being valued.  7/14/16 Transcript (D. Messina), p. 156:22-158:10.

689.    Messina's conclusions regarding SJP's "Market Comparative Value" is undercut by the fact that he chose to disregard the high multiple in calculating SJP's value, instead only using the median and low multiples.  7/14/16 Transcript (D. Messina), p. 45:16-46:9.

690.    Messina conceded in his testimony that use of the high multiples would have increased his concluded value of SJP, as illustrated by the following charts







7/14/16 Transcript (D. Messina), p. 46:21-47-21.

691.    As reflected by these charts, had Messina not inexplicably chose to ignore the high multiples, his concluded enterprise value would have been increased by approximately $10 million.

692.    Messina's report used an estimation of 2007 operating costs that was the average of the costs SJP had for the previous five years, whereas Prairie used a figure that was consistent with what it had done in 2006, which had the effect of lowering the number used by Messina for SJP's discounted cash flow. 7/14/16 Transcript (D. Messina), p. 188:20-189:19.

693.    Messina's report failed to discuss why SJP performed better in 2006 than in 2005, or why it performed better in 2005 than in 2004, nor did it touch upon why SJP's backlog had improved from 2005 to 2006 or why it was growing from 2006 to 2007 to an amount over $60 million.  7/14/16 Transcript (D. Messina), p. 179:2-180:15.

694.    Messina saw no indication in the record that SJP was going to be unable to replenish its backlog.  7/14/16 Transcript (D. Messina), p. 194:13-16.

695.    Messina failed to consider in his report the fact that SJP improved its performance from 2005 to 2006 despite the fact that it was a down economic cycle.  7/14/16 Transcript (D. Messina), p. 191:22-192:22.

696.    In fact, Messina's own projections predicted record years for SJP going forward.  7/15/16 Transcript (D. Messina), p. 26:6-27:5.

697.    Moreover, Messina admitted that he used very similar projected sales growth rate as Prairie Capital for SJP for the next "three or four" years subsequent to 2007.  7/14/16 Transcript (D. Messina), p. 167:19-22; 185:23-187:7.

698.    Although Messina acknowledged that he should not have used information that was available after Prairie rendered its report in conducting his own valuation, he admitted that he did use information that was only made available after the transaction closed, and that he could not determine what in his report was based on that information, rendering his opinion fatally flawed and unreliable.  7/15/16 Transcript (D. Messina), p. 22:10-24:12.

699.    Messina acknowledged that he considered compiled financial statements for the interim period ended April 30, 2007, even though it would have been impossible for Prairie to consider that information in its valuation as of April 16, 2007.  7/15/16 Transcript (D. Messina), p. 59:17-60:16.

700.    Messina admitted that part of his analysis involved comparing the historical return on assets for the homebuilding industry against the return on assets for SJP, even though SJP was not a homebuilder.  7/15/16 Transcript (D. Messina), p. 24:23-24:22.

701.    Messina testified that he was aware of the First American Bank loan, and that he was unaware of a bank that would knowingly lend more than one hundred percent of an enterprise value, despite concluding that SJP had a equity value that was less than the amount of that loan.  7/15/16 Transcript (D. Messina), p. 53:1-55:14; 103:17-104:8.

702.    Stoesser opined that it was inconceivable for a lender to make a commitment to finance a transaction where the loan represented over 95 percent of a company's value, as would have been the case using Messina's enterprise valuation of SJP.  7/5/16 Transcript (J. Stoesser), p. 39:16-40:5.

703.    Stoesser did not agree with Messina's opinion that it would have been easy for other companies (such as Hovnanian) to enter the heavy construction business, opining that the heavy construction business is very capital intensive, it requires skilled employees to operate the

heavy equipment involved, and it is difficult to create customer base.  7/5/16 Transcript (J. Stoesser), p. 31:3-32:25.

## XIII.   <u>No Damage Award Is Properly Entered Against FBTS</u>

704.   A significant amount of the loan used to fund the Transaction was ultimately written down by SJP (M. Munoz).  5/24/16 Transcript, p. 133:22-134:4.

705.   Specifically, SJP forgave $9.6 million in loans that it had used to fund the ESOP. 7/6/16 Transcript (M. Ash), p. 127:3-8.

706.   As a result of the debt forgiveness, the price paid by the ESOP for the SJP stock was approximately $6.3 million, which is less than the $6.515 million that the Secretary claims represented the fair market value of the shares. 5/26/16 Transcript (B. Ippensen), p. 25:1-21.

707.   The debt forgiveness fundamentally changed the economics of the Transaction to the ESOP's benefit.

708.   However, the Department of Labor did not account for the debt forgiveness and whether or not it meant that the amount paid for the SJP stock was less than the fair market value claimed by the Secretary.  5/24/16 Transcript (M. Munoz), p. 134:9-136:21.

709.   The material change in the economics requires the Court to consider the financial consequences of the debt forgiveness transactions when awarding damages to avoid giving the ESOP a windfall.  *Henry v. U.S. Trust Co. of Cal., N.A.*, 569 F.3d 96, 100 (2d Cir. 2009).

710.   As a result of the debt forgiveness transactions, the ESOP did not incur any losses and there can be no damages.  *See Harris v. Bruister*, 2013 WL 6805155, at *9 (S.D. Miss. Dec. 20, 2013); *Henry v. Champlain Enters., Inc.*, 288 F. Supp. 2d 202, 230 (N.D.N.Y. 2003).

## <u>CONCLUSION</u>

711.   The evidence shows that FBTS complied in full with its fiduciary duties and obligations with respect to the Transaction.

712.   The evidence shows the ESOP purchased SJP stock at fair market value.

713.   The Secretary has not demonstrated any actual loss to the ESOP.

714.   For the foregoing reasons, the Court hereby enters judgment in favor of FBTS and against Plaintiff.

SO ORDERED:

_____
Honorable Michael Shipp