**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

THOMAS E. PEREZ, Secretary of Labor,

Plaintiff,

v.

FIRST BANKERS TRUST SERVICES, INC., et al.,

Defendants.

Civil Action No. 12-4450 (MAS) (DEA)

**OPINION**

**SHIPP, District Judge**

This matter arises from the SJP Group, Inc. Employee Stock Ownership Plan's (the "SJP ESOP" or the "Plan") purchase of thirty-eight percent of the outstanding stock of SJP Group, Inc. ("SJP"), a total of 380,000 shares, through trustee Defendant First Bankers Trust Services, Inc. ("FBTS" or "Defendant"), from Vincent DiPano[1] ("DiPano") for $16 million. Plaintiff Thomas E. Perez,[2] the Secretary of Labor, United States Department of Labor ("Plaintiff" or the "Secretary") asserts that FBTS breached its duties of loyalty and prudence, and engaged in a prohibited transaction with respect to the Plan's purchase of DiPano's 380,000 shares. The Court conducted a seventeen-day bench trial, beginning on May 23, 2016, and culminating on September

---

[1] The Secretary of Labor and DiPano reached a settlement of the Secretary's claims against DiPano pursuant to a partial Consent Judgment and Order, which the Court approved on April 20, 2016. (ECF No. 149.)

[2] This action was originally commenced by the former Secretary of Labor, Hilda L. Solis. (ECF No. 1.) The caption was subsequently revised to reflect the succeeding, and now former, Secretary of Labor, Thomas E. Perez. Although Thomas E. Perez is no longer the current Secretary of Labor, the Court maintains Thomas E. Perez as Plaintiff in the caption above for the purpose of consistency.

23, 2016. (ECF Nos. 179-83, 186, 189-92, 199-201, 210, 213-14, 216.) The parties submitted proposed findings of fact and conclusions of law on October 28, 2016 (ECF Nos. 224, 225), and responses on November 15, 2016 (ECF Nos. 226, 227).

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, and after careful consideration of the entire record in this case and the applicable law, the Court concludes that FBTS breached its duties of prudence and loyalty, and engaged in a prohibited transaction under the Employee Retirement Income Security Act of 1974.

## I.    Jurisdiction

The Court has jurisdiction over this matter pursuant to § 1132(e)(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. Venue of this action appropriately lies in the District of New Jersey pursuant to § 1132(e)(2) of ERISA.

## II.    Findings of Fact[3]

### A.    Overview of the Litigation

1.    At all relevant times herein, the SJP ESOP was an employee stock ownership plan sponsored by SJP. (Stipulation of Facts ¶ 1, ECF No. 177; May 23, 2016 Tr. (DiPano) 31:13-15.)

2.    On or about November 16, 2006, FBTS was retained as trustee of the SJP ESOP. (Joint Ex. 6 (FBTS Engagement Agreement); May 24, 2016 Tr. (D'Esposito) 26:12-15.)

3.    The SJP ESOP was created so that SJP could sponsor a pension plan for SJP's employees. (May 23, 2016 Tr. (Dugan) 109:10-14.)

---

[3] In evaluating the testimony of the witnesses appearing at trial, and after the Court had the opportunity to hear their testimony and observe their demeanor, the Court undertook an individualized credibility assessment of each witness and assigned the appropriate weight to the testimony based on the Court's conclusions with respect to credibility. Such determinations are reflected in the factual findings.

4.      On April 16, 2007, Defendant DiPano sold 380,000 shares of stock in SJP to the SJP ESOP—representing 38% of SJP's outstanding shares—for $16 million (the "Transaction" or the "SJP ESOP Transaction"). (Stipulation of Facts ¶¶ 2-3.)

5.      In 2009, the Department of Labor ("DOL") initiated an investigation into the Transaction to determine compliance with ERISA. (May 24, 2016 Tr. (M. Munoz) 98:11-99:1.)

6.      On July 17, 2012, the DOL filed its Complaint in this action. (ECF No. 1.) In its Complaint, the DOL alleged, among other things, that FBTS, as trustee, did not adequately perform its duties and, as a result, caused the SJP ESOP to overpay for SJP common stock. (*See id.*)

7.      A bench trial for this action concluded on September 23, 2016.

**B.      Background of SJP and Its Management**

8.      At all relevant times, SJP was a closely-held site preparation construction company concentrating in the homebuilder market in New Jersey. (Stipulation of Facts ¶ 4; May 23, 2016 Tr. (Dugan) 112:7-9, 163:22-164:1; June 29, 2016 Tr. (Aliferis) 14:17-23.)

9.      SJP consists of three separately incorporated companies: Dyna-Tec Drilling and Blasting, LLC ("Dyna-Tec"), National Crushing and Recycling, LLC ("National"), and South Jersey East Coast Paving, LLC ("South Jersey") (collectively, "SJP" or the "Company"). (Joint Ex. 1 (Offering Memo), at 6; May 23, 2016 Tr. (Dugan) 112:10-14.)

10.      Each of the constituent companies of SJP specialized in a distinct area of site preparation. For example, Dyna-Tec specialized in rock drilling and blasting, National specialized in crushing and processing rocks generated from blasting operations, and South Jersey specialized in excavating and paving the site. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 11; May 23, 2016 Tr. (DiPano) 18:8-20, 19:4-13, 19:24-21:8.)

11.     In addition, SJP provided land development and construction services for residential homebuilders and commercial real estate developers in New Jersey, New York, and Pennsylvania. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 8; May 23, 2016 Tr. (DiPano) 19:1-13.)

12.     From 2002 to 2007, SJP's primary business was providing site development services for homebuilders. At all relevant times, the vast majority of SJP's work was for residential sites. (May 23, 2016 Tr. (Dugan) 117:13-118:20, 120:24-121:2, 122:9-128:10 (stating that from 2002 to 2007, SJP did not work on any projects involving oil or gas refineries, oil pipelines, theaters, railroads, airports, casinos, harbors, ports, public highways, public bridges, dams, canals, waterlocks, correctional facilities, and schools and was unsure if SJP worked on projects involving hospitals or power plants); June 29, 2016 Tr. (Aliferis) 14:21-23; Stipulation of Facts ¶ 5.)

13.     Between 2002 and 2006, South Jersey accounted for the majority of SJP's revenues. (May 23, 2016 Tr. (Dugan) 113:5-20; Joint Ex. 1 (Offering Memo), at 126-28 (revenues broken out by customer and division).)

14.     The majority of SJP's top customers were residential homebuilder companies. (May 23, 2016 Tr. (Dugan) 118:9-121:2; June 29, 2016 Tr. (Aliferis) 14:17-23.)

15.     The majority of SJP's revenues came from work on residential homebuilding projects in New Jersey. (May 23, 2016 Tr. (Dugan) 120:24-121:2, 133:11-15; May 24, 2016 Tr. (D'Esposito) 95:10-12.)

16.     Site preparation companies, such as SJP, are highly dependent on the construction of new housing. (Joint Ex. 1 (Offering Memo), at 47.)

17.     SJP operates within the homebuilding industry because its customers were homebuilders and its business was dependent on homebuilding construction. (May 23, 2016 Tr. (Dugan) 118:9-121:2; July 14, 2016 Tr. (Messina) 64:2-13.)

18.     Carmen Yacuzzio ("Yacuzzio") founded SJP in 1959 and was its owner until his death in 2004. (Joint Ex. 1 (Offering Memo), at 6, 22.)

19.     DiPano joined SJP in 1984. (Joint Ex. 1 (Offering Memo), at 22.) DiPano initially served as SJP's Vice President and subsequently became SJP's President in 2002 or 2003. (Stipulation of Facts ¶ 11.)

20.     DiPano became Chief Executive Officer ("CEO") of SJP in 2004 or 2005, following the death of Yacuzzio. (May 23, 2016 Tr. (DiPano) 23:10-17, 48:19-20; May 23, 2016 Tr. (Dugan) 107:15-20;  Stipulation of Facts ¶¶ 7, 10; Joint Ex. 1 (Offering Memo), at 29 "Organizational Chart".)

21.     DiPano became the majority owner of SJP in March of 2005 when he purchased SJP's outstanding shares from Yacuzzio for $4.5 million. (Pl.'s Ex. 1 (Yacuzzio Stock Transfer Agreement), at 63; May 23, 2016 Tr. (DiPano) 23:18-21, 26:11-20.)  Specifically, DiPano purchased 90% of the outstanding shares of South Jersey, 44% of the outstanding shares of National, and 43.48% of the outstanding shares of Dyna-Tec.  (Pl.'s Ex. 1 (Yacuzzio Stock Transfer Agreement), at 63; May 23, 2016 Tr. (DiPano) 26:11-27:4.)

22.     Upon DiPano's purchase of Yacuzzio's stock, DiPano became the majority owner of each of SJP's constituent companies in March of 2005. (Pl.'s Ex. 1 (Yacuzzio Stock Transfer Agreement), at 63; May 23, 2016 Tr. (DiPano) 23:18-21.)

23.     Frank Dugan ("Dugan") has worked for SJP since 1985. (Joint Ex. 1 (Offering Memo), at 22; May 23, 2016 Tr. (Dugan) 107:2-4.)

24.     Dugan served as SJP's Vice President from at least January 1, 2006 through the date of the Transaction. (Stipulation of Facts ¶¶ 8, 12.)

25.     Michael D'Esposito ("D'Esposito") has worked for SJP since at least the mid-1990s. (Stipulation of Facts ¶ 9; May 24, 2016 Tr. (D'Esposito) 6:16-18.)

26.     D'Esposito served as SJP's Assistant Controller and then Controller, and became SJP's Chief Financial Officer ("CFO") in 2006. (Stipulation of Facts ¶¶ 9, 13.)

27.     At the time of the Transaction, D'Esposito held the position of Secretary/Treasurer and CFO. (Stipulation of Facts ¶ 9; May 24, 2016 Tr. (D'Esposito) 7:1-12; Joint Ex. 1 (Offering Memo), at 29 "Organizational Chart.")

28.     In contemplation of the Transaction, DiPano and Dugan exchanged their shares of the three constituent companies of SJP for a pro-rata share of the newly unified SJP. (Joint Ex. 1 (Offering Memo), at 14 "Reorganization.")

29.     At the time of the Transaction, DiPano owned 70% of SJP's outstanding stock and Dugan owned 30% of SJP's outstanding stock. (Stipulation of Facts ¶¶ 7-8.)

30.     The SJP constituent companies largely had the same management, board members, and officers at the time of the Transaction. (May 23, 2016 Tr. (Dugan) 108:7-9; Joint Ex. 1 (Offering Memo), at 29 "Organizational Chart.")

31.     Since approximately January 2006 through the date of the Transaction, SJP's Board of Directors consisted of Dugan and DiPano. (Stipulation of Facts ¶ 14.)

**C.    SJP Hires Advisors in Anticipation of the SJP ESOP Transaction**

32.     In 2006, SJP retained Steven Etkind ("Etkind") of Sadis & Goldberg as legal counsel to guide SJP through the process of establishing an ESOP and to provide an opinion on whether the ESOP had been duly established. (Stipulation of Facts ¶ 18.)

33.     Sadis & Goldberg was not retained to provide an opinion regarding the fair market value of SJP. (Stipulation of Facts ¶ 19.)

6

34.     In October 2006, SJP retained Duff & Phelps, LLC ("Duff & Phelps") to advise SJP on the logistics of establishing an ESOP and again in January 2007 to act as SJP's financial advisor in connection with the SJP ESOP Transaction.  (Stipulation of Facts ¶¶ 24-25.)

35.     Pursuant to the Duff & Phelps Engagement Agreement, SJP agreed to pay Duff & Phelps professional fees, including a transaction fee "equal to 1.00% of the amount of the total anticipated committed financing ($20,000,000) or $200,000."   (Joint Ex. 8 (Duff & Phelps Engagement Agreement), at 3 ¶¶ 5.a, 5.b.)

36.     The Duff & Phelps Engagement Agreement (Joint Ex. 8, at 2-3) further provided, in pertinent part, that:

> The Company [(i.e. SJP)] agrees to furnish, or use its best efforts to cause to be furnished, to Duff & Phelps all reasonably requested data and information concerning the Company and all such other data, material and information as Duff & Phelps shall reasonably request. . . . Duff & Phelps assumes no responsibility for the accuracy or completeness of any information provided by or on behalf of the Company.

37.     Duff & Phelps's role in the contemplated Transaction was to represent the seller—i.e., DiPano and SJP—while FBTS's role was to represent the buyer—i.e., the SJP ESOP.  (May 25, 2016 Tr. (Miscione) 8:3-10:14; June 29, 2016 Tr. (Aliferis) 77:13-18, 121:19-25; June 30, 2016 Tr. (Gross) 20:14-18; July 6, 2016 Tr. (Ash) 57:3-12; May 26, 2016 Tr. (Ippensen) 4:19-23.)

**D.     Background of FBTS and FBTS Employees**

38.     FBTS has been in the business of administering ESOP plans since 1989.  (May 26, 2016 Tr. (Ippensen) 132:11-13.)

39.     In 2006 and 2007, FBTS had an Employee Benefits Committee ("EB Committee") responsible for reviewing proposed ESOP transactions.  (May 25, 2016 Tr. (Cory) 88:9-13; Stipulation of Facts ¶ 36.)

40.     The EB Committee could only approve transactions with unanimous consent of its members. (May 26, 2016 Tr. (Ippensen) 139:14-140:-3; May 27, 2016 Tr. (Serbin) 159:5-8.)

41.     As of April 16, 2007, FBTS's EB Committee was comprised of eight or nine members. (May 26, 2016 Tr. (Ippensen) 132:17-19, 138:21-25; May 27, 2016 Tr. (Serbin) 145:5-10.)

42.     At or around the time of the Transaction, Brian Ippensen ("Ippensen"), Kjersti Cory ("Cory"), Kimberly Serbin ("Serbin"), and Merri Ash ("Ash") served on the EB Committee. (May 26, 2016 Tr. (Ippensen) 132:24-133:6; May 27, 2016 Tr. (Serbin) 103:12-14; July 6, 2016 Tr. (Ash) 27:21-25.)

43.     Ash is currently employed by FBTS. (July 6, 2016 Tr. (Ash) 4:13-14.)

44.     At or around the time of the Transaction, Ash served as FBTS's Vice President of New Business Development. (July 6, 2016 Tr. (Ash) 5:1-6.)

45.     As Vice President of New Business Development, Ash's job was in sales, and she was responsible for bringing in new business. (July 6, 2016 Tr. (Ash) 5:7-12; May 26, 2016 Tr. (Ippensen) 134:23-135:1.)

46.     Ash earned a commission for all new business that she generated for FBTS. (July 6, 2016 Tr. (Ash) 100:23-101:1.)

47.     Ash received a 20% commission on fees generated by FBTS when it was retained to serve as a trustee in anticipation of an ESOP transaction and an additional 20% commission on fees generated in the first year in which FBTS was retained to serve as an ongoing trustee. (July 6, 2016 Tr. (Ash) 101:3-21.)

48.     Cory served as a trust officer at FBTS in 2006 and 2007. (May 25, 2016 Tr. (Cory) 86:25-87:5, 88:15-16.)

49. Cory left employment at FBTS in 2012 and, as of the date of her testimony, worked for an FBTS competitor. (May 25, 2016 Tr. (Cory) 87:6-8; 117:14-19.)

50. Serbin is currently employed by FBTS and was an employee of FBTS at the time of the Transaction. (May 27, 2016 Tr. (Serbin) 102:25-103:15.)

51. Serbin has an educational background in business administration with an emphasis in accounting and finance. (May 27, 2016 Tr. (Serbin) 103:16-25.)

52. Ippensen was the President of FBTS in 2006 and 2007. (May 26, 2016 Tr. (Ippensen) 4:8-12; 92:2-6.)

53. Ippensen has been a Certified Public Accountant since 1991. (May 26, 2016 Tr. (Ippensen) 133:13-16.)

54. As of April 13, 2007, Ippensen estimated that he had reviewed 250 to 300 valuation reports during the course of his career. (May 26, 2016 Tr. (Ippensen) 133:17-20.)

55. Although FBTS did not have a formal policy requiring every conversation to be memorialized, meeting minutes were typically taken at each EB Committee meeting. (May 27, 2016 Tr. (Serbin) 137:10-16; May 26, 2016 Tr. (Ippensen) 147:14-148:5.)

### E. FBTS Considers Trustee Role for SJP ESOP Transaction (October-November 2006)

56. FBTS first considered a trustee role with respect to the SJP ESOP Transaction in the fourth quarter of 2006, sometime toward the end of October. (May 27, 2016 Tr. (Serbin) 104:1-9; July 6, 2016 Tr. (Ash) 102:18-23.)

57. A professional trustee, like FBTS, possesses various capabilities in the areas of accounting, finance, legal, and ESOP administration. (June 29, 2016 Tr. (Aliferis) 111:5-18; 148:25-149:16.)

58.     Prior to being retained, FBTS performed a two-step approval process with the EB Committee. (July 6, 2016 Tr. (Ash) 103:6-104:17.)

59.     For the first step of the EB Committee's two-step approval process, Ash introduced SJP's interest in performing an ESOP transaction to the EB Committee and recommended a financial and legal advisor for the Transaction.   (July 6, 2016 Tr. (Ash) 5:1-6, 103:6-18.) Specifically, Ash informed the EB Committee that SJP was a paving company that was a fully-integrated site developer with very little competition. (July 6, 2016 Tr. (Ash) 129:7-12.)   Ash further informed the EB Committee that SJP was projected to have its most successful year in 2006. (July 6, 2016 Tr. (Ash) 129:7-18.)

60.     Ash recommended that FBTS should retain Prairie Capital ("Prairie") as the financial advisor and Steiker, Fischer, Edwards and Greenapple ("SFE&G") as the legal advisor. (July 6, 2016 Tr. (Ash) 103:15-18.)

61.     FBTS adopted Ash's recommendations for the financial and legal advisors. (May 26, 2016 Tr. (Ippensen) 143:14-144:2.)

62.     The EB Committee granted approval to proceed to the second step of the EB Committee's two-step approval process. (July 6, 2016 Tr. (Ash) 128:12-16.) The second step involved Ash providing "[m]ore information about the company." (July 6, 2016 Tr. (Ash) 129:25-130:8.)

63.     After FBTS has been appointed as trustee, it typically assigns a team to work directly on a transaction and to work and consult with the EB Committee in ultimately approving or rejecting the transaction. (May 27, 2016 Tr. (Serbin) 104: 12-25.)

64.     For the SJP ESOP Transaction, FBTS assigned Ash and Cory. (May 27, 2016 Tr. (Cory) 105:1-14.)

10

65.     Ash was the "point person" and "team leader" for the SJP ESOP Transaction and she attended the November 15, 2006 due diligence meeting on behalf of FBTS and participated in follow-up meetings on the Transaction.  (May 25, 2016 Tr. (Cory) 116:10-117:8; Sept. 23, 2016 Tr. (Cory) 4:24-5:11; May 26, 2016 Tr. (Ippensen) 140:15-141:5; (July 6, 2016 Tr. (Ash) 14:22-24); May 27, 2016 Tr. (Serbin) 150:4-6.)

66.     None of FBTS's employees, other than Ash, spoke to SJP's management prior to the Transaction.  (Sept. 23, 2016 Tr. (Cory) 64:11-14; May 27, 2016 Tr. (Serbin) 128:11-13.)

67.     With respect to the SJP ESOP Transaction, Cory did not visit SJP or meet with any of SJP's management, did not speak with Duff & Phelps, did not participate in meetings in which Ash may have participated, and "wasn't necessarily there every step of the way" until after the Transaction.  (May 25, 2016 Tr. (Cory) 94:24-95:16, 98:25-99:2, 116:15-21.)

68.     Ash and Ippensen expected that Cory would be principally responsible for reviewing SJP's financial documents.  (July 6, 2016 Tr. (Ash) 8:8-9:24, 12:1-19; May 26, 2016 Tr. (Ippensen) 37:8-12.)

69.     Cory was not a valuation expert, however, and did not consider herself to be principally responsible for reviewing and understanding valuation reports concerning SJP.  (May 25, 2016 Tr. (Cory) 92:11-93:9.)

70.     Cory believed that all EB Committee members were equally responsible for reviewing valuation reports concerning SJP.  (May 25, 2016 Tr. (Cory) 92:20-93:2.)

71.     Ippensen assumed that if he did not hear from Ash or Cory during the six-month period leading up to the SJP Transaction, then there were no major issues concerning the Transaction.  (May 26, 2016 Tr. (Ippensen) 141:18-23.)

**F.      November 15, 2006 Meeting**

72.      On November 15, 2006, FBTS retained SFE&G as independent legal counsel in connection with the proposed SJP ESOP Transaction.  (Joint Ex. 6 (FBTS Engagement Agreement), at 4; FBTS Ex. 7.)

73.      SFE&G was retained to conduct legal due diligence as opposed to financial or valuation due diligence.  (FBTS Ex. 7, D00036; May 26, 2016 Tr. (Ippensen) 76:6-8; 168:2-13.)

74.      Further, SFE&G did not opine on the fair market value of DiPano's shares but expressly relied on the opinion of Prairie, FBTS's valuation firm, concerning the value of those shares.  (FBTS Ex. 13, D00085-86, ¶ (j).)

75.      Steven Fischer ("Fischer"), who served as one of FBTS's expert witnesses at trial, was a member of SFE&G at the time of the Transaction.  (Stipulation of Facts ¶ 39.)

76.      On November 15, 2006, a meeting was held at SJP's offices in New Jersey, which included SJP's management team (i.e., DiPano, Dugan, and D'Esposito), Duff & Phelps, Prairie, and FBTS.  (Stipulation of Facts ¶¶ 44-45.)   Specifically, the following individuals were in attendance: Ash of FBTS; DiPano, D'Esposito and Dugan of SJP; Peter Aliferis ("Aliferis") of Prairie; Steve Greenapple ("Greenapple") of SFE&G; John Miscione[4] ("Miscione") of Duff & Phelps; Etkind of Sadis & Goldberg, and Alvin Cheslow ("Cheslow") of Drescher & Cheslow (SJP's corporate attorney).  (May 23, 2016 Tr. (DiPano) 53:5-12; Stipulation of Facts ¶ 45.)

77.      Ash, who was the only person that attended the November 15, 2006 meeting on behalf of FBTS, did not possess any expertise in finance or valuation.  (May 26, 2016 Tr. (Ippensen) 8:6-11, 37:2-7; July 6, 2016 Tr. (Ash) 8:1-7, 8:8-9:24, 12:1-19.)

---

[4] At the time of the Transaction, Miscione was a managing director at Duff & Phelps.  (May 25, 2016 Tr. (Miscione) 4:18-21.)

78.     Ash did not take any notes of what was discussed at the November 15, 2006 meeting.  (July 6, 2016 Tr. (Ash) 100:6-8.)

79.     Neither SFE&G nor Prairie provided Ash with a copy of any notes that they may have taken during the November 15, 2006 meeting.  (July 6, 2016 Tr. (Ash) 100:13-22.)

80.     Although Ash was not a financial expert, her role at the November 15, 2006 meeting was to evaluate SJP's management team based on her ability to assess people.  (July 6, 2016 Tr. (Ash) 8:8-9:24, 12:1-19, 107:6-14; May 26, 2016 Tr. (Ippensen) 37:2-7.)

81.     The meeting was held so that FBTS could learn about SJP and determine whether it would be interested in serving as a trustee for the proposed Transaction.  (May 26, 2016 Tr. (Ippensen) 8:12-18.)

82.     The meeting began with introductions of the attendees and with Dugan introducing the Company, its history, and financial outlook.  (July 6, 2016 Tr. (Ash) 105:2-10.)

83.     The meeting lasted between two and three hours, (May 23, 2016 Tr. (Dugan) 176:22-177:11), during which FBTS explained the process of ESOP sponsorship and the services that FBTS could provide to SJP's management and advisors.  (May 23, 2016 Tr. (Dugan) 139:2-12, 177:13-20.)

84.     The November 15, 2006 meeting included a tour of SJP's facility, where the attendees observed SJP's equipment and facilities firsthand.  (May 23, 2016 Tr. (Dugan) 139:8-12; July 6, 2016 Tr. (Ash) 105:11-15.)

85.     The November 15, 2006 meeting was the only time that FBTS met with SJP or Duff & Phelps prior to the Transaction.  (July 6, 2016 Tr. (Ash) 10:6-20; May 26, 2016 Tr. (Ippensen) 11:7-19.)

86.     At the meeting, SJP discussed its own reputation, purported competitive advantage, relationship with customers, plans to reduce customer concentration with major customers like K. Hovnanian Homes ("Hovnanian"), and plans to expand into different regions.  (June 29, 2016 Tr. (Aliferis) 47:7-22; July 6, 2016 Tr. (Ash) 105:17-106:7.)

87.     With regard to customer concentration, SJP made everyone aware that it "had a client concentration."  (July 6, 2016 Tr. (Ash) 105:21-106:3.)

88.     With regard to expansion, John Miscione stated that SJP was "interested in diversifying, not only in diversifying in terms of what kind of work [it] did, but also in geographics, moving into the state of New York."  (July 6, 2016 Tr. (Ash) 106:8-14.)

89.     FBTS had the opportunity at the meeting to interview and ask questions of SJP's management.  (May 25, 2016 Tr. (Miscione) 45:19-21; June 29, 2016 Tr. (Aliferis) 114:9-11.)

90.     Between FBTS and Prairie, only Aliferis of Prairie had received SJP's consolidated financial statements prior to the meeting, providing him with "the ability to ask some questions about those financials."  (July 6, 2016 Tr. (Ash) 105:7-10; FBTS Ex. 2.)

91.     FBTS did not receive historical financial information at this meeting beyond what SJP verbally discussed.[5]

92.     During the November 15, 2006 meeting, Duff & Phelps conveyed an offer to FBTS of $16 million to sell a minority of SJP's outstanding shares.  (July 6, 2016 Tr. (Ash) 10:2-5.)

---

[5] FBTS was unable to cite any testimony where a witness recalled receiving historical financial information at the November 15, 2006 meeting.  FBTS, rather, cites instances of custom and practice and speculates the likelihood of receiving additional information, which the Court finds unpersuasive absent other corroborating evidence. (May 24, 2016 Tr. (D'Esposito) 39:11-22; June 29, 2016 Tr. (Aliferis) 47:7-22.)

93.      Based on what she observed at the November 15, 2006 meeting, Ash determined that SJP had a "good management team" because the team members had worked together for a long time with their previous employer, and because they "looked to be a cohesive management team." (July 6, 2016 Tr. (Ash) 106:25-107:5.)

94.      Ash did not communicate the information obtained from the November 15, 2006 meeting to FBTS before signing the FBTS Engagement Agreement.[6]  (May 26, 2016 Tr. (Ippensen) 9:22-10:19.)

95.      On November 16, 2006, the day after the November 15, 2006 meeting, Ash signed the FBTS Engagement Agreement.  (Joint Ex. 6 (FBTS Engagement Agreement), at 7; Stipulation of Facts ¶ 34.)

**G.      FBTS Engagement Agreement**

96.      FBTS was retained to represent the Plan in its purchase of a minority stake of SJP from DiPano.  (Joint Ex. 6 (FBTS Engagement Agreement); Joint Ex. 7 (Prairie Engagement Agreement), at 1; Joint Ex. 1 (Offering Memo), at 8 "General Transaction Overview"; May 23, 2016 Tr. (DiPano) 30:7-18.)

---

[6] Defendant cites only the purported typical practice—which does not prove what occurred with regard to the SJP ESOP Transaction specifically—and a single cursory answer from Ippensen for the proposition that Ash presented the findings from the November 15, 2006 meeting to FBTS. (May 26, 2016 Tr. (Ippensen) 9:22-25; 137:10-22.)  Defendant failed to provide evidence with regard to the contents of the presentation, any record of the presentation, or any other details pertaining to any other details corroborating the occurrence of this purported meeting between FBTS and Ash.  In light of the presented evidence and the Court's assessment of the witnesses' credibility, the Court finds that Ash did not communicate the information obtained from the November 15, 2006 meeting to FBTS prior to signing the engagement agreement.

97.     FBTS understood that its duty as a Plan trustee included determining the fair market value of DiPano's shares.  (Joint Ex. 6 (FBTS Engagement Agreement), at 2 ¶ 5 (setting forth FBTS's appointment as Trustee of the Trust); May 26, 2016 Tr. (Ippensen) 4:24-5:2, 6:25-7:4.)

98.     FBTS understood that, at all times, it was acting in a fiduciary capacity to the SJP Plan beneficiaries.  (May 26, 2016 Tr. (Ippensen) 131:22-25.)

99.     Paragraph 5 of the FBTS Engagement Agreement (Joint Ex. 6, at 2) provides:

> First Bankers agrees as of the date set forth above to accept its appointment as Trustee of the Trust.  First Bankers will exercise all duties, responsibilities, and powers of a fiduciary under ERISA in its capacity as a discretionary Trustee of the Trust and shall control the management and disposition of the Company Stock held by the Trust to the extent such duties, responsibilities, and authority are consistent with the terms of the Plan and Trust Agreement and are not delegated to: (i) an investment manager as defined under ERISA, (ii) the Plan Administrator (as defined in the Plan) or (iii) a named fiduciary.  First Bankers acknowledges its status as a discretionary Trustee under ERISA, including the responsibilities and duties of a fiduciary involving the financing, acquisition and holding of Company Stock of a privately held Corporation.

100.    Under the FBTS Engagement Agreement, SJP agreed to pay FBTS $30,000 in consideration for FBTS's services.  (Joint Ex. 6 (FBTS Engagement Agreement), at 3 ¶ 7; May 26, 2016 Tr. (Ippensen) 140:4-9.)

101.    The FBTS Engagement Agreement did not provide for a success fee or bonus for FBTS with respect to its work as a transactional trustee for the SJP ESOP.  (May 26, 2016 Tr. (Ippensen) 140:10-14.)  If FBTS approved the SJP ESOP Transaction, however, it could be retained as an ongoing trustee.  (Joint Ex. 6 (FBTS Engagement Agreement) 12; May 26, 2016 Tr. (Ippensen) 6:16-24.)

102.     FBTS understood that even though it was paid by SJP (i.e., the seller's company), its role was to represent the interests of the Plan (i.e., the buyer).  (Joint Ex. 6 (FBTS Engagement Agreement), at 5 ¶ 2; May 26, 2016 Tr. (Ippensen) 4:19-23.)

103.     The FBTS Engagement Agreement also set forth the following fee schedule for any work FBTS performed for the Plan as an ongoing trustee: an annual fee calculated as a percentage of the Plan's assets, and in no event less than $15,000.  (Joint Ex. 6 (FBTS Engagement Agreement), at 12; May 26, 2016 Tr. (Ippensen) 6:16-24.)

104.     FBTS was permitted to engage an independent financial advisor and approve a valuation report and/or fairness opinion furnished by such independent financial advisor.  (Joint Ex. 6 (FBTS Engagement Agreement), at 10, 12.)

105.     The valuation firm would prepare a report determining the fair market value of the shares to be purchased by the ESOP.  (May 25, 2016 Tr. (Cory) 90:18-24.)

106.     The SJP ESOP trust agreement provided that all contributions from SJP would be held in trust by the named trustee (i.e., FBTS), and that the trustee would hold and invest trust assets for the exclusive benefit of the Plan participants and beneficiaries.  (Joint Ex. 3 (Trust Agreement), at 3, Article I, §§ 1.01-1.04.)

107.     The SJP ESOP trust agreement authorized the trustee (i.e., FBTS) to use trust assets to buy company stock, and required that all purchases of company stock be made at fair market value as determined in good faith and in accordance with applicable requirements of ERISA.  (Joint Ex. 3 (Trust Agreement), at 4, Article II, § 2.01(a)-(b).)

108.     As the trustee, FBTS was a "named fiduciary" within the meaning of both the SJP ESOP plan document (the "Plan Document") and ERISA § 402(a).  (Joint Ex. 4 (Plan Document), at 70 "Article Fifteen – Fiduciary Responsibility" ¶ 15.01.)

109.    The Plan Document required FBTS to discharge its duties solely in the interest of the Plan participants and beneficiaries for the exclusive purpose of providing benefits and defraying reasonable expenses.    (Joint Ex. 4 (Plan Document), at 70 "Article Fifteen – Fiduciary Responsibility" ¶ 15.03.)

110.    The Plan Document further required FBTS to discharge its "duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."  (Joint Ex. 4 (Plan Document), at 70 "Article Fifteen – Fiduciary Responsibility" ¶ 15.03.)

**H.    FBTS's Pre-Transactional Investigation Procedure[7]**

111.    FBTS does not have any written materials describing its review procedures for an initial ESOP acquisition transaction.  (May 25, 2016 Tr. (Cory) 89:3-7; May 26, 2016 Tr. (Ippensen) 115:6-17.)

112.    Between 2006 and 2012, FBTS's pre-transactional review process was "always evolving." (May 25, 2016 Tr. (Cory) 89:8-23.)

113.    There is no uniform approach in the ESOP industry as to how a fiduciary needs to conduct due diligence for an ESOP Transaction, and due diligence will vary depending on the facts and circumstances of the case.  (June 21, 2016 Tr. (Fischer) 95:1-14.)

---

[7] FBTS also contends that once it was engaged, it participated in "numerous conversations" about the SJP ESOP Transaction.  (May 27, 2016 Tr. (Serbin) 152:15-24.)  Upon reviewing Defendant's citation to the record and the relevant testimony, the Court finds that these conversations did not occur.  The Court makes this finding based on the lack of detail offered by Defendant in support, the Court's assessment of the witnesses' credibility, and the fact that the testimony mentioned the SJP ESOP Transaction as just one of many topics discussed in these purported discussions.

114.    In the ESOP industry, whether a fiduciary's reliance on a valuation report is reasonable depends not only on the four corners of the valuation report, but on the entirety of everything else the fiduciary knows, everything else the valuation firm knows, and everything discussed between the fiduciary and its attorneys, its valuation firm, and the seller's company. (June 21, 2016 Tr. (Fischer) 76:5-77:25.)

115.    The very same issue may be addressed in different ways from one experienced and reasonable trustee to the next.  (June 21, 2016 Tr. (Fischer) 77:21-25.)

**I.      FBTS Retains Prairie (November 20, 2006)**

116.    At the time of the Transaction, Prairie, among other things, was in the business of performing valuations of closely-held companies.  (June 29, 2016 Tr. (Aliferis) 4:14-19; Joint Ex. 9 (Apr. 11, 2007 Draft), at 55; June 30, 2016 Tr. (Gross) 6:8-13.)

117.    Prairie provided ongoing valuation services for approximately 80% of the plans for which it performed the initial valuation.  (June 30, 2016 Tr. (Gross) 19:13-20:3.)

118.    Prairie is a highly respected valuation firm in the ESOP industry.  (June 21, 2016 Tr. (Fischer) 40:6-7.)

119.    One of the "heads" of Prairie, Robert Gross ("Gross"), has been involved in "hundreds" of ESOP transactions over the course of his career.  (June 30, 2016 Tr. (Gross) 26:15-19; June 21, 2016 Tr. (Fischer) 40:10-18.)

120.    At the time of the Transaction, Gross was the Managing Director at Prairie.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 55.)

121.    Gross had no personal involvement in the Transaction, including preparing the valuation or the fairness opinion.  (June 30, 2016 Tr. (Gross) 20:22-22:13.)

122.   At the time of the Transaction, Aliferis was employed at Prairie as the Vice President of Corporate Finance.  (June 29, 2016 Tr. (Aliferis) 4:9-13; Joint Ex. 9 (Apr. 11, 2007 Draft), at 58.)

123.   Aliferis led the Prairie team working on the SJP valuation.  (June 29, 2016 Tr. (Aliferis) 5:7-13; June 30, 2016 Tr. (Gross) 20:19-21.)

124.   Aliferis had previously performed one to two valuations for FBTS prior to the SJP ESOP Transaction.  (June 29, 2016 Tr. (Aliferis) 6:1-3.)

125.   On November 20, 2006, FBTS entered into an engagement agreement with Prairie pursuant to which Prairie would "undertake a series of ESOP-related services" including "a Preliminary Valuation/Feasibility study."  (Joint Ex. 7 (Prairie Engagement Agreement), at 1.) FBTS retained Prairie to provide, among other things, the following services: estimate the fair market value of SJP's stock; provide a valuation report; and provide a fairness opinion.  (Joint Ex. 7 (Prairie Engagement Agreement), at 1-2.)

126.   FBTS selected Prairie based on its previous work experience with the valuation firm and believed that Prairie had a great reputation in the valuation industry.  (May 26, 2016 Tr. (Ippensen) 143:14-144:2; May 27, 2016 Tr. (Serbin) 157:24-158:5.)

127.   Pursuant to the FBTS Engagement Agreement, SJP agreed to pay for the valuation services that Prairie provided.  (Joint Ex. 6 (FBTS Engagement Agreement), at 8 ¶ 2.)

128.   Specifically, SJP agreed to pay Prairie the following fees: $16,000 to $19,000 for a "Preliminary Valuation/Feasibility" and $16,000 to $19,000 for a "[d]etailed valuation and required opinions."  (Joint Ex. 7 (Prairie Engagement Agreement), at 3 "Item 3.")

129.    FBTS understood that Prairie would not be ensuring the accuracy of the information provided by SJP or its agents.  (Joint Ex. 7 (Prairie Engagement Agreement), at 4; May 26, 2016 Tr. (Ippensen) 30:8-31:10.)

130.    Prairie's Engagement Agreement with FBTS contained the following disclaimer:

> In completing this engagement, we will rely on information provided by [FBTS] and [SJP] including, but not limited to, financial statements, projections, product information, facilities descriptions, employee data, and other information as may be requested.  We will accept this information as being accurate without independent verification.

(Joint Ex. 7, at 4.)

131.    Similarly, in the "Statement of Limiting Conditions" contained in Prairie's April 11, 2007 Draft Valuation Report and April 27, 2007 Post-Transaction Valuation Report, Prairie again advised FBTS that:

> Information supplied by others that was considered in this valuation is from sources believed to be reliable, and no further responsibility is assumed for its accuracy.  We have assumed that the information furnished by the Company has been reasonably prepared and reflects the best currently available estimates and judgment of the Company's management as the historical and expected future performance of the Company and have not undertaken any independent analysis to verify the reasonableness of such information.[8]

(Joint Ex. 9 (Apr. 11, 2007 Draft), at 54; Joint Ex. 10 (Apr. 27, 2007 Report), at 68.)

132.    Nonetheless, FBTS expected Prairie to review the financial information provided to it by SJP and Duff & Phelps.  (May 26, 2016 Tr. (Ippensen) 34:9-17.)

---

[8] Prairie states that the disclaimer does not mean that Prairie does not try to verify the information. Rather, Aliferis testified that Prairie "does make efforts to verify the financial information presented to it."  (June 29, 2016 Tr. (Aliferis) 115:22-116:4.)  Aliferis, however, did not elaborate. Accordingly, the Court finds that the "efforts" made by Prairie consist only of the actions that the Court sets forth in its findings of fact.

133.    During its due diligence process, Prairie did not discuss the basis of the valuation and the Transaction as a whole with FBTS and SJP except for the instances specifically set forth in the Court's findings of fact.[9]

134.    FBTS felt assured that Prairie received accurate information from SJP because the information primarily came in the form of audited financial statements.  (May 26, 2016 Tr. (Ippensen) 35:14-24.)

135.    Audits of financial statements for the period of 2002 to 2005 were complete at the time of the Transaction.  Audited financial statements for the year 2006 were in draft form as of the date of the Transaction, given that the Churchin Group needed the ESOP valuation to adjust SJP's 2006 financial statements for the ESOP contribution.  (July 1, 2016 Tr. (Fouratt) 22:8-12.)

136.    FBTS, however, did not obtain or review the 2006 draft audited financial statements prior to the Transaction.  (May 26, 2016 Tr. (Ippensen) 36:18-23 (FBTS did not receive any audited financials for SJP prior to the Transaction other than those contained in the Offering Memo) 37:15-38:8 (other than the financial information in the Offering Memo, FBTS, through Ash, may have verbally received "limited information" prior to the Transaction).)

---

[9] FBTS alleges that Prairie asked some questions of Duff & Phelps, SJP's financial advisor, as well as SJP's management, (June 29, 2016 Tr. (Aliferis) 115:2-8), and that Prairie also had some discussions with FBTS and its counsel regarding the basis of the valuation and the Transaction as a whole.  (June 29, 2016 Tr. (Aliferis) 115:8-11.)  FBTS, however, failed to produce any documentary evidence supporting these purported discussions.  Based on the lack of corroborating evidence and the Court's assessment of the witnesses' credibility, the Court finds that Prairie did not engage in discussions beyond those specifically outlined in the Court's findings of fact.

### J.       Duff & Phelps Offering Memorandum (January 2007)

137.     SJP retained Duff & Phelps again in January 2007 to act as SJP's financial advisor in connection with SJP's decision to implement the ESOP and in connection with the Transaction. (Court's Finding of Fact ("CFF") ¶ 34.)[10]

138.     SJP and Duff & Phelps entered into an engagement agreement dated January 18, 2007, pursuant to which Duff & Phelps agreed to perform, *inter alia*, the following services: determine the value of SJP's equity for the ESOP Transaction; prepare a transaction memorandum and financial models for presentation to the ESOP trustee; participate in due diligence visits, meetings, and consultations between SJP and the ESOP trustee; coordinate distribution of all financial information related to the ESOP Transaction to the ESOP trustee and its advisors; assist SJP in negotiating with the ESOP trustee; assist SJP in negotiating ESOP Transaction documents; and act as agent for SJP in identifying and developing sources of financing. (FBTS Ex. 25, D00485-86.)

139.     Duff & Phelps prepared a Confidential Information Memorandum dated January 2007 (the "Offering Memo") to be sent to potential third-party lenders to obtain financing and to FBTS representing DiPano's opening bid for the sale of his shares to the SJP ESOP. (Stipulation of Facts ¶ 32; May 25, 2016 Tr. (Miscione) 7:3-16, 21:10-18; *see also* Joint Ex. 1 (Offering Memo).)

140.     The Offering Memo was marketing material, which, in the context of similar transactions, tends to focus on the positive aspects of the company and downplay risk factors that would typically be identified during the buyer's due diligence investigation. (July 15, 2016 Tr.

---

[10] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

(Messina) 73:11-24; *see also* Sept. 19, 2016 Tr. (Puntillo) 110:3-22 (buyer is expected to adjust seller's projections based on risk assessment).)

141.    The Offering Memo contained a general overview discussion of the site preparation industry, including financial, regulatory, and regional issues.  (Joint Ex. 1 (Offering Memo); Joint Ex. 2 (Mar. 2, 2007 E-mail from Christoffel to Aliferis, attaching Offering Memo), at 46-54; May 26, 2016 Tr. (Ippensen), at 153:20-154:21.)

142.    The Offering Memo contained four bullet points on the issue of "seasonal demand," briefly discussing how changing demand for services between seasons affected cash flow, labor, and equipment management.  (Joint Ex. 2 (Mar. 2, 2007 E-mail from Christoffel to Aliferis, attaching Offering Memo), at 49; May 26, 2016 Tr. (Ippensen) 155:5-156:5.)

143.    Although the Offering Memo's discussion of stock prices appeared to be current through the fourth quarter of 2006, its discussion of North American housing jobs, machinery costs, gas prices, construction spending, employment rates in the site prep industry, and asphalt prices were only current through June and July of 2006.  (Joint Ex. 1 (Offering Memo), at 47-48.)

144.    The Offering Memo further contained a discussion about one of SJP's major customers, Hovnanian, including an analysis of Hovnanian's financial performance in 2005 and 2006.  (Joint Ex. 2 (Mar. 2, 2007 E-mail from Christoffel to Aliferis, attaching Offering Memo), at 53; May 26, 2016 Tr. (Ippensen) 156:22-158:17.)

145.    The Offering Memo stated that "New Jersey will continue to be a primary focus for [Hovnanian]" and that 23.7% of Hovnanian's proposed communities were located in New Jersey. (Joint Ex. 2 (Mar. 2, 2007 E-mail from Christoffel to Aliferis, attaching Offering Memo), at 53.)

146.    The Offering Memo stated that SJP had been "steadily diversifying away from Hovnanian."[11] (Joint Ex. 1 (Offering Memo), at 12.) By "diversifying" the Offering Memo meant that SJP was attempting to add additional customers. (May 24, 2016 Tr. (D'Esposito) 22:4-23:2; 35:24-36:21.)

147.    SJP was never asked to identify its purported additional customers, explain why it believed it could get more customers, or what additional costs, if any, would be needed to cultivate those additional customers. (June 29, 2016 Tr. (Aliferis) 85:6-86:8, 86:23-87:8 (did not recall SJP specifically explaining how SJP determined that municipalities and commercial developers had available projects); Sept. 23, 2016 Tr. (Cory) 43:12-19 (did not recall discussions about whether SJP was diversifying away from Hovnanian, or how it could replace Hovnanian if it lost Hovnanian as a customer); July 6, 2016 Tr. (Ash) 56:4-24 (did not recall SJP explaining specifics of its customer diversification strategy).)

148.    The Offering Memo suggested that one of the reasons that SJP was projected to outperform its historical earnings was because of its plans for customer diversification. (Joint Ex. 1 (Offering Memo), at 40.)

149.    Contrary to the seller's representation that SJP had been steadily diversifying away from Hovnanian, the Offering Memo showed that SJP's dependence on Hovnanian had actually increased from 44% in 2002 to nearly 60% in 2006. (Joint Ex. 1 (Offering Memo), at 12 ("Customer Concentration"), 126-28 ("Top Ten Customers"); Demonstrative 22.)

---

[11] As proof of this diversification strategy, the Offering Memo noted that as of December 2006, only 20% of SJP's outstanding bids were on Hovnanian jobs. (Joint Ex. 1 (Offering Memo), at 12, 27; July 6, 2016 Tr. (Ash) 66:22-67:6; May 26, 2016 Tr. (Ippensen) 93:5-14.)

150.   The Offering Memo offered 380,000 shares of DiPano's stock, or 38% of all outstanding shares in SJP for $16 million. (Joint Ex. 1 (Offering Memo), at 8, General Transaction Overview.)

151.   FBTS and its advisors did not receive a copy of the Yacuzzio Stock Transfer Agreement prior to the Transaction and were not aware that DiPano had purchased 60% of the outstanding shares of SJP just two years earlier in March of 2005 for $4.5 million—more than five times less than the price DiPano proposed to sell the shares to the SJP ESOP. (Pl.'s Ex. 4; Pl.'s Ex. 4(a); Pl.'s Ex. 4(b); Pl.'s Ex. 4(c); May 26, 2016 Tr. (Ippensen) 118:20-22.)

152.   FBTS did not obtain any of SJP's financial information with the exception of what was contained in the Offering Memo. (*See generally* Pl.'s Ex. 4; Pl.'s Ex. 4(a); Pl.'s Ex. 4(b); Pl.'s Ex. 4(c) (Index of FBTS's Rule 34 Responses); May 26, 2016 Tr. (Ippensen) 36:18-23 (FBTS did not receive any audited financials for SJP prior to the Transaction other than those contained in the Offering Memo) 37:15-38:8 (other than the financial information in the Offering Memo, FBTS, through Ash, may have verbally received "limited information" prior to the Transaction).)

153.   Cory—the individual that FBTS identified as principally responsible for reviewing the financial materials—did not receive the Offering Memo, or even know of Duff & Phelps's role, before the SJP ESOP Transaction. (May 25, 2016 Tr. (Cory) 98:25-100:25 (no recollection if she either knew about Duff & Phelps prior to the Transaction or when she saw the Offering Memo).)

154.   Duff & Phelps relied on historical financial information provided by SJP to draft the Offering Memo. (May 25, 2016 Tr. (Miscione) 34:17-20.)

155.   The Offering Memo contained a financial overview of SJP, including historical financial statements for the period 2002 through Estimated Fiscal Year End December 2006, five-

year financial projections from 2007 through 2011, a description of SJP, and a description of the proposed ESOP Transaction—the sale by DiPano of 380,000 shares of SJP to the ESOP, representing 38% of all outstanding shares of the Company, for $16 million. (*See generally* Joint Ex. 1 (Offering Memo), at 3, Table of Contents.)

156.   After SJP's 34.4% growth in 2006, Duff & Phelps projected the Company to make 0% growth in 2007. (Joint Ex. 1 (Offering Memo), at 9.) Duff & Phelps also projected 4% growth in 2008, 6% growth in 2009, 8% growth in 2010, and 6% growth in 2011. (Joint Ex. 1 (Offering Memo), at 9.)

157.   The Offering Memo attached the 2005 Audited Financial Statements (which incorporated audited financial information from 2004); Audited Prepared Combined Statements for 2002 to 2005; and a "Draft" combined forecasted financial statement for 2006. (*See* Joint Ex. 1 (Offering Memo), at 56-120.)

158.   The Offering Memo included a disclaimer that expressly advised FBTS of the following:

1.    that the Offering Memo does not purport to be all inclusive or contain all of the information that a prospective investor might find to be material;

2.    that any prospective investor should conduct its own due diligence on SJP's business, financial information and future prospects;

3.    that Duff & Phelps did not independently verify any of the information contained in the Offering Memo;

4.    that Duff & Phelps disclaimed any responsibility for the accuracy of the information contained in the Offering Memo;

5.    that Duff & Phelps disclaimed any responsibility for any material information that may have been omitted from the Offering Memo;

6.  that the information contained in the Offering Memo was only current through the date of the Offering Memo, if not earlier;

7.  that Duff & Phelps disclaimed any responsibility to supplement or update any of the information contained in the Offering Memo;

8.  that the Offering Memo did not purport to be an indication of the current state of affairs of SJP or constitute a representation that there has been no change to the business or affairs of SJP.[12]

(Joint Ex. 1 (Offering Memo), at 2.)

159.    As the information contained in the Offering Memo was prepared no later than January 2007, the Offering Memo did not incorporate SJP's actual financial performance for the first quarter of 2007. (May 25, 2016 Tr. (Miscione) 11:15-19, 13:5-14; *see generally* Joint Ex. 1 (Offering Memo).)

### K.    Duff & Phelps Sends Prairie and FBTS the Offering Memo

160.    On or about March 2, 2007, Duff & Phelps sent Prairie a copy of the Offering Memo. (Joint Ex. 2 (Mar. 2, 2007 E-mail from Christoffel to Aliferis, attaching Offering Memo).)

161.    Prairie then forwarded a copy of the Offering Memo to FBTS at some point prior to the Transaction. (May 26, 2016 Tr. (Ippensen) 37:13-20; May 25, 2016 Tr. (Miscione) 7:12-20.)

162.    FBTS understood that the seller's projections in the Offering Memo were based on financial information that was current no later than December 2006. (May 27, 2016 Tr. (Ippensen) 49:21-50:11.)

---

[12] The Court notes that this list constitutes a summary of, as opposed to a direct excerpt from, Joint Exhibit 1, at 2.

163.     Ippensen interpreted the Offering Memo as containing an industry analysis, reviewed it, and felt comfortable with the industry analysis.  (May 26, 2016 Tr. (Ippensen) 153:20-155:4; May 27, 2016 Tr. (Ippensen) 48:10-49:1.)

164.     FBTS and Prairie failed to identify the inconsistency between the Offering Memo's representation that SJP was increasingly diversifying away from Hovnanian and the fact that SJP had grown increasingly reliant on Hovnanian during the past five years.  (July 6, 2016 Tr. (Ash) 68:18-70:15 (not specifically aware of how SJP was diversifying away from Hovnanian, or how long it had been diversifying away); June 29, 2016 Tr. (Aliferis) 68:3-17 (did not recall SJP saying that it was steadily diversifying away from Hovnanian, and did not specifically recall looking to see if customer concentration was increasing or decreasing).)

**L.     March 12, 2007 Visit**

165.     Aliferis of Prairie visited several work sites near SJP's offices on March 12, 2007.[13] (June 29, 2016 Tr. (Aliferis) 43:21-44:6; *see also* Joint Ex. 9 (Apr. 11, 2007 Draft), at 6.)

166.     Aliferis only recalls being driven around by Dugan to three or four work sites and spending approximately five minutes at each work site.  (June 29, 2016 Tr. (Aliferis) 43:24-44:6, 45:5-14.)

167.     Dugan explained to Aliferis the services that SJP was providing at each work site. (June 29, 2016 Tr. (Aliferis) 45:5-14.)

---

[13] Although Prairie describes the March 12, 2007 visit as a "due diligence meeting," the Court finds no evidence concerning what specific due diligence Prairie conducted on March 12, 2007, besides visiting several of SJP's work sites.

168.     Aliferis observed firsthand that it was raining "pretty bad" during the March 12, 2007 visit.[14]  (June 29, 2016 Tr. (Aliferis) 43:21-44:21, 80:21-25; ECF No. 215-1.)

169.     No representatives from FBTS participated in or attended the March 12, 2007 visit. (June 29, 2016 Tr. (Aliferis) 42:20-43:1; May 26, 2016 Tr. (Ippensen) 11:13-19; July 6, 2016 Tr. (Ash) 112:2-10.)

170.     Prairie did not inform FBTS of anything discussed at the March 12, 2007 visit.  (May 26, 2016 Tr. (Ippensen) 11:20-12:6; July 6, 2016 Tr. (Ash) 91:11-17.)

**M.     March 13, 2007 Financing for Transaction**

171.     By correspondence dated March 13, 2007, First American Bank approved a financing package for SJP in the amount of $22.5 million in connection with the SJP ESOP Transaction—in the amount of various notes totaling $18.5 million, and a $4 million line of credit, which was collateralized by all of SJP's assets, including its equipment, bank accounts, and contracts.  (FBTS Ex. 31, at D00526-27.)

172.     Dugan and D'Esposito provided information to First American Bank regarding SJP in connection with First American Bank's loan to SJP.  (May 23, 2016 Tr. (DiPano) 97:2-6.)

173.     The information SJP provided to First American Bank in connection with financing the SJP ESOP Transaction included SJP's customers, how SJP obtained work, how SJP bid on jobs, and how SJP tracked jobs.  (May 23, 2016 Tr. (Dugan) 150:8-15.)

---

[14] On September 21, 2016, Plaintiff filed a Motion for Judicial Notice as to the weather conditions near SJP's offices on March 12, 2007.  (ECF No. 215.)  Defendant responded on September 27, 2016.  (ECF No. 217.)  Upon reviewing the parties' submissions, the Court denies Plaintiff's Motion.

174.    First American Bank representatives visited the SJP offices and job sites on more than one occasion.  (May 23, 2016 Tr. (DiPano) 98:17-24, 99:3-7; May 23, 2016 Tr. (Dugan) 153:6-7.)

175.    In addition to First American Bank, two other lending institutions, LaSalle Business Credit, LLC and Citibank, issued financing proposals to SJP in connection with the ESOP Transaction.  The financing proposals were expressly subject to those institutions performing due diligence and they expressly advised SJP that they did not constitute offers of loan commitments. (FBTS Ex. 29, at 1 ("It should be emphasized that the following is not intended to be nor should it be construed as a commitment . . . to provide the requested financing, but serves merely as a preliminary description of the possible terms of the proposed financing . . . subject to further review, analysis, consideration and credit approval . . . ."); FBTS Ex. 30, at 1 ("This letter, however, is neither a contract nor an offer to enter into a contract nor a commitment to obligate [LaSalle Business Credit] in any way."), at 5 ("[T]his letter is an expression of interest and is not a binding commitment of [LaSalle Business Credit] to provide financing . . . [and] [t]he closing of the loan would be conditioned upon [*inter alia*] . . . a satisfactory due diligence review of the business and financial affairs of [SJP].").)

176.    The SJP ESOP executed a loan from SJP to fund the Transaction (the "Internal ESOP Loan").  (May 27, 2016 Tr. (Ippensen) 24:1-5.)

177.    SJP later wrote down the Internal ESOP Loan by an undetermined amount.[15]  (May 27, 2016 Tr. (Ippensen) 24:6-10.)

---

[15] FBTS alleges inconsistent facts regarding the amount of the Internal ESOP Loan write-down. In its Proposed Findings of Fact, FBTS states that the write-down was $5.5 million, and in its Proposed Conclusions of Law, FBTS states that the write-down was $9.6 million.  (*Compare* Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 552 (citing May 27, 2016 Tr. (Ippensen) 24:6-10), *with* Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 705 (citing

### N.    March 2007 – Prairie Due Diligence

178.    On March 16, 2007, Aliferis requested additional information from D'Esposito, including, but not limited to, information regarding SJP's top ten customers in terms of overall revenue for December 31, 2006; updated backlog[16] and revenue recognition, names and estimated revenues associated with the current top five to seven job bids; an updated staffing matrix for the fiscal year ended 2006; and the "composition of revenues for SJP Contractors, National[,] and Dyna-Tec." (FBTS Ex. 32.)

179.    Aliferis also spoke with SJP management about backlog to confirm that the statements concerning backlog in the Offering Memo were correct.  (June 29, 2016 Tr. (Aliferis) 64:6-12.)

180.    In addition, Aliferis spoke with SJP management about SJP's profit margins on "average" jobs.  (June 29, 2016 Tr. (Aliferis) 70:9-14.)

181.    By e-mail message dated March 24, 2007, Aliferis sent D'Esposito and Miscione, a representative of First American Bank, the preliminary projections that were utilized by Prairie for the valuation of SJP's common stock.  (FBTS Ex. 9.)

182.    The March 24, 2007 e-mail message requested that D'Esposito "review the enclosed analysis and verify the comments" so that Prairie could move forward with its valuation report. (FBTS Ex. 9.)

---

July 6, 2016 Tr. (Ash) 127:3-8).)  FBTS fails to cite to, and the Court is unaware of, any documents presented at trial that contain the actual amount of the write-down.  Because the specific amount of the write-down is immaterial to the Court's decision for reasons set forth in the Discussion section below, the Court need not determine whether the write-down was $5.5 million or $9.6 million.

[16] Backlog is work on hand (i.e., new work or a previous year's unfinished contract work) that has yet to be performed.  (May 23, 2016 Tr. (DiPano) 41:3-14.)

183.     To verify the projections, Prairie reviewed SJP's updated financial information, which was provided by SJP.  (June 29, 2016 Tr. (Aliferis) 79:20-25.)

184.     Prairie relied on the information provided by SJP and did not undertake an independent analysis to verify the underlying rationale. (June 29, 2016 Tr. (Aliferis) 79:15-25.)

185.     On March 28, 2007, D'Esposito sent an e-mail message to Aliferis, copying Miscione and Daniel Christoffel of Duff & Phelps, attaching the draft audited combined financial statements for the period ending December 31, 2006 prepared by the Curchin Group.  (FBTS Ex. 34; May 24, 2016 Tr. (D'Esposito) 30:2-5.)

186.     In the March 28, 2007 e-mail message, D'Esposito informed Prairie that SJP exceeded its projected earnings before interest, tax, depreciation, and amortization ("EBITDA") for 2006 of $9.5 million with an adjusted EBITDA for 2006 of $11 million.  (FBTS Ex. 34; May 24, 2016 Tr. (D'Esposito) 51:12-25.)

187.     Prairie asked for information regarding the operational overview of SJP and the different services offered by SJP in the market.  (June 29, 2016 Tr. (Aliferis) 119:7-15.)

188.     Prairie also wanted to see historical audited financial statements, as well as information relating to backlog, customers, suppliers, and year-to-date financial information. (June 29, 2016 Tr. (Aliferis) 119:7-20.)

189.     SJP provided all of the information that Prairie requested.  (June 29, 2016 Tr. (Aliferis) 119:25-120:1.)  Most of this information was already contained in the Offering Memo. (May 29, 2016 Tr. (Aliferis) 119:11-13 (describing information requested as "[p]retty much consistent with—more or less consistent with what was [previously] provided by the [C]ompany's financial advisor").)

**O.     March 29, 2007 Teleconference**

190.    On March 29, 2007, Ash and Cory of FBTS held a conference call with two of FBTS's attorneys from SFE&G to discuss the Stock Appreciation Rights ("SARs") schedule and the terms of the indemnification agreement in the Stock Purchase Agreement (the "SPA"). (FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 1.)

191.    The conference call attendees were EB Committee members Cory and Ash, as well as FBTS's legal counsel, Greenapple and Margaret Steere.  (FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 1.)

192.    No one from Prairie participated in the March 29, 2007 conference call. (FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 1.)

193.    Cory took notes ("March 29, 2007 Conference Call Memorandum") during the March 29, 2007 conference call. (FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 1-2; May 25, 2016 Tr. (Cory) 126:15-127:6.)

194.    According to the March 29, 2007 Conference Call Memorandum, the only issues discussed were the SARs and the proposed indemnification clause. (FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 1.)

195.    SARs are a form of incentive compensation designed to benefit company management whereby management receives a bonus when the stock price of the company rises. (May 25, 2016 Tr. (Miscione) 54:23-55:5; May 25, 2016 Tr. (Cory) 107:21-25.)

196.    The participants of the March 29, 2007 conference call did not discuss what consequence SARs had on the fair market value of SJP and did not ask Prairie to quantify the effect of SARs on the final purchase price. (May 25, 2016 Tr. (Cory) 108:22-109:5.)

197.     Cory asked a single question about the SPA, specifically, how Section 8.5 would work. (FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 2; May 25, 2016 Tr. (Cory) 129:7-13.)

198.     The attendees discussed the indemnification clause in the SPA and noted that the indemnification should come from the seller, the party receiving the money, not the Company. (FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 1; May 25, 2016 Tr. (Cory) 130:6-16.) The meeting notes indicate that Greenapple requested a revision to the indemnification clause. (FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 1.)

199.     The terms of indemnification were not negotiated by FBTS, as FBTS merely sought to change the indemnification provision to comply with ERISA § 410.[17]   (FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 1; May 25, 2016 Tr. (Cory) 130:6-21.)

**P.       Prairie's April 11, 2007 Draft Valuation Report & Fairness Opinion**

200.     On April 11, 2007, Prairie sent a draft valuation report ("April 11, 2007 Draft Valuation Report") to Cory at FBTS. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 1.)

201.     It is typical to have a draft valuation report dated as of the transaction closing and a final report generated after the date of closing to allow for the final report to accurately reflect the valuation on the closing date.  (June 21, 2016 Tr. (Fischer) 62:4-63:12.)

---

[17] There is no evidence that the terms of the indemnification agreement were "negotiated," as opposed to being revised to comply with ERISA § 410.  *See Johnson v. Couturier*, No. 05-2046, 2008 WL 4443085, at *5 (E.D. Cal. Sept. 26, 2008), *aff'd and remanded*, 572 F.3d 1067 (9th Cir. 2009) ("A number of federal courts have held that under ERISA § 410, where an ESOP owns a substantial portion of the sponsoring company's stock, it would be inconsistent with the intentions of ERISA to allow a trustee who has breached his fiduciary duties to the ESOP to be indemnified by the sponsoring company where the ESOP would indirectly bear the financial burden.") (citations omitted).

202.   Prairie typically spends two to two-and-a-half months on a valuation report, during which Prairie works on multiple simultaneous engagements.  (June 29, 2016 Tr. (Aliferis) 136:11-16, 169:23-170:24.)

203.   The general time period spent on valuation periods depends on the circumstances of each particular transaction.   (June 29, 2016 Tr. (Aliferis) 169:23-170:24.)

204.   In the April 11, 2007 Draft Valuation Report, the Industry Analysis section was missing.   (Joint Ex. 9 (Apr. 11, 2007 Draft), at 30.)

205.   It is a best practice for a valuation professional to include an industry analysis section in a valuation report.  (June 30, 2016 Tr. (Van Horn) 130:3-6; July 14, 2016 Tr. (Messina) 72:1-3; June 30, 2016 Tr. (Gross) 23:1-4.)

206.   The industry analysis section: (1) tells the reader that the valuation professional reviewed relevant industry and economic factors that could potentially impact the subject company; and (2) educates the reader about important trends and important factors that could influence the value of the subject company.  (June 30, 2016 Tr. (Van Horn) 131:10-19.)

207.   A prudent investor would not have gone forward with the Transaction given that the April 11, 2007 Draft Valuation Report was missing information about SJP's industry and region.  (Sept. 19, 2016 Tr. (Puntillo) 87:10-24.)

208.   After the Transaction, the April 27, 2007 Post-Transaction Valuation Report contained an Industry Analysis section, which a prudent investor would have considered to be material prior to the Transaction for determining whether the tenor of the industry analysis for SJP reasonably reflected SJP's projected performance.  (Sept. 19, 2016 Tr. (Puntillo) 85:15-86:14.)

209.    The April 27, 2007 Post-Transaction Valuation Report contained no discussion explaining or justifying the financial projections for SJP in light of the unfavorable economic trends in the housing industry.  (June 30, 2016 Tr. (Van Horn) 130:20-131:19; 174:2-17.)

210.    Prairie used SJP's record 2006 financial performance as the baseline for its projections even though it resulted in projections that deviated from SJP's five-year historical average performance, due to, *inter alia*, the recent growth of the Company.  (Stipulation of Facts ¶¶ 51-52; *see also* July 5, 2016 Tr. (Stoesser) 24:5-7 ("The valuation reports by Prairie . . . and by Duff & Phelps, use[] a baseline [of] 2006, which was a really strong year for SJP"); July 14, 2016 Tr. (Messina) 96:16-22.)

211.    With the exception of the Industry Analysis section, Prairie's April 11, 2007 Draft Valuation Report contained many of the key components that are typical within the ESOP industry: a review of the transaction, a discussion of Prairie's background and experience, a discussion of the materials it reviewed, a discussion of SJP's historic financial data, a discussion of SJP's projections of future performance, and a discussion of how Prairie came up with its valuation, including the methodologies used, as well as a narrative about the Company and the economy. (June 21, 2016 Tr. (Fischer) 41:23-42:17.)

212.    Both the April 11, 2007 Draft Valuation Report and the April 27, 2007 Post-Transaction Valuation Report contained numerous errors and were missing some valuation components.  (*See, e.g.*, July 14, 2016 Tr. (Messina) 105:6-106:14 (Plaintiff's expert witness, Dana Messina ("Messina"), concluded that Prairie committed a host of valuation errors); *see generally* June 30, 2016 Tr. (Van Horn) 153:5-188-20 (Defendant's expert witness, Bradley Van Horn ("Van Horn") identified errors among valuation components).)

213.    In preparation of the April 11, 2007 Draft Valuation Report, Prairie's review included a variety of data points, such as SJP's revenue, profitability, working capital, and discount rates.  (June 29, 2016 Tr. (Aliferis) 122:19-123:7.)

214.    In preparation of the April 11, 2007 Draft Valuation Report, Prairie and FBTS did not ask Duff & Phelps follow-up questions concerning: (a) the projected growth rate; (b) the projected margins; and (c) the assumptions and justifications supporting Duff & Phelps's projections.[18]  (May 25, 2016 Tr. (Miscione) 14:21-16:8 (no recollection of being asked by FBTS or Prairie how Duff & Phelps arrived at the compound annual growth rate ("CAGR")), 16:21-17:5 (no recollection of being asked how Duff & Phelps arrived at EBITDA or gross profit margins), 83:9-12 (no recollection of being asked what assumptions were used in seller's financial model); May 24, 2016 Tr. (D'Esposito) 13:3-6 (no recollection of being asked if 2006 earnings were sustainable); June 29, 2016 Tr. (Aliferis) 114:12-15 (no recollection of what specific financial information was provided); 14:3-13 (no specific recollection of how SJP's management described SJP); 23:5-16 (no specific recollection of discussing the peer group with SJP), 58:18-20 (did not recall if SJP identified its competitors by name), 59:2-12 (no specific recollection of discussing modifications to SJP's equipment), 68:12-17 (no recollection of analyzing customer concentration trend), 77:15-78:9 (no specific recollection of discussing projections with Duff & Phelps or SJP's management), 89:11-24 (did not recall comparing size of SJP's bids after the change of ownership).)

_____

[18] Further, there is no evidence that Aliferis spoke with or obtained information directly from SJP's accountant.  (June 29, 2016 Tr. (Aliferis) 78:21-79:11 (did not know of the Curchin Group or Robert Fouratt); July 1, 2016 Tr. (Fouratt) 23:22-25 (could not recall speaking with Aliferis prior to the Transaction).)

215.    Prairie by and large accepted, without verification, representations made by SJP's management and financial advisor concerning SJP's business (e.g., its reputation, contracts, backlog, bidding, and bid rate), as well as its historical and projected financial performance. (June 29, 2016 Tr. (Aliferis) 50:1-52:16; June 30, 2016 Tr. (Gross) 24:6-25:2, 25:14-26:6.)

216.    Prairie copied verbatim information from the Offering Memo, including information about SJP and projections provided SJP, and pasted that information into the April 11, 2007 Draft Valuation Report. (*Compare* Joint Ex. 1 (Offering Memo), at 22-32, *with* Joint Ex. 9 (Apr. 11, 2007 Draft), at 8-17; May 26, 2016 Tr. (Stipulation by D. Schnapp) 66:15-20 (establishing Prairie's copying and pasting).)

217.    Prairie received financial and company information directly from SJP or its advisors, which Prairie used in preparing the April 11, 2007 Draft Valuation Report. (Stipulation of Facts ¶ 43.)

218.    It is typical in ESOP transactions that valuation companies get information relating to the company from the company itself.   (June 21, 2016 Tr. (Fischer) 42:18-23.)

219.    Dugan and D'Esposito provided information about SJP to Duff & Phelps and Prairie.[19] (May 23, 2016 Tr. (DiPano) 33:17-35:4, 42:7-19-43:2.)

---

[19] FBTS further alleges that Dugan and D'Esposito later began to communicate directly with FBTS. (May 23, 2016 Tr. (DiPano) 42:7-19-43:2.) Upon reviewing the evidence presented and assessing the credibility of the witnesses, however, the Court finds that Dugan and D'Esposito had direct communications with Prairie, but not with FBTS. (*See* May, 26 2016 Tr. (Ippensen) 75:19-20; May 27, 2016 Tr. (Ippensen) 31:2-7; July 6, 2016 Tr. (Ash) 61:9-12; Sept. 23, 2016 Tr. (Cory) 51:24-52:4.)

220.    Dugan provided information to Prairie[20] regarding contracts, backlog, customer information, and field operations. (May 23, 2016 Tr. (DiPano) 78:13-79:3; May 23, 2016 Tr. (Dugan) 149:17-150:2.)

221.    FBTS did not review any of the financial information that Prairie received to ensure that it was accurate or complete. (May 26, 2016 Tr. (Ippensen) 34:14-35:13.)

222.    The EB Committee typically receives a draft valuation report a few days before the transaction is tentatively set to close. (May 27, 2016 Tr. (Serbin) 133:12-16.)

223.    The April 11, 2007 Draft Valuation Report was provided to FBTS less than three business days before the Transaction, and less than two business days before Prairie's presentation at the April 13, 2007 conference call. (Stipulation of Facts ¶ 48 (describing conference call on April 13, 2007); Joint Ex. 5 (Stock Purchase Agreement).)

224.    Prairie did not provide FBTS with any draft valuations prior to April 11, 2007. (Pl.'s Ex. 4, Pl.'s Ex. 4(a), Pl.'s Ex. 4(b), Pl.'s Ex. 4(c) (Index of FBTS Rule 34 Responses); May 25, 2016 Tr. (Cory) 102:2-5 (testifying that she did not recall receiving a draft valuation report prior to April 11, 2007); May 26, 2016 Tr. (Ippensen) 12:7-13:1 (testifying that he was not aware of receiving any draft valuation reports prior to April 11, 2007 and that if FBTS had received a draft valuation report prior to April 11, 2007, it would have been kept in FBTS's files); May 27, 2016 Tr. (Serbin) 129:7-9 (testifying that the April 11, 2007 Draft Valuation Report is the only valuation report that she could recall); July 6, 2016 Tr. (Ash) 21:17-20, 89:20-23 (testifying that

---

[20] In his testimony, DiPano refers generally to FBTS and Prairie as "they" when describing who requested information from SJP in connection with the SJP ESOP Transaction. (May 23, 2016 Tr. (DiPano) 78:13-79:3.) In light of the lack of evidence that FBTS received financial documents directly from SJP, and after assessing the credibility of the witnesses, the Court finds that the information was provided directly to Prairie but not directly to FBTS.

she did not recall receiving a draft valuation prior to April 11, 2007); June 29, 2016 Tr. (Aliferis) 8:5-8, 94:22-25.)

225.    FBTS had an obligation to review and to understand the April 11, 2007 Draft Valuation Report.  (May 26, 2016 Tr. (Ippensen) 145:21-23.)

226.    Ippensen reviewed the April 11, 2007 Draft Valuation Report prior to the Transaction.  (May 26, 2016 Tr. (Ippensen) 133:17-134:5.)

227.    When reviewing the April 11, 2007 Draft Valuation Report, Ippensen performed his own "capitalized cash flow" calculation of market valuation using historical information as a "gut check."  (May 27, 2016 Tr. (Ippensen) 13:18-14:19.)

228.    The capitalized cash flow method is derived from the historical cash flow divided by the discount rate adjusted for growth.  (May 27, 2016 Tr. (Ippensen) 13:15-14:1.)

229.    To perform the calculation, Ippensen added together the historical EBITDA figures for 2004, 2005, and 2006 and divided that number by three.  That number was then divided by the 19.25 discount factor minus four percent, i.e., the expected growth rate in the April 11, 2007 Draft Valuation Report.  (May 27, 2016 Tr. (Ippensen) 81:5-82:25; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

230.    In making his "gut-check" calculation, Ippensen did not use SJP's historical cash flows, but rather, its historical EBITDA.  Additionally, Ippensen did not look at the full historical period set forth in the April 11, 2007 Draft Valuation Report, but rather only the three most recent years (two of which were SJP's highest performing years). (May 27, 2016 Tr. (Ippensen) 81:9-82:10; *see also* Joint Ex. 1 (Offering Memo), at 34, 37.)

231.    Ippensen's results from the capitalized cash flow method for valuation comported with Prairie's valuation of SJP.  (May 27, 2016 Tr. (Ippensen) 14:2-10.)

232. When Ippensen reviewed the April 11, 2007 Draft Valuation Report, he did so to ensure that Prairie's due diligence procedures, as set forth on page six, comported with IRS Ruling 59-60. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 6; May 26, 2016 Tr. (Ippensen) 184:6-20.)

233. Serbin also read and reviewed the April 11, 2007 Draft Valuation Report prior to the meeting on April 13, 2007, at which she voted to approve the Transaction. (May 27, 2016 Tr. (Serbin) 106:12-107:21.)

234. Prairie's fairness opinion addressed "whether the consideration to be paid for the shares by the ESOP is equal to or less than their fair market value as of the date of closing, and whether the Transaction is fair to the ESOP Trust from a financial point of view." (Joint Ex. 7 (Prairie Engagement Agreement), at 2.)

235. The purpose of Prairie's fairness opinion was to opine as to whether the Transaction was fair from a financial point of view to the ESOP and whether the terms of financing were reasonable, and set forth the terms under which it conducted its analysis. (June 30, 2016 Tr. (Gross) 48:14-49:5.)

236. Although FBTS retained Prairie to provide a valuation report, FBTS understood that FBTS was ultimately responsible for making the determination of the fair market value of DiPano's shares. (May 26, 2016 Tr. (Ippensen) 7:5-11.)

237. In its fairness opinion, Prairie opined that the consideration the SJP ESOP was paying as part of the Transaction did not exceed fair market value, and that the terms and conditions of the Transaction were fair to the SJP ESOP. (June 30, 2016 Tr. (Gross) 58:18-59:12.)

238. Prairie's fairness opinion stated:

> In completing this engagement, we have relied on information provided by the ESOP Trustee and the Company including, but not limited to, financial statements, projections, product information, facilities descriptions, employee data, and other information as may

> have been requested. This information has been accepted as being
> accurate without independent verification by us.

(Joint Ex. 11 (Apr. 16, 2007 Fairness Opinion), at 3.)

239.   Typically, one of the components of a valuation report is "[a] statement that the data received has been relied on with/without independent verification." (June 30, 2016 Tr. (Van Horn) 150:12-24.) This statement puts the reader (i.e., FBTS) "on alert" that the valuation advisor (i.e., Prairie) did not independently verify the information that it received from its sources and that the burden for conducting any necessary due diligence was shifted to the reader (i.e., FBTS). (June 30, 2016 Tr. (Van Horn) 151:12-21.)

240.   In the normal course of performing a valuation, Prairie often received financial statements; however, Prairie does not undertake an independent audit of that information as Prairie is not an accounting firm. (June 30, 2016 Tr. (Gross) 23:21-24:12; June 29, 2016 Tr. (Aliferis) 4:20-5:6.)

241.   Unless information provided by the seller is implausible on its face, Prairie will typically accept such information as true. (June 29, 2016 Tr. (Aliferis) 80:21-81:12, 83:6-84:16; June 30, 2016 Tr. (Gross) 25:14-19.)

242.   Prairie relied on projections of SJP's future performance to reach its conclusions regarding the value of DiPano's stock. (Stipulation of Facts ¶ 47.)

243.   In the April 11, 2007 Draft Valuation Report, Prairie used the discounted cash flow ("DCF") method and the market multiple method in preparing its valuation. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 46; June 29, 2016 Tr. (Aliferis) 18:11-23; May 26, 2016 Tr. (Ippensen) 103:16-20; Stipulation of Facts ¶ 49.)

244.    Prairie weighed the market multiple method and the DCF method, fifty percent each in the April 11, 2007 Draft Valuation Report.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 46; May 26, 2016 Tr. (Ippensen) 103:16-109.)

245.    Prairie's conclusion of SJP's value under the DCF method was $36,105,000. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 46.)

246.    Prairie's conclusion regarding SJP's value under the market multiple method was $53,607,000.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 46.)

247.    The market multiple method and the DCF method were both standard valuation methods used in the ESOP industry and were appropriately used by Prairie.  (June 30, 2016 Tr. (Van Horn) 82:13-83:8.) It was appropriate to give each valuation method fifty percent weight. (July 14, 2016 Tr. (Messina) 159:1-23.)

248.    Under the DCF method, the value of a company is derived by adding all of the company's projected future cash flows and discounting them to their present value.  (July 14, 2016 Tr. (Messina) 70:13-21; June 30, 2016 Tr. (Gross) 18:1-9; May 26, 2016 Tr. (Ippensen) 186:5-17. June 29, 2016 Tr. (Aliferis) 23:20-24; 148:4-14.)

249.    Under the market multiple method, the value of a closely held company is derived by identifying similar publicly traded companies (the "peer group"), expressing the known market value of the peer group (based on publicly traded share price) as a function of a financial metric, and then applying that formula to derive the privately held company's value. (June 30, 2016 Tr. (Gross) 15:5-16:2; July 14, 2016 Tr. (Messina) 111:23-112:8.)

   *i.*      ***FBTS's Review of Prairie's Reliance on 2006 Performance***

250.    FBTS understood that the financial projections used by Prairie were a leading driver of Prairie's value conclusion under the DCF method. (May 26, 2016 Tr. (Ippensen) 39:1-40:1; July

14, 2016 Tr. (Messina) 70:22-71:4 (explaining that the driving factors of the DCF method are the cash flow projections and discount rate).)

251.   SJP experienced significant, positive revenue growth in the years 2005 and 2006 and reported record revenues, gross profits, and EBITDA for 2006.[21]  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 72, 79; May 24, 2016 Tr. (D'Esposito) 11:6-12:11.)

252.   SJP's growth in the years 2005 and 2006 coincided with DiPano's assumption of the CEO position at SJP.  (May 24, 2016 Tr. (D'Esposito) 31:4-8.)

253.   FBTS attributed SJP's growth in 2005 and 2006 to the change in management structure.  (May 27, 2016 Tr. (Ippensen) 64:21-65:9; May 27, 2016 Tr. (Serbin) 118:6-11.)

254.   Although FBTS may have attributed SJP's growth to change in management, FBTS's belief was unsubstantiated given that FBTS failed to conduct any analysis or diligence to determine the actual effect of management.[22]

255.   FBTS noted SJP's growth in 2005 and 2006 by customer, utilizing the Top Ten Customer Lists in the Offering Memo.  (Joint Ex. 1 (Offering Memo), at 126-28; May 26, 2016 Tr. (Ippensen) 87:22-88:4.)

---

[21] SJP's estimated growth between 2005 and 2006 in terms of net revenues and growth was 34.4% or $60,831,000.  (Joint Ex. 1 (Offering Memo), at 122.)

[22] Defendant contends that DiPano "modernized SJP by, among other things, making upgrades to SJP's equipment fleet and computer systems, as well as changing the management of SJP's maintenance facility and the heavy equipment tracking system."  (Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 23 (citing May 23, 2016 Tr. (DiPano) 48:21-49:3).)  There is no evidence, however, that Prairie or FBTS knew or considered the effect of the change in management structure prior to the SJP ESOP Transaction.  (See June 29, 2016 Tr. (Aliferis) 60:5-20, 62:7-63:4 (Aliferis was unaware that SJP had any proprietary software, and had no recollection of discussing SJP's computer system either with SJP or FBTS) (citing June 29, 2016 Tr. (Aliferis) 60:5-20, 62:7-63:4); see also June 29, 2016 Tr. (Aliferis) 59:18-60:17 (did not recall any discussions with SJP regarding upgrading its fleet beyond the ordinary periodic maintenance, nor did he recall discussing upgrades to its computer system).)

256.    FBTS did not conduct a detailed analysis of SJP's growth in 2005 and 2006 by customer, however, and failed to identify, for example, the inconsistency between SJP's representation that it was diversifying away from Hovnanian and the fact that SJP had grown increasingly reliant on Hovnanian during the past five years. (CFF ¶ 164.)[23]

257.    FBTS also attributed the 2006 growth to SJP's bidding on larger projects and moving into areas outside of New Jersey, such as New York. (May 27, 2016 Tr. (Ippensen) 65:10-15.)  FBTS, however, did not independently verify whether this was true.  (May 26, 2016 Tr. (Ippensen) 59:10-61:17; 80:8-15 (unable to identify any evidence except SJP's top customers for 2006 as reflected in the Offering Memo); July 6, 2016 Tr. (Ash) 43:7-16.)

258.    The Offering Memo revealed that while some customer revenues were growing (e.g., Hovnanian), other customer revenues were decreasing or wholly disappeared (e.g., Sharp, Millennium, Sunrise, Kara Homes, Inc. ("Kara Homes"),[24] Artisan Group, Continental, Signature, Halpern, American Properties, Nordic, Bukiet, SGS Communities).  (Joint Ex. 1 (Offering Memo) at 126.)

259.    Ippensen reviewed the projections in the April 11, 2007 Draft Valuation Report and felt "extremely comfortable" with the projected 0% growth for 2007.  (May 26, 2016 Tr. (Ippensen) 186:24-187:5.)

---

[23] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

[24] Additionally, FBTS and Prairie did not discuss the effect of Kara Homes's bankruptcy on either SJP's ability to match its 2006 revenues, or on SJP's stated strategy of diversifying away from Hovnanian.  (May 26, 2016 Tr. (Ippensen) 102:21-103:1; May 23, 2016 Tr. (Dugan) 176:9-15, 189:17-23.)

260.    Ippensen "remember[ed] distinctly" when reviewing the projections seeing few other reports in his sixteen years of experience that projected 0% growth the year following 34% growth. (May 26, 2016 Tr. (Ippensen) 186:24-187:8.)

261.    Ippensen believed that the projections, which projected 0% growth for 2007 and increased growth in the following years, were "extremely conservative." (May 26, 2016 Tr. (Ippensen) 186:24-187:11.)

262.    Ippensen did not think that the financial projections contained in the April 11, 2007 Draft Valuation Report were unrealistic for various reasons, including growth in SJP's revenue over the prior five years; projected zero percent growth for 2007; $58 million backlog going into 2007; $8.5 million of awarded bids for 2007; and outstanding bids for 2007, which SJP could also have been awarded. (May 27, 2016 Tr. (Ippensen) 16:2-19.)

263.    The financial projections in the April 11, 2007 Draft Valuation Report increased SJP's total operating expenses between 2006 and 2007 and continued to increase the operating expenses from 2007 to 2011. (May 27, 2016 Tr. (Ippensen) 17:12-22; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

264.    SJP was projected to achieve revenue growth of $16 million during the five years 2007 through 2011, which is $1 million more than the revenue growth that SJP achieved in 2006 as compared to 2005. (May 27, 2016 Tr. (Ippensen) 21:6-20; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

265.    Prairie projected that SJP would generate average revenues, gross profits, gross profit margins, EBITDA, EBITDA margins, and cost of sales margins that deviated from SJP's historical five-year average. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

266.     Prairie projected that SJP would match its 2006 record gross profits in 2007 and achieve record gross profits in each subsequent year.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

267.     Prairie's projected cost of sales, cost of sales margins, and income from operations margins were more favorable than either SJP's five-year average, three-year average, or two-year average historical margins.  (June 29, 2016 Tr. (Aliferis) 28:4-30:3, 31:1-16; Joint Ex. 9 (Apr. 11, 2007 Draft), at 72, 79.)

268.     The financial projections in the April 11, 2007 Draft Valuation Report decreased EBITDA for 2007 by five percent as compared to 2006.  (May 27, 2016 Tr. (Ippensen) 17:23-18:17; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.   June 29, 2016 Tr. (Aliferis) 33:2-10; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)  SJP's 2007 projected EBITDA, however, was still approximately twice as large as SJP's year historical average.  (*See* Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

269.     When calculating the projected revenues and sales for SJP, Prairie took into account whether SJP had sufficient equipment, personnel, and finances to realize the projections, based on the information supplied by SJP.  (June 29, 2016 Tr. (Aliferis) 35:7-15; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

270.     Although Prairie projected SJP's costs to increase because SJP was in a capital intensive business, (June 29, 2016 Tr. (Aliferis) 35:7-22; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79), Prairie projected that SJP's costs as a percentage of sales would be 5.5% less than SJP's historical cost as a percentage of sales (Joint Ex. 9 (Apr. 11, 2007 Draft), at 79; *see also* Demonstrative 3.)

271.     SJP's 2006 unadjusted income from operations was 16.25%. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 72.)  SJP's five-year, three-year, and two-year average unadjusted income from operations were: 9.92%, 9.89%, and 12.99%, respectively.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 72.)

272.    Further, from 2002 to 2003, SJP's unadjusted income from operations decreased from 13.05% to 6.90%; and from 2003 to 2004, SJP's unadjusted income from operations decreased from 6.90% to 3.86%.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 72.)

273.    Prairie believed that the 16.25% unadjusted income from operations in 2006 demonstrated that SJP's profitability had been increasing, specifically since 2004.  (June 29, 2016 Tr. (Aliferis) 151:11-20.)

274.    Prairie also determined that the gross profit projections for 2007 to 2011, which mirrored the 25.4% achieved by SJP in 2006, were reasonable based on discussions with management, historical trend analysis, growth in revenue and profitability, strong backlog numbers, and continued solicitation of bids on new projects.  (June 29, 2016 Tr. (Aliferis) 152:16-153:10; Joint Ex. 9 (Apr. 11, 2007 Draft) at 72.)

275.    Aliferis concluded that the drivers for SJP's profitability were an increase in revenues, due to SJP's change in management, and an increase in profit margins, due to SJP's ability to provide a variety of services for each job (meaning that SJP was vertically integrated and could offer a more comprehensive array of services per job, permitting it to bid for larger projects).  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 51; June 29, 2016 Tr. (Aliferis) 87:17-89:24, 151:14-25; May 23, 2016 Tr. (DiPano) 46:2-20.)  For example, SJP had the ability to clear a work site, to process refuse from the site, and then to perform work on the site, such as paving, the creation of roads, and other necessary infrastructure for home building activity.  (May 25, 2016 Tr. (Miscione) 24:3-10.)

276.    As a function of SJP's ability to crush and recycle rock on site, the Offering Memo stated that SJP was the "only vertically integrated site developer in the region."  (Joint Ex. 1 (Offering Memo) at 11.)

277.    Notwithstanding the Offering Memo's description of SJP as "vertically integrated," SJP was only partially vertically integrated because it did not supply its own commodity products, such as asphalt, through its value chain. (July 14, 2016 Tr. (Messina) 49:21-50:6.)

278.    Prairie believed that SJP's vertical integration allowed SJP to achieve its record revenues in 2006 and to bid on larger more profitable projects. (June 29, 2016 Tr. (Aliferis) 89:7-10, 99:15-20.)

279.    SJP had been partially vertically integrated, however, since at least 1996 when Dyna-Tec's formation completed the SJP trifecta of South Jersey, National, and Dyna-Tec. (Joint Ex. 1 (Offering Memo) at 25; May 23, 2016 Tr. (DiPano) 27:20-25 (testifying that SJP had been using rock crushing equipment since 1996); May 25, 2016 Tr. (Miscione) 24:11-25:13.)

280.    SJP's partial vertical integration did not provide it with any long-term sustainable competitive advantages because smaller companies had the ability to subcontract different parts of the value chain, thereby vertically integrating themselves. (July 14, 2016 Tr. (Messina) 53:10-18; Joint Ex. 1 (Offering Memo), at 46 (stating that "[s]mall companies can compete effectively by subcontracting their services to larger firms, specializing by type of work, or becoming a preferred contractor for local builders and developers").)

281.    Although cost advantages owing to a company's vertical integration are typically quantified in a valuation report (July 14, 2016 Tr. (Messina) 53:22-54:3), SJP's purported cost advantages due to its vertical integration were not quantified in the April 11, 2007 Draft Valuation Report (*see generally* Joint Ex. 9 (Apr. 11, 2007 Draft)).

282.    The EBITDA gross profits and EBITDA margins in the April 11, 2007 Draft Valuation Report were more favorable to a higher valuation of SJP than the same computations in the Offering Memo. (May 26, 2016 Tr. (Ippensen) 54:9-21.)

283.   FBTS was never told by Prairie why the difference in the EBITDA gross profits and EBITDA margins between the Offering Memo and the April 11, 2007 Draft Valuation Report arose. (May 26, 2016 Tr. (Ippensen) 54:22-55:6.)

### ii.   FBTS's Review of Prairie's Consideration of Backlog

284.   Backlog is work on hand (i.e., new work or a previous year's unfinished contract work) that has yet to be performed. (May 23, 2016 Tr. (DiPano) 41:3-14.)

285.   SJP's backlog at the end of 2006 was approximately $58 million.[25] (Joint Ex. 1 (Offering Memo), at 27; Joint Ex. 9 (Apr. 11, 2007 Draft), at 13; June 29, 2016 Tr. (Aliferis) 153:23-154:1.)

286.   As stated in the Offering Memo, SJP's backlog grew from 2005 to 2006 as a result of SJP's bidding on larger multi-phase projects and an increased work rate. (May 23, 2016 Tr. (DiPano) 70:7-25; Joint Ex. 1 (Offering Memo), at 27.)

287.   In contrast to SJP's backlog at the end of 2006 of $58 million, SJP's backlog at the end of 2005 was $38 million and 2006 was SJP's most profitable year. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 13, 32.)

288.   SJP expected to work on 75% of the $58 million backlog in 2007. (May 26, 2016 Tr. (Ippensen) 74:15-21; Joint Ex. 1 (Offering Memo), at 27; Joint Ex. 9 (Apr. 11, 2007 Draft), at 13.)

289.   It would have been unusual for Prairie to make any sort of independent verification of SJP's backlog. (June 30, 2016 Tr. (Van Horn) 97:11-98:8.)

---

[25] SJP's 2006 year-end backlog was comprised of contracts that SJP had been awarded in 2002, 2003, 2004, 2005, and 2006. (Joint Ex. 1 (Offering Memo), at 26; May 23, 2016 Tr. (Dugan) 130:2-19 (explaining that the prefix on the Job Number referred to the year in which the contract had been awarded).)

290.    Prairie did not obtain or review any of SJP's contracts supporting the backlog. (June 29, 2016 Tr. (Aliferis) 64:13-65:16, 84:13-16.)

291.    FBTS did not independently verify SJP's representations concerning backlog prior to the Transaction.[26]

292.    The significant amount of backlog SJP had going into 2007 was one of the reasons FBTS and Prairie felt confident that SJP would be able to realize its 2007 projections as set forth in the April 11, 2007 Draft Valuation Report.  (May 26, 2016 Tr. (Ippensen) 75:6-9; May 25, 2016 Tr. (Cory) 143:19-23, 164:23-165:9; May 27, 2016 Tr. (Serbin) 121:7-9; June 29, 2016 Tr. (Aliferis) 63:12-17.)

293.    Prairie believed that SJP's revenue and revenue growth projections were supported by backlog and bids.  (June 29, 2016 Tr. (Aliferis) 106:18.)  Prairie, however, did not determine whether SJP's profit and expense margins (e.g., gross margins, EBITDA margin, cost of goods sold margins) were also supported by backlog and bids.  (July 29, 2016 Tr. (Aliferis) 131:16-136:10.)

294.    While backlog can be a good indicator of a company's revenues for the following year, particularly for a company in the construction industry, (June 29, 2016 Tr. (Aliferis) 153:11-22; July 14, 2016 Tr. (Messina) 181:10-12), backlog alone would have been insufficient to assure a prudent investor that SJP was going to meet its projections for 2007.  (Sept. 19, 2016 Tr. (Puntillo) 81:22-84:4.)

---

[26] FBTS did not obtain or review any of SJP's contracts supporting SJP's backlog figure.  (May 26, 2016 Tr. (Ippensen) 75:19-20; May 27, 2016 Tr. (Ippensen) 31:2-7; July 6, 2016 Tr. (Ash) 61:9-12; Sept. 23, 2016 (Cory) 51:24-52:4; *see also* June 29, 2016 Tr. (Aliferis) 64:13-65:16, 84:13-16 (Prairie did not obtain or review any of SJP's contracts supporting SJP's backlog figure).) Rather, this representation was copied verbatim by Prairie from the Offering Memo.  (*Compare* Joint Ex. 1 (Offering Memo), at 27, *with* Joint Ex. 9 (Apr. 11, 2007 Draft) at 13.)

295.    A prudent investor must determine what the backlog consists of, with whom the company has contracts, whether the backlog is represented by signed contracts, and how long it will take a company to generate revenue from the backlog.  (Sept. 19, 2016 Tr. (Puntillo) 81:22-84:4.)  Further, backlog is not necessarily correlated with sales because it can be cancelled.  (July 14, 2016 Tr. (Messina) 88:5-13.)

296.    Three of the largest jobs in SJP's backlog had been awarded in 2006 (i.e., Grove at New Windsor for $14,101,078, Reserve at New Windsor for $5,062,415, and Montvale for $2,829,289).  (May 23, 2016 Tr. (Dugan) 157:22-25; Joint Ex. 1 (Offering Memo), at 26.)

297.    In addition, SJP generally bid approximately $140 million in work per year and had an average historical hit rate of approximately 45%.  (Joint Ex. 1 (Offering Memo), at 27.)  The 45% hit rate represented the quantity of jobs SJP successfully bid.  (May 23, 2016 Tr. (DiPano) 59:3-17.)

298.    FBTS considered SJP's historical hit rate of 45% one of the reasons SJP could meet its 2007 projections as set forth in the April 11, 2007 Draft Valuation Report.  (Joint Ex. 1 (Offering Memo), at 26; May 26, 2016 Tr. (Ippensen) 79:10-22; July 6, 2016 Tr. (Ash) 125:13-19 (Ash believed that SJP had a good chance of making its projections given its $58 million backlog and 45% hit rate on its bids).)

299.    Going into 2007, SJP was starting to expand into New York by bidding on increasingly large-scale site development projects in that state, including work related to the Stewart Air Force Base and for Hovnanian.  (May 23, 2016 Tr. (Dugan) 145:24-146:23.)

300.    SJP's growing backlog was a positive indicator that SJP was growing as a company and winning increased bid work.  (May 23, 2016 Tr. (DiPano) 70:20-25.)

301.     In the process of carrying out its audit, the Curchin Group reviewed SJP's contracts and billings to date, confirmed the total amounts, the amount of work to date, the amounts billed, and any amounts owed to SJP.  (July 1, 2016 Tr. (Fouratt) 8:15-24.)

302.     The Curchin Group also independently verified SJP's backlog numbers by making inquiries to management and analyzing the information provided about the remaining work to be done, as well as contracts awarded but not yet started.  (July 1, 2016 Tr. (Fouratt) 9:14-22.)

303.     The Curchin Group did not complete its audit of SJP's finances for 2006 prior to the Transaction because it needed the completed SJP valuation to adjust the finances for SJP's contribution to the ESOP and did not review any of SJP's contracts prior to the Transaction.  (CFF ¶ 135.)[27]

304.     Prairie and FBTS did not determine when SJP had been awarded the contracts that constituted its backlog.  (June 29, 2016 Tr. (Aliferis) 107:8-108:10; May 27, 2016 Tr. (Ippensen) 70:20-22.)

305.     On February 7, 2007, SFE&G requested from SJP a description of SJP's contracts in excess of $50,000.  (Joint Ex. 13 (February 7, 2011 E-mail from Steere to Dugan), at 4.)

306.     On March 29, 2007, SFE&G renewed its request to SJP for a description of contracts valued in excess of $50,000.  (FBTS Ex. 64 (Mar. 29, 2007 E-mail from Steere to D'Esposito), at D00854.)

307.     In response to SFE&G's requests for contracts in excess of $50,000, SJP indicated that it would only provide SFE&G with a single basic form contract.  (FBTS Ex. 64 (Mar. 30, 2007 E-mail from Cheslow to Steere), at D00853-54.)

---

[27] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

308.    SJP did not enter into contracts with three out of its top ten customers.  (May 23, 2016 Tr. (Dugan) 135:2-24.)

309.    FBTS was not aware that SJP conducted business with some of its customers without entering into a contract.[28]

### iii.    FBTS's Review of Prairie's Consideration of Historical Volatility

310.    FBTS reviewed the historical EBITDA and EBITDA margins for SJP for the years 2002 to 2006, and did not consider SJP's financial performance to be volatile.  (May 26, 2016 Tr. (Ippensen) 56:6-58:7.)

311.    The Offering Memo and April 11, 2007 Draft Valuation Report reflected the volatility of SJP's historical margins and growth.  (Joint Ex. 1 (Offering Memo), at 34, 38; Joint Ex. 9 (Apr. 11, 2007 Draft), at 72, 79; July 14, 2016 Tr. (Messina) 89:16-24, 95:25-96:6; 97:25-98:4 (describing SJP's historical EBITDA, EBITDA margins, and cost of goods sold margins as volatile).)

312.    As reported in the April 11, 2007 Draft Valuation Report, SJP's historical margins for EBITDA, income from operations, and income before taxes and gross profit, varied substantially from one year to the next.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 72, 79 "Percentage Income Statements," "Year to Year Growth," and "EBITDA Margin"; *see also* Demonstrative 10 (showing SJP's EBITDA margin standard deviation).)

313.    FBTS never expressed any concern to either Prairie or Duff & Phelps that the historical financial performance of SJP appeared to be volatile.  (May 26, 2016 Tr. (Ippensen) 56:6-8, 58:8-12; May 25, 2016 Tr. (Miscione) 16:15-17:9.)

---

[28] Given that FBTS never independently verified SJP's representations concerning backlog prior to the Transaction (CFF ¶ 291), and in the absence of evidence to the contrary, the Court finds that FBTS did not know that SJP conducted business with some of its customers without a contract.

314.    FBTS believed that SJP's historical financial performance was not volatile because SJP's revenues grew from 2002 to 2006.  (May 27, 2016 Tr. (Ippensen) 20:16-21:5.)

315.    Revenue and revenue growth rates do not necessarily translate into profit and are not necessarily good indicators of a company's financial health, particularly in a cyclical business or a business with low margins.  (July 14, 2016 Tr. (Messina) 81:21-82:9.)

316.    In cyclical or low margin businesses, it is possible for a company to grow revenue while simultaneously failing to grow its profit.  (July 14, 2016 Tr. (Messina) 81:21-82:9.)

317.    It is important to analyze both the top line in terms of revenue and the bottom line in terms of net income and margins.  (May 27, 2016 Tr. (Serbin) 115:23-116:6 (stating that "[r]evenue is great, but you got to make money with that revenue.  So it has to be smart business versus the other.  Because you can work all day long and make—and lose lots of money"); May 25, 2016 Tr. (Cory) 166:20-167:2.)

318.    SJP's revenues in 2004 grew by $7.7 million (or 21.31%) and its net income increased 154.35%, yet its EBITDA margin decreased by 1.3% and its gross profit margin decreased by 5.9%.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 72, 79.)

#### iv.    *FBTS's Review of Prairie's Reliance on Seller's Projections*

319.    Prairie utilized the Offering Memo's projections, though it made some upwards adjustments.  (Stipulation of Facts ¶ 47; June 29, 2016 Tr. (Aliferis) 80:1-9, 91:24-92:11; May 26, 2016 Tr. (Ippensen) 41:14-23; *compare* Joint Ex. 1 (Offering Memo), at 36, 40, 122, *with* Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

320.    FBTS did not recast the seller's projections; rather, it utilized the seller's projections and/or made upward adjustments to various earnings line items (i.e., EBITDA, EBITDA margin, gross profit, gross profit margin, pretax income) or a downward adjustment to

the expense line items (i.e., cost of goods sold).  (Stipulation of Facts ¶ 47; June 29, 2016 Tr. (Aliferis) 80:1-9, 91:24-92:11; May 26, 2016 Tr. (Ippensen) 41:14-23; *compare* Joint Ex. 1 (Offering Memo), at 36, 40, 122, *with* Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

321.  A prudent investor typically recasts the projections contained in the seller's financial model based on at least some of the investor's independent due diligence.  (Sept. 19, 2016 Tr. (Puntillo) 59:23-61:1; 109:2-6.)  Recast projections tend to be more conservative than the seller's projections.  (Sept. 19, 2016 Tr. (Puntillo) 109:2-110:22.)

322.  Approximately three weeks prior to the Transaction, Prairie sought SJP's comment and approval for the projections Prairie sought to utilize in its valuation.  (FBTS Ex. 9 (Mar. 24, 2016 E-mail from Aliferis to D'Esposito and Miscione).)

323.  Neither Prairie nor FBTS spoke with SJP's accountant about SJP's historical or projected financial information.  (July 1, 2016 Tr. (Fouratt) 23:22-24:3.)

324.  Prairie assumed that the projections provided by SJP reflected SJP's best estimates. Prairie did not undertake any independent analysis to verify whether the stated reasons supporting the projections were correct apart from reviewing updated financials and speaking with the Company.  (June 29, 2016 Tr. (Aliferis) 79:15-25.)

325.  FBTS never asked Prairie how it arrived at the projection figures it used in its April 11, 2007 Draft Valuation Report.  (May 26, 2016 Tr. (Ippensen) 55:7-10.)

326.  FBTS never compared the projections used in the April 11, 2007 Draft Valuation Report with the projections contained in the Offering Memo.  (May 26, 2016 Tr. (Ippensen) 55:2-10.)

327.  FBTS never expressed any concerns that the projected revenues, EBITDA margins, or cost-of-sales margins were more favorable than SJP's historical performance.  (May 26, 2016

Tr. (Ippensen) 42:7-13 (no recollection of expressing concern that projected revenues were too high in light of historical levels), 44:17-21 (no recollection of expressing concerns to Prairie that EBITDA margin was higher than historical levels), 46:18-22 (no recollection of expressing concern regarding projected cost of sales margins lower than historical levels); Sept. 23, 2016 Tr. (Cory) 38:18-39:2.)

328.     Cory, whom FBTS identified as the employee principally responsible for the financial review, did not speak to anyone about Prairie's projections, did not know if anyone else at FBTS spoke with either SJP or Prairie about these projections, and did not recall what, if anything, FBTS did to verify that the projections were attainable.  (May 25, 2016 Tr. (Cory) 113:11-114:11.)

329.     Ash, who does not have a financial background, felt comfortable with Prairie's projections because Prairie felt comfortable with the projections.  (July 6, 2016 Tr. (Ash) 60:8-14 (stating that if Prairie is comfortable with the projections, then she is also comfortable with the projections).)

330.     FBTS did not independently review the accuracy of the financial information that SJP provided to Prairie.  (May 26, 2016 Tr. (Ippensen) 35:10-13.)

331.     FBTS did not review SJP's final 2006 audited financials as they had not been completed until after the Transaction, (July 1, 2016 Tr. (Fouratt) 22:8-10), and did not review the draft audited financials for 2006 prior to the Transaction.  (CFF ¶ 136.)[29]

332.     Unlike FBTS, at least one prospective lender solicited by SJP to finance the Transaction noted the inconsistency between the projected gross profit margins and the historical

---

[29] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

margins, and asked Duff & Phelps to explain why SJP believed it would achieve its projections. Pl.'s Ex. 5 (Jan. 25, 2007 E-mail from Buendia to Miscione), at 3.)

333.    Prairie copied verbatim large portions of SJP's business description contained in the Offering Memo and pasted those descriptions directly into its valuation report, including information pertaining to SJP's reputation, customer concentration, site job bids, bid hit rate, backlog, competition, and purported competitive advantages. (*Compare* Joint Ex. 1 (Offering Memo), at 22-32, *with* Joint Ex. 9 (Apr. 11, 2007 Draft), at 8-17; May 26, 2016 Tr. (Stipulation by Defendant's counsel) 66:15-20.)

334.    Prairie assumed the information it copied and pasted from the Offering Memo to be accurate based on discussions with SJP's management and the information that it received from SJP's advisors. (June 29, 2016 Tr. (Aliferis) 52:11-18; June 30, 2016 Tr. (Gross) 24:6-25:2, 25:14-26:6.)

335.    Although Ippensen believed that the written materials that Prairie consulted independently corroborated SJP's representations regarding its standing in the industry, (May 26, 2016 Tr. (Ippensen) 70:24-71:6), none of these materials specifically mentioned SJP or discussed SJP's industry standing. (June 29, 2016 Tr. (Aliferis) 52:19-53:6.)

336.    FBTS did not raise the issue of Prairie's copying-and-pasting with Prairie. (May 26, 2016 Tr. (Ippensen) 64:12-13.)

337.    FBTS knew that Prairie had accepted the Offering Memo's representations as true. (May 26, 2016 Tr. (Ippensen) 65:15-21.)

338.    Neither FBTS nor Prairie spoke with SJP's customers, or any trade associations, or otherwise independently verified the seller's favorable descriptions of SJP. (May 26, 2016 Tr.

(Ippensen) 69:8-18, 73:23-74:9; July 6, 2016 Tr. (Ash) 67:12-20, 80:3-20; Sept. 23, 2016 Tr. (Cory) 45:1-4.)

> **v.      FBTS's Review of Prairie's Consideration of Industry Cyclicality**

339.    Cyclical industries tend to operate with more volatility due to fluctuations within the economy. (July 14, 2016 Tr. (Messina) 61:21-62:1.)

340.    When valuing a company's historical financial performance within a cyclical industry, a valuation professional should look back at least five years. (July 14, 2016 Tr. (Messina) 77:19-23.)

341.    The homebuilding industry is cyclical. (July 14, 2016 Tr. (Messina) 61:21-66:16; May 26, 2016 Tr. (Ippensen) 158:25; July 5, 2016 Tr. (Stoesser) 89:1-14; Joint Ex. 1 (Offering Memo), at 12, 47.)

342.    The homebuilding industry cycle is approximately seven to ten years. (July 14, 2016 Tr. (Messina) 66:3-8; July 5, 2016 Tr. (Stoesser) 89:3-14.)

343.    Prairie's use of 2006 as the baseline for its projections ignored the fact that SJP was in a cyclical business and led to an inflated value conclusion by projecting SJP's "peak" indefinitely into the future. (July 14, 2016 Tr. (Messina) 62:2-10, 77:24-78:23.)

344.    When creating projections for future growth, it is not typical to simply rely on the growth of the most recent financial year. (May 25, 2016 Tr. (Miscione) 72:9-18.)

345.    At some point in 2006, the housing market in New Jersey began to decline off of its record high in 2005. (Joint Ex. 10 (Apr. 27, 2007 Report), at 32 (Residential Building Permits), at 33 (Non-Residential contracts); Joint Ex. 2 (Mar. 2, 2007 E-mail from Christoffel to Aliferis, attaching Offering Memo), at 54; May 26, 2016 Tr. (Ippensen) 158:18-25.) According to information available prior to the SJP ESOP Transaction, residential building permits in New

Jersey had declined in 2006, and were expected to further decline in 2007. (Joint Ex. 10 (Apr. 27, 2007 Report), at 32 (residential building permits in 2006 were down from 38,632 in 2005 to 33,328 in 2006, and expected to decline further to 29,996 in 2007).)

346.    FBTS interpreted the April 11, 2007 Draft Valuation Report as stating that, for the years 2007 to 2009, there would be a cooling of the national housing market. (May 26, 2016 Tr. (Ippensen) 161:25-162:13.)

347.    The April 11, 2007 Draft Valuation Report stated:

> Although recent indicators have been mixed, the economy seems likely to expand at a moderate pace on balance over coming quarters. The [Federal Open Market Committee ("FOMC")] currently acknowledges mixed signals applicable to the economy. The *Beige Book* prepared several weeks prior to a meeting of the FOMC suggested, "Despite continuing softness in automobile and housing-related sales, most Districts reported that consumer spending increased during October and early November."

(Joint Ex. 9 (Apr. 11, 2007 Draft), at 20.)

348.    The April 27, 2007 Post-Transaction Valuation Report explicitly stated that New Jersey's housing market was not expected to improve in 2007. (Joint Ex. 10 (Apr. 27, 2007 Report), at 32-33 ("New Jersey's housing market will not pull out of its slump in 2007").)

349.    FBTS understood that during this period, SJP would be working not only on residential site preparation, but also on commercial and public construction. (May 26, 2016 Tr. (Ippensen) 162:19-163:9.)

350.    FBTS was unaware, however, of how many commercial or public construction projects SJP was involved in, and, prior to the Transaction, FBTS was unaware of the percentage of SJP's revenues that came from residential as opposed to non-residential projects. (May 27, 2016 Tr. (Ippensen) 36:6-37:12.)

351.    FBTS understood that the Federal Treasury Department had predicted that the housing market was going to rebound after 2007.  (May 26, 2016 Tr. (Ippensen) 163:12-16.)

352.    Based on Ippensen's review of the April 11, 2007 Draft Valuation Report, he believed that the slowdown in the economy would have less of an effect in the Northeast than in other parts of the country.  (May 27, 2016 Tr. (Ippensen) 90:18-91:2; Joint Ex. 9 (Apr. 11, 2007 Draft), at 26.)

353.    The April 11, 2007 Draft Valuation Report, however, noted that the United States economy and other dominant world economies showed satisfactory prospects for the forthcoming quarters of 2006, not 2007.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 29 (referencing projected U.S. GDP growth for 2006, and projected growth of world economy for 2006, though noting that consumer spending in the United States was likely to slow in 2007).

354.    Return on assets is an indicator of how profitable a company is relative to its investments in capital equipment and other assets.  (July 14, 2016 Tr. (Messina) 102:7-10.)

355.    Return on assets provides a "sanity check" on projections because companies in industries tend to have consistent return on assets.  (July 14, 2016 Tr. (Messina) 102:10-16.)

356.    Return on assets is typically computed in a valuation report.  (July 14, 2016 Tr. (Messina) 102:-25-103:4; July 15, 2016 Tr. (Messina) 39:14-21; *see, e.g.*, Pl.'s Ex. 8 (Dec. 31, 2007 Report), at 89 "Rate of Return Ratios"; Sept. 23, 2016 Tr. (Cory) 40:18-22.)

357.    Companies with dominant market positions, enormous brand values, and economies of scale, such as Microsoft, Disney, IBM, and Procter & Gamble, do not achieve return on assets above 25%.  (July 14, 2016 Tr. (Messina) 104:1-13.)

358.    A company without any competitive advantages and earning returns on assets in the 25% to 30% range would expect to see competition enter its marketplace, thereby driving down margins to the company's historical average.  (July 14, 2016 Tr. (Messina) 104:20-105:5.)

359.    Prairie did not compute SJP's historical or projected return on assets in its valuation for the Transaction.  (Joint Ex. 9 (Apr. 11, 2007 Draft).)

360.    Prairie, however, did compute SJP's return on assets in subsequent valuation reports.  (*See, e.g.*, Pl.'s Ex. 8 (Dec. 31, 2007 Report), at 89; Pl.'s Ex. 9 (Dec. 31, 2008 Report), at 88.)

361.    SJP's historical return on assets were:

| Historical Return on Assets | |
| --- | --- |
| 2002 | 12.6% |
| 2003 | 0.2% |
| 2004 | 2.4% |
| 2005 | 11.9% |
| 2006 | 25.4% |

(Pl.'s Ex. 8 (Dec. 31, 2007 Report), at 89; Demonstrative 7.)

362.    SJP's five-year historical average return on assets was approximately 11%. (Demonstrative 7; Demonstrative 17.)

363.    Prairie projected that SJP would achieve return on assets in excess of 25%.  (July 14, 2016 Tr. (Messina) 103:13-19; *see also* Demonstrative 7.)

364.    FBTS never discussed either SJP's historical or projected return on assets prior to the Transaction.  (Sept. 23, 2016 Tr. (Cory) 41:15-18.)

365.     Aliferis testified that he accounted for the decline in the homebuilding industry by assuming flat revenue growth.  (June 29, 2016 Tr. (Aliferis) 102:14-17.)

366.     The flat revenue growth that Prairie projected SJP to experience in 2007 was based on SJP's highest year at the peak of the homebuilding industry's cycle.  (July 14, 2016 Tr. (Messina) 77:24-78:8 (Prairie projected SJP's peak cycle indefinitely into the future), 82:10-21 (error to assume a zero percent growth rate from a record year when industry is facing headwinds and largest customer is stating that it was going to operate as if in a prolonged decline).)

367.     Prairie's projections assumed that SJP would outperform its entire industry because Prairie believed that SJP was "run well."  (June 29, 2016 Tr. (Aliferis) 106:1-4.)

368.     Prairie's valuation failed to account for the likelihood that SJP's 2006 record performance was attributable to a contemporaneous or near contemporaneous peak in the homebuilding cycle during which it obtained several large projects from Hovnanian.  (July 14, 2016 Tr. (Messina) 62:4-63:16 (explaining dangers of using peak or trough of cycle), 66:9-16 (noting general consensus that housing cycle was coming to an end around April of 2007), 78:3-23 (indicating that Prairie used peak of cycle to formulate projections); May 23, 2016 Tr. (Dugan) 130:24-132:21 (SJP was awarded several large Hovnanian contracts).)

369.     FBTS did not consider the possibility that SJP's record 2006 performance was attributable in whole or in part to a near contemporaneous peak in the homebuilding cycle.  (May 26, 2016 Tr. (Ippensen) 81:23-82:11; June 29, 2016 Tr. (Aliferis) 107:17-19, 172:7-17.)

370.     FBTS did not question Prairie as to what Prairie did to account for the cyclicality of SJP's industry.  (Sept. 23, 2016 Tr. (Cory) 59:1-7.)

*vi.*     *FBTS's Review of Prairie's Consideration of SJP's Competitive Advantages*

371.     In determining the fair market value of a particular company, it is important to understand the company's competition and the competitive landscape.  (June 29, 2016 Tr. (Aliferis) 10:5-6, 16:13-15; June 30, 2016 Tr. (Gross) 22:21-23:13; July 14, 2016 Tr. (Messina) 33:23-37:7 (discussing concepts of competitive risk and competitive advantage as they pertain to valuation); Sept. 23, 2016 Tr. (Cory) 44:11-22.)

372.     SJP operates in a highly competitive industry.  (July 14, 2016 Tr. (Messina) 42:2-12; Joint Ex. 1 (Offering Memo), at 27-28 (discussing SJP's competition, including the trend for material suppliers to "expand their lay down operations into SJP's marketplace"), at 46 (discussing competitive landscape), at 49 (discussing competition from general contractors).)

373.     A valuation report should include the following components:

1.     Size and Competition: Discuss how the absolute and relative size of the entity affects its value, how the company determines pricing, who the competitors are and how they compete.

2.     Product/service Differentiation: Discuss how the company's products and/or services differ from its competitors.

3.     Market Share: Discuss the company's positioning relative to the industry and competition.

4.     Ease of Market Entry: Discuss the ease, barriers and obstacles of entering the market. Provide a summary of the barriers to entry and how they affect the company.[30]

(June 30, 2016 Tr. (Van Horn) 171:1-9, 172:4-11, 178:5-16.)

374.     Prairie failed to include these components in its April 11, 2007 Draft Valuation Report, in whole or in part, by failing to identify SJP's competitors by name, failing to discuss

---

[30] The Court notes that this list constitutes a summary, as opposed to a direct excerpt, of the June 30, 2016 trial transcript.

SJP's positioning relative to the industry and its competition, and failing to discuss the ease of entry or barriers to entry into SJP's market and the effect on the Company.  (June 30, 2016 Tr. (Van Horn) 171:16-22, 178:5-16.)

375.    FBTS never ascertained the identities of SJP's competitors or determined what equipment those competitors possessed.  (May 26, 2016 Tr. (Ippensen) 65:9-21, 69:8-70:2; May 25, 2016 Tr. (Miscione) 25:16-18; May 25, 2016 Tr. (Cory) 152:24-153:4; July 6, 2016 Tr. (Ash) 47:22-23; June 29, 2016 Tr. (Aliferis) 58:18-20; Sept. 20, 2016 Tr. (Puntillo) 11:21-12:13.)

376.    FBTS could not have analyzed SJP's competitive landscape without knowing who its competitors were or determining what equipment they used.  (Sept. 20, 2016 Tr. (Puntillo) 13:9-25.)

377.    Prior to the Transaction, FBTS believed that SJP had a competitive edge or a competitive advantage, (*see* May 26, 2016 Tr. (Ippensen) 67:21-25), even though the Offering Memo reported that smaller companies, which provided one or more of SJP's primary services—paving, excavation and underground utilities, rock crushing and recycling, and drilling and blasting—made up SJP's competition, and that material suppliers had entered SJP's marketplace resulting in a 30% reduction of paving revenues.  (Joint Ex. 1 (Offering Memo), at 27-28.)

378.    FBTS did not verify the seller's representations regarding SJP's purported advantages over its competitors.  (Sept. 23, 2016 Tr. (Cory) 46:22-25 (stating that she did not know what FBTS did to verify that SJP had competitive advantages); July 6, 2016 Tr. (Ash) 80:10-20.)

379.    It is generally accepted in finance that sustainable competitive advantages are typically limited to proprietary technology, brand name, and cost advantage.  (July 14, 2016 Tr. (Messina) 39:18-40:23.)

380.     Absent a sustainable competitive advantage, a company cannot continuously outperform its industry.  (July 14, 2016 Tr. (Messina) 40:24-41:17.)

381.     A valuation professional should not project that a company will outperform its industry unless such company possesses a sustainable competitive advantage.  (July 14, 2016 Tr. (Messina) 40:24-41:17.)

382.     SJP operated in an industry with low barriers to entry.  (July 14, 2016 Tr. (Messina) 42:22-43:7; Joint Ex. 1 (Offering Memo), at 28.)

383.     SJP did not possess any pricing power as it bid for a vast majority of its business. (July 14, 2016 Tr. (Messina) 42:8-12.)

384.     SJP did not differentiate its product through non-price strategies as it was dependent on bidding to obtain business.  (July 14, 2016 Tr. (Messina) 43:13-23.)

385.     SJP did not possess any proprietary technology such as patents, trademarks, or licenses.  (FBTS Ex. 64, at D00854 (item 5); June 29, 2016 Tr. (Aliferis) 62:4-9; May 23, 2016 Tr. (Dugan) 191:7-22.)

386.     SJP informed Aliferis that it was in possession of equipment it had imported from Europe and of which no competitor in the local marketplace was in possession.   (June 29, 2016 Tr. (Aliferis) 59:2-10.)

387.     At or around the time of the Transaction, National accounted for only 12.9% of SJP's revenues.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 12.)

388.     In or around 1996, National began using mobile rock crushing equipment.  (May 23, 2016 Tr. (DiPano) 27:20-23, 38:7-9; May 23, 2016 Tr. (Dugan) 87:16-25; May 24, 2016 Tr. (D'Esposito) 19:3-11 (late 1990's).)

389.   SJP's mobile rock crushers were the first of their kind in the United States and were featured in a CBS television evening news story.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 10; May 23, 2016 Tr. (DiPano) 48:10-14.)

390.   In 2006 and the first quarter of 2007, SJP's use of mobile rock crushing equipment allowed it to work in rocky areas that were difficult to develop and, therefore, to provide services in areas that none of its competitors were able to provide services.  (May 23, 2016 Tr. (DiPano) 46:21-47:16.)  Because the crushed rock could then be used for other purposes on the job site, this also eliminated the cost of purchasing and delivering the material that would otherwise be used for those purposes.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 9-10; May 23, 2016 Tr. (DiPano) 18:8-20.)

391.   Unlike a stationary rock crusher, a mobile rock crusher was track mounted and able to move around a job site.  (May 23, 2016 Tr. (DiPano) 27:8-17.)

392.   A mobile rock crusher could move to a blasting location on a site, rather than trucking the blasting refuse to the crusher.  This eliminated an additional cost.  (May 23, 2016 Tr. (DiPano) 29:20-25; May 24, 2016 Tr. (D'Esposito) 19:12-23.)

393.   SJP made modifications to the mobile rock crushing equipment on a yearly basis and employed new technology for the crushers every two to three years.  (May 23, 2016 Tr. (DiPano) 40:21-41:2.)   One of the upgrades implemented on its mobile rock crushers was a vibrating screen, which was able to more capably sort smaller rock fragments from dirt.  (May 23, 2016 Tr. (DiPano) 39:4-40:2.)

394.   One of the benefits of the mobile rock crusher was that it took less than one day to set up, as opposed to a stationary rock crusher, which took five days to set up.  (May 23, 2016 Tr. (DiPano) 28:1-9; 29:3-11.)

68

395.   SJP's use of the mobile rock crushing equipment allowed it to capture certain customers who wanted to develop sites that were previously prohibitive or more costly to develop. (May 23, 2016 Tr. (DiPano) 48:6-18.)

396.   SJP's rock crusher was not proprietary technology because anyone could purchase one. (June 29, 2016 Tr. (Aliferis) 62:4-6; July 14, 2016 Tr. (Messina) 44:6-14, 45:6-17.)

397.   As of April 16, 2007, and to the best of DiPano's knowledge, SJP was still the only company in the United States that had a mobile primary and secondary rock crusher.   (May 23, 2016 Tr. (DiPano) 45:6-17.)  But, "other companies [had] started buying crushers that were of the portable type . . . , and also cheaper—a configuration of portable and mobile.  It could be a mobile primary, but not of the quality that [SJP] would buy."  (May 23 Tr. (DiPano) 45:12-16.)

398.   The Offering Memo described SJP's use of its rock crushing equipment as a "major innovation in the industry" because it allowed SJP to reduce haul off costs by reusing the crushed rock at the worksite, and further stated that SJP's mobile rock crushing equipment allowed National to become a "dominant market leader."  (Joint Ex. 1 (Offering Memo), at 11, 23-24.)

399.   Prairie copied these representations about SJP's rock crushing equipment verbatim into its April 11, 2007 Draft Valuation Report.  (*Compare* Joint Ex. 1 (Offering Memo), at 23-24, *with* Joint Ex. 9 (Apr. 11, 2007 Draft), at 10.)

400.   Prairie obtained its information about SJP's innovative position in the market only from "discussions with [SJP's] management regarding the [C]ompany's product services, customers[,] and market" and SJP's financial advisor.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 7; June 29, 2016 Tr. (Aliferis) 50:11-52:6, 52:11-18; June 30, 2016 Tr. (Gross) 24:6-25:2, 25:14-26:6.)

401.   Cory—the individual whom FBTS identified as the person chiefly responsible for reviewing SJP's financial materials—believed that SJP's use of the mobile rock crusher justified Prairie's projections of higher profit margins than SJP's historical profit margins.  (May 25, 2016 Tr. (Cory) 145:15-19, 150:24-151:11.)

402.   FBTS determined that SJP's use of the mobile rock crushing equipment gave it a competitive advantage, which would enable SJP to reach the projections contained in the April 11, 2007 Draft Valuation Report.  (May 26, 2016 Tr. (Ippensen) 67:21-25.)

403.   FBTS believed that SJP's use of the rock crushing equipment allowed SJP to realize higher profit margins than its competitors.  (May 26, 2016 Tr. (Ippensen) 67:16-25.)

404.   FBTS never spoke with any of SJP's competitors, customers, or trade associations to verify the representations concerning SJP's rock crushing equipment.  (May 26, 2016 Tr. (Ippensen) 65:9-21, 66:23-70:2, 70:19-23.)

405.   FBTS was unaware of whether Prairie had spoken with any of SJP's customers. (May 26, 2016 Tr. (Ippensen) 70:16-18.)

406.   Neither FBTS nor Prairie determined whether any of SJP's competitors possessed similar rock crushing equipment or how easily they could acquire such equipment.  (May 25, 2016 Tr. (Cory) 152:24-153:7; May 26, 2016 Tr. (Ippensen) 69:24-70:2; June 29, 2016 Tr. (Aliferis) 57:22-58:17.)

407.   Prairie and FBTS did not determine what quantitative effect, if any, the rock crushing equipment had on SJP's expenses or profitability.  (July 6, 2016 Tr. (Ash) 47:8-12; May 25, 2016 Tr. (Cory) 152:1-4; June 29, 2016 Tr. (Aliferis) 58:21-59:1; May 26, 2016 Tr. (Ippensen) 68:1-69:7.)

408.    The April 11, 2007 Draft Valuation Report represents that SJP possessed proprietary technology.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 51 (stating "implementation of proprietary technology and improved processes and controls helped the Company realize higher margins as well as positioning it well for ongoing growth").)

409.    The April 11, 2007 Draft Valuation Report did not identify the purported "proprietary technology" it mentioned.  (*See generally* Joint Ex. 9 (Apr. 11, 2007 Draft).)

410.    SJP's attorney, Cheslow, specifically advised FBTS's attorneys that SJP did not possess proprietary technology (i.e., patents, trademarks, or licenses) prior to the Transaction. (FBTS Ex. 64 (Mar. 30, 2007 E-mail Chain), at D00854, item 5.)

411.    SJP did not possess any other type of proprietary technology prior to the Transaction.  (June 29, 2016 Tr. (Aliferis) 62:7-9.)

412.    Cory incorrectly believed that SJP's rock crushing equipment constituted SJP's proprietary technology.  (Sept. 23, 2016 Tr. (Cory) 45:11-16.)

413.    SJP had made "modifications" to its rock crushing equipment, which Dugan believed rendered the equipment proprietary.  (May 23, 2016 Tr. (Dugan) 191:7-17.)

414.    SJP did not have a patent on this modification to its equipment and any other company could have made this modification.  (May 23, 2016 Tr. (Dugan) 191:18-22.)

415.    There is no mention in the April 11, 2007 Draft Valuation Report of the modifications that Dugan identified.  (*See generally* Joint Ex. 9 (Apr. 11, 2007 Draft).)

416.    FBTS was not aware of these modifications prior to the Transaction.  (June 29, 2016 Tr. (Aliferis) 59:2-12.)

417.    FBTS never noticed or resolved the inconsistent representations in the April 11, 2007 Draft Valuation Report (Joint Ex. 9 (Apr. 11, 2007 Draft), at 51) and the e-mail message from Cheslow (FBTS Ex. 64, at D00854) regarding SJP's alleged proprietary technology.

418.    If a company possesses a patent or proprietary technology, such technology and the cost advantages associated with having such technology should be discussed in a valuation report. (July 14, 2016 Tr. (Messina) 44:15-23.)

419.    SJP did not possess a brand name that provided it with a competitive advantage over its competitors.  (July 14, 2016 Tr. (Messina) 47:9-22.)

420.    SJP did not possess any cost advantages as it was a relatively small, regional site preparation company.  (July 14, 2016 Tr. (Messina) 47:23-48:16.)

421.    SJP's competition included large companies that had the advantage of servicing multiple types of projects simultaneously.  (Joint Ex. 1 (Offering Memo), at 46.)

422.    SJP's competition included smaller companies that were able to effectively compete by subcontracting their services to larger firms.  (Joint Ex. 1 (Offering Memo), at 46.)

423.    Historically, SJP's paving division accounted for 20% of SJP's total revenue.  (Joint Ex. 1 (Offering Memo), at 28; Joint Ex. 9 (Apr. 11, 2007 Draft), at 14.)

424.    Prior to the Transaction, SJP's paving revenues had been reduced by 30% as a result of material suppliers expanding their lay down operations into SJP's marketplace.  (Joint Ex. 1 (Offering Memo), at 28; Joint Ex. 9 (Apr. 11, 2007 Draft), at 14.)

425.    Prior to the Transaction, SJP's suppliers became SJP's major competition.  (Joint Ex. 1 (Offering Memo), at 28; Joint Ex. 9 (Apr. 11, 2007 Draft), at 14.)

426.    Bargaining power describes the business leverage that one party may have over another to secure contractual advantages.  (July 14, 2016 Tr. (Messina) 61:11-17.)

427.    SJP's relationship with Hovnanian did not constitute a contractual advantage because SJP did not have any exclusive rights to perform business with Hovnanian; rather, SJP had to bid for Hovnanian's business.  (July 14, 2016 Tr. (Messina) 58:4-13; June 29, 2016 Tr. (Aliferis) 70:5-8; July 6, 2016 Tr. (Ash) 65:21-24, 66:14-18, 67:7-17; May 24, 2016 Tr. (D'Esposito) 76:4-6.)

428.    The Offering Memo downplayed the increase in major competition with SJP's business by representing that "[i]n 2005 and 2006[,] this trend has slowed and SJP feels it once again has a competitive advantage."  (Joint Ex. 1 (Offering Memo), at 28.)

429.    Prairie copied the Offering Memo's representations regarding SJP's competition verbatim and pasted them into the April 11, 2007 Draft Valuation Report.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 14.)

430.    Specifically, the April 11, 2007 Draft Valuation Report stated:

> **Paving** – while the paving division accounts for approximately 20% of SJP Group revenues, in recent years, paving revenues have been reduced by nearly 30%. The major factor contributing to the reduction of revenues was the trend for some material suppliers to expand their lay down operations into SJP's marketplace. Suppliers, who once gave SJP a competitive edge due to the Company's purchasing volume, professionalism, and prompt payment, became the major competition. In 2005 and 2006 this trend has slowed and SJP feels it once again has a competitive advantage.

(Joint Ex. 9 (Apr. 11, 2007 Draft), at 14.)

431.    Neither the Offering Memo nor the April 11, 2007 Draft Valuation Report explained why SJP believed that this trend (i.e., material suppliers becoming SJP's major competition) had slowed.  (*See* Joint Ex. 1 (Offering Memo); Joint Ex. 9 (Apr. 11, 2007 Draft); May 26, 2016 Tr. (Ippensen) 81:12-16.)

432.    FBTS did not resolve the inconsistency between Prairie's statement that SJP believed it "once again has a competitive advantage" with the seller's representation that SJP had recently lost 30% of its paving revenues to competition.[31]

### vii.    FBTS's Review of Prairie's Use of Discount Rate

433.    The discount rate in the April 11, 2007 Draft Valuation Report represented the present value of future earnings and did not represent the risk that SJP would not make its projections. (July 14, 2016 Tr. (Messina) 70:8-21.)

434.    Typically, no more than two or three percent of any present value discount rate pertains to company-specific risk factors. (July 14, 2016 Tr. (Messina) 107:1-108:6; *see also* June 30, 2016 Tr. (Van Horn) 86:22-88:23 (computing the subject company risk premium as 3.3% of the total discount rate and testifying that the remainder is objective data found from publicly available hard sources); June 29, 2016 Tr. (Aliferis) 148:15-24 (stating that company-specific premium added "2 or 2 and a half percentage point risk").)

435.    To determine a cost of equity discount rate, Prairie reviewed the capital asset pricing model, the risk-free bond rate, the market risk premium, the size of the Company, and the Company-specific premium. (June 29, 2016 Tr. (Aliferis) 131:16-133:7.)

436.    The discount rate utilized in the DCF method is primarily based on fixed numbers, with the exception of the company-specific premium, which typically adds only two to three percentage points to the total discount rate. (July 14, 2016 Tr. (Messina) 107:1-108:6; *see also* June 30, 2016 Tr. (Van Horn) 86:22-88:23 (computing the subject company risk premium as 3.3% of the total discount rate and testifying that the remainder is objective data found from publicly

---

[31] In light of the lack of evidence concerning FBTS's knowledge of the inconstancy and FBTS's failure to produce evidence as to how FBTS reconciled the inconsistency, the Court finds that FBTS did not resolve the inconsistency between Prairie and SJP's statements.

available hard sources); June 29, 2016 Tr. (Aliferis) 148:15-24 (stating that company-specific premium added "[two] or [two-]and[-]a[-]half percentage point risk").

437.    Prairie considered the issue of customer concentration in formulating the discount rate, by taking into account Company-specific risk.[32]  (June 29, 2016 Tr. (Aliferis) 148:15-24.)

438.    Prairie applied a discount rate of 19.25% in its DCF analysis.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 42.)

439.    Prairie's free cash flow projections were free cash flows that could be obtained by all equity holders and took into account interest expense and outstanding long-term debt.  (June 29, 2016 Tr. (Aliferis) 131:16-132:23.)

440.    Prairie's projected net cash flow for 2007 was $4,782,800 and Prairie's projected revenues for 2007 was $60,715,660.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 81; May 27, 2016 Tr. (Serbin) 186:24-187:8.)

441.    The 2007 projected net cash flow was then reduced by 25%, for a total of $3,587,100 in adjusted net cash flow, to account for the fact that three months of the year 2007 had passed by the time of the Transaction.[33]  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 81; May 27, 2016 Tr. (Ippensen), at 5:18-6:7.)

---

[32] While Aliferis believed that he factored in SJP's customer concentration into the company-specific discount rate, he could not recall how much he specifically contributed to the discount rate.  (June 29, 2016 Tr. (Aliferis) 148:15-24.)

[33] The 25% reduction was a necessary adjustment to reflect the fact that the buyer would not be purchasing the cash flows for January through March of 2007 (i.e., the first quarter of the year), which is entirely driven by the mathematical ratio of annual cash flows that remain available to the buyer.  (May 27, 2016 Tr. (Ippensen) 79:12-18, 80:1-5.)  Further, the 25% discount was "rounded down" (i.e., in favor of the seller), because sixteen of the fifty-two weeks in 2007 (or 30%) had elapsed prior to the Transaction, and, therefore, the ESOP would not obtain 30% of the projected cash flows for 2007 as of the Transaction date.  (May 27, 2016 Tr. (Ippensen) 79:12-25 (discount should have been larger than 25%, because 25% only accounted for passage of time

442.   In the April 11, 2007 Draft Valuation Report, Prairie also included a range of discount rates and valuation ranges for the SJP stock:

| Discount Rate | SJP Stock Valuation Range |
|---|---|
| 18.25% | $16,839,489 |
| 18.75% | $16,615,881 |
| 19.25% | $16,398,434 |

(Joint Ex. 9 (Apr. 11, 2007 Draft), at 51.)

443.   Prairie provided three, rather than one, valuation numbers, in an effort to represent a range of fairness as to price.   (Joint Ex. 9 (Apr. 11, 2007 Draft), at 51; June 29, 2016 Tr. (Aliferis) 149:17-150:15.)

444.   The April 11, 2007 Draft Valuation Report did not identify or discuss specific factors or assumptions that were used to arrive at the three different discount rates.   (Joint Ex. 9 (Apr. 11, 2007 Draft).)

445.   Prairie concluded that fair market value for 38% of the SJP stock ranged from $16,398,434 to $16,839,489.   (Joint Ex. 9 (Apr. 11, 2007 Draft), at 51; June 29, 2016 Tr. (Aliferis) 150:12-15.)

446.   The 19.25% discount rate amounted to a valuation of $16,398,434.   (Joint Ex. 9 (Apr. 11, 2007 Draft), at 48.)

447.   The $16 million purchase price was lower than the low end of Prairie's range of fairness as to price.   (June 29, 2016 Tr. (Aliferis) 150:16-18.)

---

through March, and not April); Joint Ex. 9 (Apr. 11, 2007 Draft), at 81; May 27, 2016 Tr. (Ippensen) 6:1-22.)

448.   Ippensen concluded that a lower, less conservative discount rate (i.e., 18.25%) would have been appropriate. (Joint Ex. 9; May 27, 2016 Tr. (Ippensen) 10:4-13.)

449.   Based on Prairie's April 11, 2007 Draft Valuation Report, Serbin concluded that the $16 million purchase price for the SJP stock was fair market value because it was below the value resulting from the highest discount rate, i.e., $16,398,434 from a 19.25% discount rate. (May 27, 2016 Tr. (Serbin) 123:17-124:7; Joint Ex. 9 (Apr. 11, 2007 Draft), at 51.)

450.   In addition, Prairie included a 5% discount for lack of marketability, which amounted to an additional reduction in the value of the SJP stock based on the fact that the stock was not in the publicly traded marketplace. (May 27, 2016 Tr. (Ippensen) 12:15-13:2; June 29, 2016 Tr. (Aliferis) 134:18-23; Joint Ex. 9 (Apr. 11, 2007 Draft), at 51.)

451.   The 5% discount for lack of marketability is required under the DCF method if the company is not publicly traded, and the 5% discount was in the middle range of what Ippensen would normally expect. (May 27, 2016 Tr. (Ippensen) 80:6-81:4 (5% lack of marketability is neither too high nor too low, and failure to apply a marketability discount to a privately held company would be a "clear error").)

452.   Because the SJP ESOP was purchasing the stock for less than the fair market value estimated by FBTS and Prairie, FBTS did not negotiate the price with DiPano. (May 27, 2016 Tr. (Ippensen) 12:8-14; 124:8-15; July 6, 2016 Tr. (Ash) 110:2-7.)

453.   Purchase prices in ESOP transactions are not always negotiated. A trustee may choose to accept the purchase price offered by the seller if it is reasonable or below a valuation firm's assessment of fair market value, and instead focus on negotiating other aspects of the transaction. (June 21, 2016 Tr. (Fischer) 47:7-48:7.)

### viii.    *FBTS's Review of Prairie's Consideration of SJP's 2007 First Quarter Performance*

454.    SJP's revenues for January 2007 were 37% below SJP's revenues for January 2006. (Pl.'s Ex. 23 (1006 Chart-Q1 Revenues).)

455.    SJP's revenues progressively declined for each month in the first quarter of 2007. (Pl.'s Ex. 23 (1006 Chart-Q1 Revenues).)

456.    SJP's revenues for January 1, 2007 through March 31, 2007, were 56.4% below SJP's revenues for those months in 2006.  (Pl.'s Ex. 23 (1006 Chart-Q1 Revenues).)

457.    According to SJP's interim financial statements, SJP's gross profits for January 1, 2007 through March 31, 2007 were 97.4% below SJP's gross profit for those months in 2006. (Pl.'s Ex. 24 (1006 Chart-Q1 Gross Profit).)

458.    According to SJP's interim financial statements, SJP's net income for January 1, 2007 through March 31, 2007 was 128.3% below SJP's net income for those months in 2006. (Pl.'s Ex. 25 (1006 Chart- Net Income).)

459.    FBTS did not review any of SJP's interim financial statements for the first quarter of 2007 prior to the Transaction.  (May 26, 2016 Tr. (Ippensen) 90:12-14.)

460.    During the April 13, 2007 telephone conference, Aliferis claimed to have only reviewed the interim financial statements for January 2007 and February 2007, and represented that he would review the March 2007 interim financial statements before finalizing his report. (Joint Ex. 12 (Apr. 13, 2007 Memo), at 1.)

461.    The April 27, 2007 Post-Transaction Valuation Report, however, indicated that Prairie only reviewed SJP's interim financial statements for the period ending February 28, 2007 prior to the Transaction.  (Joint Ex. 10 (Apr. 27, 2007 Report), at 3 "Analysis of Information Provided.")

462.    Ippensen speculated that the reason Prairie did not review the interim financial statements for March 2007 is because those statements may not have been available prior to the Transaction.  (May 26, 2016 Tr. (Ippensen) 27:12-17.)

463.    Ippensen was never specifically told that the interim financial statements for March were unavailable.  (May 26, 2016 Tr. (Ippensen) 29:4-12.)

464.    Ippensen assumed that the interim financials for March 2007 were unavailable because the April 27, 2007 Post-Transaction Valuation Report (Joint Ex. 10, at 3) did not reference them.  (May 26, 2016 Tr. (Ippensen) 29:1-7, 90:1-4.)

465.    Even assuming that the March 2007 interim financial statements were not prepared in their final format, all of the information used to compile the interim financial statements for March 2007 was known or knowable prior to the Transaction.  (June 29, 2016 Tr. (Aliferis) 183:23-184:21 (absent accounting changes, revenue and expenses should be documented).)

466.    Prairie was able to use interim financial information current through April 30, 2007 in its post-Transaction valuation of SJP as of April 30, 2007, because, even assuming that the actual interim statement for April 30, 2007 was not available, all of the information necessary to create the April 30, 2007 interim statement was known or reasonably knowable as of that date. (June 29, 2016 Tr. (Aliferis) 185:25-186:4; Pl.'s Ex. 7 (Apr. 30, 2007 Report), at 3.)

467.    FBTS never discussed SJP's poor 2007 first quarter performance prior to the Transaction.  (May 26, 2016 Tr. (Ippensen) 91:24-92:17; May 25, 2016 Tr. (Cory) 112:19-25; Sept. 23, 2016 Tr. (Cory) 19:20-20:3, 20:4-17.)

468.    At the time he voted for the Transaction, Ippensen had concluded that SJP had the capacity (throughout its personnel, equipment, management and backlog) to make up any seasonal

fluctuations in its revenues throughout the remainder of 2007.  (May 27, 2016 Tr. (Ippensen) 95:25-96:6.)

469.    Ippensen assumed that Aliferis confirmed with SJP that there were no operational or financial changes based on a representation to that effect in the April 11, 2007 Draft Valuation Report, but Ippensen was unaware of what specifically Aliferis did to make that determination. (May 27, 2016 Tr. (Ippensen) 61:24-62:12, 62:20-63:23; May 26, 2016 Tr. (Ippensen) 92:4-13 (did not recall discussing 2007 first quarter with anyone, but assumed Prairie discussed it because "the report included commentary about representations from SJP about no operational or financial changes").)

470.    Ippensen concluded that despite SJP's 2007 first quarter performance, the numbers set forth in the April 11, 2007 Draft Valuation Report were achievable and conservative, based on Prairie's use of a 19.25% discount rate, 0% prediction in revenue growth, 5% discount for lack of marketability, 25% discount of net cash flow, and 40% discount on the market multiple method. (May 27, 2016 Tr. (Ippensen) 27:5-14.)

471.    At the time she voted for the Transaction, Ash had concluded that SJP could still meet its projections despite a bad first quarter.  (July 6, 2016 Tr. (Ash) 125:20-126:1.)  Ash lacked the necessary ability to determine if, in fact, SJP could realistically meet its projections.  (July 6, 2016 Tr. (Ash) 8:8-9:24, 12:1-19; May 26, 2016 Tr. (Ippensen) 37:2-7.)  Rather, Ash's conclusion was based on the general principle that "you can have a bad quarter and still continue to meet the projections [because] we had nine months to go."  (July 6, 2016 Tr. (Ash) 125:20-126:1.)

472.    Revenue performance could be affected by "temporary explainable event[s]," such as adverse weather or maintenance on machinery.  (Sept. 20, 2016 Tr. (Puntillo) 42:2-43:2.)

473.    Although weather can be a "temporary explainable event" that may affect performance, it is incumbent on a prudent investor to (1) verify that weather does in fact account for the extent of the observable effect (Sept. 19, 2016 Tr. (Puntillo) 79:21-80:13); (2) verify if weather resulted in a delay or cancellation of the projects, and if delayed, for how long (Sept. 19, 2016 Tr. (Puntillo) 80:14-19); and (3) if the projects were delayed, what additional expenses would be incurred as a result of those delays and thus, the effect of those delays on profitability margins, such as EBITDA.  (Sept. 19, 2016 Tr. (Puntillo) 80:19-81:5.)

474.    FBTS assumed that projects do not just "disappear[] into thin air," (May 27, 2016 Tr. (Ippensen) 88:11-18), without ever examining what additional costs SJP would expectedly incur due to those delays (e.g., payroll and equipment leasing) (May 24, 2016 Tr. (D'Esposito) 72:4-73:12), or the mathematical effect that delays would have as a result of the progressive discounts under the DCF method.

475.    In 2006, SJP's most profitable year, 87% of SJP's total year income was earned in the first quarter of 2006, showing that SJP was capable of having an extremely successful quarter that would make its year.  (Demonstrative 24.)

476.    SJP's total 2006 first quarter revenues were $15,453,027, representing approximately 25% of its total annual revenues of $60.7 million. (Pl.'s Ex. 23.)

477.    FBTS and Prairie did not look at SJP's historical quarterly performance to assess the impact of SJP's 2007 first quarter performance on the valuation.  (May 27, 2016 Tr. (Ippensen) 96:21-24; *see also* June 29, 2016 Tr. (Aliferis) 100:5-24 (other than January 2007 and February 2007, Aliferis did not recall looking at SJP's historical quarterly or monthly performance, and did not recall being asked to do so by FBTS).)

478.   A decline of 56% in revenues was significant enough to merit additional discussion with Prairie. (Sept. 23, 2016 Tr. (Cory) 22:21-24:13.)

479.   Neither the April 11, 2007 Draft Valuation Report, the April 27, 2007 Post-Transaction Valuation Report, the April 13, 2007 Memo, nor the April 16, 2007 Financial Report Review[34] mentions SJP's 2007 first quarter financial performance or explains how SJP will be able to make up for this shortfall during the remainder of the year. (Joint Ex. 9 (Apr. 11, 2007 Draft); Joint Ex. 10; Joint Ex. 12 (Apr. 13, 2007 Memo); Joint Ex. 15 (Financial Report Review), at 3.).

480.   Generally, a valuation report should identify material information affecting its value conclusions. (July 15, 2016 Tr. (Messina) 68:9-13.)

481.   Conversely, if a valuation report does not contain a discussion of a particular issue, that issue, in all likelihood, was not considered material to the valuation. (July 15, 2016 Tr. (Messina) 68:14-17.)

482.   In light of the significant decline in revenues during the first quarter of 2007, a reliable valuation report of SJP, as of April 16, 2007, would have had some discussion of the possible causes of those results. (July 15, 2016 Tr. (Messina) 78:9-15, 78:20-79:12.)

483.   A valuation firm typically discusses its most recent financial results and their effect, if any, on projections. (July 14, 2016 Tr. (Messina) 86:22-87:2.)

---

[34] After a transaction closes, FBTS's financial analyst prepares a document called a "Financial Report Review." (Sept. 23, 2016 Tr. (Cory) 26:12-24, 69:22-25; May 26, 2016 Tr. (Ippensen) 120:11-16.) The Financial Report Review includes, *inter alia*, the names of the FBTS officers who performed a post-transaction review of the valuation, the performance of market indices for the period under review, a summary of changes to a company's financial metrics over the preceding year, and the qualifications of the valuation analyst. (*See, e.g.*, Joint Ex. 15 (Financial Report Review).)

484.    The only record of any discussion concerning SJP's 2007 first quarter performance prior to the Transaction is Cory's handwritten notation that Aliferis "briefly reviewed internally prepared 2/28/07 #s." (Joint Ex. 12 (Apr. 13, 2007 Memo), at 3.)

485.    SJP's poor 2007 first quarter performance is first mentioned in connection with Prairie's preparation of a post-Transaction report for April 30, 2007. (Pl.'s Ex. 7 (Apr. 30, 2007 Report), at 45-46.)

486.    FBTS's EB Committee notes for the post-Transaction April 30, 2007 Post-Transaction Valuation Report similarly alluded to SJP's poor 2007 first quarter performance and explained it, in part, as a result of the weather. (Pl.'s Ex. 15 (EB Committee Notes), at 3 "Post-Transaction Review April 30, 2007.")

487.    In light of SJP's actual 2007 first quarter revenues, SJP would need to realize a compound quarterly rate of approximately 58%—more than fourteen times its average historical rate of approximately 4%—to realize the revenues projected in Prairie's valuation reports. (Sept. 19, 2016 Tr. (Puntillo) 76:4-77:25; Demonstrative 19.)

488.    A prudent investor would have performed some sort of due diligence in light of the discrepancy between the projected annualized revenues and net income and the projected revenues and net income used in Prairie's valuation reports to determine the reasonableness of Prairie's projections. (Sept. 19, 2016 Tr. (Puntillo) 73:18-22; 78:16-77:12.)

489.    Even assuming that SJP achieved a 0% revenue growth rate in the second, third, and fourth quarters of 2007, SJP's overall 2007 revenue growth rate would be approximately negative 15% in light of SJP's poor performance in the first quarter of 2007. (July 14, 2016 Tr. (Messina) 85:13-25.)

490.   All else being equal, had Prairie utilized a negative 15% revenue growth rate for 2007, SJP's value under the DCF method would have decreased by $7.2 million. (July 14, 2016 Tr. (Messina) 88:14-21.)

491.   Historically, SJP earned between 15% and 20% of its annual revenues during the first quarter of a given year. (May 24, 2016 Tr. (D'Esposito) 16:13-21.)

492.   Historically, if the weather during the first quarter of a year is particularly mild, the first quarter revenues might account for closer to 20% of annual revenues, but if the first quarter experiences more severe weather, the first quarter revenues might be closer to 15% of annual revenues. (May 24, 2016 Tr. (D'Esposito) 16:22-17:1.)

493.   Based on D'Esposito's testimony regarding the historical relationship between first quarter revenues and total annual revenues, SJP's 2007 first quarter revenues of $6.73 million (Pl.'s Ex. 23) represented between $33.67 million (15%) to $44.89 million (20%) of annual projected revenues.

494.   SJP's 2007 first quarter revenues of $6.73 million (Pl.'s Ex. 23) represented approximately 17% of SJP's actual annual 2007 revenues of $40.129 million. (Pl.'s Ex. 8 (Dec. 31, 2007 Report), at 46.)

495.   Weighing each quarter evenly, SJP's actual 2007 first quarter revenues of $6.73 million yield projected annualized revenues of less than $27 million—approximately $34 million below SJP's projected revenues used in Prairie's valuation reports. (Demonstrative 24; Sept. 19, 2016 Tr. (Puntillo) 71:6-16.)

496.   Based on SJP's actual financial performance during the first quarter of 2007, SJP's annualized net income was negative $4.7 million—approximately $13.3 million below SJP's

projected net income used in Prairie's valuation reports. (Demonstrative 24; Sept. 19, 2016 Tr. (Puntillo) 73:2-23.)

497.   At the end of 2006, SJP's CFO was expecting SJP to realize approximately $5 million in revenues per month for the first quarter of 2007. (May 24, 2016 Tr. (D'Esposito) 17:2-4, 17:19-23.)

498.   FBTS never asked Prairie to determine SJP's historical quarterly growth, or determine any relationship between SJP's first quarter historical performance and its annual performance. (June 29, 2016 Tr. (Aliferis) 27:18-24, 100:5-11.)

499.   At trial, FBTS suggested that SJP's 2007 first quarter performance was due to abnormally severe weather. (May 24, 2016 Tr. (D'Esposito) 63:15-64:2; June 29, 2016 Tr. (Aliferis) 80:17-20; May 23, 2016 Tr. (DiPano) 66:1-67:5; May 27, 2016 Tr. (Ippensen) 61:4-15.)

500.   Since the 1990s, SJP has typically experienced lower revenues during the first three months of the year than in the remaining months of the year because the weather is usually worse during the first three months of the year. (May 24, 2016 Tr. (D'Esposito) 16:3-12, 36:25-37:5.)

501.   Although Prairie believed that the projects affected by weather-related delays in the first quarter of 2007 could still be completed in the 2007 fiscal year, (June 29, 2016 Tr. (Aliferis) 159:25-160:6), FBTS never determined whether any of the first quarter projects were cancelled, as opposed to delayed, (May 25, 2016 Tr. (Cory) 113:4-7), or whether SJP would incur additional expenses to make up its lost first quarter revenues. (May 24, 2016 Tr. (D'Esposito) 72:24-73:12 (did not recall being asked if SJP would incur additional expenses for wages or equipment leasing to make up the lost first quarter revenues; *see also* June 29, 2016 Tr. (Aliferis) 99:12-100:4 (Prairie never looked at SJP's financial performance on a quarter-by-quarter basis).)

502.    FBTS did not ask Prairie what the effect on the valuation would be if some of the revenues projected for 2007 were delayed until 2008.  (June 29, 2016 Tr. (Aliferis) 27:11-15.)

503.    SJP's 2007 first quarter performance was not measured in comparison to the summer of 2006, but rather the identical winter months of 2006.  Accordingly, seasonal winter weather does not explain the 2007 first quarter decline in relation to the first quarter of 2006.

504.    During particularly severe winters, SJP had earned a minimum 15% of its annual revenue during first quarters in years prior to 2007.  (May 24, 2016 Tr. (D'Esposito) 16:13-17:1.) Here, the $6.73 million first quarter revenues were less than 11% of the annual projected revenues of $61 million.

505.    There was nothing that led FBTS to believe that the weather during the first quarter of 2007 was out of the ordinary from prior years.  (May 27, 2016 Tr. (Ippensen) 60:18-20, 60:23-61:3.)

506.    Dr. David Robinson, New Jersey State climatologist for the Center for Environmental Protection, Cook College/NJAES, Rutgers University, authored a February 2007 Climate Summary showing that February 2007 was the sixteenth coldest February since 1895 and the second coldest February since 1979.  (FBTS Ex. 28, at D00508.)

507.    Prior to the Transaction, FBTS did not determine the effect of weather on SJP's 2007 first quarter performance.  (May 27, 2016 Tr. (Ippensen) 61:4-15, 67:14-20 (FBTS did not verify weather conditions in SJP's region).)

508.    Neither FBTS nor Prairie independently verified the weather conditions in SJP's region for the first quarter of 2007.  (May 27, 2016 Tr. (Ippensen) 67:17-20; June 29, 2016 Tr. (Aliferis) 80:21-25; Sept. 23, 2016 Tr. (Cory) 37:5-16.)

509.    The data from the New Jersey Office of the Climatologist shows that January 2007 was abnormally mild, and that the period of November 2006 through January 2007 was the second warmest on record, and that precipitation was 0.26 inches below normal.  (Pl.'s Ex. 16 (Jan. 2007 Weather Summary), at 1.)

510.    The monthly average temperature for January 2007 was 37.1°F, which was 5.9°F higher than the normal temperature of 31.2°F.  (Pl.'s Ex. 17 (Monthly Mean Temperatures), at 2.)

511.    The average temperature in January 2006 was 38.9ºF, which was approximately 8°F higher than normal, and the warmest since 1998.  (Pl.'s Ex. 17 (Monthly Temperature Records), at 2.)

512.    The average temperature in February 2006 was 34.3ºF, which was approximately 1°F higher than average.  (Pl.'s Ex. 17 (Monthly Temperature Records), at 2.)

513.    The average temperature in March 2006 was 41.8ºF, which was slightly higher than average.  (Pl.'s Ex. 17 (Monthly Temperature Records), at 2.)

514.    The average precipitation in February 2006 was 1.9 inches, which was approximately 0.5 to 1.0 inches below average.  (Pl.'s Ex. 18 (Monthly Precipitation Records), at 2.)

515.    The average precipitation in March 2006 was 0.8 inches, which was over three inches below average, and the driest March on record.  (Pl.'s Ex. 17 (Monthly Temperature Records), at 2.)

516.    FBTS and Prairie understood that SJP's ability to generate revenue was dependent, in part, on the weather, and that SJP could generate additional revenues if the weather was unseasonably mild.  (June 29, 2016 Tr. (Aliferis) 99:6-11; May 27, 2016 Tr. (Ippensen) 65:23-25; Sept. 23, 2016 Tr. (Cory) 37:17-23; July 5, 2016 Tr. (Stoesser) 109:10-13, 114:2-115:4.)

517.   Although SJP achieved record high revenues in 2006, neither Prairie nor FBTS considered the possibility that SJP's revenues in 2006 might have been the result of abnormally mild weather. (June 29, 2016 Tr. (Aliferis) 99:21-100:4; May 27, 2016 Tr. (Ippensen) 67:14-16; 6:113:1-3.)

518.   Under the DCF method, revenues realized later in time are discounted more steeply than revenues realized closer in time—for example, projected revenues for 2008 are worth 13% less than projected revenues for 2007. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 81 "Present Value Factors at 19.25%"; June 29, 2016 Tr. (Aliferis) 25:11-27:10.)

519.   Under the DCF method, a company that is expected to realize revenues in 2007 has a higher value than one where those revenues are delayed until 2008 or subsequent years as they are discounted more heavily. (July 14, 2016 Tr. (Messina) 86:22-87:2; July 15, 2016 Tr. (Messina) 84:20-86:12; June 29, 2016 Tr. (Aliferis) 26:25-27:7.)

520.   A prudent investor would not have accepted the seller's stated explanation that the Company's poor first quarter performance was caused by adverse weather without first independently verifying the purported connection between performance and weather. (Sept. 19, 2016 Tr. (Puntillo) 79:21-80:5.)

521.   A prudent investor would have first verified the purported weather conditions to determine if in fact they were outside of the historical norms. (Sept. 19, 2016 Tr. (Puntillo) 80:6-13.)

522.   If the weather was outside the historical norms, a prudent investor would have additionally investigated whether the target company's projects were postponed rather than cancelled as a result of the adverse weather. (Sept. 19, 2016 Tr. (Puntillo) 80:14-19.)

523.    If the projects were postponed rather than cancelled, a prudent investor would have additionally determined the effect of the postponement on SJP's cash flows and profit margins. (Sept. 19, 2016 Tr. (Puntillo) 80:19-24.)

524.    At trial, FBTS suggested that SJP's 2007 first quarter performance was due to equipment maintenance.  (Sept. 20, 2016 Tr. (Puntillo) 38:13-16 (question posed by counsel for FBTS regarding maintenance); May 23, 2016 Tr. (DiPano) 65:1-9.)

525.    SJP shut down National's operations in the beginning of January 2007 to conduct "heavy maintenance." (May 23, 2016 Tr. (DiPano) 65:1-20.)  The shutdown resulted in a lack of revenue for National and increased maintenance, equipment, and personnel costs, all of which were absorbed in January 2007.  (May 23, 2016 Tr. (DiPano) 65:1-20.)

526.    There is nothing in the April 11, 2007 Draft Valuation Report, April 27, 2007 Post-Transaction Valuation Report, the April 13, 2007 Memo, or the April 16, 2007 Financial Report Review that discussed SJP's first quarter performance or attributed it to equipment maintenance. (Joint Ex. 9 (Apr. 11, 2007 Draft); Joint Ex. 10; Joint Ex. 12; Joint Ex. 15.)

527.    FBTS did not have any conversations regarding the weather and its potential effect on SJP's valuation or regarding SJP performing maintenance on its equipment during the first quarter of 2007.[35]

528.    Neither the April 30, 2007 Post-Transaction Valuation Report nor the corresponding EB Committee notes discussed any equipment maintenance.  (Pl.'s Ex. 7 (Apr. 30,

---

[35] Although Cory testified that she recalls some conversation regarding the weather and its potential connection with SJP's 2007 first quarter performance (but cannot say if it occurred before or after the Transaction), (Sept. 23, 2016 Tr. (Cory) 30:12-17), the Court finds that no conversation took place before the SJP ESOP Transaction based on the lack of corroborating evidence and after evaluating the credibility of the witnesses.  Additionally, Cory has absolutely no recollection of any discussion regarding SJP performing maintenance on its fleet during 2007 first quarter.  (Sept. 23, 2016 Tr. (Cory) 30:18-24.)

2007 Report), at 45-46 "Revenues" (referring to weather) and "Gross Profit" (referring to housing market); Pl.'s Ex. 15 (EB Committee Notes), at 3 "Post-Transaction Review April 30, 2007" (referring to "horrible weather").)

529.   Companies typically perform equipment maintenance over a scheduled period of time because a business can operate more profitably to the extent that it can operate at a steady pace without disruption.  (July 15, 2016 Tr. (Messina) 79:2-12.)

530.   It would be very unusual for a company to take all of its equipment offline for maintenance in the first quarter and absorb a 56% revenue decline without explanation.  (July 15, 2016 Tr. (Messina) 79:2-12.)

### ix.   *FBTS's Review of Prairie's Consideration of Customer Concentration*

531.   SJP's top customer, as a percentage of revenue in 2006, was the homebuilder, Hovnanian.  (Stipulation of Facts ¶ 53; May 23, 2016 Tr. (Dugan) 118:21-24 (testifying that, although Hovnanian was not exclusively a residential builder, it was predominantly a residential builder).)

532.   SJP was able to grow its business with Hovnanian over the years because of SJP's capability to develop sites with rocky land.  (May 23, 2016 Tr. (DiPano) 56:19-57:16.)

533.   As of December 31, 2006, Hovnanian accounted for nearly 60% of SJP's revenues for 2006.  (Joint Ex. 1 (Offering Memo), at 26 (Exhibit 21); Stipulation of Facts ¶ 54.)

534.   As of December 31, 2006, more than 78% of SJP's reported backlog for 2006 was on Hovnanian projects (i.e., $45,167,302 out of a total $57,743,170).  (Joint Ex. 1 (Offering Memo), at 26 (Exhibit 22).)

535.     Between 2002 and 2006, SJP's revenue growth was almost entirely attributable to Hovnanian. (Demonstrative 22; Sept. 19, 2016 Tr. (Puntillo) 97:20-99:15; Joint Ex. 1 (Offering Memo), at 34 (historical revenues), 126-28 (historical revenues by customers).)

536.     Between 2002 and 2006, SJP's concentration in Hovnanian had increased from 44% to 59%. (Demonstrative 22; Joint Ex. 1 (Offering Memo), at 126-28.)

537.     Between 2002 and 2006, Hovnanian revenues grew at a compound annual growth rate of 25%. (Demonstrative 22; Joint Ex. 1 (Offering Memo), at 34, 36, 126-28.)

538.     Between 2002 and 2006, non-Hovnanian revenues grew at a compound annual growth rate of 7%. (Demonstrative 22; Joint Ex. 1 (Offering Memo), at 34, 36, 126-28.)

539.     In 2006, Hovnanian was the sixth or seventh largest homebuilder in the United States, a Forbes Platinum 400 company for five consecutive years and on Fortune Magazine's list of "100 Fastest Growing Companies" for four consecutive years, and #403 on the 2006 Fortune 500, ranked second based on a five-year total return to investors of 60%. (Pl.'s Ex. 12, at 3.)

540.     After the close of 2006, Hovnanian released its 2006 Annual Report (the "Hovnanian 2006 Annual Report" or "Hovnanian's 2006 Annual Report"). (Pl.'s Ex. 11 (HOV Annual Report).)

541.     Prairie did not review Hovnanian's 2006 Annual Report prior to the SJP ESOP Transaction.[36]

---

[36] Although Aliferis testified that Hovnanian's 2006 Annual Report is something Prairie "would have reviewed," (June 29, 2016 Tr. (Aliferis) 74:19-23), Aliferis did not specifically recall reviewing the document, the document was never listed as a document reviewed by Prairie, and neither the April 11, 2007 Draft Valuation Report nor the April 27, 2007 Post-Transaction Valuation Report mentioned the Hovnanian 2006 Annual Report. (July 14, 2016 Tr. (Messina) 59:15-60:9 (if Prairie relied on Plaintiff's Exhibit 11, it should have been listed in the valuation report).)

542.    Although the Hovnanian 2006 Annual Report contained optimistic statements of Hovnanian's future activity, (July 14, 2016 Tr. (Messina) 199:20-200:13 (correspondence from CEO in Annual Report has lower reliability than 10K, tends to be more optimistic)), it also indicated that, in 2006, Hovnanian had paid $159 million in penalties for walking away from projects. (Pl.'s Ex. 11 (HOV Annual Report), at 8.)

543.    The Hovnanian 2006 Annual Report also revealed that 2006 "was a challenging year" due to the "sudden downturn in many of [Hovnanian's] housing markets." (Pl.'s Ex. 11 (HOV Annual Report), at 5.) Hovnanian sustained reduced profits and stated that "it is difficult to predict when the overall housing market will turn around." (Pl.'s Ex. 11 (HOV Annual Report), at 7.)

544.    Hovnanian's 2006 Annual Report noted the sudden downturn of the homebuilding industry in that year and stated that it was managing its business as if the industry was in a prolonged downturn. (Pl.'s Ex. 11 (HOV Annual Report), at 7.)

545.    The Hovnanian 2006 Annual Report indicated that Hovnanian's total revenues had increased on a year-by-year basis from 2002 to 2006. (Pl.'s Ex. 11 (HOV Annual Report), at 3.)

546.    The Hovnanian 2006 Annual Report also showed that Hovnanian had 36 communities actively being built in New Jersey, which included some of SJP's backlog. (Pl.'s Ex. 11 (HOV Annual Report), at 4; May 24, 2016 Tr. (D'Esposito) 55:1-22.)

547.    Hovnanian's 2006 Annual Report announced that Hovnanian would reduce costs by renegotiate pricing with its subcontractors, over whom it claimed to have "a great deal of leverage." (Pl.'s Ex. 11 (HOV Annual Report), at 7.)

548.    Hovnanian had also disclosed this strategy on September 11, 2006, in a symposium on the homebuilding industry sponsored by Credit Suisse (the "Credit Suisse Report"), in which

Hovnanian represented that it would aggressively renegotiate subcontractor costs. (Pl.'s Ex. 12 (Credit Suisse Report), at 17.)

549.    FBTS acknowledged that Hovnanian's representations concerning its intent to renegotiate subcontractor contracts to reduce costs as set forth in Hovnanian's 2006 Annual Report (Pl.'s Ex. 11 (HOV Annual Report)) and the Credit Suisse Report (Pl.'s Ex. 12) could adversely affect SJP's projected margins. (May 26, 2016 Tr. (Ippensen) 95:4-25, 96:14-25.)

550.    FBTS did not review either the Credit Suisse Report (Pl.'s Ex. 12) or the Hovnanian 2006 Annual Report (Pl.'s Ex. 11 (HOV Annual Report)) prior to the Transaction. (May 26, 2016 Tr. (Ippensen) 94:8-23, 97:1-5; July 6, 2016 Tr. (Ash) 54:25-55:6.)

551.    Although Prairie acknowledged that it would have been important to determine Hovnanian's stock price prior to the Transaction, (June 29, 2016 Tr. (Aliferis) 72:19-25, 73:13-17), neither FBTS nor Prairie looked at the share price of Hovnanian prior to the Transaction. (May 26, 2016 Tr. (Ippensen) 93:21-25; Sept. 23, 2016 Tr. (Cory) 43:23-44:4; July 6, 2016 Tr. (Ash) 54:17-25; June 29, 2016 Tr. (Aliferis) 72:19-25.)

552.    Neither FBTS nor Prairie contacted Hovnanian to discuss its relationship with SJP. (July 6, 2016 Tr. (Ash) 51:4-11; May 26, 2016 Tr. (Ippensen) 85:9-13; Sept. 23, 2016 Tr. (Cory) 42:22-24; June 29, 2016 Tr. (Aliferis) 50:18-22.)

553.    FBTS did not speak with Hovnanian or any other SJP customer because it would have violated FBTS's best practices. (May 26, 2016 Tr. (Ippensen) 97:10-19.) As proposed ESOP transactions are not public, FBTS does not speak to customers because spreading information about a change in ownership of a given company could affect that company's relationship with its customers. (May 26, 2016 Tr. (Ippensen) 161:10-20; June 29, 2016 Tr. (Aliferis) 50:11-51:4.)

554. In a minority ESOP purchase, a trustee would not speak with a company's customers prior to approving a transaction because the ESOP is not a synergistic buyer looking to run the company or replace management, but is rather the classic financial buyer, and contacting customers could place the ESOP in the middle of a very important and delicate relationship. (June 21, 2016 Tr. (Fischer) 45:24-47:6; 61:7-17.)

555. A valuation report should list the materials reviewed by the valuation advisor. (July 14, 2016 Tr. (Messina) 60:3-4; June 30, 2016 Tr. (Van Horn) 153:5-19.)

556. Neither the Hovnanian 2006 Annual Report nor the Credit Suisse Report was identified as one of the documents that Prairie reviewed in either the April 11, 2007 Draft Valuation Report or the April 27, 2007 Post-Transaction Valuation Report. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 4, 6-7; Joint Ex. 10 (Apr. 27, 2007 Report), at 3, 5-6.)

557. A prudent investor would have considered a customer's representations of a dramatic slowdown in the housing market and its intention to renegotiate agreements with subcontractors to be material information in determining whether the company's projections were reliable. (Sept. 19, 2016 Tr. (Puntillo) 89:20-91:1.)

558. A prudent investor would have considered a 59% customer concentration to be material as the target company's loss of that customer would have large adverse effects on the target company. (Sept. 19, 2016 Tr. (Puntillo) 91:12-24.)

559. Based on SJP's representations regarding (1) its year end 2006 backlog; (2) its intent to work off 75% of that backlog in 2007; and (3) the percentage of Hovnanian and non-Hovnanian bids outstanding, Hovnanian represented 62% of SJP's projected revenue for 2007. (Demonstrative 23; Sept. 19, 2016 Tr. (Puntillo) 101:2-103:7; Joint Ex. 1 (Offering Memo), at 12, 26-27; Joint Ex. 9 (Apr. 11, 2007 Draft), at 13.)

560.    Based on SJP's representations regarding (1) its year end 2006 backlog; (2) its intent to work off 75% of that backlog in 2007; and (3) the percentage of Hovnanian and non-Hovnanian bids outstanding, non-Hovnanian revenues would need to grow by 117% from 2007 to 2008 to simultaneously meet SJP's projected revenues while limiting Hovnanian revenues to 20% of total revenues.[37]  (Demonstrative 20; Sept. 19, 2016 Tr. (Puntillo) 105:4-19.)

561.    A prudent investor would have been concerned with such a drastic and unprecedented reduction in the projected Hovnanian revenues given the growth of non-Hovnanian revenues required to meet SJP's projections.  (Sept. 19, 2016 Tr. (Puntillo) 105:20-106:1.)

562.    A prudent investor would have required a breakdown between projected Hovnanian and non-Hovnanian revenues in light of SJP's historical dependence on Hovnanian as well as SJP's representation that it was diversifying away from Hovnanian.  (Sept. 19, 2016 Tr. (Puntillo) 106:9-23.)

563.    FBTS believed that Prairie applied a risk discount of 19.25%, which, in part, accounted for Hovnanian's large percentage of sales with SJP.   (Joint Ex. 9 (Apr. 11, 2007 Draft) 42; May 26, 2016 Tr. (Ippensen) 82:17-83:18.)

564.    The April 11, 2007 Draft Valuation Report did not identify how much, if any, of the discount rate was due to customer concentration, and FBTS never discussed the amount of the discount rate attributable to customer concentration.  (May 26, 2016 Tr. (Ippensen) 83:19-84:6; June 29, 2016 Tr. (Aliferis) 148:4-24.)

---

[37] The Offering Memo stated that, at the end of 2006, Hovnanian only represented 20% of the outstanding bids.  (Joint Ex. 1 (Offering Memo), at 12.)

565.    The Offering Memo's representation that Hovnanian projects constituted only 20% of SJP's outstanding bids was copied into the April 11, 2007 Draft Valuation Report.  (Joint Ex. 1 (Offering Memo), at 12; Joint Ex. 9 (Apr. 11, 2007 Draft), at 13, 32.)

566.    In explaining its "diversification plan" to Prairie, SJP made general representations that it would add additional, unspecified customers, and would solicit unspecified commercial and municipal developers.  (June 29, 2016 Tr. (Aliferis) 85:6-86:8.)

567.    SJP never explained in any detail why it believed it would successfully diversify away from Hovnanian, other than telling prospective customers that SJP can offer services "for [a] reasonable pric[e] and [do] quality work."  (June 29, 2016 Tr. (Aliferis) 85:24-86:8.)

568.    FBTS and Prairie never determined which specific customers SJP planned to cultivate as part of its diversification plan, beyond SJP's general statement that "there was always demand for [SJP's] services from other customers in the marketplace."  (June 29, 2016 Tr. (Aliferis) 86:23-87:8 (did not recall SJP specifically explaining how SJP determined that municipalities and commercial developers had available projects); Sept. 23, 2016 Tr. (Cory) 43:12-19 (did not recall discussions about whether SJP was diversifying away from Hovnanian, or how it could replace Hovnanian if it lost Hovnanian as a customer); July 6, 2016 Tr. (Ash) 56:4-24 (did not recall SJP explaining specifics of its customer diversification strategy).)

569.    Prairie never considered what effect SJP's customer or regional "diversification plan" would have on its profit margins.  (June 29, 2016 Tr. (Aliferis) 71:23-72:15 (no recollection as to differences in margins depending on customer or region).)

570.    FBTS never asked, and was unaware of whether Prairie asked, SJP how it was specifically planning to reduce its customer concentration in Hovnanian.  (May 24, 2016 Tr. (D'Esposito) 24:20-24; May 26, 2016 Tr. (Ippensen) 86:2-6.)

571.   The seller's representation that only 20% of SJP's outstanding bids were for Hovnanian at the end of 2006, despite SJP's historical dependence on Hovnanian for more than half of its revenues, implied that SJP might not in fact meet its projected revenues absent an explanation as to how it would make up for this shortfall. (Sept. 19, 2016 Tr. (Puntillo) 105:20-106:8.)

572.   One of the prospective lenders whom Duff & Phelps solicited to finance the Transaction asked Duff & Phelps to explain the dramatic decrease in Hovnanian bids in light of the importance of Hovnanian to SJP's 2006 revenues and its end of year 2006 reported backlog. (Pl.'s Ex. 5 (Sovereign Bank E-mail), at 2; May 25, 2016 Tr. (Miscione) 26:8-16, 27:7-11, 28:16-19.)

573.   FBTS and Prairie did not consider the possibility that SJP's stated decline in Hovnanian bids might signal a problem in SJP's relationship with its major customer (e.g., lack of available Hovnanian projects, or Hovnanian's rejection of SJP's bids).  (May 26, 2016 Tr. (Ippensen) 86:15-87:4, 93:10-18.)

574.   FBTS and Prairie did not ask SJP to explain how SJP was planning to make up the shortfall in revenues that had traditionally been provided by Hovnanian. (Sept. 23, 2016 Tr. (Cory) 43:12-19.)

575.   On April 13, 2007—at the close of market prior to the Transaction—Hovnanian was trading at $23.69 per share. (Stipulation of Facts ¶ 55.)

576.   During the week of April 9, 2007, Hovnanian was trading at its lowest adjusted closing price since the week of May 19, 2003. (ECF No. 136-1 (Motion for Judicial Notice), at 1, facts nos. 2, 3; ECF No. 156 (Order Granting Motion for Judicial Notice as Unopposed).)

577.    Hovnanian's adjusted share price of $23.69 per share at the close of market on Friday, April 13, 2007, was its third lowest price since May 21, 2003, with the second and third lowest prices falling on April 10, 2007 and April 11, 2007.  (ECF No. 136-1 (Motion for Judicial Notice), at 6 (Chart).)

578.    The share price for Hovnanian steadily decreased from July 22, 2005 to April 13, 2007.  (ECF 136-1 (Motion for Judicial Notice), at 1, fact no. 4; ECF 136-5 (Hovnanian Stock Chart); ECF No. 155 (Order Granting Motion for Judicial Notice as Unopposed).)

### x.    FBTS's Review of Prairie's Consideration of Kara Homes's Bankruptcy

579.    Kara Homes had consistently been one of SJP's top ten customers from 2004 to 2006.  (Joint Ex. 1 (Offering Memo), at 126; Stipulation of Facts ¶ 56.)

580.    Kara Homes accounted for 1.9% of SJP's total annual revenues as of October 2006 (Joint Ex. 1 (Offering Memo), at 26), 9% of SJP's total adjusted revenues for 2005 (Joint Ex. 1 (Offering Memo), at 34, 126), and 3.5% of SJP's total adjusted revenues for 2004 (Joint Ex. 1 (Offering Memo), at 34, 126).  Prairie never discussed the number of projects that Kara Homes historically provided to SJP or the effects of Kara Homes's bankruptcy on SJP's ability to either diversify its customer base or meet its projections.  (May 23, 2016 Tr. (Dugan) 175:6-12 (no recollection of telling Prairie how many projects Kara provided), 189:17-23 (no recollection of what questions Prairie asked regarding Kara Homes).)

581.    Kara Homes declared bankruptcy in October of 2006—approximately 6 months prior to the Transaction.  (PACER, U.S. Bankruptcy Court, District of New Jersey, Chapter 11, Case No.: 06-19626(MBK)); ECF No. 136-1 (Motion for Judicial Notice), at 1, fact no. 1; ECF No. 156 (Granting Motion as Unopposed).)

582.    At the time Kara Homes declared bankruptcy, it owed SJP approximately $700,000 that SJP was unable to collect.  (May 23, 2016 Tr. (Dugan) 121:7-12.)

583.    In 2006, SJP wrote off $768,810 as an operating expense, which represented the amount owed to it by Kara Homes plus approximately $70,000 in legal fees.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 31.)

584.    The trustee in the Kara Homes bankruptcy action sued SJP to recover payments that Kara Homes made to SJP shortly before declaring bankruptcy.  (May 23, 2016 Tr. (Dugan) 121:20-122:2; FBTS Ex. 34, at D00545.)

585.    Despite the bankruptcy filing, SJP listed Kara Homes as one of its top-ten customers in the Offering Memo sent to FBTS.  (Joint Ex. 1 (Offering Memo), at 26 "Exhibit 21-SJP Top Customers YTD.")

586.    SJP informed Prairie that Kara Homes had declared bankruptcy.  (May 23, 2016 Tr. (Dugan) 175:6-176:1.)

587.    Kara Homes was not accounted for in the backlog or projected revenues for 2007 in the April 11, 2007 Draft Valuation Report.[38]  (May 26, 2016 Tr. (Ippensen) 101:16-21.)

---

[38] Aliferis gave no testimony regarding whether the Kara Homes revenues that were owed—but not paid and/or returned to the bankruptcy estate—were written off from SJP's 2006 revenues.  As the valuation reports prepared by Aliferis (Joint Ex. 9 (Apr. 11, 2007 Draft); Joint Ex. 10) do not break down historic or projected revenues by customer, it is impossible to specifically determine how Kara Homes's revenues were accounted for by Prairie in either the backlog or in the projected revenues.  Further, although historical expenses were reduced to reflect the costs SJP incurred as a result of the Kara Homes bankruptcy, it does not appear that either Duff & Phelps or Prairie adjusted SJP's historical revenues to account for the fact that SJP could not collect on the revenues earned.  Although Dugan speculated that the Kara Homes revenues might have been written off SJP's total revenues in the audited 2006 financials, he testified that he did not know whether Prairie actually made a revenue (as opposed to an expense) adjustment for Kara Homes (May 23, 2016 Tr. (Dugan) 171:6-8) and was unsure as to the year in which the Curchin Group made the appropriate write off (May 23, 2016 Tr. (Dugan) 171:9-16).  Neither SJP's draft 2006 financial report attached to the Offering Memo (Joint Ex. 1 (Offering Memo), at 116-120), nor SJP's draft 2006 financial report prepared in March (Pl.'s Ex. 22 (Combined 2006 Draft)) contained any

588.     The April 11, 2007 Draft Valuation Report referenced SJP's expenses from litigation involving Kara Homes for purposes of deducting those costs from SJP's future projected expenses. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 31 ("Kara Homes w[ri]te-off and legal fees"); May 26, 2016 Tr. (Ippensen) 100:20-101:11.)

589.     The April 11, 2007 Draft Valuation Report failed to discuss the effect of the Kara Homes bankruptcy on SJP's projected revenues or its stated customer diversification plan. (*See generally* Joint Ex. 9 (Apr. 11, 2007 Draft).)

590.     FBTS and Prairie never discussed the effect of the Kara Homes bankruptcy on either SJP's ability to match its 2006 revenues, or on SJP's stated strategy of diversifying away from Hovnanian. (May 26, 2016 Tr. (Ippensen) 102:21-103:1; May 23, 2016 Tr. (Dugan) 176:9-15, 189:17-23.)

### xi.     *FBTS's Review of Prairie's Consideration of SJP's Bidding*

591.     The Offering Memo represented that at the end of 2006, SJP had $60 million in bids outstanding, and that SJP bids for approximately $140 million in projects per year with a historical hit rate of approximately 45% on average. (Joint Ex. 1 (Offering Memo), at 27.)

592.     Prairie copied these representations verbatim and pasted them into its April 11, 2007 Draft Valuation Report. (*See* Joint Ex. 9 (Apr. 11, 2007 Draft), at 13, 32; *see also* May 26, 2016 Tr. (Ippensen) 79:10-18.)

---

adjustments to uncollected revenue based on the Kara Homes bankruptcy. As the financial reports were prepared based on the accrual method, rather than cash received (Pl.'s Ex. 22 (Combined 2006 Draft), at 8 "Basis of Accounting"), SJP's reported revenues included the amounts owed by Kara Homes, regardless of whether they were collected.

593.    FBTS believed that SJP's projections were reasonable due, in part, to SJP's outstanding hit rate. (May 26, 2016 Tr. (Ippensen) 79:19-22; *see also* Joint Ex. 12 (Apr. 13, 2007 Memo), at 1 (noting that "SJP wins about 45% of the bids they bid on").)

594.    An average historical hit rate of 45% on an average bidding volume of $140 million means that SJP was awarded on average $63 million in new projects every year. (May 26, 2016 Tr. (Ippensen) 79:23-80:4; *see also* July 5, 2016 Tr. (Stoesser) 101:13-24.)

595.    Historically, SJP had never attained $63 million in annual revenues; SJP's highest revenues were approximately $61 million and its five-year average revenues were approximately $43 million. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

596.    FBTS and Prairie also believed that SJP began bidding on larger, more profitable projects after Yacuzzio passed away. (May 26, 2016 Tr. (Ippensen) 59-10:19; May 27, 2016 Tr. (Ippensen) 22:1-2; June 29, 2016 Tr. (Aliferis) 89:7-10. *But see* July 6, 2016 Tr. (Ash) 43:7-11 (could not remember if she was told that SJP began bidding on more profitable jobs after DiPano and Dugan took over control of SJP).)

597.    FBTS never verified SJP's outstanding bids. (May 26, 2016 Tr. (Ippensen) 80:8-15.)

598.    FBTS does not know what evidence, if any, there was to support the statement that "SJP was bidding on larger, more profitable projects." (May 26, 2016 Tr. (Ippensen) 59:10-61:17 (unable to identify any evidence except SJP's top customers for 2006 as reflected in the Offering Memo); July 6, 2016 Tr. (Ash) 43:7-16.)

599.    Prairie did not review any of the bid proposals and did not compare SJP's bidding under DiPano with SJP's bidding under Yacuzzio. (June 29, 2016 Tr. (Aliferis) 89:11-24.)

600.     Prairie's representations concerning SJP's bidding were based solely on discussions with SJP and its advisors.  (June 29, 2016 Tr. (Aliferis) 89:25-90:16 (acknowledging that SJP's new business strategy was only based on discussions with management or its financial advisor).)

### xii.     FBTS's Review of Prairie's Application of the Market Multiple Method

601.     One of the methodologies used by Prairie in its valuation was the market multiple method, whereby the value of a closely held company is derived by identifying similar publicly traded companies (the "peer group"), expressing the known market value of the peer group (based on publicly traded share price) as a function of a financial metric, and then applying that formula to derive the closely held company's value.  (June 30, 2016 Tr. (Gross) 13:9-15, 15:5-16:2; July 14, 2016 Tr. (Messina) 111:23-112:8.)

602.     Prairie selected peer group companies that were much larger, had a significantly more diversified geographical and customer base, and performed far more sophisticated work than SJP.  (July 14, 2016 Tr. (Messina) 112:18-113:8.)

603.     For the market multiple method, Prairie used three metrics, EBITDA, EBIT,[39] and pretax income, from seven guideline companies and reduced those multiples by 40% to develop a more conservative comparison with SJP.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 43-45)

604.     Prairie applied the 40% discount to the multiples of the public companies used in the market multiple method for the purpose of taking into account the differences between the public companies and SJP in terms of size, access to capital, geographic diversity and economies of scale.  (June 29, 2016 Tr. (Aliferis), at 134:1-11.)

---

[39] Earnings before interest and taxes ("EBIT").

605.    Aliferis concluded that the 40% discount was conservative.  (June 29, 2016 Tr. (Aliferis) 135:23-136:10.)

606.    Prairie also attempted to quantify the dilutive aspect of the stock appreciation rights plan.  (June 29, 2016 Tr. (Aliferis) 134:23-25.)

607.    In addition, Prairie looked at dividends in the marketplace to assess what comparable dividends were trading at as compared to an SJP security.  (June 29, 2016 Tr. (Aliferis) 135:11-16.)

608.    Prairie determined that an SJP security would trade comparably to dividends in the marketplace or below.  (June 29, 2016 Tr. (Aliferis) 135:11-16.)

609.    As the April 11, 2007 Draft Valuation Report sets forth, "when using multiples from publicly traded companies, a discount is used to account for differences in size, risk, diversification, customer concentration and other factors."  (Joint Ex. 9, at 45.)

610.    Ippensen determined that the 40% discount utilized by Prairie was even more conservative than he expected and resulted in his having even greater comfort in relying on the April 11, 2007 Draft Valuation Report.  (May 26, 2016 Tr. (Ippensen) 191:7-17.)

611.    Financial information from SJP's closest competitors, which were private companies, was not readily available.  (May 23, 2016 Tr. (Dugan) 164:2-19; Joint Ex. 9 (Apr. 11, 2007 Draft), at 44.)

612.    It is difficult to find companies that are "exactly" like the subject company because the guideline companies may have larger operations, access to capital that the subject company does not, or provide different services; nonetheless, it is prudent to use guideline companies in a valuation analysis.  (June 29, 2016 Tr. (Aliferis) 21:13-25.)

613.   FBTS did not find it unusual that SJP outperformed its peer companies, as set forth in the market multiple method analysis of the April 11, 2007 Draft Valuation Report, in the categories of EBITDA, EBIT and pretax income percentage, because SJP had less overhead than these larger publicly traded companies.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 43; May 26, 2016 Tr. (Ippensen) 111:16-112:6.)  Publicly traded companies typically perform better, however, than privately traded companies.  (July 14, 2016 Tr. (Messina) 137:1-10.)  This is the reason why a valuation professional must apply a discount when performing the market multiple method.  (June 29, 2016 Tr. (Aliferis) 136:3-10; June 30, 2016 Tr. (Gross) 35:1-10.)

614.   Although Aliferis typically consults with company management to ask if peer group candidates performed similar work to that of the target company, Prairie did not consult SJP on this subject matter.  (June 29, 2016 Tr. (Aliferis) 23:1-16; May 23, 2016 Tr. (Dugan) 128:14-22, 163:18-21; Sept. 23, 2016 Tr. (Cory) 64:15-19.)

615.   Prairie selected the following peer group companies in conducting its market multiple analysis of SJP: Fluor, which engages in engineering for upstream oil and gas production; Perini, which constructs highways, bridges, light rail transit systems, subways, airports and wastewater treatment facilities; Jacobs Engineering, which designs and engineers processing plants, including projects for clients in chemicals and polymers, pharmaceuticals and biotechnology, oil and gas, refining, and food and consumer products; Granite Construction, Inc., which constructs dams, mass transit facilities, pipelines, canals, tunnels, waterway locks and dams, and airport infrastructure; Meadow Valley Corp., which constructs highway bridges and airport runways; and URS Corp., which provides systems engineering and technical assistance for the design and development of new weapons systems and the modernization of aging weapons

systems.  (July 14, 2016 Tr. (Messina) 113:13-114:12; Joint Ex. 9 (Apr. 11, 2007 Draft), at 64-69.)

616.    Although Prairie used Sterling Construction Co., Inc. ("Sterling") as one of the publicly traded companies in its peer group (Joint Ex. 9 (Apr. 11, 2007 Draft), at 43; Joint Ex. 10 (Apr. 27, 2007 Report), at 57), Prairie omitted the company description of Sterling from both the April 11, 2007 Draft Valuation Report and the April 27, 2007 Post-Transaction Valuation Report. (May 26, 2016 Tr. (Ippensen) 110:14-22).

617.    FBTS did not identify the omission of Sterling prior to the Transaction.  (Sept. 23, 2016 Tr. (Cory) 65:15-20; May 26, 2016 Tr. (Ippensen) 110:14-111:1.)

618.    FBTS was unable to assess the comparability of Sterling with SJP without having been provided a description of Sterling.

619.    FBTS did nothing to determine if the peer group selected by Prairie was appropriate.  (Sept. 23, 2016 Tr. (Cory) 63:24-65:10; May 26, 2016 Tr. (Ippensen) 114:7-24.)

620.    The peer group companies that Prairie selected were incomparable to SJP.  (July 14, 2016 Tr. (Messina) 112:18-23; May 23, 2016 Tr. (Dugan) 122:9-128:10 (stating that for the period from 2002 to 2007, SJP did not work on any projects involving oil or gas refineries, oil pipelines, theaters, railroads, airports, casinos, harbors, ports, public highways, public bridges, dams, canals, waterlocks, correctional facilities, and schools and was unsure if SJP worked on projects involving hospitals or power plants).)

621.    SJP's financial metrics, market cycle, and operations did not closely resemble the financial metrics, market cycle, and operations of the peer group companies Prairie selected.  (July 14, 2016 Tr. (Messina) 113:1-8; *see also* Joint Ex. 9 (Apr. 11, 2007 Draft), at 64-69; Demonstratives 9, 10, 13, 15, 17, 18.)

622.   The peer group companies Prairie selected only had minimal exposure to the housing market and their performance was not strongly correlated with the cyclicality of the homebuilding industry.  (July 14, 2016 Tr. (Messina) 119:13-120:17; Demonstrative 9, 10, 13; July 14, 2016 Tr. (Messina) 113:9-12.)

623.   From 2002 to 2006, the peer group companies Prairie selected achieved a consistent return on assets ranging from 4.9% to 5.6%.  (Demonstrative 17.)

624.   From 2002 to 2006, SJP achieved a return on assets which fluctuated wildly between 2.4% and 29.1%.  (Demonstrative 17.)

625.   The fluctuations in SJP's historical return on assets were largely due to the fact that SJP operated in a competitive cyclical industry.  (July 14, 2016 Tr. (Messina) 135:13-21.)

626.   SJP's historical returns and margins exhibited dramatically more volatility than the historical returns and margins of the peer group companies Prairie selected.  (Demonstrative 10; July 14, 2016 Tr. (Messina) 120:4-9.)

627.   SJP's EBITDA margin had a significantly higher standard deviation than the standard deviation of the EBITDA margin of the peer group companies Prairie selected.  (July 14, 2016 Tr. (Messina) 120:4-17; Demonstrative 10.)

628.   It is generally accepted in finance that high volatility in margins is evidence that the company's industry is cyclical.  (July 14, 2016 Tr. (Messina) 61:18-62:1, 135:13-21.)

629.   The profit margins of the peer group companies Prairie selected were, on average, approximately 2.3%.  (Demonstrative 15.)

630.   SJP's five-year historical average profit margin was 3.9%.  (Demonstrative 15.)

631.   Prairie projected that SJP's profit margins would average 8.4%.  (Demonstrative 16.)

632.   SJP's projected profit margins were over three times higher than the profit margins of the peer group companies Prairie selected.   (July 14, 2016 Tr. (Messina) 133:13-17; Demonstrative 15, Demonstrative 16.)

633.   According to the April 27, 2007 Post-Transaction Valuation Report, SJP's projected return on assets was approximately five times higher than the historical returns of the peer group companies selected by Prairie.   (July 14, 2016 Tr. (Messina) 138:6-139:4; Demonstrative 18.)

634.   According to the April 27, 2007 Post-Transaction Valuation Report, SJP's projected profit margins of 8.4% (Demonstrative 16) were between two to eight times higher than the profit margins of each of the peer group companies used by Prairie. (Demonstrative 15; July 14, 2016 Tr. (Messina) 133:10-17.)

635.   Although it is generally accepted in finance that a company may temporarily realize returns in excess of its industry, that company cannot indefinitely realize above-industry returns absent a sustainable competitive advantage.  (CFF ¶ 380.)[40]

636.   Prairie's execution of the market multiple method overemphasizes SJP's abnormally strong performance in 2006 and minimizes SJP's weaker performance during other times within the homebuilding industry cycle. (July 14, 2016 Tr. (Messina) 123:16-124:1.)

637.   Under Prairie's approach, approximately 80-90% of SJP's fair market value was driven by SJP's 2006 performance. (July 14, 2016 Tr. (Messina) 123:11-124:1.)

---

[40] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

638.     SJP's net income in 2006 was approximately $5 million, whereas its three-year historical average net income and five-year average net income were approximately $2.5 million and $2 million, respectively.  (Demonstrative 11.)

639.     Despite the fact that the majority of SJP's projects were in site preparation for homebuilders, Prairie did not include the Homebuilders Index in the peer group, even though homebuilders had similar financial metrics to SJP.  (July 14, 2016 Tr. (Messina) 64:2-13, 114:18-24, 117:16-119:6; Demonstrative 9.)

640.     Homebuilder companies were more comparable peer group companies than the peer group companies selected by Prairie because SJP's financial results and end-market demands more closely resembled those of homebuilder companies.  (July 14, 2016 Tr. (Messina) 114:19-24, 117:11-119:6; Demonstrative 9.)

641.     The homebuilder companies used by Messina in his market multiple method analysis included: Brookfield Homes, Beazer Homes, DR Horton, Dominion Homes, Hovnanian, KB Homes, Lennar Corp., Orleans Homebuilder, MDC Holdings, Inc., M/I Homes, Meritage Homes Corp., NVR Inc., Pulte Group, The Ryland Group, Standard Pacific Corp., Toll Brothers, Tousa Inc., and WCI Communities (collectively, the "Homebuilder Peer Group").  (July 14, 2016 Tr. (Messina) 115:8-116:24.)

642.     Prairie should have utilized SJP's five-year historical performance in its market multiple method to normalize for SJP's historical performance.  (July 14, 2016 Tr. (Messina) 124:2-6.)

643.     Prairie's application of a 40% discount to the multiples of the peer group companies selected by Prairie did not adequately account for the differences between SJP and those peer group companies.  (July 14, 2016 Tr. (Messina) 128:2-129:2.)

644.     Even after applying a 40% discount to the multiples of the peer group companies selected by Prairie, the multiples of the Homebuilder Peer Group companies were more similar to SJP.  (July 14, 2016 Tr. (Messina) 129:10-130:2; Demonstrative 13.)

**Q.     Miscellaneous Errors in Prairie's Valuation Reports**

645.     Prairie incorrectly identified the target company as "The Care of Trees Earnings" instead of "SJP" in a chart in both the April 11, 2007 Draft Valuation Report and the April 27, 2007 Post-Transaction Valuation Report.  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 86; Joint Ex. 10 (Apr. 27, 2007 Report), at 100.)

646.     There is no evidence that FBTS noted this error prior to the Transaction or considered this error to be critical.  (Sept. 23, 2016 Tr. (Cory) 78:2-16.)

647.     The Offering Memo and all of the transactional documents, including the SPA, the ESOP Promissory Note, and the ESOP Pledge Agreement described the stock to be sold to the SJP ESOP as "Class B Shares" or "Series B Convertible Common Stock."  (Joint Ex. 1 (Offering Memo), at 1; Joint Ex. 5 (Stock Purchase Agreement), at 2; Pl.'s Ex. 40 (Promissory Note), at 1; Pl.'s Ex. 41 (ESOP Pledge Agreement), at 1.)

648.     Both the April 11, 2007 Draft Valuation Report and the April 27, 2007 Post-Transaction Valuation Report identify the securities as "Super Common Stock."  (Joint Ex. 9 (Apr. 11, 2007 Draft), at 49; Joint Ex. 10 (Apr. 27, 2007 Report), at 63.)

649.     FBTS did not consider Prairie's misidentification of the shares to be a critical error prior to the Transaction.  (Sept. 23, 2016 Tr. (Cory) 81:16-22.)

650.     Both the April 11, 2007 Draft Valuation Report and the April 27, 2007 Post-Transaction Valuation Report contained numerous mathematical errors.  (June 30, 2016 Tr. (Van Horn) 163:7-164:8.)

### R.     April 13, 2007 Teleconference

651.     FBTS conducted a conference call on April 13, 2007, where presentations were given by its advisors, Aliferis and Greenapple, about the April 11, 2007 Draft Valuation Report and legal due diligence, respectively.  (May 25, 2016 Tr. (Cory) 105:4-8; May 27, 2016 Tr. (Serbin) 108:2-7; July 6, 2016 Tr. (Ash) 25:7-12; 115:7-21; Stipulation of Facts ¶ 48.)

652.     The April 13, 2007 conference call consisted, in part, of a presentation by Prairie of its April 11, 2007 Draft Valuation Report, and a presentation by SFE&G of legal issues relating to the anticipated Transaction.  (Stipulation of Facts ¶ 48; May 27, 2016 Tr. (Serbin) 108:2-7; July 6, 2016 Tr. (Ash) 25:7-12, 122:18-123:2.)

653.     The April 13, 2007 conference call attendees included EB Committee members Ash, Serbin, and Cory, as well as Greenapple and Aliferis.  (Joint Ex. 12 (Apr. 13, 2007 Memo).)  Cory, Serbin and Ash were the only EB Committee members to attend this meeting.  (May 25, 2016 (Cory) 103:15-21; *see also* Joint Ex. 12 (Apr. 13, 2007 Memo).)  In other words, only three of the eight to nine members of the EB Committee attended this final EB committee meeting on April 13, 2007.  (May 26, 2016 Tr. (Ippensen) 132:17-19, 138:21-25; May 27, 2016 Tr. (Serbin) 145:5-10; May 25, 2016 (Cory) 103:15-21; *see also* Joint Ex. 12 (Apr. 13, 2007 Memo).)  Ippensen, who typically attended the final EB Committee meeting, did not attend the April 13, 2007 teleconference.  (May 25, 2016 Tr. (Cory) 92:10, 103:15-21; *see also* Joint Ex. 12 (Apr. 13, 2007 Memo).)

654.     Cory took notes during the teleconference on April 13, 2007.  (Joint Ex. 12; May 25, 2016 Tr. (Cory) 102:17-103:11.)  Cory's two pages of handwritten notes, which were subsequently typed, were the only notes that memorialized the April 13, 2007 conference call.  (*See* Joint Ex. 12 (Apr. 13, 2007 Memo); May 26, 2016 Tr. (Ippensen) 17:13-21.)

655.    The April 13, 2007 conference call began at 2:00 p.m. and lasted two to three hours.
(FBTS Ex. 10 (E-mail from M. Steere to P. Aliferis dated April 13, 2007) (noting a 2:00 p.m. start time); July 6, 2016 Tr. (Ash) 25:22-26:7 (testifying that meetings typically last two to three hours); June 29, 2016 Tr. (Aliferis) 163:6-9.)

656.    According to the notes of the meeting, the only[41] issues discussed pertaining to valuation were:

1.    SJP has a competitive edge by bringing large equipment to the site and making gravel with the old pavement instead of hauling the old pavement away and bringing in the new gravel.

2.    Post-transaction director positions.

3.    The transaction is for 38%.

4.    A collective bargaining agreement to which SJP was a party.

5.    An OSHA exam.

6.    Company management's focus and enthusiasm about SJP and the proposed transaction.

7.    SJP is vertically integrated in its paving operations.

8.    SJP wins 45% of the jobs it bids on.

9.    SJP's succession planning. If something happened to Frank Dugan, "this would not be devastating."

10.    Aliferis stated that he "briefly reviewed" the interim financials through February 28, 2007 and would review the

---

[41] Defendant alleges that not all topics discussed during the meeting were included in the meeting notes. (May 27, 2016 Tr. (Serbin) 109:3-18; 110:21-111:8; June 29, 2016 Tr. (Aliferis) 163:12-15.) The Court acknowledges that the notes are not transcripts and most likely do not memorialize absolutely everything said during the conference call. The Court, however, finds that only the topics encompassed within the notes were discussed in significant detail, absent specific testimony concerning other discussions that the Court expressly sets forth in its findings of fact. The Court finds that other discussions may have occurred but only in an informal and cursory fashion. The Court's finding is supported by the fact that the testimony cited by Defendant does not specifically identify any issues discussed but excluded from the memo. For example, even with regard to Defendant's purported discussion about "some" industry talk, Defendant fails to identify what information was discussed. (*See* May 27, 2016 Tr. (Serbin) 132:8-16).)

interim financials through March 31, 2007 to finalize the
valuation report.[42]

(Joint Ex. 12 (Apr. 13, 2007 Memo).)

657.    The participants of the April 13, 2007 teleconference did not discuss industry trends

prior to the Transaction.[43]   (June 29, 2016 Tr. (Aliferis) 37:15-38:19; Sept. 23, 2016 Tr. (Cory)

59:10-21.)

658.    Aliferis walked the EB Committee through the April 11, 2007 Draft Valuation

Report, helping it understand how Prairie arrived at its valuation and conclusion that the SJP ESOP

was paying less than fair market value for SJP's shares, and taking the time to go through the

pertinent pages of the report, with the EB Committee having the opportunity to ask questions

throughout the process.   (July 6, 2016 Tr. (Ash) 118:10-119:1; May 27, 2016 Tr. (Serbin) 110:4-

20.)

659.    Aliferis informed the EB Committee that, based on his review of interim financial

statements for the period ending on February 28, 2007 and what he had been advised verbally by

SJP, there were no "substantial changes" and stated that SJP remained in position to realize its

revenue projections for 2007 and beyond.   (Joint Ex. 12; May 25, 2016 Tr. (Cory) 123:10-16; June

29, 2016 Tr. (Aliferis) 162:11-163:2.)

660.    Although Prairie represented in the April 11, 2007 Draft Valuation Report that

"discussions with management have yielded that the [sic] conclusion there has been no material

---

[42] The Court notes that this list constitutes a summary, as opposed to a direct excerpt, of Joint
Exhibit 12.

[43]   The notes memorializing the April 13, 2007 teleconference—either those created
contemporaneously or those created subsequently—did not discuss the industry trends.   (Joint Ex.
12 (Apr. 13, 2007 Memo); FBTS Ex. 12 (Draft Valuation with Notes; Joint Ex. 15 (Financial
Report Review), at 3-4; Pl.'s Ex. 15 (EB Committee Notes), at 3 (SJP Group Annual Review Apr.
16, 2007).)

change in the operations and financial statements of the Company from December 31, 2006 to April 16, 2007," the financial data for the first quarter of 2007 revealed that SJP's revenues for January 1, 2007 through March 31, 2007, was 56.4% below SJP's revenues for those months in 2006, that SJP's gross profit for January 1, 2007 through March 31, 2007 was 97.4% below SJP's gross profit for those months in 2006, and that SJP's net income for January 1, 2007 through March 31, 2007 was 128.3% below SJP's net income for those months in 2006.  (CFF ¶¶ 454-58.)[44]

661.    During the April 13, 2007 conference call, FBTS did not discuss SJP's poor 2007 first quarter performance prior to the Transaction.[45]  (May 26, 2016 Tr. (Ippensen) 91:24-92:17; May 25, 2016 Tr. (Cory) 112:19-25; Sept. 23, 2016 Tr. (Cory) 19:20-20:3, 20:4-17; May 24, 2016 Tr. (D'Esposito) Tr. 18:17-24; June 29, 2016 Tr. (Aliferis) 37:15-20, 38:16-19.)

662.    Prior to voting, Serbin reviewed the projected financial statements in the April 11, 2007 Draft Valuation Report, including the historical sales numbers, net income, EBITDA, company profits, projected revenue, projected net income, and projected EBITDA margins.  (May 27, 2016 Tr. (Serbin) 115:13-116:22; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

663.    Based on Serbin's review of the April 11, 2007 Draft Valuation Report, Serbin felt that she was able to evaluate the risk for the buyer.   (May 27, 2016 Tr. (Serbin) 116:11-22.)

---

[44] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

[45] Defendants allege that "Aliferis relayed all information he learned from [SJP] management about the [C]ompany's financial performance for the first quarter of 2007, as well as the causes of that performance, to FBTS during the April 13, 2007 meeting."  (June 29, 2016 Tr. (Aliferis) 201:13-20.)  Based on the testimony, Cory's notes, and the Court's evaluation of the witnesses' credibility, the Court finds that FBTS did not discuss SJP's poor 2007 first quarter performance prior to the Transaction.

664.     Serbin felt comfortable voting to approve the Transaction based, in part, on the April 11, 2007 Draft Valuation Report's projection of zero percent revenue growth in 2007.  (May 27, 2016 Tr. (Serbin) 119:18-25.)

665.     In addition, Serbin voted to approve the Transaction as a result of the strength of the management team and the $58 million backlog, approximately 75% of which SJP was expected to complete in 2007.  (May 27, 2016 Tr. (Serbin) 120:1-6, 120:16-121:6.)

666.     Serbin also reviewed the April 11, 2007 Draft Valuation Report to determine whether Prairie was using appropriate methodologies to calculate the enterprise value of SJP and weighing the approaches correctly.  (May 27, 2016 Tr. (Serbin) 122:2-16.)

667.     In addition to considering the April 11, 2007 Draft Valuation Report, Ippensen considered his independent knowledge and experience, as well as information he gained from reading and watching the news, when voting to approve the Transaction.  (May 27, 2016 Tr. (Ippensen) 89:4-90:14.)

668.     Based on media reports and his general knowledge, Ippensen believed that the economy would slow down during 2007, but subsequently trend upward.  (May 27, 2016 Tr. (Ippensen) 90:11-14.)

669.     Ippensen voted affirmatively to approve the Transaction.  (May 27, 2016 Tr. (Ippensen) 22:23-23:1.)

670.     FBTS had no further discussions regarding Prairie's valuation of SJP prior to April 13, 2007 (*see* Pl.'s Ex. 4(b); Pl.'s Ex. 4(c) (Index of FBTS's Rule 34 Responses)), and did not have any prior meetings in which valuation issues were discussed.  (May 26, 2016 Tr. (Ippensen) 19:3-20:24, 21:9-25, 25:22-26:7 (apart from a possible meeting on April 6, 2007 based solely on the handwritten portion of FBTS Exhibit 12, at 1, is not aware of any other meetings); May 25, 2016

Tr. (Cory) 105:19-106:1 (believes there were meetings prior to April 13, 2007, but concedes she may not have participated in those meetings and is unaware of any documents memorializing those meetings); Sept. 23, 2016 Tr. (Cory) 75:17-23 (cannot recall any other discussions apart from March 29, 2007, where valuation was not discussed, April 13, 2007, and April 16, 2007).)

671.     Each member of the EB Committee casts a vote to approve or reject a transaction. (May 26, 2016 Tr. (Ippensen) 139:14-21.)

672.     Unanimity was required to approve the Transaction.  (CFF ¶ 40.)[46]

673.     Members of the EB Committee were permitted to cast a vote even if they had not participated in the presentation by the valuation advisor.  (July 6, 2016 Tr. (Ash) 26:25-27:2; May 27, 2016 Tr. (Serbin) 147:16-24, 159:18-22.)

674.     It was the EB Committee's job to thoroughly review the April 11, 2007 Draft Valuation Report, be prepared to ask questions and, if necessary, challenge the information that had been provided to the EB Committee.   (May 27, 2016 Tr. (Serbin) 107:8-18.)

675.     If the EB Committee determines that a valuation report needs to be revised, it can either: a) request that the information be provided and wait for it prior to voting; or b) ask its professional advisors to provide additional detail as to the requested information and ask that it be included in the valuation report when available. (May 27, 2016 Tr. (Serbin) 130:15-131:23.)  The EB Committee did not take either of these courses of action with regard to the SJP ESOP Transaction.

---

[46] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

676.     FBTS has not produced any records or documents showing who voted to approve the Transaction.  (*See* Pl.'s Ex. 4; Pl.'s Ex. 4(a); Pl.'s Ex. 4(b); Pl.'s Ex. 4(c) (Index of FBTS's Rule 34 Responses).)

**S.     FBTS's Lack of Negotiation as to Price and Other Terms**

677.     In private equity transactions, a prudent investor will typically negotiate the price of the securities.  (Sept. 19, 2016 Tr. (Puntillo) Tr. 61:19-22.)

678.     Serbin testified that FBTS typically negotiates the purchase price in ESOP Transactions.  (May 27, 2016 Tr. (Serbin) 127:23-128:7.)

679.     In this case, Duff & Phelps had been retained to negotiate with FBTS.  (Joint Ex. 8 (Duff & Phelps Engagement Agreement), at 2 ¶ b(iii), (iv); May 25, 2016 Tr. (Miscione) 18:1-11.)

680.     FBTS had been retained to negotiate with SJP and DiPano.  (Joint Ex. 6 (FBTS Engagement Agreement), at 2 ¶ 3.a.)

681.     FBTS did not make any counteroffers or engage in any negotiations with DiPano or his agents over the $16 million asking price.  (May 27, 2016 Tr. (Serbin) 127:17-25; July 6, 2016 Tr. (Ash) 64:2-15, 108:24-109:1; May 25, 2016 Tr. (Miscione) 22:7-9.)

682.     FBTS did not propose a counteroffer to the proposed $16 million purchase price for the stock in the Offering Memo because FBTS concluded that the fair market value of 38% of SJP's shares was in excess of $16 million.  (Joint Ex. 1 (Offering Memo), at 8; May 26, 2016 Tr. (Ippensen) 116:20-117:20.)

683.     SARs are an item that can be negotiated between the buyer and seller of stock. (May 25, 2016 Tr. (Miscione) 55:6-9.)

684.     Here, the SARs were not "negotiated" as opposed to being a subject of discussion.[47] (*See* FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo) (indicating that "clarification" was needed for the second tranche for the stock appreciation rights).)

685.     Contrary to FBTS's claim otherwise, the evidence shows that FBTS also did not negotiate the indemnification provision and representations and warranties in the SPA.   (CFF ¶ 199.)[48]

686.     FBTS negotiated the ESOP interest rate on the ESOP loan, which the SJP Plan would be taking out from the Company to make the stock purchase.   (May 26, 2016 Tr. (Ippensen) 171:15-172:1.)

687.     FBTS did not negotiate aspects of the employment agreements with Dugan and DiPano, including compensation and non-compete and non-solicitation provisions.[49]

---

[47] FBTS alleges that it negotiated the SARs.   (May 26, 2016 Tr. (Ippensen) 171:15-172:1; May 27, 2016 Tr. (Serbin) 126:3-5.)   FBTS, however, has offered no testimony or documentary evidence concerning how the SARs were negotiated, the terms of such negotiation, and/or who negotiated the SARs.   Further, Cory testified that she believed SARs only conferred an intangible value to a company and could not recall discussing what effect SARs had on the fair market value of SJP, or asking Prairie to quantify the effect of SARs on the final purchase price.   (May 25, 2016 Tr. (Miscione) 54:23-55:5; May 25, 2016 Tr. (Cory) 107:21-23, 110:4-6.)   Based on the evidence presented and upon the Court's evaluation of the credibility of the witnesses, the Court finds that the parties did not "negotiate" the SARs terms.

[48] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

[49] Although Serbin testified that there were "discussions" about employment agreements with key employees of SJP, (May 27, 2016 Tr. (Serbin) 124:23-125:16), there is no corroborating evidence that FBTS engaged in any negotiations with respect to the employment agreements.   In fact, FBTS has not produced any record evidence of employment agreements, or even as to discussions or negotiations about such employment agreements.   Based on the evidence presented and upon the Court's evaluation of the credibility of the witnesses, the Court finds that the parties did not "negotiate" aspects of the employment agreements with Dugan and DiPano.

117

### T.     April 16, 2007 Closing

688.    Before the Transaction closed, on the morning of April 16, 2007, FBTS had a "very short" telephone conversation with SJP's management to inquire whether there had been any substantial changes to SJP's performance in the first quarter of 2007.  (Sept. 23, 2016 Tr. (Cory) 32:7-20.)

689.    On April 16, 2007, FBTS authorized the Plan to purchase 380,000 shares of SJP from DiPano, representing 38% of SJP's outstanding shares, for $16 million.  (Stipulation of Facts ¶ 59; Joint Ex. 5 (Stock Purchase Agreement).)

690.    The Transaction closed with the same material terms as those that the seller initially proposed during the November 15, 2006 Meeting and in the Offering Memo.  (Joint Ex. 1 (Offering Memo), at 8; July 6, 2016 Tr. (Ash) 10:2-5.)

### U.     Post-Transaction

691.    On April 27, 2007, FBTS received the April 27, 2007 Post-Transaction Valuation Report from Prairie.  (Joint Ex. 10 (Apr. 27, 2007 Report), at 1, "04-27-07" date stamp; *see also* May 25, 2016 Tr. (Cory) 110:7-24; May 26, 2016 Tr. (Ippensen) 15:14-21.)

692.    The April 27, 2007 Post-Transaction Valuation Report largely reached the same value conclusions as the April 11, 2007 Draft Valuation Report—approximately $36 million under the DCF method and approximately $53 million under the market multiple approach—but it contained an additional fifteen pages discussing economic trends relevant to SJP's industry.[50] (*Compare* Joint Ex. 10 (Apr. 27, 2007 Report), at 29-43, 56, 60, *with* Joint Ex. 9 (Apr. 11, 2007 Draft), at 30, 42, 46.)

---

[50] The April 11, 2007 Draft valued SJP at $36,105,000 under the DCF method and $53,607,000 under the market approach, whereas the April 27, 2007 Post-Transaction Valuation Report valued SJP at $35,470,000 under the DCF method and $52,743,000 under the market approach.

693.    The industry analysis contained in the April 27, 2007 Post-Transaction Valuation Report described a softening in the housing industry, particularly in New Jersey, and forecasted that New Jersey's housing market would not pull out of its slump in 2007.  (Joint Ex. 10 (Apr. 27, 2007 Report), at 32-33.)

694.    The industry analysis noted that, in 2006, new housing permits in New Jersey fell by 13.7% and that construction contracts fell by 11%.  (Joint Ex. 10 (Apr. 27, 2007 Report), at 32-33.)

695.    The information regarding industry trends contained in the April 27, 2007 Post-Transaction Valuation Report, which set forth Prairie's opinion of SJP's value as of April 16, 2007, was known or reasonably knowable as of the date of the Transaction.  (June 29, 2016 Tr. (Aliferis) 9:2-17 (information used in a valuation report must be reasonably knowable as of the date the company is being valued).)

696.    The fact that the economic trends are referenced in the post-Transaction April 30, 2007 valuation EB Committee notes, but not in the April 16, 2006 EB Committee notes, suggests that FBTS did not discuss the economic trends prior to the Transaction.  (Pl.'s Ex. 15 (EB Committee Notes), at 3 (cf. entry for "SJP Group Annual Review April 16, 2007" and "SJP Group Post-Transaction Review April 30, 2007").)

697.    As the seller, DiPano executed the SPA, along with Ash of FBTS, and Dugan of SJP dated April 16, 2007.  (Joint Ex. 5.)

698.    The SPA set forth various terms and conditions relating to the sale of 38% of SJP's stock to the SJP ESOP by DiPano.  (Joint Ex. 5.)

699.    Paragraph 3.11 of the SPA between DiPano and FBTS provides, in relevant part:

> All information, reports, financial statements, exhibits and schedules furnished or to be furnished by or on behalf of the Seller or the

Company pursuant to the terms of this Agreement (the "Documents") are, to the knowledge of the Seller and the Company, accurate and complete in all material respects and do not and will not omit to state any material fact necessary in order to make the information furnished, in the light of the circumstances under which such information is furnished, not misleading, and are sufficient to provide a prospective [Employee Stock Ownership Trust ("ESOT")] of Company stock with appropriate information about the Company and its affairs. To the knowledge of the Seller and the Company, no information, report, financial statement, exhibit or schedule prepared or furnished by or on behalf of the Seller or the Company in connection with any of the transactions contemplated under this Agreement, the Documents, or included herein or therein, contained or contains as of the date prepared or furnished any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(Joint Ex. 5, at 6.)

700.    Paragraph 8.1 of the SPA between DiPano and FBTS provides, in relevant part:

Subject to the provisions of Section 8.2 below, the Seller shall indemnify the ESOT for any loss, cost, expense or other damage, including attorney's fees suffered by the ESOT ("Damages"), resulting from, arising out of or incurred with respect to any misrepresentation or breach of any representation, warranty or covenant made by the Seller or the Company herein.

(Joint Ex. 5, at 20.)

701.    Following the Transaction, FBTS was retained to serve as the Plan's ongoing trustee, and Prairie was retained to prepare the Plan's annual valuation reports.  (Stipulation of Facts ¶ 62; May 26, 2016 Tr. (Ippensen) 5:18-6:12.)

702.    FBTS served as the ongoing trustee for the Plan until 2014.  (May 27, 2016 Tr. (Ippensen) 5:18-6:1, 68:18-24; Stipulation of Facts ¶ 62.)

703.    In situations where FBTS serves as an ongoing trustee, FBTS follows a four-step process for reviewing post-transactional annual valuation reports: (1) it reviews a draft valuation report; (2) it conducts a conference call with the valuation professional; (3) FBTS's internal

financial analyst completes a number of forms documenting certain aspects of the draft valuation report, and forwards the report with his analysis to FBTS's president; and (4) FBTS's president reviews the draft report and the internal financial analyst's report, and presents his recommendations to FBTS's committee for its review.  (Pl.'s Ex. 14 (Oct. 4, 2009 E-mail from Cory to Munoz); May 26, 2016 Tr. (Ippensen) 119:7-22.)

704.    FBTS does not follow the four-step review process described above in reviewing initial acquisition transactions. (Sept. 23, 2016 Tr. (Cory) 68:10-23; May 26, 2016 Tr. (Ippensen) 118:23-119:22.)

705.    After a transaction closes, FBTS's financial analyst prepares a document called a "Financial Report Review." (Sept. 23, 2016 Tr. (Cory) 26:12-24, 69:22-25; May 26, 2016 Tr. (Ippensen) 120:11-16.)

706.    The Financial Report Review includes, *inter alia*, the names of the FBTS officers who performed a post-transaction review of the valuation, the performance of market indices for the period under review, a summary of changes to a company's financial metrics over the preceding year, and the qualifications of the valuation analyst. (*See, e.g.*, Joint Ex. 15 (Financial Report Review).)

707.    As part of the Financial Report Review, FBTS inputs data into a program called the "Baker Hill" system to run a risk analysis on the company. (May 26, 2016 Tr. (Ippensen) 120:19-122:3; *see also* Joint Ex. 15 (Financial Report Review), at 5-8 (containing the footer "Baker Hill").)

708.    FBTS does not prepare a Financial Report Review or generate a Baker Hill Report, or prepare any comparable reports, prior to a transaction. (Sept. 23, 2016 Tr. (Cory) 70:5-72:11; *see also* May 26, 2016 Tr. (Ippensen) 120:11-16.)

709.    The purpose of the Financial Review Report is to provide a starting point for subsequent reviews, and to allow EB Committee members who were not involved prior to the transaction to "come up to speed." (Sept. 23, 2016 Tr. (Cory) 70:1-4, 71:16-21.)

710.    The Financial Report Review for the SJP Transaction was prepared months after the Transaction. (May 26, 2016 Tr. (Ippensen) 120:14-16; Sept. 23, 2016 Tr. (Cory) 27:24-28:14; Joint Ex. 15 (Financial Report Review), at 1 "Date of Report").)

711.    Handwritten notes taken by Aliferis after the Transaction closed reflected information received from SJP's management, including information on the impact of the weather and SJP having $45 million of work remaining to complete in 2007, which was communicated to FBTS after the Transaction closed.[51]   (Plaintiff Ex. 36; June 29, 2016 Tr. (Aliferis) 158:13-159:23.) These notes also showed that Aliferis was also given information about SJP's efforts to keep more work in-house, rather than subcontracting it out, which would result in higher profit margins. (June 29, 2016 Tr. (Aliferis) 160:13-19.)

712.    Sometime after the Transaction, Cory took notes entitled "SJP Transaction Questions."[52]   (FBTS Ex. 12, at D00082.)

---

[51] The language in Plaintiff's Exhibit 36 concerning the weather and SJP's 2007 first quarter performance is virtually identical to the language that appears in Aliferis's post-Transaction valuation (Pl.'s Ex. 7, at 45-46), but is wholly lacking in either of the pre-Transaction valuations (Joint Ex. 9 (Apr. 11, 2007 Draft) and Joint Ex. 10; June 29, 2016 Tr. (Aliferis) 179:12-181:7.) Accordingly, the Court finds that the handwritten notes at Plaintiff's Exhibit 36—which reference the "first four months of the year" and the precipitation for the month of April—were taken after the Transaction. (See Pl.'s Ex. 36; see also June 29, 2016 Tr. (Aliferis) 176:20-178:13.)  Aliferis testified that he did not know, either way, when the notes at Plaintiff's Exhibit 36 were prepared, and that "one could infer that they might have been prepared after the [T]ransaction." (June 29, 2016 Tr. (Aliferis) 182:8-18.)

[52] FBTS's Exhibit 12, which references content by page numbers in the valuation report, primarily corresponds with the content and pages numbers in the April 27, 2007 Post-Transaction Valuation Report, rather than the content in the April 11, 2007 Draft Valuation Report.  For instance, Cory's notes refer to CAPM on Page 53.  Only page 53 of the April 27, 2007 Post-Transaction Valuation

713.     The notes show that Cory reviewed the April 27, 2007 Post-Transaction Valuation Report through the feasibility analysis which comes at the end of the report.  (FBTS Ex. 12, at D00082; May 25, 2016 Tr. (Cory) 142: 8-17.)

714.     The notes show that Cory had discussions about backlog, employee relations, employee participation in benefits, top-line growth of the Company, competitive advantage of the mobile rock crusher, SJP's liquidity ratio, and the capital asset pricing model with Aliferis after the SJP ESOP Transaction had closed.  (FBTS Ex. 12, D00082; May 25, 2016 Tr. (Cory) 142:21-147:25.)

### V.     Fair Market Value

715.     SJP's fair market value as of April 16, 2007 was $17,144,737.[53]  (July 14, 2016 Tr. (Messina) 33:13-16.)

716.     SJP's fair market value as of April 16, 2007, using the DCF method, was $13,859,289.[54]  (July 14, 2016 Tr. (Messina) 33:19-22, 110:8-10.)

717.     SJP's fair market value as of April 16, 2007, using the market multiple method, was $20,430,185 million.[55]  (July 14, 2016 Tr. (Messina) 33:19-22.)

---

Report, however, contains a discussion of CAPM.  Page 53 of the April 11, 2007 Draft did not contain a discussion of CAPM, rather, that page is the Reconciliation and Conclusion of Value.

[53] Messina rounded the value in his trial testimony to $17.1 million.  The precise figure is contained in Messina's expert report (Pl.'s Ex. 19, at 6), which was not admitted into evidence.  Because Messina was describing the figures in his expert report when rounding the values in his testimony, the Court finds that Messina was referring to the precise value contained in his expert report.

[54] Messina rounded the value in his trial testimony to $13.9 million.  The precise figure is contained in Messina's expert report (Pl.'s Ex. 19, at 6), which was not admitted into evidence.  Because Messina was describing the figures in his expert report when rounding the values in his testimony, the Court finds that Messina was referring to the precise value contained in his expert report.

[55] Messina rounded the value in his trial testimony to $20.4 million.  The precise figure is contained in Messina's expert report (Pl.'s Ex. 19, at 6), which was not admitted into evidence.  Because

718.    The fair market value of 38% of SJP as of April 16, 2007 was $6,515,000.[56]  (July 14, 2016 Tr. (Messina) 33:13-16.)

719.    Unlike Prairie's valuation, Messina adjusted SJP's projected growth to account for SJP's abnormally profitable year of 2006 and the peaks and troughs of a typical cycle.  (July 14, 2016 Tr. (Messina) 78:15-79:8.)

720.    In performing the DCF analysis, Messina utilized a negative 15% revenue growth rate for 2007, which was based on the assumption that SJP was down 56% in revenue in the first quarter of 2007 and would generate 0% revenue growth in the remainder of 2007.  (July 14, 2016 Tr. (Messina) 85:13-25; *see also* Demonstrative 8.)

721.    According to Messina, Prairie's use of a 0% growth rate in 2007 when its business was down 56% in the first quarter of 2007 and in light of the industry headwinds was not supported by the data and facts.  (July 14, 2016 Tr. (Messina) 82:10-21.)

722.    Had Prairie utilized SJP's five-year[57] average historical gross profit margin of 21.06%, SJP's fair market value under the DCF method would have been $12.1 million lower. (July 14, 2016 Tr. (Messina) 93:12-94:23.)

---

Messina was describing the figures in his expert report when rounding the values in his testimony, the Court finds that Messina was referring to the precise value contained in his expert report.

[56] Messina rounded the value in his trial testimony to $6.5 million.  The precise figure can be derived from Messina's expert report (Pl.'s Ex. 19, at 6), which was not admitted into evidence. Messina's expert report finds the total value of SJP to be $17,144,737, of which 38% is $6,515,000. Because Messina was describing the figures in his expert report when rounding the values in his testimony, the Court finds that Messina was referring to the precise value as derived from his expert report.

[57] *Fish v. Greatbanc Tr. Co.*, No. 09-1668, 2016 WL 5923448, at *51 (N.D. Ill. Sept. 1, 2016) (finding a five-year historical average to be an appropriate benchmark for valuation projections).

723.    Messina computed SJP's fair market value under the DCF method by assuming negative 15% sales in 2007, growing thereafter at a rate of 5%, using historic operating margins for gross margin and EBITDA to achieve a return on assets ranging between 10.2% and 13.8%. (July 14, 2016 Tr. (Messina) 109:12-110:12; Demonstrative 8.)

724.    Unlike Prairie's valuation, Messina's projected growth accounts for the unfavorable industry "headwinds," which Prairie identified in its April 27, 2007 Post-Transaction Valuation Report but failed to account for in its valuation of SJP.  (July 14, 2016 Tr. (Messina) 85:12-25.)

725.    Unlike Prairie's valuation, Messina's projected growth accounts for the 56% decline in SJP's 2007 first quarter revenues and its likely effect on SJP's margins.  (July 14, 2016 Tr. (Messina) 79:24-80:11, 82:12-21, 85:12-25, 86:15-87:2, 168:2-16.)

726.    Unlike Prairie's valuation, Messina's projected growth is grounded in SJP's historical gross margins and EBITDA margins, and is slightly higher than SJP's historical return on assets.  (July 14, 2016 Tr. (Messina) 109:8-21.)

727.    Messina also based his growth rate projections on the 3% growth of the economy at the time of the Transaction.  (July 14, 2016 Tr. (Messina) 87:18-22.)

728.    Messina used a 20% discount rate in contrast to Prairie's 19.25% discount rate to account for the various risks associated with SJP such as customer concentration. (July 14, 2016 Tr. (Messina) 108:7-14.)

729.    The fair market value of 38% of SJP as of the date of the Transaction was $6,515,000, or $9,485,000 less than the $16 million price that FBTS caused the SJP ESOP to pay for DiPano's shares. (July 14, 2016 Tr. (Messina) 140:23-141:4; Demonstrative 8; Demonstrative 14.)

## III.   Parties' Positions[58]

Plaintiff, the Secretary of Labor, asserts that FBTS failed to meet its fiduciary duties of loyalty and prudence under ERISA § 404(a)(1)(A) and (B). (Pl.'s Post Trial Br. 7, ECF No. 224.) Plaintiff further asserts that Defendant committed a prohibited transaction under ERISA § 406 by causing the SJP ESOP to pay more than the fair market value for the stock.  (Pl.'s Post Trial Br. 7-8.)

### A.   Duty of Loyalty

Plaintiff asserts that Defendant "violated its duty of loyalty mandated by ERISA" by failing to protect the interest of the Plan "over and above any other party's interest." (*Id.* at 25-26.) Specifically, Plaintiff argues that Defendant caused the SJP ESOP to execute an imprudent transaction because Defendant sought retention as the SJP ESOP's ongoing trustee upon completion of the Transaction. (*Id.* at 27.)

Plaintiff argues that "[w]hen a fiduciary is presented with unsubstantiated evidence supporting the seller's valuation, the duty of loyalty compels the fiduciary to diligently question and probe such evidence." (*Id.* at 26.)  Plaintiff further argues that Defendant "consistently accepted, without substantiation, information in favor of DiPano and . . . accepted his explanations . . . without independently verifying those explanations" to remain the Plan's trustee. (*Id.* at 27.) Plaintiff additionally argues that although Defendant had a duty to negotiate the best possible price for SJP's shares, Defendant never even attempted to negotiate the price. (*Id.* at 26.)  Plaintiff asserts that "[s]uch deference to the [s]eller is wholly inconsistent with a true arm's length

---

[58] The Court primarily utilizes the parties' post-trial submissions to briefly summarize their positions. (Pl.'s Post Trial Br., ECF No. 224; Def.'s Proposed Findings of Fact and Conclusions of Law, ECF No. 225; Pl.'s Resp. Br., ECF No. 226; Def.'s Resp. Br., ECF No. 227.)  Although the Court utilizes the parties' post-trial submissions in compiling this summary, the Court considers the totality of the evidence and arguments presented at trial in reaching its decision.

transaction." (*Id.* at 27.)  As such, Plaintiff argues that Defendant breached its duty of loyalty by acting in its own interest to the detriment of the Plan.  (*Id.* at 25-27.)

Defendant argues that it did not breach its duty of loyalty.  (Def.'s Resp. Br. 28, ECF No. 227.)  Defendant argues that it verified all information, ensured the information provided to it was "complete," and asserts that there "is no evidence of any information that [Defendant] should have considered, but did not."  (*Id.* at 28.)  Furthermore, Defendant argues that it was not required to negotiate the price of the stock, as the offer price was already at fair market value.  (*Id.* at 28-29.)  Defendant finally asserts that Plaintiff's claim that it acted in its own interest is "patently absurd." (*Id.* at 29.)

### B.   Duty of Prudence

Plaintiff argues that Defendant violated a trustee's duty of prudence as required under ERISA § 404(a)(1)(B) by failing to conduct a prudent investigation as to the fair market value of the shares. (Pl.'s Post Trial Br. 7-9.)   Plaintiff asserts that when Defendant's conduct is weighed against that of a prudent investor making a comparable purchase, Defendant's conduct fails to reach the required standard of care because Defendant failed to: (1) follow up and resolve red flags in the April 11, 2007 Draft Valuation Report; (2) independently verify material information; (3) ensure that the April 11, 2007 Draft Valuation Report was reliable; and (4) employ an adequate review process. (Pl.'s Post Trial Br. 10-21.)

Defendant, on the other hand, argues that the "prudence standard is not concerned with results, but rather looks at the conduct and procedures utilized." (Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 561, ECF No. 225 (citing *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 918 (8th Cir. 1994)).)  Defendant argues that a trustee may obtain the advice of an expert to

demonstrate good faith, but make his own decisions based upon that advice.  (*Id.* ¶¶ 562-68.) Defendant states that it satisfied its legal obligations to investigate under ERISA.  (*Id.* ¶¶ 569-99.)

      1.    <u>Red Flags</u>

To prove a breach of the duty of prudence, Plaintiff relies upon testimony by its expert, Professor Richard Puntillo ("Professor Puntillo"), that Defendant failed to identify, follow up, or resolve red flags with regard to the transaction.  (Pl.'s Post Trial Br. 10.)  The red flags Plaintiff identified were: (1) SJP's poor financial performance in the three months prior to the Transaction; and (2) the reduction of bids from Hovnanian projects, which had previously accounted for 50% of SJP's revenue, to a mere 20% of SJP's outstanding bids at the end of 2006.  (*Id.* at 10-12.) Plaintiff argues that Defendant's failure to identify these red flags constituted "a profound departure from the custom and practice of prudent investors."  (*Id.* at 13.)

Defendant, however, argues that Professor Puntillo's "'red flags' are fabrications" and that the "investor due diligence" standard Professor Puntillo relied upon in reaching his conclusions is inapplicable to the ESOP industry.  (Def.'s Resp. Br. 9-11; Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 634-35.)  Defendant asserts that because Professor Puntillo is "unfamiliar with the ESOP industry," he was unable to determine the standard of care and whether a breach of that standard had occurred.  (Def.'s Resp. Br. 9; Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 649-52.)  Defendant argues that its expert witness, Fischer, was the only expert to opine as to the customs in ESOP transactions.  (Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 576-81.)   Defendant asserts that Fischer is familiar with ESOPs based on his education and experience.  (*Id.*)  Defendant argues that Fischer testified that there is "no bright line rule with regard to what a fiduciary must do to comply with ERISA."  (Def. Resp.'s Br. 10; Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 575.)

Defendant responds that Defendant considered the poor performance of SJP in the first quarter of 2007 before the Transaction but believed that SJP would recover and meet its revenue projections. (Def.'s Resp. Br. 12-13; Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 653-55.) Defendant believed that the 2007 downturn was due to weather conditions and that SJP had historically recovered from downturns. (Def.'s Resp. Br. 12-13; Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 658-72.) Defendant argues that Plaintiff's red flag argument regarding Hovnanian was also "fabricated." (Def.'s Resp. Br. 13.) Defendant asserts that SJP was attempting to diversify away from Hovnanian and obtain new clients. (*Id.* at 14.) Defendant further argues that SJP's diversification strategy "did not mean dropping Hovnanian as a client" and "was not a radical departure" from SJP's business strategy. (*Id.*) Additionally, Defendant states that Hovnanian continued to be a "terrific" customer for SJP and that SJP was working on a "$100 million job" for Hovnanian in 2006. (*Id.*)

### 2.   Independent Verification of Material Information

Plaintiff argues that "[a] prudent investor cannot blindly accept self-serving representations by a conflicted party, but must exercise a healthy degree of skepticism to ensure there is sufficient basis to rely on those representations." (Pl.'s Post Trial Br. 13.) Plaintiff asserts that Defendant failed to independently verify material information, including: "(1) SJP's reported backlog; (2) SJP's purported 'dominance' in its industry; (3) SJP's supposed 'competitive advantages'; (4) SJP's stated 'diversification away' from Hovnanian; and (5) SJP's status as the preferred site developer for Hovnanian in New Jersey." (*Id.*)

Plaintiff argues that this is particularly troubling as SJP's representations were contradicted by other disclosed information such as: (1) rock crushing equipment that was projected to increase profits over previous years that had already been in use for the past ten years; (2) claims that the

growth was based on "proprietary technology" when SJP had no proprietary technology; and (3) statements that SJP had been diversifying away from Hovnanian when SJP's concentration in Hovnanian had increased in the previous four years. (*Id.* at 13-14.) Furthermore, Plaintiff asserts that Defendant failed to sufficiently investigate the relationship between Hovnanian and SJP, in light of SJP's historical reliance on Hovnanian. (*Id.* at 14-15.)

Defendant argues that it conducted appropriate verification as the professionals it retained were qualified, it took steps to ensure the accuracy of the financial information provided, and it reviewed and questioned the valuation report before relying upon it. (Def.'s Resp. Br. 14-18; Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 569-72.) Defendant claims that SJP's backlog was not disputed and that "no further verification was needed." (Def.'s Resp. Br. 16.) Furthermore, Defendant claims that it verified that backlog by speaking with SJP management. (*Id.* at 17.) Defendant states that Plaintiff's expert, Messina, agreed that the backlog was work that would be finished in 2007 or 2008 and there was no indication that SJP would not be able to replenish its backlog. (*Id.*) Defendant also argues that "SJP's pattern of industry success and competitive advantage was thoroughly reviewed and considered by [Defendant] at the time of the transaction and there is no evidence that further diligence would have uncovered anything to the contrary at the time." (*Id.* at 17-18.)

Furthermore, Defendant argues that "the record evidence shows that [Defendant] and its advisors obtained appropriate information regarding Hovnanian and took this information into account." (*Id.* at 18.) Defendant points to the Offering Memo, which analyzed Hovnanian's "financial performance in 2005 and 2006" and stated that "25.7% of Hovnanian's proposed communities are in New Jersey." (*Id.*) Defendant also states that Hovnanian's impact on SJP was discussed in the November 15, 2006 meeting. (*Id.*) Defendant asserts that it reviewed publicly

available information about Hovnanian and that it is not industry custom or practice to contact customers and doing so "would have had an adverse effect on [SJP's] business." (*Id.* at 15.)

3.   Prairie Valuation

Plaintiff asserts that the April 11, 2007 Draft Valuation Report prepared by Prairie was unreliable and that Defendant breached its fiduciary duty by not ensuring that its reliance on the draft report was reasonably justified. (Pl.'s Post Trial Br. 15.) Plaintiff argues that "Prairie expressly advised [Defendant] that it was not verifying any of the inputs used to create its valuation." (*Id.*) Plaintiff asserts that Prairie copied the seller's descriptions verbatim into its reports and did not investigate the seller's claims. (*Id.*) Furthermore, Plaintiff asserts that, according to the April 11, 2007 Draft Valuation Report, SJP's "projected performance was far more favorable than its historical performance" and the draft report used SJP's financial performance in 2006 as a baseline for comparison, even though 2006 was an outlier year. (*Id.*) Plaintiff further asserts that the April 11, 2007 Draft Valuation Report used higher profit margins than SJP had previously ever attained and incorrectly chose engineering firms instead of homebuilders as peer group companies for the market multiple method of valuation. (*Id.* at 16.)

Defendant argues that its expert, Fischer, testified that the April 11, 2007 Draft Valuation Report was "detailed, thorough, professional, well-organized, and of high quality" and could be relied upon. (Def.'s Resp. Br. 10; Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 587-89.) Defendant states that because Prairie was a "major player" in the ESOP world, it was "reasonable . . . to be more comfortable with Prairie['s] . . . work product" than that of another unfamiliar company. (Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 590.) Furthermore, Defendant asserts that its expert, Van Horn, opined that Prairie's valuation reports were "comprehensive and in line with the normal and customary valuation procedures that were

131

expected at the time to produce a reliable opinion." (Def.'s Resp. Br. 10; Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 591-99.)   Defendant argues that Plaintiff's own expert, Messina, used very similar projected sales growth rates as Prairie and was "unaware of any information provided by SJP . . . that was misleading, inaccurate or erroneous." (Def.'s Resp. Br. 17, 23.)   Additionally, Defendant argues that the information Prairie received from SJP was primarily in the form of audited financial statements, which could reasonably be relied upon. (*Id.* at 19-20.)   Defendant, therefore, argues that it reasonably relied on the April 11, 2007 Draft Valuation Report. (*Id.* at 22.)

Defendant further argues that it gave the April 11, 2007 Draft Valuation Report a "meaningful review" and "understood its obligations with respect to evaluating the report and fulfilled those obligations" by ensuring Prairie had accurate information and raising questions on numerous topics. (*Id.* at 22-23.)   Defendant argues that SJP experienced growth in the past two years and it was reasonable for Prairie to predict continued growth. (*Id.* at 23-25.)   In fact, Defendant argues that the final projections in the April 11, 2007 Draft Valuation Report were conservative. (*Id.* at 24-25.)   Defendant additionally argues that the peer group companies Prairie selected for the market multiple method were appropriate because SJP was not a homebuilder. (*Id.* at 25.)   Instead, the group that SJP was compared to included "construction and engineering firms with similar characteristics to SJP." (*Id.*)   Furthermore, Defendant states that it applied "an extremely conservative discount rate" to make the comparison even more conservative. (*Id.*)

4.   Review Process

Finally, Plaintiff asserts that Defendant breached its duty of prudence by engaging in a hasty and inadequate review process. (Pl.'s Post Trial Br. 17.)   Plaintiff claims that Defendant received the April 11, 2007 Draft Valuation Report only three days before the Transaction and that

Cory, who FBTS claims was in charge of reviewing the underlying documents, never saw the financial statements underlying the Offering Memo prior to the Transaction. (*Id.*)

Plaintiff further argues that, despite Defendant's assertion that there were "numerous" discussions about the Transaction, there was no evidence presented that anyone at FBTS reviewed the April 11, 2007 Draft Valuation Report prior to the April 13, 2007 teleconference. (*Id.* at 18; Pl.'s Resp. Br. 4.) Plaintiff urges the Court to reject Defendant's assertion that the April 11, 2007 Draft Valuation Report must have been reviewed because it is routine practice to review draft valuation reports. (Pl.'s Post Trial Br. 18.) Plaintiff argues that Defendant cannot demonstrate that it satisfied the duty of prudence simply by pointing to its typical process for reviewing valuation reports. (Pl.'s Resp. Br. 2.)

Furthermore, Plaintiff argues that even if the purported "numerous discussions" had occurred, the lack of records of a review process is troubling, stating "it does not matter how many people staffed a transaction if they cannot account for what they did or why they did it." (*Id.* at 19-20.) Plaintiff additionally argues that Defendant's own witness, Ash, stated that there might not have been meetings if "a report makes sense to her and the asking price is within the [valuation] reports' concluded range," thus contradicting Defendant's claim that FBTS followed the typical process on this Transaction. (*Id.*)

Finally, Plaintiff argues that based upon *Horn v. McQueen*, 215 F. Supp. 2d 867 (W.D. Ky. 2002), Defendant's "generally vague and unsupported testimony" does not support a finding of good faith in determining fair market value. (Pl.'s Post Trial Br. 21.) Plaintiff asserts that Defendant's statements of due diligence are "vague and unsupported" as there is no record of the numerous meetings and investigations that Defendant claims occurred and Defendant's witnesses fail to recall with specificity what was discussed at the purported meetings. (Pl.'s Resp. Br. 4-9.)

Defendant argues that it acted in good faith in determining the value of the shares. (Def.'s Resp. Br. 18-19.) Defendant states that it "engaged highly competent, experienced advisors that sufficiently vetted the Transaction, and . . . [Defendant] not only reasonably relied on its advisors, but took measures to confirm their work as well." (*Id.* at 19.) Defendant alleges that it had multiple meetings about the April 11, 2007 Draft Valuation Report and gave the draft report a "meaningful review." (*Id.*) Defendant states that Prairie is a "highly respected valuation firm" and the information provided to Prairie was "accurate." (*Id.* at 19-20.) Defendant further argues that its reliance on the April 11, 2007 Draft Valuation Report was "reasonably justified under the circumstances" because Defendant's employees discussed the draft report with Prairie, reviewed liquidity reports, and reviewed the pricing model. (*Id.* at 20.)

## C.   Prohibited Transactions

Plaintiff argues that under ERISA § 406(a) (1) (A) and (D), Defendant was prohibited from causing the SJP ESOP to purchase employer stock. (Pl.'s Post Trial Br. 7.) Plaintiff further asserts that the "adequate consideration" exemption does not apply because Defendant caused the SJP ESOP to pay more than the "fair market value" of the shares. (*Id.* at 7-8, 22-23.) Plaintiff's expert witness, Messina, testified that the "fair market value of DiPano's shares at the time of the Transaction was only $6,515,000—only a fraction of the price that [Defendant] caused the Plan to pay." (*Id.* at 22.)

Plaintiff argues that Defendant's criticism of Messina is "without merit." (Pl.'s Resp. Br. 26.) Plaintiff asserts that Messina was qualified as an expert since he had previously performed valuations of homebuilder construction companies. (*Id.*) Plaintiff further argues that the fact that SJP was able to obtain a loan in the amount of $22.5 million is not a corroboration of its value. Furthermore, Plaintiff states that while Messina predicted record revenues, he adjusted them in

134

light of SJP's poor performance in 2007. (*Id.* at 26-27.) Plaintiff additionally argues that Messina disregarded the high end market multiples in his valuation of SJP as they reflected companies that were larger and more profitable than SJP. (*Id.*)

On the other hand, Plaintiff asserts that Defendant's expert witness, Fischer, gave testimony that was "self-serving," "vague," and inconsistent. (*Id.* at 23.) Plaintiff also argues that Defendant's expert witness, Van Horn, gave testimony that was based on "circular reasoning" and "unsupported assumptions" and that he relied upon a checklist that was "facially unhelpful, [and] arbitrar[y]. (*Id.* at 23-24.) Finally, Plaintiff argues that Defendant's expert witness, Joel Stoesser ("Stoesser"), was "unpersuasive" because he "did not know the value the banks assigned to SJP . . . or what process they may have used to reach a value" and could not explain his conclusions. (*Id.* at 24.)

Defendant argues that the Transaction was not prohibited, as the SJP ESOP paid the fair market value of the stock, and because the April 11, 2007 Draft Valuation Report was reliable. (Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 608-33; Def.'s Resp. Br. 26-28.) In fact, Defendant's expert witness, Stoesser, opined that the price projected by Prairie was too conservative. (Def.'s Resp. Br. 26-28.) On the other hand, Defendant argues that Plaintiff's expert witness, Messina, gave testimony as to the value of the stock that "improperly considered SJP's performance in hindsight" and was "not credible" as Messina has "no experience in the construction industry" and did not investigate the industry. (*Id.* at 26-27.) Furthermore, Defendant argues that, while calculating SJP's value, Messina disregarded high multiples that would have "increased [the value] by approximately $10 million" with no explanation, rendering his valuation "biased and flawed." (*Id.*)

### D.     Indemnification

Defendant asserts that the SPA between DiPano and Defendant states that DiPano has provided full and accurate information to Defendant and that DiPano will indemnify the Plan for any failure to do so.  (Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 317-26.)

Plaintiff asserts that Defendant "cannot escape liability based on the Indemnification Provision contained in the [SPA]."  (Pl.'s Resp. Br. 18.)  Plaintiff argues that these provisions "do not provide a safe harbor" for Defendant because Defendant still had a fiduciary duty to verify material representations and the indemnification clause only takes effect if DiPano "knowingly" provided false information.  (*Id.* at 19-20.)

### E.     Loan Forgiveness

Defendant states that SJP forgave $9.6 million of the $22.5 million loan that was used to finance the transaction, bringing the amount of the loan below the amount of Plaintiff's assessment of SJP's fair market value.[59]  (Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 705.)

On the other hand, Plaintiff argues that, although SJP's loan was forgiven several years later by SJP, the loan forgiveness does not retroactively reduce the purchase price that the SJP ESOP paid to DiPano.  (Pl.'s Resp. Br. 28-29.)  Furthermore, Plaintiff argues that because neither the loan documents nor the forgiveness documents were entered into evidence, the Court should not consider them.  (*Id.*)  Plaintiff also asserts that there is no legal exception for loan forgiveness under ERISA § 406(a) (1) (A), (D).  (*Id.*)

---

[59] Defendant alleges inconsistent amounts with regard to the loan forgiveness.  (*See* CFF ¶ 177 n.15.)  For the purpose of summarizing Defendant's legal position, however, the Court characterizes Defendant as contending that the write-down was for $9.6 million because Defendant makes this argument using the $9.6 million figure in its post-trial submission.  (*See* Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 704-10.)

## IV.   Conclusions of Law

Congress enacted ERISA to "protect . . . the interests of participants in employee benefit plans and their beneficiaries" by setting out substantive regulatory requirements for employee benefit plans and to "provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts."   29 U.S.C.  §  1001(b).   ERISA's "comprehensive legislative scheme" includes "an integrated system of procedures for enforcement." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985) (citation omitted).   ERISA subjects employee benefit plans to participation, funding, and vesting requirements, and to uniform standards on matters like reporting, disclosure, and fiduciary responsibility. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90-91 (1983).

"Under ERISA, a plan that primarily invests in the shares of stock of the employer that creates the plan is referred to as an ESOP." *Chao v. Hall Holding Co.*, 285 F.3d 415, 425 (6th Cir. 2002).   "Even though ESOPs can be much riskier than a typical ERISA plan, the fiduciaries of [ESOP] plans are still held to their fiduciary responsibilities." *Id.*

ERISA defines a "fiduciary" as:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).   ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan, thus expanding the universe of persons subject to fiduciary duties." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (internal citation omitted).   "ERISA requires every plan to have one or more named fiduciaries." *Renfro v. Unisys*

*Corp.*, 671 F.3d 314, 323 (3d Cir. 2011) (citing 29 U.S.C. § 1102(a)(1)). Additionally, "[u]nder ERISA, even if a person is not named as a fiduciary in plan documents, he may still be 'a fiduciary with respect to a plan to the extent . . . he . . . exercises any authority or control respecting management or disposition of its assets." *Sec'y of Labor v. Doyle*, 675 F.3d 187, 200 (3d Cir. 2012) (quoting 29 U.S.C. § 1002(21)(A)(i)).

Section 404 of ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . [and] with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A), (B). Section 406 supplements an ERISA fiduciary's general duties of loyalty and prudence to the plan's beneficiaries, as set forth in Section 404, "by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241-42 (2000) (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 160 (1993)). Specifically, Section 406 of ERISA categorically bars transactions for the purchase of employer stock on behalf of an employee benefit plan by a plan fiduciary. 29 U.S.C. § 1106(a)(1)(A), (D). Section 408, however, exempts certain transactions prohibited under Section 406. 29 U.S.C. § 1108.

Here, the Secretary[60] asserts that FBTS, acting as the Plan's fiduciary, breached its duty of loyalty under Section 404(a)(1), breached its duty of prudence under Section 404(a)(1)(B), and

---

[60] Section 502(a)(2) of ERISA provides that the Secretary may bring a civil action for appropriate relief, including losses suffered by a plan as a result of a fiduciary's breach and to enjoin a fiduciary from any further act or practice that violates ERISA. 29 U.S.C. § 1132(a)(2).

engaged in a prohibited transaction under Section 406(a)(1)(A) and (D) that was not exempt pursuant to Section 408(e).

### A.     Duty of Prudence

ESOP fiduciaries are subject to the same duty of prudence that applies to ERISA fiduciaries in general, except that they need not diversify the fund's assets. *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2463 (2014).  Section 404(a)(1)(B) of ERISA provides that a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "These duties are the 'highest known to the law.'" *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

"[T]he courts measure [S]ection 1104(a)(1)(B)'s 'prudence' requirement according to an objective standard, focusing on a fiduciary's conduct[61] in arriving at an investment decision, not on its results, and asking whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434-35 (3d Cir. 1996) (citations omitted).  "A trustee's lack of familiarity with investments[, however,] is no excuse: under an objective standard[,] trustees are to be judged 'according to the standards of others acting in a like capacity and familiar with such matters.'" *Katsaros v. Cody*, 744 F.2d

---

[61] Because the analysis is focused on conduct, the Court finds unpersuasive FBTS's argument that First American Bank's willingness to finance the SJP ESOP Transaction indicates that the Transaction was prudent, especially in light of the evidence of FBTS's failure to act as a prudent investor.  (CFF ¶ 171; Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 702.) Additionally, Defendant asserts that Plaintiff's arguments are based on hindsight, (Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 683), but that argument is untenable where the analysis is focused on a fiduciary's conduct at the time of the Transaction. *Perez v. Bruister*, 823 F.3d 250, 264 (5th Cir. 2016).

270, 279 (2d Cir.), *cert. denied*, 469 U.S. 1072 (1984) (citation omitted). "[T]he definition of 'prudent behavior' is an evolving concept that is given meaning by the facts and circumstances of each case." *Brock v. Teamsters Local Union No. 863*, 113 F.R.D. 32, 34 (D.N.J. 1986) (quoting *Donovan v. Walton*, 609 F. Supp. 1221, 1240 (S.D. Fla. 1985)).

Additionally, although "[e]mploying a financial advisor is evidence of adequate investigation, . . . reliance on experts is not a shield—it is 'but a single factor to be weighed in determining whether a fiduciary has breached [its] duty.'" *Chesemore v. All. Holdings, Inc.*, 886 F. Supp. 2d 1007, 1041-42 (W.D. Wis. 2012), *aff'd sub nom., Chesemore v. Fenkell*, 829 F.3d 803 (7th Cir. 2016) (quoting *Eyler v. Comm'r of Internal Revenue*, 88 F.3d 445, 456 (7th Cir. 1996)). In other words, "[a]n independent appraisal is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled." *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983). While fiduciaries may "rely on the expertise" of a valuation expert such as Prairie, fiduciaries remain "responsible for ensuring that [the] information is complete and up-to-date." *Id.*

Upon reviewing the totality of the evidence presented at trial, the Court finds that FBTS breached its duty of prudence. Despite FBTS's purported expertise and capacity for conducting the requisite diligence in an ESOP transaction,[62] FBTS did little more than delegate all of its responsibilities to third parties. In sum, FBTS relied entirely on information provided by its valuation advisor, Prairie, who in turn relied entirely on information provided by the seller and his financial advisor, Duff & Phelps.[63] (*See* CFF ¶¶ 129-36.) By merely retaining Prairie and SFE&G,

---

[62] (CFF ¶¶ 38, 57.)

[63] Although Duff & Phelps was retained by SJP, it was understood that Duff & Phelps's role in the Transaction was to represent the seller. (*See* CFF ¶ 37.)

holding *pro forma* meetings that lacked substantive review of the Transaction, and engaging in cursory informal discussions,[64] FBTS failed to fulfill its duty of prudence to the SJP ESOP.

Principally, FBTS failed to fulfill its duty to "make an honest, objective effort to read [Prairie's] valuation [report], understand it, and question the methods and assumptions that [did] not make sense." *Howard*, 100 F.3d at 1490. Regardless of whether a fiduciary retains a third-party valuation expert, ERISA requires a fiduciary to "evaluate the advice given and 'exercise [its] own judgment' about the transaction." *All. Holdings, Inc.*, 886 F. Supp. 2d at 1041-42 (quoting *Jenkins v. Yager*, 444 F.3d 916, 927-28 (7th Cir. 2006)). Accordingly, "[t]he degree to which a fiduciary makes an *independent* inquiry is critical" when determining whether the fiduciary breached its duty of prudence. *Eyler*, 88 F.3d at 456 (emphasis added).

Here, FBTS's independent inquiry into Prairie and Duff & Phelps's valuations of SJP was effectively nonexistent. For example, when reviewing the April 11, 2007 Draft Valuation Report, FBTS attributed SJP's success to change in management, (CFF ¶ 253), the purported diversification effort in customers, (CFF ¶¶ 148, 164), and SJP's expansion of bidding on larger

---

[64] Various witnesses proffered by Defendant alleged that they engaged in numerous informal discussions, but failed to specify the substance of the discussions with any meaningful detail and failed to produce sufficient corroborating testimony or documentary evidence. *See supra*, note 6. The Court, accordingly, finds that the lack of notes or any other corroborating evidence in conjunction with the lack of detailed testimony failed to establish that any of these informal discussions occurred. *See supra*, note 6. In making this finding, the Court acknowledges that "[t]he focal point of [the Court's] inquiry under ERISA is not whether a fiduciary took adequate notes of its investigation, but whether it acted with the prudence required of a fiduciary under the prevailing circumstances at the time of the transaction." *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 620 (2d Cir. 2006). Even in the absence of sufficient notes, for example, other evidence, such as evidence of a meeting generally to raise concerns, and evidence that "the report changed in ways that reflected those concerns" can demonstrate that a fiduciary satisfied its duty. *Id.* at 620-21. Here, however, no such evidence was presented. The purported informal conversations were uncorroborated by specific testimony or documentary evidence, and the April 11, 2007 Draft Valuation Report was never altered in a manner that would indicate that the alleged conversations had occurred.

projects and on projects in New York (CFF ¶ 257).  FBTS never verified or attempted to quantify the effects of these purported rationales for SJP's purported continued success, and instead felt satisfied after a superficial review of the draft report.  (CFF ¶¶ 254, 256, 257.)  The mere fact that the April 11, 2007 Draft Valuation Report called for zero percent growth after a record year in 2006, and the use of a 19.25% discount rate, were FBTS's primary bases for concluding that the projections were conservative.  (CFF ¶¶ 227-29, 259-60, 449, 470, 563.)

When FBTS retained Prairie, Prairie expressly stated that it would be relying on information provided by FBTS and SJP without conducting independent verification.  (CFF ¶¶ 129-31.)  Accordingly, a prudent investor would have recast projections from the April 11, 2007 Draft Valuation Report after having completed at least some independent due diligence.  (CFF ¶ 321.)  FBTS, however, never asked Prairie how it arrived at the projection figures it used in the April 11, 2007 Draft Valuation Report and never compared the projections from Prairie with the Offering Memo.  (CFF ¶¶ 147, 214, 325-26, 498, 502, 570, 574); *see also Chao*, 285 F.3d at 432 (stating that one indicator of the lack of prudence was that the trustee did not know which documents the valuation advisor reviewed in preparing the valuation report).

Additionally, FBTS never independently reviewed the accuracy of the financial information SJP provided to Prairie.  (CFF ¶ 330.)  Although FBTS argues that it reasonably relied on audited financial statements, FBTS had never obtained or reviewed SJP's audited financials for 2006, which Prairie used as a baseline for its projections.  (CFF ¶¶ 134-35.)  FBTS has consistently argued that it did not conduct an independent inquiry because it never had any reason to doubt the accuracy of the information provided by SJP and Duff & Phelps.  (Def.'s Resp. Br. 19-23.)  Yet, that argument is self-serving given that FBTS would have discovered reasons to doubt the accuracy of the seller's representations had FBTS conducted the required level of due diligence.

Similarly, FBTS suggests that it took reasonable care to ensure that Prairie received complete and accurate information from SJP because the SARs between DiPano and FBTS provided that DiPano would indemnify the SJP ESOP for damages arising out of DiPano or SJP's misrepresentation or breach of any representation, warranty, or covenant. (*See* Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 317-20 (citing Joint Ex. 5 (SARs between DiPano and FBTS), at 20).) In conjunction with an agreement between Duff & Phelps and SJP, ensuring that SJP would provide accurate and complete information to Duff & Phelps, FBTS believed that the indemnification provision precluded the need to conduct its own independent inquiry. (*See id.* ¶¶ 317-26.)

ERISA makes clear, however, that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." 29 U.S.C. § 1110(a); *see also Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 837 (6th Cir. 2007) ("Indemnification agreements do not prevent a fiduciary from being held liable, but instead only provide that if the fiduciary is held liable, then someone else will compensate the fiduciary for that liability."). The mere fact that SJP and DiPano agreed to provide complete and accurate information, therefore, did not relieve FBTS of its fiduciary obligation to conduct an independent inquiry.

The Court next considers the most glaring issues that any meaningful review of the April 11, 2007 Draft Valuation Report would have revealed. Although the April 11, 2007 Draft Valuation Report superficially contained many of the critical components of a valuation report, (CFF ¶ 211), it contained a blank page where it indicated that information about the state of SJP's industry and region was missing. (CFF ¶ 204). A prudent investor would not have moved forward with the Transaction where a valuation report was missing an entire industry analysis section.

(CFF ¶¶ 204-07.)  Similarly, the EBITDA gross profits and margins in the April 11, 2007 Draft Valuation Report differed from the Offering Memo without any explanation.  (CFF ¶¶ 282-83.) With regard to the rest of the April 11, 2007 Draft Valuation Report, Prairie copied and pasted entire sections from the Offering Memo into its draft report.  (CFF ¶¶ 216, 333-34, 336, 399, 429, 565, 592.)  The Court finds it odd that FBTS never raised the verbatim copying-pasting by Prairie, and that FBTS never questioned Prairie's blanket adoption of Duff & Phelps's position.  Moreover, the April 11, 2007 Draft Valuation Report contained numerous other obvious errors.  (CFF ¶¶ 212, 645-50.)  The fact that FBTS failed to follow up and question Prairie about any of these glaring issues is troublesome.

Beyond these glaring errors, FBTS's failure to inquire about the critical assumptions within the April 11, 2007 Draft Valuation Report is even more troubling.  *See Cunningham*, 716 F.2d at 1469-70 ("The insufficiency of [the fiduciary's] investigation lies in [its] failure to identify the facts and assumptions underlying the [valuation report] and to consider whether they remained valid at the time of the ESOP transactions."); *see also id.* at 1470 (finding that the fiduciary breached its duty of prudence where "[c]ursory study of [the valuation report] would have shown that [the author of the report] did not [identify the facts and assumptions underlying the valuation report and did not consider whether they remained valid] in several material respects").  First, while FBTS attributed SJP's 2006 growth to SJP's bidding on larger projects and moving into areas outside of New Jersey, such as New York, FBTS never verified whether this was true.  (CFF ¶ 257.)  Next, FBTS relied on Prairie's rationale that the optimistic projections beyond 2006 were attributable to SJP's vertical integration.  (CFF ¶¶ 277-78.)  FBTS, however, never raised the fact that SJP was vertically integrated since 1996, making it questionable that vertical integration was the cause of the 2006 record revenues.  (CFF ¶¶ 279-81.)

Another example where FBTS failed to independently verify critical facts is with regard to SJP's backlog.  (CFF ¶¶ 221, 291.)  FBTS relied entirely on Prairie's copied-and-pasted section from the seller's Offering Memo.  (CFF ¶¶ 215-16, 290-91.)  Although it may be unusual for an ESOP fiduciary to verify every contract related to backlog, a prudent investor would have conducted some minimal level of due diligence given how significant backlog is for predicting future revenues.  (CFF ¶¶ 294-95.)  In addition, FBTS did not review the audits for SJP's 2006 financials prior to the Transaction.  (CFF ¶ 136.)

Similarly, FBTS failed to raise any issues with Prairie regarding Prairie's failure to account for industry cyclicality in the April 11, 2007 Draft Valuation Report, despite the fact that the market had begun to trend downward at the end of 2006.[65]  (CFF ¶¶ 339-70.)  Moreover, SJP's largest customer, Hovnanian, had similarly begun to trend downward in performance, but FBTS had never reviewed Hovnanian's 2006 Annual Report or stock prices, which would have revealed the trend.  (CFF ¶¶ 531-78.)  Instead, FBTS failed to consider that the homebuilding industry had potentially peaked when adopting Prairie and SJP's overly optimistic projections.  (CFF ¶¶ 343, 366-70.)  Additionally, FBTS did nothing to determine whether Prairie's selection of peer group companies was appropriate when applying the market multiple method.  (CFF ¶ 619.)  Although SJP closely resembled homebuilders, Prairie selected peer companies that had minimal exposure to the housing market.  (CFF ¶¶ 610-44.)

FBTS also failed to question Prairie's overstatement of SJP's mobile rock crusher as a sustainable competitive advantage, where it did not fall into any of the established categories of sustainable competitive advantages: (1) proprietary technology; (2) brand name; or (3) cost

---

[65] FBTS also failed to raise any issues with respect to Prairie's failure to account for SJP's historical volatility.  (CFF ¶¶ 310-18.)

advantage.  (CFF ¶¶ 371-415.)   Although the mobile rock crusher provided a competitive advantage, FBTS failed to establish or verify that it would be sustainable to support the long term projections of SJP's performance.  (CFF ¶¶ 371-415.)   Moreover, although the April 11, 2007 Draft Valuation Report represented that SJP possessed proprietary technology, the draft report did not identify the purported proprietary technology.  (CFF ¶¶ 408-09.)   As further indication of FBTS's failure to properly review the April 11, 2007 Draft Valuation Report, FBTS failed to question SJP's unsubstantiated claim of possessing proprietary technology.  (CFF ¶ 417.)   Moreover, FBTS never recognized or resolved the inconsistency between the April 11, 2007 Draft Valuation Report's claim that SJP "fe[lt] it once again ha[d] a competitive advantage," and the draft report's representation that SJP's revenues were falling due to increased competition.  (CFF ¶¶ 428-32.)

Finally, the two most significant indicators of FBTS's breach of its duty of prudence are: (1) FBTS's failure to consider SJP's poor performance in the first quarter of 2007; and (2) FBTS's failure to consider SJP's customer concentration.   "A trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent." *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 734 (7th Cir. 2006).  When reviewing the April 11, 2007 Draft Valuation Report, FBTS ignored the increased risk associated with SJP's poor performance in the first quarter of 2007 and SJP's increased reliance on Hovnanian.

SJP struggled during January 2007, bringing in 37% below SJP's January 2006 revenues, and SJP's revenues progressively declined in each of the three months of the first quarter.  (CFF ¶¶ 454-55.)   Combined, SJP's first quarter revenues were 56.4% lower than the first quarter revenues in 2006, and SJP's first quarter gross profits were 97.4% below the first quarter gross profits in 2006.  (CFF ¶¶ 456-67.)   Oddly, however, neither the April 11, 2007 Draft Valuation

Report nor the April 27, 2007 Post-Transaction Valuation Report mentioned SJP's first quarter performance in 2007. (CFF ¶ 479.) Consistent with FBTS's pattern of blind adoption of Prairie's draft report, FBTS never reviewed the interim financials for SJP in 2007. (CFF ¶¶ 459, 467); *see Cunningham*, 716 F.2d at 1469 (finding that a company's underperformance in the time since the valuation report, but before the ESOP transaction, should be taken into consideration when determining the final purchase price of the company's stock).

Although FBTS claims to have attributed the first quarter performance to weather and maintenance, FBTS did not behave like a prudent investor because it never verified whether its reasoning was accurate and what the consequences would be on SJP's valuation. (CFF ¶¶ 473-530.) In addition, FBTS never discussed these purported conclusions with Prairie or among its own employees to indicate any diligence with respect to these considerations. (CFF ¶¶ 477, 484-86, 498, 502-02, 507-08, 527-28.) FBTS's conclusion that SJP could still make up the revenues reflected nothing more than an unsubstantiated belief without a diligent review of the facts. (CFF ¶¶ 468, 471); *see Cunningham*, 716 F.2d at 1469 (finding that relying upon "knowledge they had gained as managers [of the company] to conclude that the company was just as strong, and hence just as valuable" despite recent underperformance was an insufficient basis for relying on a valuation report generated prior to the underperformance period); *id.* at 1474 (stating that "[i]n these circumstances, it was not enough for fiduciaries to simply rely on their generalized notions that the company's prospects were good").

The other significant indicator of FBTS's breach of its duty of prudence was its failure to consider SJP's increasing reliance on Hovnanian and FBTS's simultaneous failure to investigate Hovnanian's projections. *Katsaros*, 744 F.2d at 276, 279 (finding that the fiduciary breached its duty of prudence where "red flags would have been uncovered if a reasonably careful inquiry had

been made"). Here, SJP and Duff & Phelps represented that SJP was actively diversifying away from Hovnanian, which Prairie, and later FBTS, adopted without question. (CFF ¶¶ 146-49.) SJP, however, never explained how it would accomplish diversifying and what effect that would have going forward. (CFF ¶¶ 146-49.)

In addition to the inherent risk of SJP's dependence on a single customer, Hovnanian's 2006 Annual Report contained numerous red flags that Prairie and FBTS never considered. Hovnanian, as a whole, was experiencing slowdowns, and had to pay $159 million in penalties for walking away from projects.   (CFF ¶ 542.)   In fact, Hovnanian's 2006 Annual Report acknowledged a sudden downturn in the homebuilding industry and stated that Hovnanian was managing its business as if the industry was in a prolonged downturn.   (CFF ¶¶ 543-44.) Additionally, Hovnanian announced that it would reduce costs by renegotiating pricing with its subcontractors, such as SJP, because Hovnanian possessed substantial leverage. (CFF ¶¶ 547-48.) FBTS never reviewed the Hovnanian 2006 Annual Report and even a brief review of the report would have revealed these material concerns regarding SJP's future. (CFF ¶ 550.)  Moreover, FBTS and Prairie failed to even look at Hovnanian's stock price or conduct any other form of minimal due diligence to check the health of Hovnanian and its relationship with SJP. (CFF ¶ 551.) Further, while a prudent investor would have required a breakdown between Hovnanian and non-Hovnanian projected revenues, FBTS and Prairie failed to do so as part of their overall failure to consider customer concentration in their valuation of SJP. (CFF ¶¶ 562-68.)

In addition to the two key red flags that FBTS and Prairie failed to identify or consider, the April 11, 2007 Draft Valuation Report, and FBTS's adoption of the draft report, ignored another issue.  By the time the Offering Memo listed Kara Homes as a top ten customer, Kara Homes had already declared bankruptcy. (CFF ¶¶ 579-82.)  Although SJP informed Prairie that Kara Homes

was bankrupt (CFF ¶ 586), Prairie and FBTS never accounted for Kara Homes in the backlog, SJP's diversification plan, or projected revenues for 2007, other than deducting litigation costs from SJP's future projected expenses. (CFF ¶¶ 587-90); *see Cunningham*, 716 F.2d at 1471 (finding that a prudent ESOP investor must consider something that will drain cash from the company).

Beyond FBTS's failure to conduct a meaningful substantive review and independent inquiry, FBTS's review process for the Transaction also suffered from procedural deficiencies. First, the April 11, 2007 Draft Valuation Report was given to FBTS less than three business days before the Transaction, and less than two business days before Prairie's April 13, 2007 presentation. (CFF ¶ 223.) Ippensen reviewed the April 11, 2007 Draft Valuation Report and merely conducted a "gut check" calculation to determine that he was comfortable with the valuation. (CFF ¶¶ 227-31.) He did not review or independently verify any of the underlying information. (*See, e.g.*, CFF ¶¶ 91, 136, 152, 221, 256, 291); *Brundle v. Wilmington Tr., N.A.*, No. 15-1494, 2016 WL 6542718, at *12 (E.D. Va. Nov. 3, 2016) (stating that concerns may also arise when the fiduciary or its independent advisers are pressed for time (citing *Perez v. First Bankers Tr. Servs., Inc.*, No. 12-8648, 2016 WL 5475997 (S.D.N.Y. Sept. 28, 2016))).

Additionally, while Ash was the only person from FBTS to attend the November 15, 2006 meeting and was assigned as the team lead on the Transaction, she did not possess any expertise in finance or valuation, and did not take notes during the meeting, which would have permitted her to effectively report back to someone with the appropriate credentials. (CFF ¶¶ 77-78.) While this November meeting was introductory in nature, where Ash introduced the ESOP Transaction process to SJP, Ash's lack of financial expertise was significant because the November meeting was the only time that FBTS would ever meet with SJP or Duff & Phelps prior to the Transaction.

(CFF ¶ 85); *see Katsaros*, 744 F.2d at 275 (finding that the fiduciary breached its duty of prudence where the fiduciary's employees that received the presentation for the proposed transaction did not have "sufficient training to express an opinion as to the soundness of the [transaction]" nor the proper expertise or background in the important matters of the evaluating the transaction). Moreover, Ash never reported what was discussed at the meeting to FBTS before signing the engagement letter. (CFF ¶ 94.)

Further, there was miscommunication among FBTS's employees. Ash was the FBTS team lead on the SJP ESOP Transaction, but expected Cory to be principally responsible for reviewing SJP's financial documents. (CFF ¶ 68.) In contrast, Cory believed that all EB Committee members were equally responsible for reviewing the financial documents. (CFF ¶ 70.) Even if Cory had known she was principally in charge of reviewing SJP's financial documents, however, she was not a valuation expert and, therefore, did not possess the requisite competency to properly evaluate the Transaction. (CFF ¶ 69.) Nevertheless, Ippensen believed that Cory and Ash, neither of whom were qualified to evaluate the April 11, 2007 Draft Valuation Report, would be able to identify any issues in the Transaction and report them to him. (CFF ¶ 71.)

The numerous problems with FBTS's conduct as a fiduciary ultimately culminated in FBTS's failure to negotiate the price that the SJP ESOP would pay for DiPano's shares.[66] *Howard*, 100 F.3d at 1489 (identifying the failure to negotiate price as one indication of the lack of prudence). FBTS blindly adopted Duff & Phelps's original offer of $16 million in the Offering Memo via Prairie's adoption of Duff & Phelps's analysis. (CFF ¶¶ 92, 681-82.) Although the failure to negotiate price alone is insufficient to demonstrate that FBTS breached its fiduciary duty,

---

[66] The only thing FBTS negotiated was the ESOP loan interest rate. (CFF ¶¶ 199, 452, 684-87.)

it weighs heavily against FBTS in light of the substantial evidence indicative of FBTS's imprudent conduct. *Perez*, 2016 WL 5475997, at *12.

In sum, the Court need not determine whether any single action or inaction by FBTS may have constituted a breach of its fiduciary duty because the totality of FBTS's missteps conclusively prevented FBTS from exercising its own judgment regarding the Transaction. *See All. Holdings, Inc.*, 886 F. Supp. 2d at 1041-42 ("The fiduciary must still evaluate the advice given and "exercise [its] own judgment" about the transaction." (quoting *Jenkins*, 444 F.3d at 927-28.)). Here, FBTS's failure to conduct an independent inquiry into the myriad of red flags, glaring errors, and other significant issues affecting the valuation of SJP led to a passive and blind adoption of the seller's optimistic valuation.[67] These failures, in conjunction with FBTS's decision to accept the seller's initial offer without negotiating the price, demonstrate that FBTS failed to fulfill its duty of prudence under ERISA.

## B.   Duty of Loyalty

Section 404(a)(1)(A) of ERISA provides that "a fiduciary shall discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A). A "trustee[] violate[s its] duty of loyalty when [it] act[s] in the interests of the plan sponsor rather than with an eye single to the interests of the participants and beneficiaries of the plan." *Reich v. Compton*, 57 F.3d 270, 291 (3d Cir. 1995) (citation omitted). "A fiduciary breaches [its] duty of loyalty whenever [it] acts to benefit [its] own personal interest" or "when [it] acts in favor of the interests of a third party, even if [its] own personal interest is not directly

---

[67] *Katsaros*, 744 F.2d at 275 (finding that the fiduciary breached its duty of prudence where it "passively received a rosy superficial picture of [a] bank and its holding company from persons with an interest in obtaining their approval" before the fiduciary approved a loan from the pension fund to the bank).

implicated." *Bevel v. Higginbottom*, No. 98-474, 2001 WL 1352896, at *14 (E.D. Okla. Oct. 4, 2001) (citing *Marshall v. Kelly*, 465 F. Supp. 341, 350 (W.D. Okla. 1978) (loans and payment to plan fiduciary and his wholly-owned company; fiduciary extended loans to personal friend on terms more favorable than those available to plan participants).

"The duty of loyalty is grounded in the motivation driving a fiduciary's conduct, and liability will not lie where a fiduciary's decisions were motivated by what is best for the ESOP, even if those decisions also incidentally benefit the fiduciary." *Perez*, 2016 WL 5475997, at *13 (citing *Bierwirth*, 680 F.2d at 271). "The presence of conflicting interests imposes on fiduciaries the obligation to take precautions to ensure that their duty of loyalty is not compromised." *Perez v. Bruister*, 54 F. Supp. 3d 629, 654 (S.D. Miss. 2014) (quoting *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000)). "The level of precaution necessary to relieve a fiduciary of the taint of a potential conflict should depend on the circumstances of the case and the magnitude of the potential conflict." *Id.* (quoting *Bussian*, 223 F.3d at 299).

One instance where a fiduciary may have dual loyalties is where a plan is acquiring the stock of the sponsoring corporation. *See Donovan v. Bierwirth*, 538 F. Supp. 463, 468 (E.D.N.Y. 1981), *modified*, 680 F.2d 263 (2d Cir. 1982). "[T]o ensure that actions are in the best interests of plan participants and beneficiaries, fiduciaries under certain circumstances may have to 'at a minimum' undertake an 'intensive and scrupulous independent investigation of [the fiduciary's] options." *Bussian*, 223 F.3d 299 (quoting *Leigh v. Engle*, 727 F.2d 113, 125-26 (7th Cir. 1984) (second alteration in original)). Accordingly, in an ESOP transaction where a fiduciary has dual loyalties, the fiduciary's "independent investigation into the basis for an investment must be both intensive and scrupulous and must be discharged with the greatest degree of care that could be expected under all the circumstances by reasonable beneficiaries and participants of the plan."

*Bierwirth*, 538 F. Supp. at 470; *see Bussian*, 223 F.3d at 299 (finding that the duty of loyalty overlaps with the duty of care). Here, FBTS was subject to dual loyalties because it was in its interest to complete the ESOP Transaction so that it could earn $15,000 in annual fees as the SJP ESOP's ongoing trustee.[68]  (CFF ¶¶ 101-03, 701-02.)

Upon reviewing the totality of the evidence presented at trial, the Court finds that FBTS breached its duty of loyalty.  FBTS failed to conduct the requisite due diligence and failed to negotiate the price of the stock.  While lack of negotiation by itself is not dispositive, courts have found a breach of the duty of loyalty in ESOP transactions where the purchase price was reached without negotiation and the fiduciary also failed to conduct a thorough investigation. *See, e.g., Chao*, 285 F.3d at 437 (holding that the trustee breached his duties when: (1) the trustee relied on incorrect information; (2) the trustee was generally unaware of what was going on; (3) the trustee was not consulted on major decisions; (4) there was no negotiation as to the stock price; (5) there was more concern for the return on investment for the Master Trust; and (6) the ESOP was charged several thousand dollars more so that defendants could deal in round numbers).[69]

Here, it is undisputed that Defendant did not negotiate the purchase price. (*See* May 27, 2016 Tr. (Serbin) 127:17-25; July 6, 2016 Tr. (Ash) 64:2-15, 108:24-109:1; May 25, 2016 Tr.

---

[68]  Moreover, Ash, FBTS's team lead on the Transaction, would receive an additional 20% commission on fees generated in the first year in which FBTS was retained to serve as an ongoing trustee. (CFF ¶ 47.) Similarly, Prairie provided ongoing valuation services for approximately 80% of the plans for which it performed the initial valuation. (CFF ¶ 117.)

[69] *See also Howard*, 100 F.3d at 1489 (finding a breach where the trustee accepted a valuation without further investigation and did not attempt to negotiate the purchase price)*; Dimond v. Ret. Plan for Emps. of Michael Baker Corp. & Affiliates*, 582 F. Supp. 892, 898 (W.D. Pa. 1983) (finding a breach when the trustee conducted no investigation and relied solely upon the words of the seller without seeking independent advice); *Horn*, 215 F. Supp. 2d at 882 (finding a breach when the trustee failed to complete negotiations for the purchase price and could not articulate where the purchase price came from).

(Miscione) 22:7-9.)   Additionally, for the reasons set forth in the above discussion regarding the duty of prudence, FBTS failed to conduct the SJP ESOP Transaction at arm's length, as evidenced by its repeated deference to the seller's representations, and failed to conduct an intensive and scrupulous investigation.   *See Howard*, 100 F.3d at 1488-89.   Accordingly, the Court finds that FBTS breached its duty of loyalty.

### C.      Prohibited Transaction

Section 406 of ERISA categorically bars transactions for the purchase of employer stock on behalf of an employee benefit plan by a plan fiduciary. 29 U.S.C. § 1106(a)(1)(A), (D). Section 408, however, exempts certain transactions prohibited under Section 406.   29 U.S.C. § 1108. Specifically, Section 408(e) exempts certain transactions if the purchase of the employer stock was for "adequate consideration."   29 U.S.C. § 1108(e)(1).

"In transactions involving securities with no known market value, as is the case here, ERISA defines 'adequate consideration' as 'the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary.'"   *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 618 (2d Cir. 2006) (quoting 29 U.S.C. § 1002(18)(B)).   "In order to rely on the adequate consideration exemption, a trustee or fiduciary has the burden to establish that the ESOP paid no more than fair market value for the asset, and that the fair market value was determined in good faith by the fiduciary."[70]   *Keach v. U.S. Tr. Co.*, 419 F.3d 626, 636 (7th Cir. 2005). "Although fair

---

[70] The majority of courts addressing this issue have adopted a two-part standard for evaluating the adequacy of consideration under Section 408(e): (1) fair market value; and (2) good faith.   *See Henry*, 445 F.3d at 619; *Chao*, 285 F.3d at 436-37; *Eyler*, 88 F.3d at 454-55; *Howard*, 100 F.3d at 1488; *Cunningham*, 716 F.2d at 1467.   They have done so based on a 1988 Department of Labor proposed regulation that has yet to be approved for publication in the Code of Federal Regulations. *See* Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 17, 632 (May 17, 1988) (to be codified at 29 C.F.R. § 2510-3(18)(b)).

market value and good faith are often stated as distinct requirements, they are closely intertwined." *Perez*, 2016 WL 5475997, at *8 (quoting *Henry*, 445 F.3d at 619).

"Whether a fiduciary has made a proper determination of 'fair market value' depends on whether the parties 'are well-informed about the asset and the market for that asset.' Thus, in practice, the 'fair market value' inquiry overlaps considerably with the 'good faith' inquiry; both are 'expressly focused upon the *conduct* of the fiduciaries.'" *Henry*, 445 F.3d at 619 (quoting *Cunningham*, 716 F.2d at 1467). It is the fiduciary's burden to prove that the ESOP received "adequate consideration" for its purchase of company stock by a preponderance of the evidence. *Id.* Accordingly, "the ESOP fiduciaries will carry their burden to prove that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing." *Cunningham*, 716 F.2d at 1468; *see also In re Unisys Sav. Plan Litig.*, 74 F.3d at 446 (quoting *Cunningham*'s incorporation of the duty of prudence to demonstrate adequate consideration); *Perez v. Bruister*, 823 F.3d 250, 262 (5th Cir. 2016) (stating that the adequate consideration "requirement must be interpreted, 'so as to give effect to the Section 404 duties,'" which includes the duty of prudence (quoting *Cunningham*, 716 F.2d at 1467)).

Additionally, "[a]lthough securing an independent assessment from a financial advisor or legal counsel is evidence of a thorough investigation, it is not a complete defense to a charge of imprudence." *Howard*, 100 F.3d at 1489 (citation omitted). A fiduciary must "investigate the expert's qualifications," "provide the expert with complete and accurate information," and "make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Id.* (citing *Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir. 1983), and *Cunningham*, 716 F.2d at 1474).

Here, the parties do not dispute that the SJP ESOP Transaction was a prohibited transaction within the meaning of Section 406 of ERISA. The issue, therefore, is whether the adequate consideration exemption to Section 406 applies. Specifically, the Court must determine whether the SJP ESOP received adequate consideration for $16 million in the SJP ESOP Transaction. As set forth in the Court's discussion regarding the duty of prudence, FBTS was not well-informed about the asset and blindly adopted a valuation report that failed to consider material facts concerning SJP's market. Accordingly, the Court finds that FBTS failed to overcome its burden to demonstrate an exemption to its engagement in a prohibited transaction.

**D.   Remedies**

As a preliminary matter, FBTS argues that because SJP forgave $9.6 million in loans that the SJP ESOP had used to fund the Transaction, the SJP ESOP really paid only $6.3 million, which is less than the fair market value alleged by Plaintiff.[71] (Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 704-10.) The case law FBTS relies upon, however, does not support FBTS's position. In fact, in *Henry v. U.S. Trust Co. of California, N.A.*, the Second Circuit flatly disagreed with the position espoused by FBTS, finding that the cancellation of debt in an ESOP context cannot "be construed as having reduced, *post facto*, the purchase price" in an earlier ESOP transaction. 569 F.3d 96, 99-100 (2d Cir. 2009).

FBTS also relies on *Harris v. Bruister*, which is distinguishable because the seller in *Harris* was paid less than the market value estimated by the Secretary of Labor's valuation expert. No. 10-77, 2013 WL 6805155, at *17 (S.D. Miss. Dec. 20, 2013). Here, the seller received $16 million,

---

[71] Defendant alleges inconsistent amounts with regard to the loan forgiveness. (*See* CFF ¶ 177 n.15.) For the purpose of summarizing Defendant's legal position, however, the Court characterizes Defendant as contending that the write-down was for $9.6 million because Defendant makes this argument using the $9.6 million figure in its post-trial submission. (*See* Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 704-10.)

which far exceeded Messina's estimate of the fair market value for the purchased shares. Similarly, FBTS's reliance on *Henry v. Champlain Enterprises, Inc.*, is unavailing because the plaintiff in *Henry* "did not specifically allege any loss" from the alleged breach of duty. 288 F. Supp. 2d 202, 230 (N.D.N.Y. 2003). Here, as set forth in *Henry*, the purported cancellation of debt does not affect Plaintiff's request for damages. Accordingly, the Court does not consider SJP's cancellation of the SJP ESOP's debt in assessing damages.

> 1.   Restitution of Plan Losses

Section 409(a) of ERISA provides that a fiduciary who breaches its duty to a plan "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a). Here, "the correct measure of damages is the amount [the SJP ESOP] overpaid." *Bruister*, 823 F.3d at 266 (quoting *Bruister*, 54 F. Supp. 3d at 676). As set forth in the Court's findings of fact above, the fair market value of DiPano's shares at the time of the SJP ESOP Transaction was $6,515,000, for which the SJP ESOP paid $16 million. Accordingly, the Court awards $9,485,000, plus interest, representing the lost opportunity cost suffered by the SJP ESOP,[72] subject to the appropriate reduction outlined in the Court's April 20, 2016 Final Judgment and Bar Order as to DiPano. (ECF No. 150.)

> 2.   Injunctive Relief

Plaintiff also seeks injunctive relief permanently enjoining FBTS "from serving as a fiduciary to an ERISA-covered Plan in the future." (Pl.'s Post-Trial Br. 29.) Section 409(a) of ERISA permits the Court to issue "equitable or remedial relief as the court may deem appropriate,

---

[72] "Prejudgment interest exists to make plaintiffs whole and to preclude defendants from garnering unjust enrichment." *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 102 (3d Cir. 2012). Prejudgment interest on restitution for violations of ERISA is determined by 26 U.S.C. §§ 6621, 6622. *See, e.g.*, *Whitfield v. Tomasso*, 682 F. Supp. 1287, 1306 (E.D.N.Y. 1988) (applying 26 U.S.C. §§ 6621, 6622).

including removal of [a] fiduciary." 29 U.S.C. § 1109(a).  Upon reviewing the totality of the evidence presented, the Court does not find that FBTS's conduct warrants the requested injunctive relief.

## V.    **Conclusion**

For the reasons set forth above, the Court finds that FBTS breached its duties of prudence and loyalty, and engaged in a prohibited transaction under ERISA.  Accordingly, the Court awards $9,485,000, plus interest, subject to the appropriate reduction outlined in the Court's April 20, 2016 Final Judgment and Bar Order as to DiPano.  (ECF No. 150.)  An order consistent with this Opinion will be entered.

s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

**Dated:** March 31, 2017